FILED

2010 FEB -3 P 3:17

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
N.D. CA. SAN JOSE

1  THE WESTON FIRM
2  GREGORY S. WESTON (239944)
   888 Turquoise Street
3  San Diego, CA 92109
4  Telephone:   858 488 1672
   Fax:         480 247 4553
5  greg@westonfirm.com
6
   BECK & LEE BUSINESS TRIAL LAWYERS
7  JARED H. BECK (233743)
8  28 West Flagler Street, Suite 555
   Miami, FL 33130
9  Phone: 305 789 0072
10 Fax: 786 664 3334
   jared@beckandlee.com
11
12 Counsel for Plaintiffs

13              UNITED STATES DISTRICT COURT
14          NORTHERN DISTRICT OF CALIFORNIA
15                 SAN JOSE DIVISION

16 ROBERT CHACANACA and VICTOR              Case No:
17 GUTTMANN, on Behalf of Themselves and
   All Others Similarly Situated,           C 10-00502
18                                          CLASS ACTION
19                          Plaintiffs,     COMPLAINT FOR VIOLATIONS OF
20                                          THE LANHAM ACT,
                                            UNFAIR COMPETITION LAW,
21    v.                                    COMMON LAW OF UNFAIR
                                            COMPETITION, FALSE
22 THE QUAKER OATS COMPANY,                 ADVERTISING LAW, AND
23                                          CONSUMER LEGAL
                            Defendant.      REMEDIES ACT
24
25                                          DEMAND FOR JURY TRIAL
26
27
28
29
30
31
32

COMPLAINT FOR VIOLATIONS OF THE LANHAM ACT, UNFAIR COMPETITION LAW, COMMON LAW
OF UNFAIR COMPETITION, FALSE ADVERTISING LAW, AND CONSUMER LEGAL REMEDIES ACT

Plaintiffs Robert Chacanaca and Victor Guttmann, on behalf of themselves, all others
similarly situated, and the general public, by and through undersigned counsel, hereby sue
Defendant The Quaker Oats Company ("Quaker") and, upon information and belief and
investigation of counsel, allege as follows:

## JURISDICTION

1. This Court has original jurisdiction over this action under 28 U.S.C. §1331 and 15
U.S.C. §1121.

2. This Court also has original jurisdiction under 28 U.S.C. §1332(d)(2) (The Class
Action Fairness Act) because the matter in controversy exceeds the sum or value of $5,000,000
exclusive of interest and costs. Further, more than two-thirds of the members of the Class reside
in states other than the state of which Defendant is a citizen.

## VENUE

3. Venue is proper in this Court pursuant to 28 U.S.C. §1391 because Plaintiffs
reside in and suffered injuries as a result of Defendant's acts in this district, many of the acts and
transactions giving rise to this action occurred in this district, and Defendant (1) is authorized to
conduct business in this district and has intentionally availed itself of the laws and markets of
this district through the promotion, marketing, distribution, and sale of its products in this
district; (2) resides in this district; and (3) is subject to personal jurisdiction in this district.

## INTRADISTRICT ASSIGNMENT

4. This civil action primarily arose in the county of Monterey and further is related
to *Rosen v. Unilever United States,* No. 5:09-cv-02563 JW, an action pending in the San Jose
Division. This action should therefore be assigned to the San Jose Division.

## INTRODUCTION

5. Plaintiffs Robert Chacanaca and Victor Guttmann repeatedly purchased packaged
food products made by Quaker in California during the class period defined herein. Quaker
falsely markets its products as healthful despite the fact that they have dangerous levels of
artificial trans fat, a toxic food additive banned in many parts of the world.

6. Quaker falsely labels Chewy Granola Bars as "0g trans fat" when they contain
dangerous amounts of artificial trans fat, a toxic product that causes cancer, diabetes, and heart
disease, and is banned in an increasing number of United States and foreign jurisdictions.

7. Plaintiffs seek an order that compels Quaker to (1) cease marketing its products
using the misleading tactics complained of herein, (2) conduct a corrective advertising campaign,

2

1   (3) restore the amounts by which Quaker was unjustly enriched, (4) destroy all misleading and

2   deceptive materials and products, and (5) compensate Plaintiffs and the Plaintiff Class for

3   purchasing and consuming these products.

