**THE WESTON FIRM**
GREGORY S. WESTON (239944)
888 Turquoise Street
San Diego, CA 92109
Telephone: (858) 488-1672
Facsimile: (480) 247-4553
greg@westonfirm.com

JACK FITZGERALD (257370)
2811 Sykes Court
Santa Clara, CA 95051
Telephone: (408) 459-0305
jack@westonfirm.com

**BECK & LEE BUSINESS TRIAL LAWYERS**
JARED H. BECK (233743)
ELIZABETH LEE BECK (233742)
28 West Flagler Street, Suite 555
Miami, FL 33130
Telephone: (305) 789-0072
Facsimile: (786) 664-3334
jared@beckandlee.com
elizabeth@beckandlee.com

**Counsel for Plaintiffs**

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISON**

| | |
|---|---|
| ROBERT CHACANACA and VICTOR GUTTMANN, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>THE QUAKER OATS COMPANY,<br><br>Defendant. | Case No. 5:10-cv-00502 RS<br><br>Pleading Type: Class Action<br><br>**PLAINTIFFS' OPPOSITION TO QUAKER'S MOTION FOR JUDGMENT ON THE PLEADINGS**<br><br>Judge: The Hon. Richard Seeborg<br>Hearing Date: July 15, 2010<br>Time: 1:30 p.m.<br>Location: Courtroom 3, 17th Floor |

# <u>TABLE OF CONTENTS</u>

I. INTRODUCTION ....................................................................................................... 1

II. ARGUMENT .............................................................................................................. 2

    A. Rule 12 Dismissal Is Reserved For "Extraordinary Cases" ................................... 2

    B. Plaintiffs' Claims Are Not Preempted .................................................................. 2

        1. There Is No "Clear And Manifest Purpose Of Congress" To Preempt ...... 3

        2. Preemption Applies To Labeling "Requirements," Not State Law Claims 5

        3. Plaintiffs' Claims Are Permitted Because Express Nutrient Content Claims May Not Be "False or Misleading In Any Respect" ..................... 6

        4. Plaintiffs' Claims Concerning Quaker's *Front Label* "0g trans fat" Statements Are Not Preempted By FDA Regulations Concerning The Nutrition Facts Box ................................................................................ 7

        5. There Is No Preemption Where The FDA Does Not Regulate Disqualifying Trans Fat Criteria ................................................................ 10

    C. The Court Should Not Refer This Action To The FDA ....................................... 11

    D. There Is No Basis For "Abstention" .................................................................... 17

    E. *Cel-Tech's* "Safe Harbor" Is Inapplicable ........................................................... 18

    F. Plaintiffs' Injuries Establish Standing ................................................................ 19

    G. Plaintiffs Have Satisfied Applicable Pleading Standards .................................... 20

    H. The Challenged Statements Are Not "True" ....................................................... 22

        1. "0g Trans Fat" ............................................................................................ 22

        2. "Wholesome" ............................................................................................. 22

        3. "Good source of calcium and fiber"; "Made with whole grain oats"; images of oats and nuts (and children in soccer uniforms); "No high fructose corn syrup" .................................................................................. 22

        4. "Smart Choices Made Easy" ...................................................................... 23

        5. The Purported Truth Of A Claim Is Not Determinative ........................... 24

    I. The Challenged Statements Are Not "Mere Puffery" .......................................... 24

    J. Plaintiffs Have Lanham Act Standing Under § 1116 For Injunctive Relief ........ 25

III. CONCLUSION .......................................................................................................... 25

i

# **TABLE OF AUTHORITIES**

## **Cases**

*Aaronson v. Vital Pharms, Inc.*, No. 09-CV-1333, 2010 U.S. Dist. LEXIS 14160 (S.D. Cal. Feb. 17, 2010)...................................................................................................................... 16

*All One God Faith, Inc. v. Hain Celestial Group, Inc.*, No. C 09-03517, 2009 U.S. Dist. LEXIS 115928 (N.D. Cal. Dec. 14, 2009) ........................................................................... 16

*Alpharma, Inc. v. Pennfield Oil Co.*, 411 F.3d 934 (8th Cir. 2005) ............................................. 12

*Altria Group Inc. v. Good*, 129 S. Ct. 538 (2008) ................................................................... 3, 5

*Alvarez v. Chevron Corp.*, No. CV 09-3343, 2009 U.S. Dist. LEXIS 94377 (C.D. Cal. Sept. 30, 2009)....................................................................................................................... 18

*Ashcroft v. Iqbal*, 129 S.Ct. 1937 (2009) ................................................................................. 2

*Baas v. Dollar Tree Stores, Inc.*, No. C 07-03108, 2007 U.S. Dist. LEXIS 65979 (N.D. Cal. Aug. 29, 2007)....................................................................................................................... 20

*Barrus v. Sylvania*, 55 F.3d 468 (9th Cir. 1995)..................................................................... 25

*Bates v. Dow Agrosciences LLC*, 544 U.S. 431 (2005) ............................................................ 7

*Bernhardt v. Pfizer, Inc.*, No. 00 Civ. 4042, 2000 U.S. Dist. LEXIS 16963 (S.D.N.Y. 2000) .... 17

*Birdsong v. Apple, Inc.*, 590 F.3d 955 (9th Cir. 2009)............................................................ 19

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141 (1989)...................................... 4

*Brown v. MCI Worldcom Network Servs., Inc.*, 277 F.3d 1166 (9th Cir. 2002)......................... 12

*Buckland v. Threshold Enters., Ltd.*, 155 Cal. App. 4th 798 (2007) ....................................... 19

*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal. 4th 163 (1999)...................................................................................................................... 18

*Cipollone v. Liggett Group, Inc.*, 505 U.S. 504 (1992) ............................................................ 5

*Clark v. Actavis Group hf*, 567 F. Supp. 2d 711 (D.N.J. 2008)................................................ 17

*Clark v. Time Warner Cable*, 523 F.3d 1110 (9th Cir. 2008).................................................. 12

*County of Santa Clara v. Astra United States*, 588 F.3d 1237 (9th Cir. 2009) ........................ 12

*Ctr. For Biological Diversity, Inc. v. FPL Group, Inc.*, 166 Cal. App. 4th 1349 (2008) ............. 17

*Davel Communs., Inc. v. Qwest Corp.*, 460 F.3d 1075 (9th Cir. 2006)................................ 12, 13

*Desert Healthcare Dist. v. PacifiCare FHP, Inc.*, 94 Cal. App. 4th 781 (2001)......................... 17

*DeVivo v. Indymac Bank*, No. CV 09-2555, 2009 U.S. Dist. LEXIS 51477 (C.D. Cal. June 10, 2009)....................................................................................................................... 2

*Doyle v. Ill. Cent. R.R. Co.*, No. CV F 08-0971, 2009 U.S. Dist. LEXIS 8852 (E.D. Cal. Jan. 29, 2009)....................................................................................................................... 2

*Dworkin v. Hustler Magazine Inc.*, 867 F.2d 1188 (9th Cir. 1989)......................................... 2

*Elhilu v. Quizno's Franchising Co.*, LLC, No. 06-cv-07855, 2008 U.S. Dist. LEXIS 109435 (C.D. Cal. Apr. 3, 2008)........................................................................................... 20

*English v. Gen. Elec. Co.*, 496 U.S. 72 (1990) ................................................................ 3

*Farm Raised Salmon Cases*, 42 Cal. 4th 1077 (2008) ...................................................... 3

*Farokhzadeh v. Too Faced Cosmetics*, No. B213306, 2010 Cal. App. Unpub. LEXIS 3004 (Apr. 26, 2010) ....................................................................................................................... 19

*Franklin Fueling Sys. v. Veeder-Root Co.*, 2009 U.S. Dist. LEXIS 72953 (E.D. Cal. Aug. 11, 2009) ............................................................................................................................. 24

*Freightliner Corp. v. Myrick*, 514 U.S. 280 (1995) .................................................. 10, 11

*Gatherer v. Purdue Pharma L.P.*, No. BC257852, 2002 WL 32144622 (Cal. Super. Ct. Dec. 13, 2002) ............................................................................................................................. 18

*Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246 (9th Cir. 1997) ........................................... 2

*Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542 (9th Cir. 1990) ....................... 2

*Healthpoint, Ltd. v. Allen Pharm., LLC*, No. SA-07-CA-0526, 2008 U.S. Dist. LEXIS 20971 (W.D. Tx. Mar. 18, 2008) ................................................................................................. 14

*Hitt v. Arizona Beverage Co.*, No. 08-cv-809, 2009 WL 449190 (S.D. Cal. Feb. 4, 2009) ........... 9

*Holk v. Snapple Bev. Corp.*, 575 F.3d 329 (3d Cir. 2009) ......................................... 3, 4

*Hoyte v. Yum! Brands, Inc.*, 489 F. Supp. 2d 24 (D.D.C. 2007) ..................................... 24

*In re Bisphenol-A Polycarbonate (BPA) Plastic Prods. Liab. Litig.*, MDL No. 1967, 2009 U.S. Dist. LEXIS 104451 (W.D. Mo. Nov. 9, 2009) .......................................................... 13, 14

*In re Epogen & Aranesp Off-Label Mktg. & Sales Practices Litig.*, 590 F. Supp. 2d 1282 (C.D. Cal. 2008) ..................................................................................................................... 14

*In re Human Tissues Prods. Liab. Litig.*, 488 F. Supp. 2d 430 (D.N.J. 2007) ........................... 16

*Kearns v. Ford Motor Co.*, 567 F.3d 1120 (9th Cir. 2009) ............................................ 21

*Koh v. S.C. Johnson & Son, Inc.*, No. C-09-0927, 2010 WL 94265 (N.D. Cal. Jan. 6, 2010) ..... 20

*Korens v. R.W. Zukin Corp.*, 212 Cal. App. 3d 1054 (1989) ........................................... 17

*Laster v. T-Mobile United States, Inc.*, 407 F. Supp. 2d 1181 (S.D. Cal. 2005) ........................ 19

*Lockwood v. Conagra Foods, Inc.*, 597 F. Supp. 2d 1028 (N.D. Cal. 2009) ..................... 8, 15, 17

*Mazza v. Am. Honda Motor Co.*, 254 F.R.D. 610, 623 (C.D. Cal. 2008) .............................. 25

*Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996) ...................................................... 3, 5, 7

*Moore v. Kayport Package Express, Inc.*, 885 F.2d 531 (9th Cir. 1989) .......................... 20, 21