4                                      **PARTIES**

5        14.    Defendant Quaker Foods, Inc. is a Delaware corporation with its principal place

6   of business in California. Quaker is the manufacturer of Chewy Granola Bars, which contain

7   artificial trans fat.

8        15.    Plaintiffs are residents of California who repeatedly purchased Quaker Chewy

9   Granola Bars for their own use in various California stores during the class period defined below.

10                  **SUMMARY OF THE STRONG EVIDENCE OF HEALTH**
                        **DANGERS OF ARTIFICIAL TRANS FAT**
11

12  **Artificial trans fat is a manufactured food product whose basic chemical structure is**
    **different from natural fat molecules.**
13

14       16.    Trans fat is naturally found in trace amounts in foods derived from ruminant

15  animals, primarily in red meat.[1]

16       17.    Also known as vaccenic acid, natural trans fat has never been linked to any

17  negative health effect in human beings and is chemically different than artificial trans fat.

18       18.    Initial studies on rats seem to indicate that consumption of vaccenic acid is

19  beneficial to health.[2]

20       19.    Artificial trans fat is manufactured in an industrial process called hydrogenation,

21  in which hydrogen atoms are added to normal vegetable oil by heating the oil to temperatures

22  above 400 degrees Fahrenheit in the presence of ion donor catalyst metals such as rhodium,

23  ruthenium, and nickel.[3]

24       20.    Nearly all the trans fat in the U.S. diet is the artificial fat present in partially

25  hydrogenated vegetable oil ("PHVO").[4]

26  _____

27  [1] Dariush Mozaffarian *et al.*, *Trans Fatty Acids and Cardiovascular Disease*, 354 New Eng. J.
    Med. 1601, 1608 (2008).

28  [2] Ye Wang *et al.*, *Trans-11 Vaccenic Acid Dietary Supplementation Induces Hypolipidemic*

29  *Effects on JCR:LA-cp Rats*, 138 J. Nutrition 2117 (November 2008).

30  [3] *See* Alice H. Lichtenstein, *Trans Fatty Acids, Plasma Lipid Levels, and Risk of Developing*
    *Cardiovascular Disease*, 95 Circulation 2588, 2588-90 (1997).

31  [4] *See* Mozaffarian, 354 New Eng. J. Med. at 1608.

32

                                          3

21.    PHVO was invented in 1901 and patented in 1902 by German chemist Wilhelm Normann. Trans fat molecules chemically differ from the natural fat molecules in other food products, as shown in the illustrations that follow.

22.    Natural fat, except the trace amounts of natural trans fat from ruminant animals, comes in two varieties: (1) fats that lack carbon double bonds ("saturated fat") and (2) fats that have carbon double bonds with the hydrogen atoms on the same side on the carbon chain ("cis fat"). Trans fat, however, has double bonds on opposite sides of its carbon chain.



4



**Trans fatty acid**

● = Hydrogen atom   ● = Carbon atom

23.    PHVO was initially a "wonder product" attractive to the packaged food industry because it combines the low cost of unsaturated cis fat with the flexibility and long shelf life of saturated fat. Like cis fat, PHVO is manufactured from lower-cost legumes,[5] while saturated fat is derived from relatively expensive animal and tropical plant sources.[6]

24.    Like natural saturated fat, PHVO has a long shelf life, physical solidity, and flavor stability. The industrial process that adds hydrogen ions to normal vegetable oil improves food texture and permits food products to withstand heavy mechanical processing and high temperatures.[7] Given its versatility, PHVO was recently used in 40 percent of processed packaged foods.[8]

25.    Artificial trans fat does not exist in nature, and the human body has not evolved to digest it. The same unusual and unnatural chemical structure that gives artificial trans fat properties attractive from an industrial perspective makes it highly toxic to human health.

**Trans fat causes cardiovascular disease, type 2 diabetes, and cancer.**

---

[5] e.g., corn oil, soybean oil, peanut oil

[6] e.g., butter, cream, tallow, coconut oil

[7] *See* Alberto Ascherio *et al.*, *Trans Fatty Acids & Coronary Heart Disease*, 340 New Eng. J. Med. 94, 94-8 (1999). *See also* Ctr. for Food Safety & Applied Nutrition, U.S. Food & Drug Admin., Questions & Answers About Trans Fat Nutrition Labeling (Update 2006) (2003), *available at* http://www.cfsan.fda.gov/%7Edms/qatrans2.html#fn.