*Morgan v. AT&T Wireless Services, Inc.*, 177 Cal. App. 4th 1235 (2009) ................................ 24

*Mut. Pharm. Co. v. Watson Pharms., Inc.*, No. 09-5421, 2010 U.S. Dist. LEXIS 10542 (D.N.J. Feb. 8, 2010) ................................................................................................................... 14

*N.Y. State Rest. Ass'n v. N.Y. City Bd. Of Health*, 556 F.3d 114 (2d Cir. 2009) ........................ 11

*N.Y. State Restaurant Ass'n v. N.Y. City Board Of Health*, 509 F. Supp. 2d 351 (S.D.N.Y. 2007) ............................................................................................................................... 6

*Nader v. Allegheny Airlines*, 426 U.S. 290 (1976) ...................................................... 14

iii

*Neubronner v. Milken*, 6 F.3d 666 (9th Cir. 1993) ....................................................... 20

*Newcal Indus. v. Ikon Office Solutions*, 513 F.3d 1038 (9th Cir. 2008) ........................... 24

*Pelman v. McDonald's Corp.*, 237 F. Supp. 2d 512 (S.D.N.Y. 2003) ............................ 24

*Pom Wonderful LLC v. Ocean Spray Cranberries, Inc.*, 642 F. Supp. 2d 1112 (C.D. Cal. 2009) ............................................................................................................................ 15

*Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62 (1970) ........................................................................................................................... 12

*Reyes v. McDonald's*, No. 06 C 1604, 2006 U.S. Dist. LEXIS 81684 (N.D. Ill. Nov. 8, 2006) .... 6

*Ryan v. Chemlawn Corp.*, 935 F.2d 129 (7th Cir. 1991) ................................................. 14

*Semegen v. Weidner*, 780 F.2d 727 (9th Cir. 1985) ....................................................... 20

*Smith v. State Farm Mut. Auto. Ins. Co.*, 93 Cal. App. 4th 700 (2001) ........................... 18

*Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134 (9th Cir. 1997) ...................... 24

*TrafficSchool.com, Inc. v. Edriver, Inc.*, 633 F. Supp. 2d 1063 (C.D. Cal. 2008) ............ 25

*Tylka v. Gerber Prods. Co.*, 211 F.3d 445 (7th Cir. 2000) ............................................ 25

*Tylka v. Gerber Prods. Co.*, No. 96 C 1647, 1999 U.S. Dist. LEXIS 10718 (N.D. Ill. June 29, 1999) ........................................................................................................................... 24

*United States v. General Dynamics Corp.*, 828 F.2d 1356 (9th Cir. 1987) ..................... 12

*United States v. Redwood City*, 640 F.2d 963 (9th Cir. 1981) ......................................... 2

*Vermont Pure Holdings, Ltd. v. Nestle Waters N. Am.*, No. 03-11456, 2006 U.S. Dist. LEXIS 13683 (D. Mass. Mar. 28, 2006) ............................................................................... 11

*Von Koenig v. Snapple Beverage Corp.*, No. 09-cv-00606, -- F. Supp. 2d. --, 2010 WL 1980208 (E.D. Cal., May 10, 2010) ............................................................. 18, 19, 20, 21

*Weinberger v. Bentex Pharms.*, 412 U.S. 645 (1973) .................................................... 16

*Williams v. Gerber Prods. Co.*, 552 F.3d 934 (9th Cir. 2008) ....................... 9, 21, 24, 25

*Wolfe v. State Farm Fire & Cas. Ins. Co.*, 46 Cal. App. 4th 554 (1996) ......................... 17

*Wool v. Tandem Computers, Inc.*, 818 F.2d 1433 (9th Cir. 1987) ................................... 21

*Wright v. General Mills*, No. 08cv1532, 2009 U.S. Dist. LEXIS 90576 (S.D. Cal. Sept. 30, 2009) ...................................................................................................................... 13, 15

*Wyeth v. Levine*, 129 S. Ct. 1187 (2009) ..................................................... 3, 4, 5, 6

*Yeksigian v. Nappi*, 900 F.2d 101 (7th Cir. 1990) .......................................................... 2

*Yumul v. Smart Balance, Inc.*, No. CV 10-00927, slip op. (C.D. Cal., May 24, 2010) ......... 21, 22

## **Statutes**

15 U.S.C. § 1116 ............................................................................................................. 25

15 U.S.C. § 1334(b) ......................................................................................................... 5

21 U.S.C. § 343(r)(2)(A)(vi) ............................................................................................ 10

21 U.S.C. § 343-1 ........................................................................................................... 17

21 U.S.C. § 343-1(a) ...................................................................................................... 5

7 U.S.C. § 136(q)(1)(a) .................................................................................................. 7

7 U.S.C. § 136v(b) ......................................................................................................... 7

Pub. L. No. 101-535, § 6(c)(1)............................................................................... 3, 4, 17

Pub. L. No. 101-535, § 6(c)(2)......................................................................................... 4

Pub. L. No. 111-148, § 4205 ........................................................................................... 4

### Other Authorities

136 Cong. Rec. H5836 .................................................................................................... 4

51 F.R. 25,012 (July 9, 1986) ......................................................................................... 4

60 F.R. 57076-01 (Nov. 13, 1995) ............................................................................ 4, 10

68 F.R. 41433 (July 11, 2003) ................................................................................... 8, 11

Connecticut Attorney General's Office Press Release, dated October 20, 2009 .......................... 23

Food and Drug Administration, "*Trans* Fat Now Listed with Saturated Fat and Cholesterol on the Nutrition Facts Label" (Jan. 1, 2006) ...................................................... 11

Food and nutrition board, institute of medicine of the national academies, *Dietary Reference Intakes for Energy, Carbohydrate, Fiber, Fat, Fatty Acids, Cholesterol, and Amino Acids (Macronutrients)*, 504 (National Academies Press) (2005) ...................................... 1

William Neuman, *For Your Health, Froot Loops*, N.Y. Times, September 4, 2009 .................. 23

### Rules

Fed. R. Civ. P. 8 ............................................................................................................. 2

Fed. R. Civ. P. 9 ........................................................................................................... 20

### Regulations

21 C.F.R. § 100.1 ........................................................................................................... 5

21 C.F.R. § 101.13(b) .................................................................................................... 6

21 C.F.R. § 101.13(c) ................................................................................................. 8, 9

21 C.F.R. § 101.13(i)(3) .......................................................................................... passim

21 C.F.R. § 101.62(b)(2) ................................................................................................. 8

21 C.F.R. § 101.62(d) .................................................................................................... 10

21 C.F.R. § 101.62(d)(1)(i)(C) ...................................................................................... 10

21 C.F.R. § 101.9(c)(2)(ii) ....................................................................................... 6, 7, 9

21 C.F.R. § 101.9(f)(1) .................................................................................................... 7

40 C.F.R. § 156.10(a)(5)(ii) ............................................................................................ 7

*Chacanaca et al. v. The Quaker Oats Company,* Case No. 5:10-cv-00502 RS
PLAINTIFFS' OPPOSITION TO QUAKER'S MOTION FOR JUDGMENT ON THE PLEADINGS

## I.       INTRODUCTION

The *eighteen* occurrences in Quaker's Memorandum of the incorrect phrase "trace amounts" notwithstanding[1]—and contrary to Quaker's contention that its products contain an "insignificant amount" of trans fat—scientific evidence overwhelmingly shows *there is no safe level of trans fat intake*.

Trans fats are dangerous even in miniscule quantities. Humans do not digest these man-made acids, which are stiff and build up in the body, unlike natural fats, which are supple and pliable. Trans fats irritate and clog the linings of blood vessels and surfaces in the brain. The intake of trans fats—even in small quantities—causes coronary heart disease, diabetes, cancer, obesity, high cholesterol, liver dysfunction, Alzheimer's Disease, and female infertility. Artificial trans fat both *raises* LDL levels and *lowers* protective "good" HDL cholesterol concentrations.[2] Scientists at the Harvard School of Public Health estimate that up to 100,000 Americans each year die from diseases contracted through the intake of trans fat. Several countries and U.S. jurisdictions already ban or severely limit use of the toxin.

Because of these risks, nutritionists advise *completely avoiding* the intake of trans fats. The National Academy of Science, which advises the U.S. government on nutritional science for use in public policy and product labeling, has concluded that there is no safe level of trans fat consumption, and has refused to recommend a daily amount or tolerable upper limit for trans fats.  That Quaker's products contain trans fats is itself disturbing, particularly because there are several safe alternatives. But Quaker compounds the problem—and violates California's Unfair Competition Law, False Advertising Law, Consumer Legal Remedies Act, and the Lanham Act—when it tells consumers those products are healthy.

---

[1] Scientifically, a "trace amount" is detectable but too small to even accurately measure, i.e., approaching the limit of detection.

[2] Food and nutrition board, institute of medicine of the national academies, *Dietary Reference Intakes for Energy, Carbohydrate, Fiber, Fat, Fatty Acids, Cholesterol, and Amino Acids (Macronutrients)*, 504 (National Academies Press) (2005) ("the net result is a higher total cholesterol or LDL cholesterol: HDL cholesterol ratio" (citations omitted)).

1

## II.     ARGUMENT

### A.     Rule 12 Dismissal Is Reserved For "Extraordinary Cases"

Judgment on the pleadings is proper only where "the moving party clearly establishes on the face of the pleadings that no material issue of fact remains to be resolved and that it is entitled to judgment as a matter of law." *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1550 (9th Cir. 1990). On a Rule 12(c) motion, the allegations of the non-moving party must be accepted as true. *Id.* Such motions are "functionally identical" to Rule 12(b)(6) motions to dismiss. *Dworkin v. Hustler Magazine Inc.*, 867 F.2d 1188, 1192 (9th Cir. 1989).

The Ninth Circuit is "particularly hostile" to such motions. *DeVivo v. Indymac Bank*, No. CV 09-2555, 2009 U.S. Dist. LEXIS 51477, at *6 (C.D. Cal. June 10, 2009). Dismissal is proper under Rule 12 only in "extraordinary" cases. *United States v. Redwood City*, 640 F.2d 963, 966 (9th Cir. 1981). Federal pleading requirements are "extremely liberal," requiring only "a short and plain statement of the claim," so as to "minimize disputes over pleading technicalities." *Doyle v. Ill. Cent. R.R. Co.*, No. CV F 08-0971, 2009 U.S. Dist. LEXIS 8852, at *9-10 (E.D. Cal. Jan. 29, 2009) (citing Fed. R. Civ. P. 8). In addition, "[p]leadings must be construed so as to do justice." Fed. R. Civ. P. 8(e). "The Rule 8 standard contains a powerful presumption against rejecting pleadings for failure to state a claim." *Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 248-49 (9th Cir. 1997) (internal quotation omitted).