[8] Mary Carmichael, *The Skinny on Bad Fat*, Newsweek, Dec. 1, 2003, at 66. *See also* Kim Severson, *Hidden Killer. It's Trans Fat. It's Dangerous. And It's In Food You Eat Every Day*, S.F. Chron., Jan. 30, 2002.

- **Heart Disease**

26.     In a joint Dietary Guidelines Advisory Committee Report, the U.S. Department of Health and Human Services and the U.S. Department of Agriculture recognized **"[t]he relationship between trans fatty acid intake and LDL cholesterol is direct and progressive, increasing the risk of cardiovascular disease."**[9]

27.     Food products with trans fat harm the heart by "rais[ing] the concentration of the most dangerous form of serum cholesterol (LDL cholesterol)" and "lower[ing] a protective form of serum cholesterol (HDL cholesterol)."[10]

28.     The American Heart Association notes **"trans fats raise your bad (LDL) cholesterol levels and lower your good (HDL) cholesterol levels. Eating trans fats increases your risk of developing heart disease."**[11]

29.     After an extensive evaluation of the scientific literature on the trans fat/Coronary Heart Disease connection, the FDA concluded:

> based on the consistent results across a number of the most persuasive types of study designs (i.e., intervention trials and prospective cohort studies) that were conducted using a range of test conditions and across different geographical regions and populations...the available evidence for an adverse relationship between trans fat intake and CHD [Coronary Heart Disease] risk is strong.[12]

30.     Trans fat raises the risk of CHD more than any other known nutritive product.[13]

31.     Removing 2% of daily calories from trans fat from the American diet "would prevent approximately 30,000 premature coronary deaths per year, and epidemiologic evidence suggests this number is closer to 100,0000 premature deaths annually."[14]

32.     A study on the impact of trans fatty acids on heart health provides evidence that:

[9] Dep't of Health & Human Serv. & U.S. Dep't of Agric., 2005 Dietary Guidelines Advisory Committee Report, Section 10 (2005).

[10] Id.

[11] Am. Heart Ass'n., *Trans Fat Overview*, *available at* http://www.americanheart.org/presenter.jhtml?identifier=3045792.

[12] Ctr. for Food Safety & Applied Nutrition, U.S. Food & Drug Admin., Questions & Answers About Trans Fat Nutrition Labeling.

[13] Mozaffarian, 354 New Eng. J. Med. at 1603.

[14] Alberto Ascherio *et al.*, *Trans Fatty Acids & Coronary Heart Disease*, 340 New Eng. J. Med. 94, 94-8 (1999).

[E]ven the lower estimates from the effects [of PHVO] on blood lipids would suggest that more than 30,000 deaths per year may be due to the consumption of partially hydrogenated vegetable fat. Furthermore, the number of attributable cases of nonfatal coronary heart disease will be even larger.[15]

33.    Since "the adverse effect of trans fatty acids is stronger than that of saturated fatty acids," saturated fat consumption would need to be reduced by 10 percent of caloric intake to have the same impact.[16]

34.    "10 to 19 percent of CHD events in the United States could be averted by reducing the intake of trans fat."[17]

35.    By raising LDL levels and lowering HDL levels, trans fat causes a wide variety of dangerous heart conditions, including low flow-mediated vasodilation, coronary artery disease, and primary cardiac arrest.

36.    After conducting a crossover diet trial, Danish researchers determined that healthy men and women who maintained a high-trans fat diet had 21 percent lower protective HDL levels and 29 percent lower flow-mediated vasodilation ("FMD") than those on a high-saturated fat diet. Since FMD measures the percent increase between the diameter of the artery at ordinary and at maximum dilation, low FMD is "a risk marker of coronary heart disease.[18]

37.    Australian researchers observed that heart attack patients possess elevated amounts of trans fat in their adipose tissue, strongly linking heart disease with long-term consumption of trans fat.[19]

38.    By taking blood samples from 179 survivors of cardiac arrest and 285 randomly-selected control patients and comparing the top fifth with the bottom fifth of participants by trans fat intake, another study published in the American Heart Association's *Circulation* found that

---

[15] W.C. Willett *et al., Trans Fatty Acids: Are the Effects only Marginal?* 84 Am. J. Pub. Health 722, 723 (1994).