"[D]efendants have the burden on a motion to dismiss to establish the legal insufficiency of the complaint." *Yeksigian v. Nappi*, 900 F.2d 101, 104 (7th Cir. 1990). A plaintiff's claim should not be dismissed where "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009). Moreover, "[w]hen there are well-pleaded allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Iqbal*, 129 S.Ct. at 1950.

### B.     Plaintiffs' Claims Are Not Preempted

There are two "cornerstones" of pre-emption jurisprudence:

First, the purpose of Congress is the ultimate touchstone in every pre-emption

*Chacanaca et al. v. The Quaker Oats Company,* Case No. 5:10-cv-00502 RS
PLAINTIFFS' OPPOSITION TO QUAKER'S MOTION FOR JUDGMENT ON THE PLEADINGS

case. . . . Second, in all pre-emption cases, and particularly in those in which Congress has legislated in a field which the States have traditionally occupied, we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.

*Wyeth v. Levine*, 129 S. Ct. 1187, 1194-95 (2009) (citations omitted). The assumption against preemption exists because "respect for the States as 'independent sovereigns in our federal system'" leads to the assumption that "Congress does not cavalierly pre-empt state-law causes of action." *Id.* at 1195 n.3 (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)). The assumption "applies with particular force when Congress has legislated in a field traditionally occupied by the States." *Altria Group Inc. v. Good*, 129 S. Ct. 538, 543 (2008). "[T]he mere existence of a federal regulatory or enforcement scheme, even [a detailed one], does not by itself imply pre-emption of state remedies." *English v. Gen. Elec. Co.*, 496 U.S. 72, 87 (1990).

"[C]onsumer protection laws such as the UCL, false advertising law, and CLRA, are within the states' historic police powers and are therefore subject to the presumption against preemption." *Farm Raised Salmon Cases*, 42 Cal. 4th 1077, 1087-88 (2008) (interpretation of the Federal Food, Drug, and Cosmetic Act is "informed by a strong presumption against preemption"). Laws concerning "the proper marketing of food, including the prevention of deceptive sales practices, are likewise within states' historic police powers." *Id.*

> 1.    There Is No "Clear And Manifest Purpose Of Congress" To Preempt

As the proponent of preemption, Quaker has the burden of demonstrating a "clear and manifest purpose of Congress" to preempt Plaintiffs' state law claims under the Nutrition Labeling and Education Act, but has failed to do so. On the contrary, the legislative history shows Congress intended to preserve state authority in the food and beverage labeling field.

The NLEA categorically excludes implied preemption, Pub. L. No. 101-535, § 6(c)(1), and prior to its passage, there was no express preemption provision in the Federal Food, Drug and Cosmetics Act. *See Wyeth*, 129 S. Ct. at 1200. This alone demonstrates "we are lacking a 'clear and manifest' expression of Congressional intent to occupy" the food and beverage field. *Holk v. Snapple Bev. Corp.*, 575 F.3d 329, 338 (3d Cir. 2009) (no preemption over state law claims concerning the "all natural" statement on beverage label).

3

*Chacanaca et al. v. The Quaker Oats Company,* Case No. 5:10-cv-00502 RS
PLAINTIFFS' OPPOSITION TO QUAKER'S MOTION FOR JUDGMENT ON THE PLEADINGS

1    And the NLEA's express preemption provision itself demonstrates Congress' intent to

2    keep intact the states' police powers over food labeling. Pub. L. No. 101-535, § 6(c)(1) (the Act

3    "*shall not be construed to preempt any provision of State law*, unless such provision is expressly

4    preempted . . . ." (emphasis added)). The NLEA also preserves state warning laws, Pub. L. No.

5    101-535, § 6(c)(2). "These provisions demonstrate that Congress was cognizant of the operation

6    of state law and state regulation in the food and beverage field, and it therefore enacted limited

7    exceptions in the NLEA." *Holk*, 575 F.3d at 338. "The case for federal pre-emption is

8    particularly weak where Congress has indicated its awareness of the operation of state law in a

9    field of federal interest, and has nonetheless decided to stand by both concepts and to tolerate

10    whatever tension there is between them." *Wyeth*, 129 S. Ct. at 1200 (quoting *Bonito Boats, Inc.*

11    *v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 166-67 (1989)).

12    The Congressional Record confirms Congress' intent to preserve state authority over

13    food labeling. *See* 136 Cong. Rec. H5836 (the NLEA "recognize[s] the important contribution

14    that [states] can make in regulation, and it must leave a role for the state.") Congress' recently-

15    passed health care reform bill, which amended the FDCA to strengthen nutrition disclosures by

16    chain restaurants, *see* Pub. L. No. 111-148, § 4205, reiterated this intent:

17    > Nothing in the amendments made by this section shall be construed to preempt
> any provision of State or local law, unless such provision establishes or continues
18    > into effect nutrient content disclosures of the type required under section
> 403(q)(5)(H) of the [FDCA] (as added by subsection (b)) and is expressly
19    > preempted under subsection (a)(4) of such section . . . .

20    *Id.* at § 4205(d)(1).

21    The FDA has also expressed a policy favoring state law: "The agency does not use its

22    authority to preempt State requirements unless there is a genuine need to stop the proliferation of

23    inconsistent requirements between the FDA and the States." 51 F.R. 25,012, at 25,016 (July 9,

24    1986). Moreover, the FDA has stated in response to requests for clarification as to the scope of

25    preemption under § 343-1, "[t]he only State requirements that are subject to preemption are those

26    that are *affirmatively different* from the Federal requirements." 60 F.R. 57076-01, 57120 (Nov.

27    13, 1995) (emphasis added).

28

4

1    Quaker's reliance on 21 C.F.R. § 100.1 (Mot. at 7) to suggest an expansive scope of

2    preemption is wrong for two reasons. First, the section is expressly limited to "the submission

3    and consideration of petitions . . . *by a State or political subdivision of a State*, requesting

4    exemption of a State requirement from preemption under section 403A(a)" of the FDCA. *Id.* §

5    100.1(a)(1) ("Scope and purpose"). Section 100.1 has nothing at all to do with state fraud and

6    unfair competition claims brought by private consumers. Second, even if the section applied to

7    this suit (which it does not), the FDA's interpretation of 403A(a) "does not merit deference," *see*

8    *Wyeth*, 129 S. Ct. at 1203, because "agencies have no special authority to pronounce on pre-

9    emption absent delegation by Congress . . . ." *Id.* at 1201.

10              2.    <u>Preemption Applies To Labeling "Requirements," Not State Law Claims</u>

11    Plaintiffs' state law claims fall outside the NLEA's preemption clause because it applies

12    only to "any *requirement* for nutrition labeling of food . . . ." 21 U.S.C. § 343-1(a) (emphasis

13    added). California's consumer fraud laws cannot be preempted because they impose no

14    "requirement" for nutrition labeling; instead, food product manufacturers are subject to the same

15    standard as all companies that sell products to the public—they may not deceive or defraud.

16    It was for this exact reason that the Supreme Court upheld claims under Maine's Unfair

17    Trade Practices Act for a cigarette manufacturer's use of the term "light." *See Altria*, 129 S. Ct.

18    538. At issue in *Altria* was a preemption provision under the Federal Cigarette Labeling and

19    Advertising Act, which stated "[n]o *requirement* or prohibition based on smoking and health

20    shall be imposed under State law with respect to the advertising or promotion of any cigarettes

21    the packages of which are labeled in conformity with the provisions of this Act." *Id.* at 544

22    (emphasis added) (quoting 15 U.S.C. § 1334(b)). "Although both the Act's purposes are

23    furthered by prohibiting States from supplementing the federally prescribed warning," the Court

24    held, "neither would be served by limiting the States' authority to prohibit deceptive statements

25    in cigarette advertising." *Id.* at 544. Moreover, state fraud rules do not defeat the Act's purpose

26    of preventing nonuniform state warning requirements because "fraud claims rely only on a

27    single, uniform standard: falsity." *Id.* at 545 (quoting *Cipollone v. Liggett Group, Inc.*, 505 U.S.

28    504, 529 (1992)). *See also Medtronic*, 518 U.S. 470 (no preemption over claims that pacemaker

5

regulated under FDCA violated Florida state common law duties); *Reyes v. McDonald's*, No. 06 C 1604, 2006 U.S. Dist. LEXIS 81684 (N.D. Ill. Nov. 8, 2006) (no preemption of claim under Illinois Consumer Fraud and Deceptive Practices Act concerning misrepresentation of trans fat, fat and calorie content of french fries); *c.f. N.Y. State Restaurant Ass'n v. N.Y. City Board Of Health*, 509 F. Supp. 2d 351 (S.D.N.Y. 2007) (city regulation requiring specific calorie content disclosures on restaurant menus preempted under NLEA § 343(r)).

The Supreme Court similarly ruled that the FDA's approval of a drug label does not preempt a state tort claim based on the label's failure to disclose all risks of its use. Although there was no applicable preemption clause in the FDCA concerning prescription drugs, *Wyeth*, 129 S. Ct. at 1200, the question the Court faced was nevertheless one of preemption: whether the FDA's labeling judgments "preempt state law product liability claims premised on the theory that different labeling judgments were necessary to make drugs reasonably safe for use." *Id.* at 1193. Concurring that the FDA's approval of the label did not provide Wyeth with a complete defense to Levine's tort claims, Justice Thomas explained that FDA approval does not "give[] Wyeth the unfettered right, for all time, to market its drug with the specific label that was federally approved. . . . It does not represent a finding that the drug, as labeled, can never be deemed unsafe by . . . application of state law." *Id.* at 1210.

Here, FDA regulations similarly "approve" the use of the term "0g" to indicate trans fat levels below a half-gram in the Nutrient Facts box (though not on the front-side label, as discussed in Section B(4) below), 21 C.F.R. § 101.9(c)(2)(ii), and approve nutrient characterizations under certain circumstances, *see* § 101.13(i)(3). But that approval does not license Quaker to deceive consumers in violation of California state law.