[16] Mozaffarian, 354 New Eng. J. Med. at 1609.

[17] *See* Mozaffarian, 354 New Eng. J. Med. at 1611.

[18] Nicole M. De Roos *et al., Replacement of Dietary Saturated Fatty Acids by Trans Fatty Acids Lowers Serum HDL Cholesterol and Impairs Endothelial Function in Healthy Men and Women,* 21 Am. Heart Assoc. 1233, 1233-37 (2001).

[19] Peter M. Clifton *et al., Trans Fatty Acids In Adipose Tissue And The Food Supply Are Associated With Myocardial Infarction.* 134 J. of Nutrition 874, 874-79 (2004).

COMPLAINT FOR VIOLATIONS OF THE LANHAM ACT, UNFAIR COMPETITION LAW, COMMON LAW OF UNFAIR COMPETITION, FALSE ADVERTISING LAW, AND CONSUMER LEGAL REMEDIES ACT

1  the largest consumers of trans fat have three times the risk of suffering primary cardiac arrest,

2  even after controlling for a variety of medical and lifestyle risk factors.[20]

3  • **Diabetes**

4      39.    Artificial trans fat causes type 2 diabetes.[21]

5      40.    A 14-year study of 84,204 women found that for every 2 percent increase in

6  energy intake from trans fat, the relative risk of type 2 diabetes was 1.39. In other words, each 2

7  percent of calories from artificial trans fat increases the risk of type 2 diabetes by 39 percent.[22]

8  • **Cancer**

9      41.    Trans fat is a known carcinogen shown to cause breast, prostate, and colorectal

10  cancer.

11      42.    A 13-year study of 19,934 French women showed 75 percent more women

12  contracted breast cancer in the highest quintile of trans fat consumption than did those in the

13  lowest.[23]

14      43.    In a 25-year study of 14,916 U.S. physicians, the doctors in the highest quintile of

15  trans fat intake had over a 100% greater risk of developing prostate cancer than the doctors in the

16  lowest quintile.[24]

17      44.    A study of 1,012 American males observing trans fat intake and the risk of

18  prostate cancer found "[c]ompared with the lowest quartile of total trans-fatty acid consumption,

19  the higher quartiles gave odds ratios (ORs) equal to 1.58," meaning those in the highest quartile

20  are 58% more likely to contract prostate cancer than those in the lowest.[25]

21      45.    A 600-person study found an 86 percent greater risk of colorectal cancer in the

22

23

24  [20] Rozenn N. Lemaitre et al., Cell Membrane Trans-Fatty Acids and the Risk of Primary Cardiac Arrest, 105 Circulation 697, 697-701 (2002).

25  [21] Am. Heart Ass'n., Trans Fat Overview.

26  [22] Jorge Salmeron et al., Dietary Fat Intake and Risk of Type 2 Diabetes in Women, 73 Am. J. of

27  Clinical Nutrition 1019, 1023 (2001).

28  [23] Véronique Chajès et al., Association between Serum Trans-Monounsaturated Fatty Acids and Breast Cancer Risk in the E3N-EPIC Study. 167 Am. J. of Epidemiology 1312, 1316 (2008).

29  [24] Jorge Chavarro et al., A Prospective Study of Blood Trans Fatty Acid Levels and Risk of

30  Prostate Cancer., 47 Proc. Am. Assoc. of Cancer Research 95, 99 (2006).

31  [25] Xin Liu et al., Trans-Fatty Acid Intake and Increased Risk of Advanced Prostate Cancer:

32  Modification by RNASEL R462Q Variant, 28 Carcinogenesis 1232, 1232 (2007).

1  highest trans fat consumption quartile.[26]

2      46.    A 2,910-person study found "trans-monounsaturated fatty acids...were dose-
3  dependently associated with colorectal cancer risk," which showed "the importance of type of fat
4  in the etiology and prevention of colorectal cancer."[27]