> 3.   Plaintiffs' Claims Are Permitted Because Express Nutrient Content Claims May Not Be "False or Misleading In Any Respect"

"0g trans fat" is an express nutrient content claim, *see* 21 C.F.R. § 101.13(b). Such claims may not be "false or misleading in any respect . . . ." 21 C.F.R. § 101.13(i)(3). Plaintiffs allege that Quaker's "0g trans fat" statements are literally false *and* misleading because they falsely claim or suggest that the Quaker products do not contain trans fat and are healthy. Thus,

6

1 Plaintiffs' claims are not preempted, but expressly allowed, as the Supreme Court held in *Bates*

2 *v. Dow Agrosciences LLC*, 544 U.S. 431 (2005).

3      *Bates* involved claims brought by Texas peanut farmers that the label on the pesticide

4 Strongarm, which stated "use of Strongarm is recommended in all areas where peanuts are

5 grown," *id.* at 435, were misleading because the pesticide actually stunted the growth of peanuts

6 in soils with a pH above 7.0. Defendant Dow argued that plaintiffs' claims were preempted

7 under the Federal Insecticide, Fungicide, and Rodenticide Act, which contains a clause exactly

8 like 21 C.F.R. § 101.13(i)(3): under FIFRA, a pesticide is misbranded if "its labeling bears any

9 statement . . . which is *false or misleading in any particular*." 7 U.S.C. § 136(q)(1)(a); 40 C.F.R.

10 § 156.10(a)(5)(ii) (emphasis added); *see Bates*, 544 U.S. at 438. FIFRA also contains a

11 preemption clause just like the NLEA's—it prohibits state-law labeling and packaging

12 requirements that are "in addition to or different from" the requirements under FIFRA. 7 U.S.C.

13 § 136v(b). "Petitioners argue that their claims based on fraud and failure to warn are not pre-

14 empted because these common-law duties are equivalent to FIFRA's requirements that a

15 pesticide not contain 'false or misleading' statements, or inadequate instructions or warnings. We

16 agree . . . [and] hold that state law need not explicitly incorporate FIFRA's standards as an

17 element of a cause of action in order to survive pre-emption." *Bates*, 544 U.S. at 447.[3]

18      4.      Plaintiffs' Claims Concerning Quaker's *Front Label* "0g trans fat"
              Statements Are Not Preempted By FDA Regulations Concerning The

19           Nutrition Facts Box

20      Section 101.9(c)(2)(ii) concerns *only* a product's "Nutrition Facts" box content—not the

21 other portions of the label—and thus cannot preempt Plaintiffs' claims.[4] *See Lockwood v.*

22

23      [3] *See also Medtronic,* 518 U.S. at 513 (O'Connor, J., concurring in part and dissenting in

24 part) (claims not preempted because, "[w]here a state cause of action seeks to enforce an FDCA
requirement, that claim does not impose a requirement that is 'different from, or in addition to,'

25 requirements under federal law").

26      [4] Quaker's claim that § 101.9(f)(1) reflects an FDA *finding* "that the under 0.5 gram
definition of 'zero' is appropriate *because levels of* trans *fat below that level are insignificant*"

27 (Mot. at 7, emphasis added), is wrong. Section 101.9(f) concerns the circumstances under which
nutrition information may be presented in a simplified form, for example, when the regulations

28 allow several nutrient categories to be marked "0." For convenience, the section defines the
allowance of a declaration of a nutrient as "0" as "insignificant amount," but that is *not* logically

7

*Chacanaca et al. v. The Quaker Oats Company,* Case No. 5:10-cv-00502 RS
PLAINTIFFS' OPPOSITION TO QUAKER'S MOTION FOR JUDGMENT ON THE PLEADINGS

1   *Conagra Foods, Inc.*, 597 F. Supp. 2d 1028, 1031 (N.D. Cal. 2009) (claim that a product's "all

2   natural" label was deceptive because it contained high fructose corn syrup not preempted

3   because it did not implicate FDA regulations concerning labeling of artificial flavors, colors or

4   preservatives). Quaker misreads § 101.13(i)(3) as "expressly permit[ting] representations that are

5   made within the Nutrition Facts box . . . to appear elsewhere on the label . . . ." (Mot. 8; *see id.* at

6   1, 10). Section 101.13 actually provides:

7           Information that is required or permitted . . . to be declared in nutrition labeling,
            and that appears as part of the nutrition label [i.e., the Nutrition Facts box], is not
8           a nutrient content claim and is not subject to the requirements of this section. *If
            such information is declared elsewhere on the label or in labeling, it is a nutrient
9           content claim and is subject to the requirements for nutrient content claims.*

10  21 C.F.R. § 101.13(c) (emphasis added). The import of the regulation is not to rubberstamp label

11  representations that are consistent with the statements in the Nutrition Facts box, as Quaker

12  suggests (Mot. at 1-2, 8),[5] but to subject any representation on the label outside of the "Nutrition

13  Facts" box to regulations concerning nutrient content claims—including the regulation that such

14  claims not be "false or misleading in any respect," § 101.13(i)(3)—and there is a sharp

15  distinction between the two categories of representations.[6]

16  _____

17  or factually equivalent to an independent finding that trans fat amounts below half-a-gram per
    serving are "insignificant" in terms of human health or nutritional science. To the contrary, the
18  FDA has found—just like nearly every scientist or organization that has researched this issue—
    that "trans fat consumption [should] be as low as possible," 68 F.R. 41433, at 41436 (July 11,
19  2003).

20          [5] Quaker's reliance on the November 6, 2007 FDA letter (Mot. at 9) is misplaced. That
    letter was the result of an FDA investigation that found the product at issue contained over 5
21  grams of fat, although its Nutrition Facts box claimed only 2 grams of fat. The front-side label
    stated the product was "low fat," but that statement is permitted only where a product contains
22  below 3 grams of fat. Thus the FDA found the product was misbranded because the fat content
    described in the Nutrition Facts box was *false*. The letter has nothing at all to do with
23  inconsistencies between the Nutrition Facts box and the front-side labeling except insofar as the
    fat levels were false. Moreover, unlike that situation, here there are *no* FDA regulations
24  concerning front-side label statements that a product contains "no trans fat," "0g trans fat," "low
    trans fat" or anything similar to the "low fat" regulation, 21 C.F.R. § 101.62(b)(2).
25

26          [6] *See N.Y. State Restaurant Ass'n*, 556 F.3d 114, 126 (2d Cir. 2009) (21 C.F.R. 101.13(c)
    "reflects the FDA's view that a quantitative statement as to a nutrient amount, 100 calories, for
27  example, is not a [nutrient content] claim when such a statement appears in the nutrient panel . . .
    , *but* is one when it does not." (emphasis in original)); *N.Y. State Restaurant Ass'n*, 509 F. Supp.
28  2d at 361 ("it is clear that under the federal statutory scheme, the mandatory statement of nutrient

                                                        8

There are, however, *no* regulations concerning the nutrient content claim, "0g trans fat,"[7] aside from the general prohibition against false and misleading statements, § 101.13(i)(3), and thus there can be no preemption. *See Hitt v. Arizona Beverage Co.*, No. 08-cv-809, 2009 WL 449190, at *12 (S.D. Cal. Feb. 4, 2009) (no preemption over statements "100% Natural," "All Natural," and "Natural" where defendant failed to "reference any express preemption provision [in the NLEA] that applies to Plaintiff's claims"). Because Plaintiffs contend that the false front-label *statement* that a product has no trans fat is literally *false*—and misleading—Plaintiffs' claims are consistent with FDA regulations, and therefore expressly permitted.

Quaker's argument may be conceived in another way that equally demonstrates no preemption under controlling Ninth Circuit authority. According to Quaker, the FDA's requiring trans fat levels below half-a-gram to be expressed as "0g" in the Nutrition Facts box, § 101.9(c)(2)(ii), cures the false front-label statement that a product made with partially hydrogenated oil contains no (or "0g") trans fat. But the Ninth Circuit held in *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 939 (9th Cir. 2008), that while the Nutrition Facts box "serves some purpose," it does not provide a "shield for liability for [] deception" on a product's front-side label. Nor should "reasonable consumers [] be expected to look beyond misleading representations on the front of the box to discover the truth from the ingredient list in small print on the side of the box." *Id.* This applies with particular force where reasonable consumers may not know, after scouring an ingredient list in miniscule font, that the presence of partially hydrogenated oil necessarily means the product contains trans fat. Even the FDA recognizes that the specialized rules for expressing certain information in the Nutrition Facts box are inapplicable and inappropriate for determining the propriety of front-label representations. § 101.13(c). In sum, setting forth information in small print in the Nutrition Facts box does not cure false and misleading labeling or advertising, either practically or as a matter of law.

---

amount in the familiar Nutrition Facts panel is not a 'claim,' while an identical statement voluntarily made elsewhere on a food product label is a 'claim' subject to § 343(r), the attendant FDA regulations . . . .").

[7] The *sole* FDA regulation concerning trans fat labeling is 21 C.F.R. § 101.9(c)(2)(ii) and deals only with the mandatory disclosure in the Nutrition Facts box.

9

5.     There Is No Preemption Where The FDA Does Not Regulate
Disqualifying Trans Fat Criteria

In addition to the requirement that nutrient content claims not be false or misleading under § 101.13(i)(3), some nutrient content claims are subject to disqualifying criteria. For example, "no cholesterol" claims are subject to disqualifying criteria for cholesterol, saturated fat and total fat. That is, manufacturers are prohibited from making "no cholesterol" claims, even if true, where a product's cholesterol, saturated fat or total fat exceeds a prescribed level. *See* 21 C.F.R. § 101.62(d) . Implicit in these regulations is the notion that a true statement might nevertheless mislead consumers by drawing attention away from harmful aspects of a product.[8] Thus, for example, a product that contains no cholesterol may not be labeled "no cholesterol" if it contains more than 2 grams of saturated fat. 21 C.F.R. § 101.62(d)(1)(i)(C).

But because the FDA has *not* established disqualifying trans fat criteria for the challenged statements ("wholesome," "good source of calcium and fiber," "made with whole grain oats," "no high fructose corn syrup," and "smart choices made easy," as well as images of oats, nuts and children in soccer uniforms), claims that such statements are misleading on products containing trans fat are not subject to NLEA preemption. *See* 60 F.R. 57076-01, 57120 (Nov. 13, 1995) (FDA clarified that where no federal requirement exists, preemption does not occur).