5      47.    The serious health conditions caused by trans fat consumption only occur from
6  artificial trans fat, not the trace natural trans fat found in ruminant sources:

7          Of four prospective studies evaluating the relation between the intake of trans
8          fatty acids from ruminants and the risk of CHD, none identified a significant
9          positive association, whereas three identified nonsignificant trends toward an
10         inverse association. ... [T]he sum of the current evidence suggests that the public
11         health implications of consuming trans fats from ruminant products are relatively
12         limited.[28]

13  **The grave, concrete risks of artificial trans fat consumption far outweigh any**
14  **conceivable benefits of Quaker's conduct.**

15      48.    There is no health benefit to artificial trans fat consumption and "no safe level" of
16  artificial trans fat intake. [29]

17      49.    According to the established consensus of the scientific community, consumers
18  should keep their consumption of trans fat "as low as possible."[30]

19      50.    As Dariush Mozaffarian, M.D., notes in the New England Journal of Medicine:
20         [F]rom a nutritional standpoint, the consumption of trans fatty acids results in
21         considerable potential harm but no apparent benefit. ... Thus, complete or near-
22         complete avoidance of industrially produced trans fat—a consumption of less than
23         0.5 percent of the total energy intake—may be necessary to avoid adverse effects

24

25  [26] L.C. Vinikoor *et al.*, *Consumption of Trans-Fatty Acid and its Association with Colorectal*
26  *Adenomas*, 168 Am. J. of Epidemiology 289, 294 (2008).
27  [27] Evropi Theodoratou *et al.*, *Dietary Fatty Acids and Colorectal Cancer: A Case-Control Study*,
    166 Am. J. of Epidemiology 181 (2007).
28  [28] Mozaffarian, 354 New Eng. J. Med. at 1608-1609.
29  [29] Food & Nutrition Bd., Inst. of Med., Dietary Reference Intakes For Energy, Carbohydrate,
30  Fiber, Fat, Fatty Acids, Cholesterol, Protein, and Amino Acids (2005).
    [30] Food & Nutrition Bd., Inst. of Med., Dietary Reference Intakes For Energy, Carbohydrate,
31  Fiber, Fat, Fatty Acids, Cholesterol, Protein, and Amino Acids 424 (2005).
32

9

and would be prudent to minimize health risks.[31]

**Trans fat is so inherently dangerous that it is being banned in an increasing number of American states and European countries.**

51.    In 2008, California became the first state to ban all restaurant food with artificial trans fat, a law affecting approximately 88,000 eating establishments. Trans fats are now banned in restaurants as of January 1, 2010 and will be removed from retailers starting January 1, 2011.

52.    New York City banned all trans fat in its 20,000 food establishments in 2006. Similar laws exist in Philadelphia; Baltimore; Stamford, Connecticut; and Montgomery County, Maryland.

53.    A 2004 Danish law restricted all foods to under 2 percent of calories from trans fat. Switzerland made the same restriction in 2008.[32]

54.    After conducting a surveillance study of Denmark's trans fat ban, researchers concluded the change "did not appreciably affect the quality, cost or availability of food" and did not have "any noticeable effect for the consumers."[33]

55.    In 2006, a trans fat task force co-chaired by Health Canada and the Heart and Stroke Foundation of Canada recommended capping trans fat content at 2 percent of calories for tub margarines and spreads and 5 percent for all other foods. On September 30, 2009, British Columbia became the first province to impose these rules on all restaurants, schools, hospitals, and special events.[34]

*//*

*//*

*//*

---

[31] Mozaffarian, 354 New Eng. J. Med. at 1609.

[32] Andrew Collier, *Deadly Fats: Why Are We still Eating Them?*, The Independent (UK), June 10, 2008.

[33] Mozaffarian, 354 New Eng. J. Med. at 1610; *see also* High Levels of Industrially Produced Trans Fat in Popular Fast Food, 354 New Eng. J. Med. 1650, 1652 (2006).

[34] *Province Restricts Trans Fat in B.C.*, British Columbia Ministry of Healthy Living and Sport Press Release (2009), *available at* http://www2.news.gov.bc.ca/news_releases_2005-2009/2009HLS0013-000315.htm.