In *Freightliner Corp. v. Myrick*, 514 U.S. 280 (1995), the Supreme Court held that the absence of a federal standard is not itself a standard that extinguishes state law under a preemption scheme. *Myrick* involved automobile accidents caused when two trucks, which were not equipped with anti-lock brakes, jackknifed into oncoming traffic. Defendants argued Plaintiffs' tort claims were preempted by the National Traffic and Motor Vehicle Safety Act (which includes an express preemption clause like the NLEA), under which the National Highway Traffic Safety Administration had issued a regulation that would necessitate anti-lock brakes on trucks. But that regulation became suspended upon a Ninth Circuit finding that the agency had not compiled sufficient justifying evidence. *See id.* at 283-86. The Supreme Court

---

[8] *See, e.g.*, 21 U.S.C. § 343(r)(2)(A)(vi) (a nutrient content claim may not be made if "the claim is misleading in light of the level of another nutrient in the food.")

10

1   rejected the petitioners' argument that "the absence of regulation itself constitutes regulation"

2   such that the respondent's claims were preempted. *Id.* at 286.

3          Like in *Myrick*, the FDA's failure to establish disqualifying trans fat criteria for health

4   claims is not an affirmative decision that the minimum, objective standard should be "the

5   absence of all standards," *id.* at 287, but rather stems from the lack of sufficient evidence to

6   establish a Daily Reference Value, a prerequisite to regulating health claims for a substance.[9]

7   And where there is no regulation, there can be no preemption. This case is thus like *Vermont*

8   *Pure Holdings, Ltd. v. Nestle Waters N. Am.*, No. 03-11456, 2006 U.S. Dist. LEXIS 13683 (D.

9   Mass. Mar. 28, 2006)  (no preemption of claim for misleading "pure" statement where no FDA

10  standards for purity existed) and *N.Y. State Rest. Ass'n*, 556 F.3d 114 (no preemption in the

11  absence of a regulation under the FDCA for the disclosure of calorie information by chain

12  restaurants).

13  **C.**       **The Court Should Not Refer This Action To The FDA**

14         The Court should not refer this matter to the FDA under the primary jurisdiction doctrine

15  because (1) Quaker fails to raise a threshold issue requiring agency resolution, (2) the FDA has

16  intentionally refrained from regulating health claims in relation to trans fat, (3) Quaker has not

17  demonstrated that FDA scientific or technical expertise is needed, and (4) the FDA cannot

18  provide the remedies Plaintiffs seek. The doctrine of primary jurisdiction provides that, "[w]hen

19  there is a basis for judicial action, independent of agency proceedings, courts may route the

20

21         [9] By policy, the FDA limits the regulation of health claims to substances for which the
   agency has established a Daily Reference Value. 68 F.R. 41433, at 41464-65 (July 11, 2003).
22  After soliciting comment through an Advanced Notice of Proposed Rulemaking in 2003, 68 F.R.
   41507 (July 11, 2003), the FDA elected to require the disclosure of trans fat in the Nutrition
23  Facts box, but declined to regulate health claims concerning products containing trans fats
   because "[w]hile scientific reports have confirmed the relationship between trans fat and an
24  increased risk of [Coronary Heart Disease], none has provided a reference value for trans fat or
   any other information that FDA believes is sufficient to establish a Daily Reference Value or a
25  %DV." Food and Drug Administration, "*Trans* Fat Now Listed with Saturated Fat and
   Cholesterol on the Nutrition Facts Label" (Jan. 1, 2006), *available at*
26  http://www.fda.gov/Food/LabelingNutrition/ConsumerInformation/ucm109832.htm#choice2.
27  The failure to establish a suitable DRV is because, while "trans fat consumption [should] be as
   low as possible," "trans fats are unavoidable in ordinary diets . . . ." 68 F.R. 41433, at 41436
28  (citation omitted).

11

1    threshold decision as to certain issues to the agency charged with primary responsibility for

2    governmental supervision or control of the particular industry or activity involved." *United*

3    *States v. General Dynamics Corp.*, 828 F.2d 1356, 1362 (9th Cir. 1987) (quoting *Port of Boston*

4    *Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 68 (1970)). Primary

5    jurisdiction "applies in a limited set of circumstances," *Clark v. Time Warner Cable,* 523 F.3d

6    1110, 1114 (9th Cir. 2008), and "is to be invoked sparingly, as it often results in added expense

7    and delay." *Alpharma, Inc. v. Pennfield Oil Co.*, 411 F.3d 934, 938 (8th Cir. 2005) (citation

8    omitted). Courts prudentially apply the doctrine of primary jurisdiction *only* where there is (1) a

9    need to resolve an issue that (2) has been placed by Congress within the jurisdiction of an

10    administrative body having regulatory authority (3) pursuant to a statute that subjects an industry

11    or activity to a comprehensive regulatory authority that (4) requires expertise or uniformity in

12    administration. *General Dynamics*, 828 F.2d at 1362.

13       At the motion to dismiss stage, when deciding whether to defer jurisdiction, the courts

14    must "apply a standard derived from Rule 12(b)(6) jurisprudence: whether the complaint

15    plausibly asserts a claim that would *not* implicate the doctrine." *County of Santa Clara v. Astra*

16    *United States*, 588 F.3d 1237, 1251-52 (9th Cir. 2009) (declining to invoke primary jurisdiction

17    where action could "plausibly be adjudicated" without agency's expertise) (citations omitted).

18    Where "the allegations of the complaint do not necessarily require the doctrine's applicability,

19    then the primary jurisdiction doctrine may not be applied on a motion to dismiss . . . ." *Davel*

20    *Communs., Inc. v. Qwest Corp.*, 460 F.3d 1075, 1088 (9th Cir. 2006).

21       The primary jurisdiction doctrine "is not designed to secure expert advice from agencies

22    every time a court is presented with an issue conceivably within the agency's ambit" but instead

23    "is to be used only if a claim requires resolution of an issue of first impression, or of a

24    particularly complicated issue that Congress has committed to a regulatory agency." *Clark*, 523

25    F.3d at 1114 (citations omitted); *see also Brown v. MCI Worldcom Network Servs., Inc.*, 277

26    F.3d 1166, 1172 (9th Cir. 2002) (same); *Davel*, 460 F.3d at 1086 (The doctrine "does not require

27    that all claims within an agency's purview be decided by the agency" (citation omitted));

28    *General Dynamics*, 828 F.2d at 1363 ("While it is certainly true that the competence of an

12

*Chacanaca et al. v. The Quaker Oats Company,* Case No. 5:10-cv-00502 RS
PLAINTIFFS' OPPOSITION TO QUAKER'S MOTION FOR JUDGMENT ON THE PLEADINGS

1  agency to pass on an issue is a necessary condition to the application of the doctrine, competence

2  alone is not sufficient."). The Court should not invoke the FDA's primary jurisdiction here.

3      *First*, Quaker does not identify any issue that needs resolving, instead merely noting that

4  the FDA has regulatory authority over general subject matter of the Complaint. (Mot. at 12.) But

5  this does not identify or even suggest the presence of a threshold issue needing agency resolution

6  before the court may hear plaintiffs' claims. Quaker begs the question rather than identifying an

7  issue requiring the FDA's scientific expertise. Moreover, the FDA's jurisdiction over the subject

8  matter of the Complaint does not rob this Court of jurisdiction—because primary jurisdiction is

9  applicable to claims properly cognizable in court, it "is not a doctrine that implicates the subject

10 matter jurisdiction of the federal courts. . . . Consequently, even where the doctrine requires an

11 issue to be referred to an administrative agency, it does not deprive the court or jurisdiction."

12 *Davel*, 460 F.3d at 1080 (citations and internal quotations omitted).

13     *Second*, the FDA has specifically declined to promulgate regulations concerning trans fat

14 disqualifying levels for the claims Plaintiffs challenge, as described *supra* in footnote 9. While

15 the FDA solicited comment on the possibility of establishing qualifying trans fat criteria for "no

16 cholesterol" claims, 68 F.R. 41507 (July 11, 2003), that was seven years ago; the Court may

17 properly take into account an agency's lack of diligence in resolving an issue in exercising its

18 discretion to retain jurisdiction. *See In re Bisphenol-A Polycarbonate (BPA) Plastic Prods. Liab.*

19 *Litig.*, MDL No. 1967, 2009 U.S. Dist. LEXIS 104451, at *31 (W.D. Mo. Nov. 9, 2009).

20 Because the FDA has not yet acted, the Court should not invoke the primary jurisdiction doctrine

21 to refer the matter to the FDA. Facing a similar situation, the court in *Wright v. General Mills*,

22 No. 08cv1532, 2009 U.S. Dist. LEXIS 90576, at *8-9 (S.D. Cal. Sept. 30, 2009), declined to

23 refer to the FDA plaintiff's claims under the UCL, FAL and CLRA concerning defendant's use

24 of the term "100% natural" in labeling and advertising its Nature Valley products. While the

25 FDA had "addressed the use of the term 'natural,'" its policy with respect to the use of the term

26 was "unrestrictive," and therefore, state law claims based upon the term were not an issue of first

27 impression, did not require technical expertise within the FDA's special competence, and did not

28 raise particularly complicated issues outside the ability of the Court to consider and decide. *Id.*

13

*Chacanaca et al. v. The Quaker Oats Company,* Case No. 5:10-cv-00502 RS
PLAINTIFFS' OPPOSITION TO QUAKER'S MOTION FOR JUDGMENT ON THE PLEADINGS

*Third*, the Court does not need the FDA's technical or scientific expertise to resolve Plaintiff's claims. Those claims do not depend upon the establishment of a trans fat DRV to determine whether trans fat is dangerous, and whether, in light of its danger, Quaker's health claims are misleading. *See Nader v. Allegheny Airlines*, 426 U.S. 290, 304 (1976) (fraudulent omission claim against airline carrier was not within primary jurisdiction of FAA because the standards to be applied in an action for fraudulent misrepresentation are within the conventional competence of the courts); *see also Mut. Pharm. Co. v. Watson Pharms., Inc.*, No. 09-5421, 2010 U.S. Dist. LEXIS 10542 at *16 (D.N.J. Feb. 8, 2010) ("the complaint alleges that defendants . . . made false and misleading representations on their product inserts and labels. Whether these statements are false and misleading to relevant consumers is not a matter reserved for the FDA, but a matter that falls within the jurisdiction of this Court."); *In re Epogen & Aranesp Off-Label Mktg. & Sales Practices Litig.*, 590 F. Supp. 2d 1282, 1292 (C.D. Cal. 2008) ("To hold contrary would mean that the FDA, not the courts, would be responsible for resolving all questions of whether a statement made in connection with prescription drug advertising was false, misleading, or omitted a material fact. This Court would not extend the FDA's primary jurisdiction so far."). While the FDA is the correct body to establish a trans fat DRV, that is not a prerequisite to adjudicating Plaintiffs' claims. It is within the Court's competence to review the scientific literature and expert testimony offered to determine how dangerous trans fat is and, based on that determination, to decide whether Quaker's advertising practices are unlawful. *See, e.g.*, *Healthpoint, Ltd. v. Allen Pharm., LLC*, No. SA-07-CA-0526, 2008 U.S. Dist. LEXIS 20971 at *32-33 (W.D. Tx. Mar. 18, 2008) (even where FDA has not required a defendant to demonstrate a quality of its product, the defendant is "not free to make false or misleading statements about its product").