## SPECIFIC MISREPRESENTATIONS, MATERIAL
## OMISSIONS, AND DECEPTIVE ACTS

56.    Both Quaker Granola Bar products pictured below contain partially hydrogenated oil, a form of artificial trans fat.

**Chewy with Protein: Chocolate & Peanut Butter**



COMPLAINT FOR VIOLATIONS OF THE LANHAM ACT, UNFAIR COMPETITION LAW, COMMON LAW
OF UNFAIR COMPETITION, FALSE ADVERTISING LAW, AND CONSUMER LEGAL REMEDIES ACT



COMPLAINT FOR VIOLATIONS OF THE LANHAM ACT, UNFAIR COMPETITION LAW, COMMON LAW
OF UNFAIR COMPETITION, FALSE ADVERTISING LAW, AND CONSUMER LEGAL REMEDIES ACT

1  **Chewy 25% Less Sugar Variety Pack**



2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32

COMPLAINT FOR VIOLATIONS OF THE LANHAM ACT, UNFAIR COMPETITION LAW, COMMON LAW
OF UNFAIR COMPETITION, FALSE ADVERTISING LAW, AND CONSUMER LEGAL REMEDIES ACT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32





14

57. **False and misleading 0g trans fat claims:** The side and back labels of Quaker Chewy 25% Less Sugar Granola Bars claim they contain "0g Trans Fat." The actual content of trans fat per serving is not "0g" and is deceptively omitted.

58. **Misleading Packaging:** Quaker misleads consumers into believing Quaker Chewy granola bars are healthy by making misleading claims on the products' packaging. Such statements include the phrases "wholesome," a "good source of calcium and fiber," "made with whole grain oats," "no high fructose corn syrup," and "smart choices made easy." Though possibly true, these statements are deceptive in intent and nature: they imply that Quaker Chewy granola bars are healthy despite that they contain artificial trans fat, a toxic additive that causes heart disease, cancer, and type-2 diabetes.

59. Quaker also labels Quaker Chewy granola bars with images of oats, nuts, and children in soccer uniforms. The obvious implication of this is that Quaker Chewy granola bars are, like oats, nuts, and exercise, part of a healthy lifestyle. In fact, Quaker Chewy granola bars contain artificial trans fat, which renders them unfit for human consumption.

60. **False and misleading "wholesome" claim:** Quaker labels its Chewy granola bars as "wholesome." Quaker Chewy granola bars, however, contain artificial trans fat which, far from "wholesome," causes heart disease, cancer, and type-2 diabetes.

61. **False and misleading "Smart Choices Made Easy" claim:** The package of Quaker Chewy granola bars bears the phrase "SMART CHOICES MADE EASY" and includes a brief paragraph listing some of the products' attributes. This is false and/or misleading in several respects. First, this list represents Quaker Chewy granola bars as containing "0g trans fat," which is false. Second, the obvious implication of the statements, taken in context, is that Quaker Chewy granola bars are a good decision for one's health. In fact, the trans fat content of Quaker Chewy granola bars renders them unfit for human consumption.

## CLASS ACTION ALLEGATIONS

62. Plaintiffs bring this action on behalf of themselves and all others similarly situated (the "Class") in accordance with Rule 23 of the Federal Rules of Civil Procedure.

63. The Class is defined as:

All persons (excluding officers, directors, and employees of Quaker) who purchased, on or after January 1, 2000, one or more Quaker Chewy Granola Bar products containing artificial trans fat for their own use rather than resale or distribution.

15

64.     Questions of law and fact common to Plaintiffs and the Class include:

    a.     Whether Quaker contributed to, committed, and/or is responsible for the conduct alleged herein;

    b.     Whether Quaker's conduct constitutes the violations of law alleged herein;

    c.     Whether Quaker acted willfully, recklessly, negligently, or with gross negligence in the violations of law alleged herein; and

    d.     Whether Class members are entitled to compensatory, injunctive, and other equitable relief.

65.     By purchasing and/or using these products, all Class members were subjected to the same wrongful conduct.

66.     Absent these material deceptions, misstatements, and omissions, Plaintiffs and other Class members would not have purchased these Quaker products.