*Fourth*, because the FDA cannot provide the monetary relief Plaintiffs seek, the Court should decline to invoke primary jurisdiction. *See Ryan v. Chemlawn Corp.*, 935 F.2d 129, 131 (7th Cir. 1991) ("[A]s both parties agree that the EPA cannot provide the plaintiff with any form of compensatory or punitive damages, we fail to understand what role the EPA can play in this suit . . . ."); *In re BPA*, 2009 U.S. Dist. LEXIS 104451 at * 31-32 ("With respect to the type of

14

1 relief requested, Plaintiffs seek only monetary remedies, which the FDA cannot provide. This

2 factor further supports denial of Defendants' claim that the FDA has primary jurisdiction over

3 Plaintiffs' claims.").

4     That primary jurisdiction referral is inappropriate here is reflected in the case law. In

5 *Lockwood*, 597 F. Supp. 2d 1028, a plaintiff consumer alleged the defendant deceptively labeled

6 its pasta sauce "all natural" even though it contained high fructose corn syrup. In denying the

7 defendant's motion to dismiss, the court found "application of the [primary jurisdiction] doctrine

8 is not appropriate" because the question of deceptive food labeling "is not a technical area in

9 which the FDA has greater technical expertise than the courts—every day the courts decide

10 whether conduct is misleading." *Id.* at 1035. Judge Breyer also noted that "plaintiffs' claims are

11 based on state law and, as the Court's analysis of implied preemption suggests, even if the FDA

12 were to formally define 'natural,' federal law would not dispose of plaintiffs' state law claims."

13 *Id.* The court in *Pom Wonderful LLC v. Ocean Spray Cranberries, Inc.*, 642 F. Supp. 2d 1112

14 (C.D. Cal. 2009), followed the *Lockwood* court's reasoning. There, a plaintiff beverage producer

15 alleged the defendant competitor deceptively marketed beverage products as pomegranate and

16 cranberry juice even though the primary ingredients were apple and grape juice. In denying

17 defendant's motion to dismiss, Judge Pregerson found that even though "there [were] complex

18 labeling issues raised," the case did "not require expertise or implicate uniformity in

19 administration." *Id.* at 1123. The court further found "plaintiff's claims are not based on a

20 technical area over which the FDA has more expertise than the courts" and "are also based on

21 state law, which would not necessarily be resolved in the event of an FDA ruling." *Id.* (citation

22 omitted). Finally, in *Wright*, the court determined that, even where "the FDA has addressed the

23 use of [a] term" it does not apply the primary jurisdiction doctrine in deference to the FDA if the

24 question presented is "not an issue of first impression [requiring] technical expertise within the

25 special competence of the FDA." *Wright*, 2009 U.S. Dist. LEXIS 90576, at *8.

26     The cases Quaker relies on (Mot. at 12-13) are distinguishable—unlike *Lockheed*, *Pom*

27 *Wonderful*, and *Wright*, none of those cases involved food labeling issues. For example,

28 *Aaronson* involved challenges to the defendant's "design, testing, manufacture, assembly,

15

*Chacanaca et al. v. The Quaker Oats Company,* Case No. 5:10-cv-00502 RS
PLAINTIFFS' OPPOSITION TO QUAKER'S MOTION FOR JUDGMENT ON THE PLEADINGS

development, marketing, advertising and labeling" of a drink called Redline containing medically active ingredients including caffeine, yohimbine HCl, B-Phenylethylamine HCl, N-methyl Tyramine, 5-Hydroxy-L-Tryptophan, yerba mate, vinpocetine, and hypericin. *Aaronson v. Vital Pharms, Inc.*, No. 09-CV-1333, 2010 U.S. Dist. LEXIS 14160, at *2-4 (S.D. Cal. Feb. 17, 2010). Among plaintiff's claims was that the defendant failed to inform the public of the proper dosage of the Redline ingredients. *Id.* at *5. The defendant sought referral to the FDA specifically because "the safety of dietary supplements is not regulated until after they enter the market." *Id.* This differs from the instant case, which involves far simpler questions on issues already well-vetted.

       *Hain Celestial* is also inapposite, not even involving products regulated by the FDA. That was a *competitor* case brought by a *soap* maker whose product was certified by the *United States Department of Agriculture* as organic. *All One God Faith, Inc. v. Hain Celestial Group, Inc.*, No. C 09-03517, 2009 U.S. Dist. LEXIS 115928 (N.D. Cal. Dec. 14, 2009). The plaintiff was challenging the labeling of competitor products as "organic" under standards created by a private organization, which were far less stringent than the USDA's requirements. The Court referred the matter to the USDA under the primary jurisdiction doctrine, but noted that if the complaint had been limited to issues of consumer deception—as this case is—it would not have made such a referral, *see id.* at *24. Instead, the complaint went "much further," was "premised on the very regulatory framework . . . developed by the USDA," and "expressly asks this Court to enjoin Defendants from labeling its products as 'organic' unless and until they comply with agency standards. . . that the USDA itself has refused to impose upon Defendants." *Id.* at*24-25. Plaintiffs here make no similar claims or requests, instead limiting their claims to Quaker's deceptive labeling.

       Finally, the out-of-Circuit drug cases Quaker relies on involved complicated issues of whether a drug was a "new drug" under FDA guidelines and whether it fell under the Act's "grandfather clause," *Weinberger v. Bentex Pharms.*, 412 U.S. 645 (1973), and the issuance of prescription drug notices, *In re Human Tissues Prods. Liab. Litig.*, 488 F. Supp. 2d 430 (D.N.J. 2007); *Bernhardt v. Pfizer, Inc.*, No. 00 Civ. 4042, 2000 U.S. Dist. LEXIS 16963 (S.D.N.Y.

16

1  2000), a task relegated to the FDA, unlike the determination of whether a product label is

2  deceptive—that task is left to the courts.

3      **D.**    **There Is No Basis For "Abstention"**

4         Quaker's abstention argument is unclear and unavailing. To the extent the argument is

5  really one for implied preemption, it must fail because the NLEA is categorically limited to

6  express preemption. *See Lockwood*, 597 F. Supp. 2d at 1032 ("the preemption provisions added

7  to the FDCA by the NLEA include an express savings clause that disavows any implied

8  preemption" (citing Pub. L. No. 101-535, § 6(c)(1); 21 U.S.C. § 343-1 note)). Moreover, the

9  legislative history, case law, and statutory framework itself, explicitly authorize state regulation

10  of food labeling. Quaker's suggestion that the Court eviscerate the role of state law by requiring

11  judicial abstention from deciding state-law claims is improper.

12         To the extent the argument is really one for primary jurisdiction (*see, e.g.*, *Clark v.*

13  *Actavis Group hf*, 567 F. Supp. 2d 711, 715 (D.N.J. 2008) ("Primary jurisdiction applies when

14  decision-making is divided between the courts and administrative agencies. It calls for 'judicial

15  abstention in cases where protection of the integrity of a regulatory scheme dictates preliminary

16  resort to the agency . . . .'" (citation omitted)), it is already addressed. Moreover, Quaker's cases

17  involve abstention—not to the FDA—but *state* public authorities responsible for: operating

18  wind turbines (*Ctr. For Biological Diversity, Inc. v. FPL Group, Inc.*, 166 Cal. App. 4th 1349

19  (2008)[10]); overseeing capitation levels and distribution of risk in the healthcare finance industry

20  (*Desert Healthcare Dist. v. PacifiCare FHP, Inc.*, 94 Cal. App. 4th 781 (2001)); assessing

21  homeowner risk vis-à-vis earthquake insurance (*Wolfe v. State Farm Fire & Cas. Ins. Co.*, 46

22  Cal. App. 4th 554 (1996), a case that never even uses the term "abstention" or "abstain"); and

23  regulating the transfer of security deposits in residential leases (*Korens v. R.W. Zukin Corp.*, 212

24  Cal. App. 3d 1054 (1989), another case that never uses the term "abstention" or "abstain"). The

25  single exception is *Gatherer v. Purdue Pharma L.P.*, No. BC257852, 2002 WL 32144622 (Cal.

26

27      [10] Quaker's assertion that the court abstained (Mot. at 14) is wrong. Instead, it affirmed

28  dismissal of the case for failure to join the county as a necessary party to the action, *see id.* at 1372.

*Chacanaca et al. v. The Quaker Oats Company,* Case No. 5:10-cv-00502 RS
PLAINTIFFS' OPPOSITION TO QUAKER'S MOTION FOR JUDGMENT ON THE PLEADINGS

1   Super. Ct. Dec. 13, 2002). But that 2-page decision concerned the regulation of prescription

2   OxyContin, including the activities of pharmaceutical representatives in selling the drug to

3   doctors and conducting seminars. States have historically had *no* role in the regulation of

4   prescription drugs, whereas the States' role in the regulation of *food labels* is substantial, widely

5   recognized including in the federal statutes, and broad. Given that role, there is no basis for

6   abstaining in deference to the FDA here.

7        E.    *Cel-Tech's* **"Safe Harbor" Is Inapplicable**

8        The "Safe Harbor" holding of *Cel-Tech Communications, Inc. v. Los Angeles Cellular*

9   *Telephone Co.*, 20 Cal. 4th 163, 182 (1999) is limited to actions between competitors, and does

10  not apply to Plaintiffs' consumer claims. *Smith v. State Farm Mut. Auto. Ins. Co.*, 93 Cal. App.

11  4th 700, 720 & n.23 (2001) (Under *Cel-Tech*, when "specific legislation provides a 'safe harbor,'

12  plaintiffs may not use the general unfair competition law to assault that harbor. . . . [H]owever . .