67.     Plaintiffs' claims are typical of the Class's claims. Plaintiffs will fairly and adequately protect the interests of the Class, have no interests that are incompatible with the interests of the Class, and have retained counsel competent and experienced in class litigation.

68.     The Class is sufficiently numerous, as it includes hundreds of thousands of individuals who purchased Quaker Chewy Granola Bars throughout the United States.

69.     Class representation is superior to other options for the resolution of the controversy. The relief sought for each Class member is small. Absent the availability of class action procedures, it would be infeasible for Class members to redress the wrongs done to them.

70.     Quaker has acted on grounds applicable to the Class, thereby making appropriate final injunctive relief or declaratory relief concerning the Class as a whole.

71.     Questions of law and fact common to the Class predominate over any questions affecting only individual members.

**Quaker fraudulently concealed the health hazards of consuming its products.**

72.     Quaker has tolled any applicable statute of limitations by affirmatively concealing and publically misrepresenting its violations of law as described herein. A reasonable consumer would have relied on the deceptive and false claims made on the packaging of Quaker products, and through the exercise of reasonable diligence would not have discovered the violations alleged herein because Quaker actively and purposefully concealed the truth regarding its products.

## FIRST CAUSE OF ACTION

### False Advertising under the Lanham Act, 15 U.S.C. § 1125 *et seq.*

73.     Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth in full herein.

74.     Quaker has made and distributed, in interstate commerce and in this District, products that make false or misleading statements of fact regarding their content. All of the products described herein were placed into interstate commerce by Quaker and sold throughout the country and this District.

75.     These products contain on their labels actual misstatements and/or misleading statements and failures to disclose, including, among others, the statement that such products contain "no" or "0g" trans fat.

76.     These false and/or misleading statements and omissions actually deceive, or have a tendency to deceive, any reasonable consumer. This deception is material in that it is likely to influence the purchasing decision of a reasonable consumer.

77.     Plaintiffs seek an order directing Quaker to destroy all misleading and deceptive advertising materials and products in accordance with 15 U.S.C. § 1118.

78.     Plaintiffs further seek an injunction under 15 U.S.C. § 1116 restraining Quaker, its agents, employees, representatives, and all persons acting in concert with Quaker from engaging in further acts of false advertising, and ordering removal of all of Quaker's false advertisements and products possessing misleading statements or omissions of fact.

## SECOND CAUSE OF ACTION

### Violations of the California Unfair Competition Law, Bus. & Prof. Code § 17200 *et seq.*, and the Common Law of Unfair Competition

79.     Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth in full herein.

80.     Bus. & Prof. Code § 17200 prohibits any "unlawful, unfair or fraudulent business act or practice."

81.     The acts, omissions, misrepresentations, practices, and non-disclosures of Quaker as alleged herein constitute "unlawful" business acts and practices in that Quaker's conduct violates the Lanham Act, the False Advertising Law and the Consumer Legal Remedies Act.

82.     The acts, omissions, misrepresentations, practices, and non-disclosures of Quaker as alleged herein constitute "unfair" business acts and practices in that Quaker's conduct is

17

1 immoral, unscrupulous, and offends public policy. Further, the gravity of Quaker's conduct
2 outweighs any conceivable benefit of such conduct.

3     83.    The acts, omissions, misrepresentations, practices, and non-disclosures of Quaker
4 as alleged herein constitute "fraudulent" business acts and practices in that Quaker's conduct has
5 a tendency to deceive the Class and the general public.

6     84.    By violating the California Unfair Competition Law, Quaker also violated the
7 common law of unfair competition.

8     85.    In accordance with Bus. & Prof. Code § 17203, Plaintiffs seek an order enjoining
9 Quaker from continuing to conduct business through unlawful, unfair, and/or fraudulent acts and
10 practices and to commence a corrective advertising campaign.

11    86.    Plaintiffs further seek an order for the disgorgement and restitution of all monies
12 from the sale of these products, which were acquired through acts of unlawful, unfair, and/or
13 fraudulent competition.

14                          **THIRD CAUSE OF ACTION**
15               **Violations of the California False Advertising Law,**
16                     **Bus. & Prof. Code § 17500 *et seq.***

17    87.    Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if
18 set forth in full herein.