13  .[,] as the [California Supreme Court] itself acknowledged, we are not to read *Cel-Tech* as

14  suggesting that such a restrictive definition of 'unfair' should be applied in the case of an alleged

15  *consumer* injury."). Moreover, no legislature or regulatory agency has ever expressly

16  mandated—or even permitted—the conduct forming the basis for Plaintiffs' claims against

17  Quaker, as discussed throughout this memorandum.[11] But even if *Cel-Tech's* "safe harbor"

18  applied to consumer claims, which it does not, it cannot bar *this* suit, where the FDA has not

19  regulated the use of "0g trans fat" outside the Nutrition Facts Box, *see supra* Section B(4), or

20  regulated disqualifying trans fat criteria for the other challenged claims, *see supra* Section B(5).

21  *See Von Koenig v. Snapple Beverage Corp.*, No. 09-cv-00606, --- F. Supp. 2d. ---, 2010 WL

22  1980208, at *4-7 (E.D. Cal., May 10, 2010) (*Cel-Tech* "safe harbor" did not bar action for UCL

23  claims concerning use of statement "all natural" on beverage label absent FDA regulation).

24

25

---

26  [11] *Cf., e.g.*, *Alvarez v. Chevron Corp.*, No. CV 09-3343, 2009 U.S. Dist. LEXIS 94377, at
    *18 (C.D. Cal. Sept. 30, 2009) ("[T]he governing regulatory scheme expressly requires single-

27  nozzle pumps, prohibits draining or diversion mechanisms, and forbids a change in unit price
    mid-delivery. Because Defendants have only acted as mandated by law, their conduct falls

28  clearly within a 'safe harbor' . . . .").

1    **F.**    <u>**Plaintiffs' Injuries Establish Standing**</u>

2    Plaintiffs purchased the Quaker products at issue for their own use, and would not have

3  done so but for Quaker's deceptive labeling practices. (FAC ¶¶ 15, 66.) California courts have

4  held that consumers' purchases of products as a result of deceptive advertising establishes

5  Article III standing for claims under the UCL, FAL and CLRA. *Laster v. T-Mobile United*

6  *States, Inc.*, 407 F. Supp. 2d 1181, 1194 (S.D. Cal. 2005); *see also Farokhzadeh v. Too Faced*

7  *Cosmetics*, No. B213306, 2010 Cal. App. Unpub. LEXIS 3004 (Apr. 26, 2010) (consumer

8  establishes injury in fact standing by buying a product that does not meet represented qualities).

9    *Birdsong* (Mot. at 17) *supports* Plaintiffs' standing. Unlike this *consumer fraud* case,

10  *Birdsong* involved alleged *defects* in the Apple iPod. "[T]o plead a UCL claim, the plaintiffs

11  must show, consistent with Article III, that they suffered a distinct and palpable injury as a result

12  of the alleged unlawful or unfair conduct." *Birdsong v. Apple, Inc.*, 590 F.3d 955, 960 (9th Cir.

13  2009) (citing *Buckland v. Threshold Enters., Ltd.*, 155 Cal. App. 4th 798, 814 (2007)). The court

14  found no standing because "at most plaintiffs plead a potential risk of hearing loss not to

15  themselves, but to other unidentified iPod users who might *choose* to use their iPods in an unsafe

16  manner. The risk of injury the plaintiffs allege is not concrete and particularized *as to them*." *Id.*

17  The court also found that the alleged injury—hearing loss—was hypothetical, since plaintiffs did

18  not allege the iPod had caused anyone to lose hearing. *Id.* at 961. Unlike the Plaintiffs here, the

19  *Birdsong* plaintiffs did "not contend . . . that such alleged economic harm [i.e., the reduction in

20  the value of an iPod due to its risk of hearing loss] satisfies the injury in fact requirement." *Id.*

21    Importantly, the court *contrasted* the harm alleged in that case with the harm alleged

22  *here*, where Plaintiffs claim Quaker misrepresented its products:

23    The plaintiffs' benefit of the bargain theory fares no better. They have not alleged
     that they were deprived of an agreed-upon benefit in purchasing their iPods. The
24    plaintiffs do not allege that Apple made any representations that iPod users could
     safely listen to music at high volumes for extended periods of time. In fact,
25    plaintiffs admit that Apple provided a warning . . . ."

26  *Id.* This case is, therefore, more like *Von Koenig*, 2010 WL 1980208, in which the court found

27  Article III standing over nearly identical claims under the UCL and FAL. As the court explained,

28  "a plaintiff may sufficiently allege injury where she contends that she did not receive the benefit

19

1   of the bargain because a purchased product cost more than similar products without misleading

2   labeling." *Id.* at *9. Moreover, a plaintiff alleges injury-in-fact where she asserts that she paid

3   more for defendant's products and would have been willing to pay less if she had not been

4   mislead by defendant's labeling, so that the product receives was worth less than what the

5   plaintiff paid for it. *Id.* (citing *Koh v. S.C. Johnson & Son, Inc.*, No. C-09-0927, 2010 WL 94265,

6   at *2 (N.D. Cal. Jan. 6, 2010) (plaintiff sufficiently alleged injury under UCL, FAL, and CLRA,

7   where he asserted that the product cost more than similar products without misleading labeling)).

8   Plaintiffs *also* have standing where they seek a product with certain qualities, purchase

9   defendant's product believing it has those qualities based on the product's deceptive labeling,

10  and where the product is actually unsatisfactory. *Id.*

11  **G.    Plaintiffs Have Satisfied Applicable Pleading Standards**

12          Rule 9(b) is satisfied where allegations are "specific enough to give defendants notice of

13  the particular misconduct which is alleged to constitute the fraud charged so that they can defend

14  against the charge and not just deny that they have done anything wrong." *Semegen v. Weidner*,

15  780 F.2d 727, 731 (9th Cir. 1985). And while averments of fraud must be particularized, Rule

16  9(b) "must be read in harmony with Fed. R. Civ. P. 8's requirement of a 'short and plain'

17  statement of the claim." *Baas v. Dollar Tree Stores, Inc.*, No. C 07-03108, 2007 U.S. Dist.

18  LEXIS 65979 at *5 (N.D. Cal. Aug. 29, 2007). The particularity requirement is satisfied "if the

19  complaint 'identifies the circumstances constituting fraud so that a defendant can prepare an

20  adequate answer from the allegations.'" *Id.* (quoting *Moore v. Kayport Package Express, Inc.*,

21  885 F.2d 531, 540 (9th Cir. 1989)). A claim should not be dismissed under Rule 9(b) where

22  "[a]lthough plaintiffs do not identify every speaker who made representations to them . . . there

23  is more than sufficient detail in the Complaint to enable defendants to formulate a defense."

24  *Elhilu v. Quizno's Franchising Co.*, LLC, No. 06-cv-07855, 2008 U.S. Dist. LEXIS 109435 at

25  *12 (C.D. Cal. Apr. 3, 2008). Moreover, the requirements of Rule 9(b) "may be relaxed with

26  respect to matters within the opposing party's knowledge. In such situations, plaintiffs can not be

27  expected to have personal knowledge of the relevant facts." *Neubronner v. Milken*, 6 F.3d 666,

28  672 (9th Cir. 1993). Where there are allegations of fraud, "the particularity requirement may be

20

1    satisfied if the allegations are accompanied by a statement of facts on which the belief is

2    founded." *Moore*, 885 F.2d at 540 (citing *Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1439

3    (9th Cir. 1987)).

4         Unlike the complaint dismissed in *Kearns v. Ford Motor Co.*, 567 F.3d 1120 (9th Cir.

5    2009), which failed to state the specific content of the allegedly deceptive statements, *id.* at 1126,

6    Plaintiffs here specify the exact wording of each deceptive statement, include images of each

7    claim on the product, and describe in detail why each statement is deceptive. (FAC ¶¶ 56-61.)

8    This is sufficient to satisfy Rule 9(b) in a consumer false advertising case. *Von Koenig*, 2010 WL

9    1980208, at *8-9 (in a false advertising case, a plaintiff's "allegation[s] are sufficient to establish

10   the 'time, place, and specific content' requirements of Rule 9(b)" where she alleges (1) the

11   specific misrepresentations challenged by attaching the product labels, (2) the time period when

12   the misrepresentations were made, and (3) that she would not have purchased the product if she

13   had not relied on the alleged deception).

14        Moreover, contrary to Quaker's argument under *Twombly* and *Iqbal* (Mot. at 21),

15   Plaintiffs' have asserted plausible claims that the challenged statements may be deceiving to a

16   reasonable consumer. Following a detailed review of applicable case law, a Central District of

17   California court recently rejected the argument that Plaintiffs' claims should be dismissed

18   because packaging like Quaker's is not misleading under the reasonable consumer standard. *See*

19   *Yumul v. Smart Balance, Inc.*, No. CV 10-00927, slip op. at 9-16 (C.D. Cal., May 24, 2010)

20   (Morrow, J.) (lodged concurrently herewith). In *Yumul*, Judge Morrow held that Smart Balance's

21   representations on its Nucoa margarine packaging—including that the product was "healthy" and

22   "Cholesterol Free"—might lead a reasonable consumer to believe the product contained nothing

23   that raised blood cholesterol levels, which is untrue because the product contains trans fat.[12]

24

25

----

26   [12] The Court should not give weight to the *Rosen v. Unilever* opinion (Mot. at 21)

27   because it applied an incorrect standard, *i.e.*, not the reasonable consumer standard under
     *Williams*, 552 F.3d 934, as the Central District of California recently recognized. (See Transcript

28   of Yumul Hearing, dated May 17, 2010, at 14:15-23, attached to the Declaration of Gregory S.
     Weston as <u>Exhibit A</u>).

*Chacanaca et al. v. The Quaker Oats Company,* Case No. 5:10-cv-00502 RS
PLAINTIFFS' OPPOSITION TO QUAKER'S MOTION FOR JUDGMENT ON THE PLEADINGS

## H.   The Challenged Statements Are Not "True"

As noted, Judge Morrow held that challenges to similar statements may be actionable despite their literal truth. *Yumul*, slip op. at 9-16. Regardless of the "truth" of the statement that Nucoa margarine was "Cholesterol Free," Judge Morrow held that it may nevertheless be deceptive to a reasonable consumer who takes the statement to mean that the product is healthy and/or that it has nothing in it which would raise blood cholesterol levels.

### 1.   "0g Trans Fat"

Quaker's claim that the products contain 0g of trans fat should not be dismissed on this basis because that claim is *false*. Quaker's argument that permitting the expression of trans fats in the amount of less than a half-gram per serving in the Nutrition Facts box as "0g" means a statement that a product which contains trans fat contains no trans fat is true (Mot. at 22), is nonsense. And as discussed above, the FDA's regulation of trans fat disclosures within the Nutrition Facts box does not permit a false front-label statement.