19    88.    In violation of Bus. & Prof. Code § 17500 *et seq.*, the advertisements, labeling,
20 policies, acts, and practices described herein were designed to, and did, result in the purchase and
21 use of the products without the knowledge that these products contained toxic artificial trans fat.

22    89.    Quaker knew and reasonably should have known that the labels on these products
23 were untrue and/or misleading.

24    90.    As a result, Plaintiffs, the Class, and the general public are entitled to injunctive
25 and equitable relief, restitution, and an order for the disgorgement of the funds by which Quaker
26 was unjustly enriched.

27                          **FOURTH CAUSE OF ACTION**
28               **Violations of the Consumer Legal Remedies Act,**
29                     **Civ. Code § 1750 *et seq.***

30    91.    Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if
31 set forth in full herein.

32    92.    The CLRA prohibits deceptive practices in connection with the conduct of a

18

1   business that provides goods, property, or services primarily for personal, family, or household

2   purposes.

3         93.     Quaker's policies, acts, and practices were designed to, and did, result in the

4   purchase and use of the products primarily for personal, family, or household purposes, and

5   violated and continue to violate the following sections of the CLRA:

6             a.   § 1770(a)(5): representing that goods have characteristics, uses, or benefits which
7                 they do not have.

8             b.   § 1770(a)(7): representing that goods are of a particular standard, quality, or grade
9                 if they are of another.

10            c.   § 1770(a)(9): advertising goods with intent not to sell them as advertised.

11            d.   § 1770(a)(16): representing the subject of a transaction has been supplied in
12                 accordance with a previous representation when it has not.

13         94.     As a result, Plaintiffs and the Class have suffered irreparable harm and are entitled

14   to injunctive relief and restitution.

15         95.     In compliance with Civ. Code § 1782, Plaintiffs have given written notice to

16   Quaker of their claims.

17                            **PRAYER FOR RELIEF**

18         WHEREFORE, Plaintiffs, on behalf of themselves. all others similarly situated, and the

19   general public, pray for judgment and relief against Defendants as follows:

20         A.     Declaring this action to be a proper class action.

21         B.     An order enjoining Quaker from marketing its products that contain artificial trans

22   fat as "0g trans fat";

23         C.     An order compelling Quaker to conduct a corrective advertising campaign to

24   inform the public that its products contain unsafe amounts of trans fat at consumers' actual

25   consumption levels.

26         D.     An order requiring Quaker to disgorge all monies, revenues, and profits obtained

27   by means of any wrongful act or practice.

28         E.     An order compelling Quaker to destroy all misleading and deceptive advertising

29   materials and products as provided by 15 U.S.C. § 1118.

30         F.     An order requiring Quaker to pay restitution to restore all funds acquired by

31   means of any act or practice declared by this Court to be an unlawful, unfair, or fraudulent

32   business act or practice, untrue or misleading advertising, or a violation of the CLRA, plus pre-

19

1    and post-judgment interest thereon;

2         G.     Costs, expenses, and reasonable attorneys' fees;

3         H.     Any other and further relief the Court deems necessary, just, or proper.

4                              **JURY DEMAND**

5         Plaintiffs demand a trial by jury on all causes of action so triable.

6

7    DATED: February 3, 2010                    Respectfully Submitted,

8

9

10                                              Gregory S. Weston
11                                              THE WESTON FIRM
                                                888 Turquoise Street
12                                              San Diego, CA 92109
                                                Telephone: 858 488 1672
13                                              Facsimile:  480 247 4553
14                                              greg@westonfirm.com

15                                              BECK & LEE BUSINESS TRIAL
16                                              LAWYERS
                                                Jared H. Beck
17                                              28 West Flagler Street, Suite 555
18                                              Miami, FL 33130
                                                Telephone: 305 789 0072
19                                              Facsimile:  786 664 3334
20                                              jared@beckandlee.com

21

22

23

24

25

26

27

28

29

30

31

32

COMPLAINT FOR VIOLATIONS OF THE LANHAM ACT, UNFAIR COMPETITION LAW, COMMON LAW
OF UNFAIR COMPETITION, FALSE ADVERTISING LAW, AND CONSUMER LEGAL REMEDIES ACT