### 2.   "Wholesome"

While paying lip service to the purported "truth" of Quaker's "wholesome" claim (Mot. at 22), Quaker never states why the claim is truthful, instead relying only on its puffery argument (addressed below). Since "wholesomeness" is a characterization, it cannot be "true." Moreover, if Quaker were correct, it could make a "wholesome" claim no matter the ingredient composition of its products—even if they contained, for example, lead paint chips or—as is the case—where they contain carcinogenic trans fat.

### 3.   "Good source of calcium and fiber"; "Made with whole grain oats"; images of oats and nuts (and children in soccer uniforms); "No high fructose corn syrup"

Quaker's claim that the products are healthy because they contain certain minerals or ingredients is likely to be deceptive to a reasonable consumer in light of the trans fat content of the products. Although some minerals in the products might be beneficial, a reasonable consumer can easily obtain the minerals from healthier products that do not contain trans fat.

---

22

4.    "Smart Choices Made Easy"

Quaker's Smart Choices Program claim is also deceitful. That program is an industry-funded initiative created by a coalition of market giants including Quaker, Kraft, Kellogg's, General Mills, Unilever, ConAgra, Tyson Foods, and PepsiCo. Products that have received the "Smart Choices" checkmark include Froot Loops, Lucky Charms, Cocoa Crispies, Ritz Bitz Peanut Butter Chocolately Blast Crackers, both regular and light mayonnaise, and Fudgesicles. Froot Loops contains 41% sugar by weight—more than many popular brands of cookies.

The chair of the nutrition department at the Harvard School of Public Health called Smart Choice's criteria "seriously flawed," and "not credible."[13] New York University nutrition professor Marion Nestle said, "[t]he object of this is to make highly processed foods appear as healthful as unprocessed foods, which they are not." *Id.* Michael Jacobson, executive director of the Center for Science in the Public Interest, was previously part of the Smart Choices panel responsible for devising nutritional criteria, but quit because it was dominated by members of the food industry, which skewed the panel's decisions. *Id.* Those criteria, for example, designate as a "Smart Choice" frozen meals and sandwiches containing 600 milligrams of sodium, a quarter of the recommended daily maximum intake. *Id.* So dubious is the Smart Choices program that Connecticut's Attorney General initiated an investigation into whether it represents a form of consumer deception in September, 2009, calling the program "nutritionally suspect."[14] In the light of extensive criticism and following a letter from the FDA, Smart Choices *voluntarily suspended its program on October 23, 2009*. Following that suspension, PepsiCo cut ties with the program and Kellogg's announced it would phase out packaging bearing the Smart Choices label. But Quaker has kept the Smart Choice label. In light of these facts, Quaker's "Smart Choices Made Easy" claim plainly could be deceptive to a reasonable consumer, and the Court should allow Plaintiffs to offer evidence of that deception.

---

[13] William Neuman, *For Your Health, Froot Loops*, N.Y. Times, September 4, 2009, *available at* http://www.nytimes.com/2009/09/05/business/05smart.html.

[14] *See* Connecticut Attorney General's Office Press Release, dated October 20, 2009, *available at* http://www.ct.gov/ag/cwp/view.asp?Q=449216&A=3673.

1          5.      The Purported Truth Of A Claim Is Not Determinative

2          Finally, the purported truth of a claim is not determinative of whether it is actionable

3   under the UCL, FAL and Lanham Act. *See Morgan v. AT&T Wireless Services, Inc.*, 177 Cal.

4   App. 4th 1235, 1255 (2009)  ("A perfectly true statement couched in such a manner that it is

5   likely to mislead or deceive the consumer, such as by failure to disclose other relevant

6   information, is actionable under the UCL."); *Franklin Fueling Sys. v. Veeder-Root Co.*, No. S-

7   09-580, 2009 U.S. Dist. LEXIS 72953, at *21-22 (E.D. Cal. Aug. 11, 2009) (the FAL prohibits

8   "not only advertising which is false, but advertising which, although true, is either actually

9   misleading or which has a capacity, likelihood, or tendency to deceive or confuse the public");

10  *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1140 (9th Cir. 1997)  (A literally true

11  statement is actionable under the Lanham Act if it "has misled, confused, or deceived").

12  **I.      The Challenged Statements Are Not "Mere Puffery"**

13         Puffery involves "outrageous generalized statements . . . that are so exaggerated as to

14  preclude reliance by consumers." *Franklin Fueling*, 2009 U.S. Dist. LEXIS 72953, at *14.

15  "Conversely, 'misdescriptions of specific or absolute characteristics of a product are

16  actionable.'" *Id.* A statement is mere puffery only where it is "*extremely unlikely* to induce

17  consumer reliance." *Newcal Indus. v. Ikon Office Solutions*, 513 F.3d 1038, 1053 (9th Cir. 2008)

18  (emphasis added). This is untrue of the challenged Quaker statements, which are part and parcel

19  of the deceptive packaging of the Quaker products at issue. Moreover, where a series of

20  statements "contribute[s] to the deceptive context of the packaging as a whole" the court should

21  not dismiss the statements as puffery. *See Williams*, 552 F.3d at 939 n.3.

22         The cases Quaker relies on are inapplicable because they involve claims addressed to the

23  relative merits of the product in the marketplace, phrased in superlative terms, for example, "best

24  food," *Hoyte v. Yum! Brands, Inc.*, 489 F. Supp. 2d 24, 30 (D.D.C. 2007), or "nutritionally you

25  can't buy a better food [than Gerber]," *Tylka v. Gerber Prods. Co.*, No. 96 C 1647, 1999 U.S.

26  Dist. LEXIS 10718 (N.D. Ill. June 29, 1999).[15] The Quaker statements, by contract, call attention

27

28         [15] *Hoyte*, *Tylka* and *Pelman v. McDonald's Corp.*, 237 F. Supp. 2d 512 (S.D.N.Y. 2003)
    are out-of-state cases, but "California's consumer protection statutes are among the strongest in

                                              24

to the product's attributes. The Ninth Circuit has held nearly identical statements to Quaker's are *not* mere puffery because, individually or collectively, they contribute to the potential deception caused by a product's packaging. *Williams*, 552 F.3d at 939. A comparison of the non-puffery statements in *Williams* to Quaker's must resolve any lingering doubt:

| Non-Puffery Gerber Statement | Quaker Statement |
|---|---|
| "made with fruit juice" | "made with whole grain oats"; <br> "No high fructose corn syrup"; <br> images of oats, nuts and children in soccer uniforms |
| "nutritious" | "wholesome"; "smart choice" |
| "help toddlers grow up strong and healthy" | "good source of calcium and fiber" |

**J.      Plaintiffs Have Lanham Act Standing Under § 1116 For Injunctive Relief**

Because Plaintiffs seek only injunctive relief under the Lanham Act (FAC ¶¶ 103-104), standing is governed by 15 U.S.C. § 1116, not § 1125(a)(1). *Barrus v. Sylvania*, 55 F.3d 468 (9th Cir. 1995) (Mot. at 21) was dismissed for lack of § 1125(a)(1) standing. Section 1116, which governs Lanham Act *injunctive relief* actions, is far broader. *See TrafficSchool.com, Inc. v. Edriver, Inc.*, 633 F. Supp. 2d 1063, 1085 (C.D. Cal. 2008) ("Plaintiffs need not prove actual injury in order to be entitled to injunctive relief under the Lanham Act . . . . [R]elief is available under Lanham Act §43(a) if it can be shown that the advertisement has misled, confused or deceived the consuming public."). Decisions whether to grant injunctive relief under the statute are governed by "principles of equity and upon such terms as the court may deem reasonable"; where the case involves the public interest, "those equitable powers assume an even broader and more flexible character than when only a private controversy is at stake." *Id.* (citations omitted).

**III.      CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Quaker's Motion for Judgment on the Pleadings.

---

the country." *Mazza v. Am. Honda Motor Co.*, 254 F.R.D. 610, 623 (C.D. Cal. 2008). Thus, they are of limited—if any—persuasive value with respect to the standard for puffery under California law. Moreover, *Tylka* was later vacated by the Seventh Circuit, *Tylka v. Gerber Prods. Co.*, 211 F.3d 445 (7th Cir. 2000).

25

1      DATED: June 17, 2010                      Respectfully Submitted,

2                                             /s/ Jack Fitzgerald

3                                            **THE WESTON FIRM**

4                                            Gregory S. Weston
888 Turquoise Street

5                                            San Diego, CA 92109
Telephone:  858 488 1672

6                                            Facsimile:   480 247 4553

7                                            Jack Fitzgerald

8                                            2811 Sykes Court
Santa Clara, CA 95051

9                                            Telephone:  650 440 3170

10                                         **BECK & LEE BUSINESS TRIAL LAWYERS**

11                                            Jared H. Beck

12                                            Elizabeth Lee Beck
28 West Flagler Street, Suite 555

13                                            Miami, FL 33130
Telephone:  305 789 0072

14                                            Facsimile:   786 664 3334

15                                            **<u>Counsel for Plaintiffs</u>**

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**CERTIFICATE OF SERVICE**

2

I, Jack Fitzgerald, declare:

3

     I am a resident of the State of California, over the age of eighteen years, and not a party

4

to the within action. My business address is The Weston Firm, 888 Turquoise Street, San Diego,

5

California, 92109. On June 17, 2010, I served the following documents:

6

    **1.  Plaintiffs' Opposition to Quaker's Motion for Judgment on the Pleadings**

7

8

    **2.  Declaration of Gregory S. Weston in Support of Plaintiffs' Opposition to Quaker's Motion for Judgment on the Pleadings**

9

10

    **3.  Notice of Lodging of Supplemental Authority (*Yumul v. Smart Balance, Inc.*)**

11

by notice of Electronic Filing, which is a notice automatically generated by the CM/ECF system

12

at the time the documents listed above were filed with this Court, to lead counsel listed by

CM/ECF as "*ATTORNEY TO BE NOTICED.*"

13

     I declare under penalty of perjury under the laws of the State of California that the

14

foregoing is true and correct.

15

16

                       Executed on June 17, 2010 in Santa Clara, California.

17

18

                   _/s/ Jack Fitzgerald___

19

                   Jack Fitzgerald

20

21

22

23

24

25

26

27

28

---

*Chacanaca et al. v. The Quaker Oats Company,* Case No. 5:10-cv-00502 RS
PLAINTIFFS' OPPOSITION TO QUAKER'S MOTION FOR JUDGMENT ON THE PLEADINGS