Pages 1 – 58

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE RICHARD SEEBORG

| | |
|---|---|
| ROBERT CHACANACA and          )<br>VICTOR GUTTMANN, on Behalf of   )<br>Themselves and All Others       )<br>Similarly Situated,            )<br>                              )<br>         Plaintiffs,      )<br>                              )<br>  vs.                       )<br>                              )<br>THE QUAKER OATS COMPANY,      )<br>                              )<br>         Defendant.       )<br>                              )<br>_____) | NO. C 10–00502 RS<br><br><br>San Francisco, California<br>Thursday<br>July 15, 2010<br>2:03 p.m. |

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

**For Plaintiff:**           The Weston Firm
                            2811 Sykes Court
                            Santa Clara, CA  95051
                            (408) 459-0305
             **BY:  JACK FITZGERALD**

**For Plaintiff:**           Beck & Lee, Business Trial Lawyers
                            26 West Flagler Street, Suite 555
                            Miami, FL  33130
                            (305) 789-0072
             **BY:  JARED HARRISON BECK**

(Appearances continued on next page)

**Reported By:**     **Lydia Zinn, CSR #9223, RPR**
                   **Official Reporter – U.S. District Court**

1    <u>APPEARANCES (CONT'D)</u>

2    **For Defendant:**           ARNOLD & PORTER, LLP
                                   22nd Floor
3                                  One Embarcadero Center
                                   San Francisco, CA  94111-3711
4                                  (415) 356-3068
                                   **(415) 356-3099 (fax)**
5                          BY:  **ANGEL A. GARGANTA**
                                 **RACHEL L. CHANIN**

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              THE CLERK:  C. 10-00502, Robert Chacanaca versus

 2  Quaker Oats Company.

 3              MR. FITZGERALD:  Good afternoon, your Honor.

 4  Jack Fitzgerald, from The Weston Firm, on behalf of plaintiffs;

 5  and with me is Jared Beck and Elizabeth Lee Beck, of the Beck &

 6  Lee firm.

 7              THE COURT:  Good afternoon.

 8              MR. GARGANTA:  Good afternoon, your Honor.

 9  Angel Garganta, of the Arnold & Porter firm, on behalf of the

10  defendant; and with me are my colleagues, Rachel Chanin, and

11  Ms. Adriana Reyes-Villaneuva of the Quaker Legal Department.

12              THE COURT:  Good afternoon.

13              MS. REYES-VILLANUEVA:  Good afternoon.

14              THE COURT:  This, as I understand it, is a motion for

15  judgment on the pleadings.  And there are several arguments

16  advanced by the defendants in support of that motion.

17              What I'm not proposing to do is to give you some

18  tentative conclusion.  I want to hear your arguments, but I

19  will, just in terms of going through the list of the arguments

20  that, Mr. Garganta, you've made, I want to at least give you

21  some idea of where I'd like to concentrate your discussion, if

22  that would be helpful to you.

23              The complaint alleges -- I think there are four

24  claims for relief, if I've got my count right:  The Lanham Act

25  claim, the 17200 claim, California false advertising, and
```

1   California Consumer Legal Remedies Act.

2        And I know that the motion for judgment on the

3   pleadings -- were it to be granted in full, all of those claims

4   would be subject, according to Defendant's position, to

5   judgment.

6        With respect to the preëmption claim, which is the

7   one I actually want you to focus on, I take it that wouldn't

8   directly -- that wouldn't pertain to the Lanham Act claim, to

9   the extent -- I know you have other reasons, Mr. Garganta, why

10  you think the Lanham Act claim should fall by the wayside, but

11  obviously, it's a federal claim.

12            **MR. GARGANTA:**  That's correct, your Honor.

13            **THE COURT:**  So right.

14       Preëmption is an area I would like you to focus upon;

15  perhaps a little less so with respect to the arguments about

16  primary jurisdiction and equitable abstention.  Talk a bit,

17  perhaps, about the *Cel-Tech* argument and the standing argument

18  that you make.

19       The 9(b) arguments and the *Twombly* arguments on the

20  inadequacy of the misrepresentations -- I'm perhaps a little

21  less -- you know, we deal with that pretty regularly, and I'll

22  deal with it, but I don't particularly need argument on that

23  too much.

24       And then the, you know, truth or puffery arguments --

25  I would like you to address that a bit.

```
 1              And then the Lanham Act claim, I'm perhaps a bit less
 2    in need of some further discussion on that point.
 3              So the real big issue to me -- and you know, I think
 4    the preëmption argument is an interesting argument, and
 5    particularly in this context.  And so that's perhaps the best
 6    place for you to focus your attention at the moment.
 7              MR. GARGANTA:  Thank you, your Honor.
 8              THE COURT:  Why don't you go ahead, Mr. Garganta?
 9              MR. GARGANTA:  I'll try.  I guess our basic point is
10    that this case is not a dispute with Quaker, but with the Food
11    and Drug Administration.
12              And what I mean by that is that there is no dispute
13    here that the Food and Drug Administration, pursuant to its
14    authority under the Food, Drug, and Cosmetic Act, has
15    promulgated various regulations.
16              One of those regulations that not even the plaintiffs
17    say is not preëmpted -- and that is the regulation that governs
18    what goes --
19              THE COURT:  The box.
20              MR. GARGANTA:  The box.  Inside the box.
21              And it's also not in dispute that, for purposes of a
22    trans fat disclosure inside the box or a food product like
23    these food products -- again, it's not disputed or at least
24    it's not alleged otherwise, contains less than half a gram of
25    trans fat.
```

1          That number must -- those are the words of the

2    regulation -- be rounded down to zero.

3          And the reason, or at least one explanation for

4    that -- and that is given by the FDA in

5    21 C.F.R. 101.9(f)(1) -- is that those amounts -- amounts that

6    must be rounded down to zero -- are considered, quote,

7    "insignificant" by the FDA.

8          And so, your Honor, let's think about the other

9    statements that they take issue with.  And I'll concentrate on

10   two for now, if I may:  The zero gram trans fat statement --

11           **THE COURT:**  Mm-hm.

12           **MR. GARGANTA:**  -- about half an inch away from the

13   nutrition-fact box; and the statement that the products -- the

14   Chewy Granola Bars -- are a good source of fiber and calcium.

15   They say those statements are somehow false or misleading.

16          In their latest attempt to argue that, they seem to

17   almost concede that there's some kind of preëmption here,

18   because they cite the *Mason* case.  And then they say, "All

19   we're trying to do here is enforce the general prohibition on

20   false or misleading statements in 101.13(i)."

21          I would submit, your Honor, if that were the case, if

22   that's what those words "false" or "misleading" mean, when

23   there are specific regulations on point -- and here I'm not

24   just talking about the inside-the-box reg., 101.9.  I'm talking

25   about 101.13(i) and its specific reference that says that you

1  can provide a statement about the level -- percentage or level

2  of a nutrient, provided it is not characterized and is not

3  false or misleading.  And it says, paren, (e.g., 100 calories,

4  5 grams of fat).

5        Now, your Honor --

6        **THE COURT:**  I'm with you.  And I can tell you this

7  much.  I think there isn't any dispute, as you suggest, with

8  respect to the box.

9        And I think, as you've described in Subsection (i),

10 the argument is a strong argument that if you transport the

11 zero trans fat onto another part of the box, sub (i) is going

12 to help you, but -- and it helps you in the sense that it's

13 preëmpted; but once you get into the statements, you then say

14 in your brief:  And it follows, then, that the other statements

15 are preëmpted as well, because they tie back to that.  And

16 that's where -- I am not sure where that goes.

17       **MR. GARGANTA:**  And let me address that, because

18 there's one, two, three, four other statements.  To be precise:

19 Wholesome; good source of calcium and fiber; made with

20 whole-grain oats; no high-fructose corn syrup; and smart

21 choices made easy.  And actually, that makes five.

22       And then there's the picture of the oats and grains,

23 and the children in soccer events.

24       **THE COURT:**  Right.

25       **MR. GARGANTA:**  So the Court's point is well taken.

1          I would say that perhaps our briefing -- our -- and

2   certainly our initial brief was not clear on which ones of

3   these statements are expressly preëmpted.  And I would concede

4   to your Honor that the ones that are expressly preëmpted are

5   zero grams trans fat, and good source of calcium and fiber,

6   because good source of calcium and fiber is expressly regulated

7   by 101.54(c) and (d).

8          **THE COURT:**  Right.

9          **MR. GARGANTA:**  And there, it appears to me, as far as

10  I can follow, the plaintiffs' beef with that is that we

11  shouldn't have said that, even though there's a regulation that

12  allows us to, because the product has these trace amounts of

13  trans fat that they consider dangerous, and so it's misleading

14  generally.

15          Your Honor, on that statement, like zero grams trans

16  fat, if that argument flew, the preëmption provisions would be

17  meaningless.

18          Let me address the other ones.  And I know you said,

19  "Don't spend a lot of time on *Twombly* and *Iqbal*," and I won't,

20  but I do want to say this.  And this is -- you can call it

21  "*Twombly,*" "*Iqbal*," or maybe you could call it "the pleading

22  standards before *Twombly* and *Iqbal*."  The plaintiffs' complaint

23  about the balance of the statements is that they are misleading

24  because Quaker has failed to disclose something else; namely,

25  the trace amounts of trans fat in the product.  And, although

1  they don't use that word, they consider that material.

2          And in order for otherwise-true statements -- and

3  their own complaint, in paragraph 58, says these statements are

4  possibly true.  In otherwise -- in order for otherwise-true

5  statements to be misleading, I think the law is pretty clear

6  you have to be leaving out something else that matters that

7  would then render them untrue, or at least misleading.  And

8  that something, according to the plaintiffs, is less than half

9  a gram of trans fat.

10          Now, I would submit to your Honor that that cannot

11  be, both as a matter of law and as a matter of logic.

12          As a matter of law -- and this is not a preëmption

13  argument, but as a matter of law, because the federal Food and

14  Drug Administration -- the agency charged with giving consumers

15  accurate and helpful information -- they have a whole building

16  in a Maryland suburb, full of people working on this.  And they

17  looked extensively, after notice and comment, taking into

18  account the views of a various stakeholders.  Looking at the

19  science, they determined that when you have less than half a

20  gram of trans fat, what you should do is round down, and you

21  say "zero."

22          Now, if the FDA thinks it's not misleading to tell

23  consumers in the nutrition-fact box that those miniscule

24  amounts of trans fat equal zero, then how can it possibly be

25  the case, your Honor -- call it "law"; call it "logic" -- that

1  putting it half an inch away would be -- or that making

2  otherwise-true statements are rendered somehow false or

3  misleading by virtue of omitting that information that the

4  claimants want stated, but which the FDA has determined doesn't

5  need to be in that box?

6  Now, that's what we say, your Honor.  Their argument

7  is not with Quaker, or with any of the numerous other food

8  companies that they've sued on this issue, because they have

9  sued, as I'm sure your Honor's aware, practically the entire

10 industry in front of different judges and various districts in

11 California.

12 How is my client, Ms. Reyes-Villanueva here, who has

13 to advise her business clients, her marketing people what

14 statements they can make -- what is she supposed to do, if,

15 every time a plaintiff, however well-intentioned -- and these

16 are very intelligent, able counsel.  And I think they believe

17 in their case -- however well-intentioned, can go out and

18 challenge a statement like this, or these kinds of statements?

19 I mean, okay.  Soccer -- kids in soccer uniforms.

20 They're not inside the ingredients, but I would venture to say

21 it's true that they eat granola bars made with whole-grain

22 oats; no high-fructose corn syrup.

23 It hasn't been alleged, nor can it, that none of

24 these statements aren't true.

25 Wholesome.  Well, whatever exactly that means; but

1   the only reason they identify why that's misleading is because

2   we haven't disclosed the trans fat.

3           **THE COURT:**  Well, let's get to, again, you know, the

4   focus is, at least for purposes of this part of our discussion,

5   what's preëmptive and what is not?

6           And I struggle a little bit, because, as I read

7   through the papers, it appeared that -- and I'm no food

8   scientist, but you know, the nutritional box -- I agree with

9   you, Mr. Garganta, on the chain of argument that says:  Zero

10  trans fats.  I don't think there's anything actionable there.

11  It's preëmpted.

12          That moves its way on to the rest of the box.  Zero

13  trans fats.  I'm with you.

14          But at the same time, the box has "PHVO."  And it

15  says that's an ingredient in this product.

16          And the plaintiffs' argument -- and we're at the

17  pleadings stage.  They may never be able to prove that, but the

18  plaintiffs' argument is that that ingredient is dangerous.

19          So there -- because if they said nothing about trans

20  fats in this case, and they had brought the case based on

21  saying, "The box says this is wholesome.  And the

22  ingredients -- and it contains an ingredient, PHVO, which we

23  say is extremely dangerous," would there be a preëmption issue

24  here?

25          And that is causing me some concern, because I'm with

1   you on the zero-trans-fat representation, but the answer, in

2   part --

3          And you then say, "Well, as a matter of logic, all of

4   the other claims on the box have to be looked at in the context

5   of that -- of that zero-trans-fat-is-okay FDA determination,"

6   but if you then take the same box and the same notation on the

7   box that makes a reference to more than zero being an

8   ingredient of PHVO, which, as I understand it, is the same

9   thing as trans fats, then, you know, you kind of go off on a

10  different line of analysis, at least, for pleadings purposes.

11          **MR. GARGANTA:**  Let me clarify.  Again, if it didn't

12  come across clearly, I'm not saying that other than zero gram

13  trans fat, in the box and outside of the box, and good source

14  of calcium and fiber.  Those are expressly preëmpted.

15          **THE COURT:**  Right, sir.

16          **MR. GARGANTA:**  All right, sir.

17          Now, the other statements, your Honor -- what -- if

18  you look at the complaint, what they are alleging -- and the

19  reason they are alleging that partially hydrogenated vegetable

20  oils is a dangerous ingredient is because it is the source of

21  trans fats.

22          And what is further alleged is that, by virtue of a

23  nutrition-fact box in the packages that are referred to, that

24  the amount of trans fat that this PH -- these PHVOs produce is

25  less than half a gram.

1          So the PHVOs are not a dangerous ingredient because

2    they're PHVOs.  What's alleged is that they're dangerous

3    because they create artificial trans fat.

4          They're not the same thing.  One leads to the other.

5    And I think if you read the complaint carefully, you'll see

6    that, even in the complaint.  So it is not what they're

7    claiming.

8          What they're basically alleging in this case is that

9    we have failed to disclose a level of trans fats.

10          I hear where your Honor's going.  You're analogizing,

11    perhaps, to the *Gerber* case.  And you're thinking:  Should a

12    consumer have to look and see that it says "PHVOs"?  But it's a

13    different situation, because this is not like *Gerber*, where

14    you've got a lot of fruity fruits that aren't anywhere in

15    there.

16          What this case is, is a case where you're putting

17    representations that are entirely consistent with a

18    nutrition-fact box with that zero grams, which your Honor has

19    acknowledged is preëmptive.

20          They're not saying we're contradicting.  They're

21    saying we're being consistent with.

22          Now --

23          **THE COURT:**  *Gerber* doesn't help us much on the

24    preëmption point, because they said --

25          **MR. GARGANTA:**  It's not a preëmption case.

1          **THE COURT:**  It's not a preëmption case.

2          **MR. GARGANTA:**  No.  And so -- but again, I'm not

3    arguing here, your Honor, because I think you're correct that

4    all of these statements are preëmpted.

5          What I'm saying is the key statement, "zero grams,"

6    is preëmpted; that there is no dispute that the FDA -- and

7    again, take a look at 101.9(f)(1).  The FDA has determined that

8    when you round down, these amounts are -- quote, unquote --

9    "insignificant."

10         And what I am saying is that, in order for the case

11   to proceed on the other statements, there must be -- there has

12   to be some actionable materiality at these levels.  And, if

13   this Court finds that there is or there could be, it then

14   stands federal labeling regulations and the role of the FDA on

15   its head, with all respect.  It also stands logic on its head,

16   because -- let's think of it in a different way.  Let's say

17   instead of it being zero grams trans fat, the dispute were with

18   the calorie number.  As the Court may or may not know, calories

19   are rounded, too.  And there's an 80/120 rule.  And you can

20   have up to 120 calories or 80 calories, and, you know, they'll

21   round in a certain way.

22         Well, you know, somebody -- and this is all my own

23   conjecturing, but someone could say, "Well, gee.  That's not a

24   wholesome product, because that really has more calories, or it

25   has more fat, or whatever, than is being disclosed here," just

1   as in this case, the contention is it has more trans fats than

2   are being disclosed.  That's why PHVO matters, your Honor.

3         In fact, Judge Weir addressed a very similar issue in

4   the *Rosen* case, which the Court is familiar with.  In that

5   case -- in that case, your Honor, there wasn't any allegation

6   about zero grams trans fat.  At least, they didn't challenge

7   the statement zero grams, which was on that product as well.

8         And Judge Weir observed in *Rosen* that, had they, it

9   would be preëmpted, as your Honor had said; but he went on to

10  hold, in kind of an Aristotelian way, perhaps --

11        **THE COURT:**  He had some interesting --

12        **MR. GARGANTA:**  -- of some interest and -- and I'd

13  like to say "of some interest and elegance"; others might

14  differ -- he went on to say because a product has PHVOs, that

15  doesn't mean that you can't call the product -- say the product

16  is made with a blend of nutritious oils.  That doesn't negate

17  the -- that doesn't make that misleading.

18        I'm going a little bit further here -- and not so

19  much further -- in saying:  When it's got an insignificant

20  amount of trans fat, and your complaint with the PHVOs is

21  because of that amount -- that insignificant amount of trans

22  fat -- you can't suddenly challenge every accurate statement on

23  the box.  I mean, it's plainly made with oatmeal.

24        **THE COURT:**  And you think you can -- and you think

25  all of these things -- obviously, you do, because you brought

1  the motion -- all of these things can be adjudicated at the

2  judgment-on-the-pleadings stage?

3          I mean, you may be right that at summary judgment,

4  you'd be able to demonstrate all of that you've just said.  You

5  take it a step further and say, "As a matter of law, you can

6  conclude that these statements are not misleading; that

7  they're, you know, not actionable."  And, you know, I'm trying

8  to get a handle on that.

9          **MR. GARGANTA:**  Yes, I do, your Honor, based on what

10  this case is about.  This case is about the amount of trans fat

11  in this product.  Read all of the briefs.  Read the complaint.

12  That's what it's about.

13          They're not suing about some other product, and

14  about, you know, the product being too fatty, or the product --

15  you know, I'm not going to tell them how to file their next

16  case; but this case is about the trace amounts of trans fat

17  that the FDA has determined are sufficiently insignificant that

18  they should be rounded down to zero.  And I don't think they

19  can amend their way around that.

20          And I think it would, frankly, be -- it would be a

21  shame, your Honor.

22          **THE COURT:**  But, you know, they're -- I'll let them,

23  obviously, characterize their complaint, and they'll do it

24  better than I; but what they're saying is, "Yes, we do think

25  that trans fats are a very dangerous, even in very small

1  amounts.  And even if there are certain aspects of the labeling

2  that are preëmpted by the FDA, once you get outside of that

3  particular defined area, you don't have the protection

4  preëmption anymore."

5          And then -- you may profoundly disagree with them,

6  but I would suspect they'd say, Once preëmption isn't there

7  anymore, we can at least make our argument that trans fats are

8  so dangerous, even in a small amount, that to suggest that this

9  is a wholesome product is, at the end of the day, misleading.

10         And your answer, as I understand it, is to say if --

11  you can't parse the FDA's -- you've got to read it in the

12  context of what the FDA is finding here.  And what they're

13  finding is that, by virtue of rounding it down to zero, they're

14  sending the message, if you will, that this is not -- there's

15  nothing misleading about saying it's wholesome, if your basis

16  is only -- if the reason you don't think it's wholesome is that

17  there's some trans fats in it.

18         **MR. GARGANTA:**  Let me put it to you a different way.

19  I think for you to follow their line of argument, you would

20  have to find that what the FDA does inside their nutrition-fact

21  box -- forget preëmption -- that that is misleading.

22         And that's something that I think -- well, maybe it

23  is a matter of preëmption this Court, under the Act, doesn't

24  have the authority to do.

25         **THE COURT:**  Well, and I know that sort of leads into

1  your -- which I was cutting you off a bit, but your primary

2  jurisdiction and your abstention argument, which effectively

3  says, "You know, they're the ones that know.  Leave it to

4  them."

5          I do think that, in reading some of the case law, it

6  seemed to me that -- I read that *Lockwood* decision that

7  Judge Breyer issued.  And he gave primary jurisdiction a bit of

8  a short shrift on that.  I didn't think of that much.  And I

9  have to say that my inclination is that he is right about that;

10  but in any event, a lot of what I'm hearing you say effectively

11  is kind of in a hybrid between preëmption and primary

12  jurisdiction.

13          So to the extent it's not -- it's not expressly

14  preëmpted, you ought to let -- it's so closely related to what

15  the FDA is doing, you ought to leave it to the FDA.

16          **MR. GARGANTA:**  Maybe so, your Honor.  It's also,

17  though, I think -- and I was intrigued that your Honor asked

18  about the *Cel-Tech* safe harbor, because I think that's a whole

19  separate and independent basis.  And my point is on that -- is

20  if the FDA actually requires that declaration of zero grams, in

21  effect, it says, "That is okay."  You know, that is not

22  misleading.  All right?

23          Then how can it be misleading to make a true

24  statement elsewhere, by failing to disclaim trans fat or

25  omitting something that the FDA is saying is okay?

1          So I think although the statement "wholesome" is not

2    expressly permitted, the whole argument for the untruth of that

3    statement is based on something that absolutely is.  So I think

4    there's an argument here for the safe harbor under *Cel-Tech* as

5    well.

6          **THE COURT:**  Doesn't the safe-harbor notion just -- it

7    doesn't get you all that much further than preëmption does; I

8    mean, because it is effectively saying that -- it's a bit

9    circular.  If you say you're protected because you're directed

10   to say this, if you're directed to say this, then you've got a

11   pretty strong preëmption argument.  I'm not sure that *Cel-Tech*,

12   you know, advances the ball much.  It doesn't -- I'm not saying

13   it would hurt you any, but I'm not saying it gets you further

14   than your preëmption argument gets you, but okay.

15         Why don't I --

16         Go ahead.

17         **MR. GARGANTA:**  Can I just make a couple of other

18   points?  Because I think -- well, I want to make sure I don't

19   forget about the Lanham Act, and 9(b), and so on.

20         **THE COURT:**  Okay.  Go ahead.

21         **MR. GARGANTA:**  But let me close on this general area.

22         The notion that you can premise a statement, or a

23   claim that a truthful statement is false or misleading, on the

24   failure to disclose something that the FDA has determined need

25   not be disclosed, and -- it just fails logic.  And again, I do

1  bring it back a little bit to *Twombly* and *Iqbal*, because what

2  they're basically saying is, "Well, look.  We don't like that.

3  And we're even going to" -- I mean, in all other cases they've

4  sued Kraft for putting zero grams inside the box.  That's

5  before Judge Wu in the Central District, who's looking at it.

6         The notion that you can -- you can sue a manufacturer

7  for complying to the letter with federal labeling laws, and

8  then making otherwise truthful statements, and the reason they

9  call them untruthful, your Honor -- let's he keep our eye on

10 this.  The reason they claim they are untruthful -- they give

11 no other reason, other than these trace amounts of trans fat.

12         That just defies logic, it if it doesn't defy law.

13         And remember that the standard under *Twombly* and

14 *Iqbal* is that there has to be a claim that's plausible.

15         And what your Honor is saying -- "I'm going to let

16 them go ahead and amend."

17         And, you know, what exactly is it that they would

18 amend?  What would they say?  "The FDA was wrong in that

19 determination, and we're going to prove it"?  And then this

20 Court is going to conclude, after trial, that the FDA was

21 wrong?  That's their case, your Honor.

22         So I say that that's -- it's a case that can't and

23 shouldn't go past the pleadings stage.  For you to let it do so

24 means that you're basically disagreeing with that.

25         **THE COURT:**  What it means is I'm not -- at the

1   pleading stage, if I were to do that, I would be saying I'm

2   leaving for another day the determination of whether or not I'm

3   ultimately disagreeing with the FDA.

4           You're saying, well, you can't -- you can't entertain

5   the question; but I don't agree that, were I to deny in part

6   your motion for judgment on the pleadings, it would effectively

7   say, "I disagree with the FDA," because all I would be saying

8   is that they've made certain allegations.  I have to assume

9   that they're true for purposes of that; i.e., any amount of

10  trans fats is dangerous, and precludes making representations

11  along the lines of "wholesome," and other representations.

12          And perhaps at the summary-judgment stage, you

13  demonstrate that, indeed, the FDA was exactly right; that there

14  is no, you know, rounding down to zero.  Makes perfect sense,

15  because trace amounts are not at all inconsistent with the idea

16  of wholesome, et cetera, et cetera, et cetera.

17          Anyway --

18          **MR. GARGANTA:**  Well, let me try to address, if I

19  may --

20          **THE COURT:**  Go ahead.

21          **MR. GARGANTA:**  -- some of the other issues you raise.

22          I don't think there's any question, your Honor, that

23  there's no Lanham Act claim here, even in the case they cited.

24  The *Trafficschool versus Edriver* case squarely finds that, to

25  make these claims, you have to be a competitor.  Mr. Chacanaca

1 and Mr. Guttmann -- I don't know if they're making Chewy bars

2 in their garage, but I don't think so, so I think that should

3 be out.

4        With respect to Rule 9(b), if the Court looks at

5 these pleadings, there's a lot of general allegations about

6 scientific studies. And there's a lot of packaging and

7 photographs. And then these statements are called out.

8        What it lacks is any specificity as to which specific

9 products. And there are about 15 or 20 skews of these Chewy

10 bars. Which ones they bought; what representations they saw;

11 that they relied on them -- there's none of that in the

12 complaint.

13        **THE COURT:** Which of the claims for relief do you

14 think the 9(b) standard would apply? I mean, you know, with

15 *Twombly, Iqbal*, it's kind of moving towards 9 pleading across

16 the board, but you know, the Lanham Act claim, the

17 false-advertising claim, and Consumer Legal Remedies Act

18 claim -- are those subjects --

19        **MR. GARGANTA:** Yes, yes.

20        **THE COURT:** Is your argument they're subject to 9(b)

21 because they sound in fraud?

22        **MR. GARGANTA:** Yes. The Consumer Legal Remedies Act

23 certainly does. I mean, there's case law on that.

24        **THE COURT:** How about false advertising?

25        **MR. GARGANTA:** Absolutely. And U.C.L. as well. All

1   of those.

2          Now, yes.

3          **THE COURT:**  And Lanham Act also?

4          **MR. GARGANTA:**  You know, to be honest with you, I

5   haven't looked at that, but I would imagine it would, because

6   the whole basis of the Lanham Act is also false advertising, so

7   should sound in fraud.

8          By the way, if the Court disagrees with me on

9   standing, please let me know.  I'd like to turn you around on

10  competitors' standing, because it sounds like maybe the Court

11  does --

12         **THE COURT:**  You're talking about injury in fact?

13         **MR. GARGANTA:**  No, no.  I'm talking about the

14  Lanham Act.

15         **THE COURT:**  The Lanham Act.

16         **MR. GARGANTA:**  Because, I mean, otherwise, it's a

17  moot question whether they sound in fraud or not.  It should be

18  dismissed with prejudice.

19         **THE COURT:**  I understand.  I understand.

20         It was more a point of:  Don't assume that means I

21  have disagreed with you on the only-applies-to-competitor

22  point.  I was just curious what your view was on the issue.

23         **MR. GARGANTA:**  I would think it would.  Even if it

24  doesn't, it should be out of here.

25         And, as to the other claims, they certainly do.

1   That's the *Kerns* case.  And what we're lacking here is any

2   specificity as to these plaintiffs.

3           As to the standing argument, that's an argument,

4   again, that -- I think this is a case that is in many respects

5   similar to the *Birdsong* case, which was a case the *Birdsong*

6   *versus Apple* case, which Judge Weir had at the trial court.

7   And maybe way back then -- I don't know -- maybe your Honor

8   might have been a magistrate.  I don't know.

9           **THE COURT:**  I don't think that one was the -- I don't

10  think that was mine.

11          **MR. GARGANTA:**  You didn't have that?  But there the

12  allegation was that consumers were facing a risk of hearing

13  loss, and that that risk of hearing loss meant that they paid

14  more; that undisclosed -- they paid more for these products

15  than they otherwise would have.

16          And we cited a couple of other cases; in particular,

17  the Third Circuit case in the *Koronthaly versus L'Oreal*.

18  That's a case where the plaintiffs filed a class action,

19  alleging they were misled into purchasing unsafe lipstick

20  products.  Even though FDA had determined the lead levels in

21  the lipsticks were not dangerous and didn't require warnings.

22  I think that's also a case that's very similar to this one.

23  Both of those cases, your Honor, were dismissed at the pleading

24  stages, on the grounds that there was no standing because the

25  injury alleged was too speculative.  And they were both

1   false-advertising cases.

2          I think in particular, there is really, at bottom, no

3   allegation of a harm or a risk of harm, again, keeping in mind

4   these small –– these trace levels of trans fat, sufficient to

5   support the economic damages that are being sought here.  And I

6   realize it's not a personal-injury case; but sufficient to

7   support the allegation of these products –– or at least, it's

8   not pled adequately –– that these products are worth less than

9   they were paid for.

10          They don't allege that there were other products they

11   would have bought instead that didn't contain trans fats, for

12   example, that they would have paid less for.  Than –– all of

13   that is absent.  So I don't think standing is demonstrated

14   here.

15          **THE COURT:**  Although one –– that would certainly be

16   an opportunity to amend, wouldn't it, for those?  Not that you

17   want to, you know, give them ideas, but I mean, those are

18   things that perhaps could be amended.

19          **MR. GARGANTA:**  I think if your Honor were to give

20   them standing to amend on the claims with respect to the other

21   statements, perhaps it might make sense with respect to

22   standing; but I don't think they should have leave to amend for

23   the reasons that I explained.  I think that's –– I've said my

24   piece.

25          **THE COURT:**  Okay, okay.  The plaintiffs' turn.

 1              **MR. FITZGERALD:**  Thank you, your Honor.  I've

 2  certainly got a lot to respond to, and I'm going to do my best.

 3              **THE COURT:**  There are a lot of issues, so go forward.

 4              **MR. FITZGERALD:**  Yeah.  I'd like to start with the

 5  preëmption issue; specifically, the zero grams trans fat, and

 6  good source.  I think we're all in agreement that those are the

 7  only two statements that are, arguably, expressly preëmpted.

 8  And I'd like to suggest why they're not preëmpted,

 9  notwithstanding the Court's inclination at this point.

10              Now, the key regulation here is 101.13(i)(3), which

11  prohibits express nutrient content claims, like zero grams of

12  trans fat, if those claims are false or misleading.

13              Now, Quaker interprets that to sort of rubber-stamp

14  what's inside the nutrition-facts box.  In fact, they talk a

15  lot about the location -- "It's only a half inch away" -- as if

16  the distance matters.

17              What I'd like to suggest is that there are really

18  fundamental differences between what's inside the

19  nutrition-facts box, and what's outside of it; that the FDA

20  regulates them absolutely separately, has different policy

21  reasons for regulating them, and that they're subject to

22  completely different standards, so that there really is not a

23  rubber-stamp thing going on here.

24              **THE COURT:**  How does that jibe with 101.13(i)(3)?

25  Because that says the statement does not in any way implicitly

1  characterize the level of the nutrient in the food, and it is

2  not false or misleading in any respect, in which case no

3  disclaimer is required; e.g., a hundred calories or 5 grams of

4  fat is the e.g.  Isn't that saying, effectively, that if you

5  simply repeat what's in the box elsewhere in terms of a

6  nutrient level, then you're okay?

7          **MR. FITZGERALD:**  No, your Honor, I don't think that's

8  what that's saying at all.

9          101.13(i)(3) says that you can make statements about

10  nutrients that are in the product, as long as they're not false

11  or misleading; but it doesn't say that that's the equivalent of

12  what's inside the nutrition-facts box.  And what I would

13  suggest --

14          **THE COURT:**  But I don't see how, as a matter of

15  preëmption, if the FDA is saying you can, in the nutrition

16  box -- not only you can, but -- I think defendants are right --

17  you must say "zero grams trans fat," and then there is a

18  provision that effectively, as I read it, says that if you

19  simply repeat without any change what you've been mandated to

20  put in the nutrition box -- you may profoundly disagree with

21  that, but as a matter of preëmption, I don't see how we can't

22  say the FDA has covered that terrain.

23          **MR. FITZGERALD:**  Respectfully, your Honor, I just

24  don't think that's what the regulation says.  The

25  nutrition-facts box is subject to a different part of the

1  statute.  It's 343(r), versus 343(q).  Q.  Q regulates or

2  governs nutrition claims statements.  And they're also subject

3  to different regulations.  The nutrition-facts box is under

4  101.9.

5          Now, inside the nutrition-facts box, it's a limited

6  universe of information.  It's the serving size; the number of

7  servings; calories; nine specific nutrients; certain vitamins

8  and minerals; and an ingredient list.  And it's highly

9  regulated inside that box, under 101.9.  It's everything from

10 the colors that are used; the line spacing; when you can use

11 capital letters.  Highly regulated.

12         So the chance or the threat of something deceptive

13 happening within that box, because it's so highly regulated, is

14 extremely minimal, unless a food manufacturer just outright

15 lies about the nutrient that's in a product.

16         On the other hand, outside of the box is advertising.

17 Those are claims.  And advertising is only limited by the

18 imagination of the food manufacturer.  It's sort of like the

19 Wild West.

20         So what the FDA has done is it's come up with

21 definitions of common advertisements, which are regulated under

22 101, Subpart D.  "Good source" is one of those.  Others are

23 things like "no cholesterol," or "low fat"; but it recognizes

24 that it can't anticipate every advertisement that a food

25 manufacturer might come up with some time.  So it says that any

1  time you make a claim about the amount of nutrient in a

2  product, it's subject to a false and misleading statement.  It

3  can't be false and misleading.

4          And not only that, but the FDA can't even anticipate

5  the context in which every statement -- even the ones it

6  defines under Subpart D can be used.

7          So each of those -- those -- I believe there are 12

8  advertisements that are regulated under Subpart D.  Each of

9  those in Part A of their respective section is subject also to

10  101.13.

11          Now I'd also like to point the Court to 101.13(c).

12          **THE COURT:**  No.  I am familiar with your argument

13  about C, and I understand where you're going; but I think your

14  C argument ignores I.

15          **MR. FITZGERALD:**  Well, your Honor, I think that, you

16  know, one of the things to note is that inside the

17  nutrition-facts box, it's serving size.  It's -- and so it is

18  not actually expressed as zero grams trans fat, the way it is

19  on the front label.

20          **THE COURT:**  Yeah.

21          **MR. FITZGERALD:**  It's just expressed as zero as a

22  line item, but it's also expressed as zero as a serving.

23          Now, that statement is on the front of the box.  The

24  statement on the front of the box is "zero grams trans fat."

25  That doesn't parse it out by serving size.  It's not the same

 1   thing.  It's a different -- it's a different claim.  It's

 2   certainly an advertisement.

 3          Now, if -- I think one other thing that's important

 4   to note here is if 101.13(i)(3) were simply saying you could

 5   say the same number inside and outside the box, then the

 6   language is not false or misleading in any respect.  It would

 7   be rendered meaningless.  It's superfluous.  A number, in and

 8   of itself, can only be true or false.  It can't be misleading

 9   in some respect.  There has to be context in order for it to be

10   misleading.

11          So I think what the FDA is really saying there is

12   that in certain contexts when you repeat that information

13   outside the box and it's an advertisement -- that's the big

14   bold green letters that people see on the box, on Quaker's

15   box -- that's something different than a disclosure inside the

16   box.

17          And the disclosures that are inside the box come

18   about through a different process.  The -- those come through

19   FDA decision making that weighs a lot of policy issues.  And I

20   think the zero grams, under -- when you're under a half of a

21   gram of trans fat here -- how you can express it as zero --

22   it's not because the FDA found that it's insignificant as a

23   matter of human health.  That's simply not true.  The FDA said,

24   time and again, that trans fat should be avoided.  They

25   considered putting a footnote in there that said that you

1  should limit it as much as you can.

2          What the FDA said in 1999 when it set up these things

3  was that we can't accurately measure levels below half of a

4  gram at this point -- in 1999 -- and that's why we're letting

5  you express it as zero.  It has to do with measurements.

6          **THE COURT:**  Well, but then why didn't they say you

7  round up?

8          I mean, all of what you've just said, in some ways,

9  frankly, to me, is sort of an argument now, going into the

10  primary jurisdiction area.  You're talking about all sorts of

11  things that the FDA is taking into account, not taking into

12  account.  You know, how they're interpreting the box; nutrition

13  box versus the rest of the box.  You're sort of doing a job,

14  you know, of convincing me that it ought to be in the primary

15  jurisdiction area of the FDA, because the more you're saying

16  this is, you know, this is kind of a whole morass of what's

17  going on that I'm not going to understand, you know, maybe

18  you're right.

19          **MR. FITZGERALD:**  Well, your Honor, I certainly didn't

20  mean to suggest that.  And I don't think that's the conclusion

21  from what I was saying.  All I wanted to suggest was that

22  what's inside the box is not the same as what's outside of it.

23  And they're subject to different regulations.

24          And the regulations for outside of it have a false

25  and misleading standard.

1                   And now I think there's a really important case on

2       point here:  *Bates versus Dow*.  And that case -- it had to do

3       with the Federal Rodenticide Pesticide Act.  And there was a

4       preëmption provision in that Act exactly like the preëmption

5       provision here that expressly preëmpted any labeling

6       requirements that were not identical, and also a regulation

7       that prohibited any labels that were false or misleading.

8                   And the farmers there brought their claims under

9       Texas state law that those -- that it -- for fraud, and failure

10      to warn, and so forth.  And what the Supreme Court said is that

11      if the lower court determines that the Texas state standards

12      state the same false and misleading standard as the regulation,

13      then it's an identical requirement, and it's not preëmpted.

14                  The Supreme Court remanded that to the Fifth Circuit

15      for decision, and the case settled shortly thereafter, so the

16      Fifth Circuit never decided that as a matter of Texas law, but

17      plaintiffs moving here under the familiar false and misleading

18      standards under the U.C.L. under the F.A.L., and that's the

19      identical standard that applies to express nutrient-content

20      claims that are outside of the nutrition-facts box.

21                  And I would like to make one correction.  Plaintiffs

22      in the *Kraft* case do not challenge the zero gram inside the

23      nutrition-facts box.

24                  **THE COURT:**  This is it case in front of Judge Wu in

25      the Central District?

```
 1              MR. FITZGERALD:  Yes, it is.  Yes.

 2              THE COURT:  What are they challenging?

 3              MR. FITZGERALD:  Kraft doesn't make any

 4    zero-gram-trans-fat claims in that case.  There's a

 5    no-cholesterol claim.  And then there's a whole slew of claims

 6    like, "Made with real vegetables."  And I may be off on my

 7    exact -- nutritious or wholesome --

 8              THE COURT:  You're not counsel in that case?

 9              MR. FITZGERALD:  We are counsel.  Yes, your Honor.

10              THE COURT:  Oh.

11              MR. FITZGERALD:  And what Judge Wu found in his

12    tentative order was that all of those other -- all of those

13    things that, you know, weren't expressly preëmpted were --

14    under the reasonable-consumer standard, should go -- should not

15    be dismissed.

16              MR. GARGANTA:  But are subject to a motion to strike,

17    and which he's considering now.  You invited it, your Honor.

18    I'm sorry.

19              THE COURT:  Well, has Judge Wu actually issued an

20    order in this Kraft case?

21              MR. FITZGERALD:  It was just a tentative ruling.

22              THE COURT:  Those are kind of dangerous.

23              Well, it wouldn't be binding authority in any event,

24    but it's even less so if it's just kind of out there as a

25    tentative conclusion.
```

1          **MR. FITZGERALD:**  That's right, your Honor.

2          **THE COURT:**  So I won't spend too much time on

3   Judge Wu's *Kraft* case.

4          **MR. FITZGERALD:**  So with respect to the zero grams

5   trans fat, there is that regulation under 101.9 that allows the

6   suppression in the nutrition-facts box; but the regs say that

7   when it's inside the nutrition-facts box, it's not a claim, so

8   it's not subject to the false and misleading standard; but when

9   it's outside, it is subject to that false and misleading

10  standard under 101.13.  And the regulation that says that is

11  101.13C.

12         And two of the cases that we cite hold that that's

13  the case.  Those are the *New York State Restaurant Association*

14  cases.  And, just quoting from the Second Circuit case, there,

15  the court there said that 21 C.F.R. 101.13(c) reflects the

16  FDA's view that a quantitative statement as to nutrient

17  amount -- 100 calories, for example -- is not a

18  nutrient-content claim when such a statement appears in the

19  nutrition panel in the nutrition-facts box, but is one when it

20  does not.  So when it appears outside the box, it's a

21  nutrient-content claim that's subject to that.

22         **THE COURT:**  I just -- I just can't see how -- even

23  putting aside your interesting point that you make that there's

24  the limitation -- serving-size limitation with respect to the

25  box, it simply cannot be that if you repeat in exactly the same

1  form a representation in the nutrient box in another part of

2  the box, that it's false and misleading.  I mean, that -- I do

3  think that brings the problem of just notice and direction to

4  the manufacturers.  I mean, that -- that entity and to the

5  consumer.  I mean, what would we be saying if -- well, if it's

6  located here on the box, it's misleading.  If it's located

7  here, it's not?

8          It simply cannot be.

9          Now, I understand you say you've got to consider

10 context, and you've got to consider, you know, how it's used.

11 And I can see that to some extent, but I think there's a

12 fundamental problem with the notion that the same exact

13 quantitative representation in one place in a box can be

14 misleading, and is protected and deemed effectively not

15 misleading in another part of the box.

16          **MR. FITZGERALD:**  Well, your Honor, that might be true

17 if Quaker were forced to put "zero grams trans fat" on its box,

18 but that's a voluntary advertisement.  All Quaker has to do to

19 avoid being false and misleading is not put it on there.

20          **THE COURT:**  Aren't we -- at the end of the day, the

21 fundamental point -- and there's no shame in this -- that you

22 simply disagree with what the FDA has done; that the FDA has

23 made a mistake, in your view, in terms of its conclusion that

24 "zero trans fats" is the appropriate notation in the box?

25          And you may -- you know, I don't know, but isn't that

1  your argument?  Because at the end of the day, that's what it

2  seems to me to be.

3  　　　　　 **MR. FITZGERALD:**  Your Honor, that's not our argument

4  at all.  And we don't take any issue with the way that the FDA

5  mandates the disclosure because of the issue of measurement

6  within the nutrition-facts box.

7  　　　　　 I mean, the FDA takes into account a lot of issues --

8  a lot of policy issues that go into why disclosures are made

9  that way.  There are similar disclosures.  If you have under

10  2 milligrams of cholesterol, you can express it as zero.

11  　　　　　 It also has to do the scientific limitations of

12  measurement at the time that it was passed.  The FDA certainly

13  hadn't said that those are insignificant as a matter of health.

14  And the nutrition-facts box doesn't suggest that that's the

15  FDA's position.

16  　　　　　 **THE COURT:**  Right, but we're not -- right now, we're

17  not talking about that.  We're talking about taking that exact

18  same numeric representation, and putting it elsewhere on the

19  box.

20  　　　　　 **MR. FITZGERALD:**  Right.

21  　　　　　 **THE COURT:**  We're not talking about a statement that

22  says elsewhere on the box, you know, "Great for your

23  cholesterol."  I mean, that would be a different proposition.

24  　　　　　 What we're talking about is taking the same exact

25  entry, and putting it someplace else.

1        Now, I understand your point that says, "Nobody makes

2   them do it, so they've elected to do it."  And your point is,

3   once they've elected to go outside the protected boundary of

4   the box, it's -- at least, for purposes of litigation, they --

5   you know, they're going to have to defend it, but it's a

6   troubling notion.

7        It does seem to me to be exactly what preëmption is

8   all about, if it's simply repeating the same thing that the

9   federal agency has said is okay.

10       **MR. FITZGERALD:**  Let me suggest if the statement

11  wasn't "zero grams trans fat," but if it was "no trans fat"

12  instead, we'd be making the same argument.  It would be a

13  representation of what's inside the box.  "Zero grams" isn't a

14  representation of what's inside the box.

15       If you look at the box:  Trans fat.  Next line says,

16  "zero," but it doesn't say, "zero grams trans fat."

17       Not only that; the box is per serving size.  When you

18  put it on the front side of the box as an advertisement, you're

19  suggesting that this whole product, as a whole, contains no

20  trans fat, which is manifestly false in a product that has PHVO

21  as an ingredient.

22       Now --

23       **THE COURT:**  I suppose your argument is it's

24  wholesome.  You ought to eat more than one serving size.  It

25  will be good for you.

1          **MR. FITZGERALD:**  Exactly.  I'm not sure what the

2    serving size on these products is, but you know, if it's a

3    third of a bar, maybe and you have .4 grams.  So you're at the

4    zero level.  Now you're eating 1.2 grams.

5          **MR. GARGANTA:**  It's one bar, your Honor.

6          **MR. FITZGERALD:**  That's not the point.  I mean, the

7    point is it's something different than what's inside the box.

8    And it's an advertisement.

9          Not only that, but if you compare two products -- if

10   I have Quaker's Chewy Granola Bars that say "zero grams of

11   trans fat," and I have Nature Valley Granola Bars that say

12   "zero grams of trans fat," and Quaker's contains PHVO, and

13   Nature Valley's doesn't, as a consumer, I have no way of

14   distinguishing between those two things -- whether I'm going to

15   be taking trans fat into my body -- unless I look at the

16   ingredient list; but Williams says that consumers shouldn't be

17   expected to look at the ingredient list to fix -- to correct

18   misrepresentations on the front of the label.

19         So I'm saying when Quaker says "zero grams trans fat"

20   on the front of the label, that's a literally false statement,

21   even if the disclosure is regulated that way, because they're

22   separate entities, they're subject to different standards, and

23   there's different reasons for those standards.

24         **MR. GARGANTA:**  May I respond to that?

25         **THE COURT:**  No, not yet, because I want to make sure

1  I cover a couple of other things.  And I'll certainly let you

2  respond, Mr. Garganta; but I'd like you to go on to the

3  Lanham Act competitor issue, and then also the standing issue.

4  And so why don't you address those?

5          **MR. FITZGERALD:**  With respect to the Lanham Act, I'll

6  only say that I don't believe there's any case that's been

7  cited where plaintiffs were only seeking equitable relief.

8  And, pursuant to the Court's inherent power and powers of

9  equity, plaintiffs would argue that the Court has the power

10 to -- to award equitable relief under the Lanham Act Section

11 1116.

12         **THE COURT:**  And unencumbered by the case law that

13 says you've got to be a competitor --

14         **MR. FITZGERALD:**  Yes, sir.

15         **THE COURT:**  -- because it's equitable.

16         Do you have any support for that notion?  Case

17 support?

18         **MR. FITZGERALD:**  Well, the case we cited talks about

19 the sort of broad discretion under the equitable principles;

20 the *Trafficschool* case.

21         **THE COURT:**  Okay.  Okay.  How about standing?

22         **MR. FITZGERALD:**  Now as far as standing, I think that

23 the two cases that are really on point here are *Von Koenig*

24 *versus Snapple*, which we cited in our brief.  And there's

25 another case which we haven't cited.  It was a case in the

1  Ninth Circuit.  What happened is the day after we filed our

2  opposition, the Ninth Circuit had remanded a case, but the

3  Ninth Circuit's decision was unpublished.  The remanded case

4  referred to the unpublished decision, so we only became aware

5  of it after we filed the opposition.

6          The Ninth Circuit decision is *Chavez versus Blue Sky*.

7  And the cite is 340 Federal Appendix 359.  It's Ninth Circuit,

8  June 23rd, 2009.

9          I have copies of the case with me.  I'd be happy

10 to --

11         **THE COURT:**  That's okay.  That's all right.

12         **MR. FITZGERALD:**  I'd be happy to provide it.  That

13 case, like *Von Koenig*, found that similar claims were subject

14 to or had met the standing requirements, where -- specifically,

15 where the plaintiff had purchased defendant's product instead

16 of other brands based on a misrepresentation; where the

17 plaintiff had lost money as a result of the defendant's

18 deception, in that the plaintiff didn't receive what he had

19 paid for it; and that the plaintiff altered his position, to

20 his detriment, and suffered damages in an amount equal to the

21 amount for what he paid for defendant's product.

22         So the Ninth Circuit, I think, in -- under

23 allegations that are very similar to the ones made in the

24 complaint here, has found that there was standing.  And same

25 thing in *Von Koenig*.

1          If the Court nevertheless finds that the allegations

2     here are insufficient, I'm confident that we could amend the

3     complaint in order to sufficiently --

4          **THE COURT:**  On the standing issue?

5          **MR. FITZGERALD:**  Yeah.  The injury for standing.

6          Now, I think that Quaker mischaracterizes some of the

7     things about this case.  For example, they say that plaintiffs'

8     claims depend on Quaker having failed to disclose the actual

9     amount of trans fat in its product.

10          That's not the case.  The claims depend on the

11     presence of trans fat in the product.

12          We're not saying that Quaker has any obligation in

13     the nutrition-facts box or outside of the nutrition-facts box

14     to disclose the actual amount; all we're saying that when you

15     have the PHVO on the product, you can't say on the front-side

16     label that you don't have it, because that's misleading.

17          As far as the other claims that we've -- that I

18     suppose everybody agrees aren't even subject to an argument on

19     express preëmption -- I think the case that's really

20     instructive here is *Yumul versus Smart Balance*, which I believe

21     we lodged with the Court.

22          In that case, that --

23          **THE COURT:**  That's the case that just -- you gave me

24     the supplemental submission on?

25          **MR. FITZGERALD:**  I believe we -- I believe we did.

1          It was decided by Judge Morrow, in the Central

2    District.

3          **THE COURT:**  Okay.

4          **MR. FITZGERALD:**  A few weeks ago.  It's -- I believe

5    it's cited in the brief, and it was lodged concurrently with

6    the opposition.

7          **THE COURT:**  Okay.

8          **MR. FITZGERALD:**  In any case, it's *Yumul versus Smart*

9    *Balance*.  In that case, plaintiffs claim that margarines

10   containing trans fat had misleading representations that the

11   margarines were cholesterol free and healthy.  And Judge Morrow

12   went over the case law about a reasonable-consumer standard

13   from Williams, and then, you know, contrasted the case with

14   some of the cases that the Ninth Circuit had dismissed, like

15   *Freeman*, and found that this is not a case.  These types of

16   claims -- wholesome, nutritious, healthy, made with oats --

17   these types of things are not cases where it would be

18   impossible for a plaintiff to prove that a reasonable consumer

19   could be misled.  And, for that reason, they shouldn't be

20   dismissed at the pleading stage.

21          And I think that seems like that's the Court's

22   inclination here.  And, you know, that's certainly our position

23   as well.

24          As far as *Cel-Tech*, I agree with the Court that it

25   rises or falls with the preëmption issue.  And in that case, I

1  think it's a bit redundant if there is preëmption.  And I

2  suppose there's already a safe harbor there.  If there's no

3  preëmption, there's not.

4           I would suggest, however, that *Cel-Tech* itself said

5  that its holding was limited only to competitor cases, not to

6  consumers, and that there's been -- there have been a few cases

7  afterwards -- I believe *Lozano* was one -- that -- that further

8  held that it's limited to the competitor context.  And I think

9  that's basically in order to give --

10          **THE COURT:**  That's sort of a confusing area.  I've

11  had it come up in a couple of cases.

12          **MR. FITZGERALD:**  Yeah.

13          **THE COURT:**  What that is -- I mean, it's, as I

14  understand it at the moment that that -- that the

15  competitor-consumer distinction goes to the definition of

16  unfair practice, as opposed to, you know, the question of

17  whether or not the -- you know, the claim itself, but let's --

18  I don't want to get too enmeshed in it.

19          **MR. FITZGERALD:**  Well, moving back to the other --

20  all of the other five or six representations here, you know, I

21  think what Quaker is really doing is they're making an implied

22  preëmption argument.  They're saying, you know, if the FDA lets

23  you disclose it this way, how can it be misleading outside the

24  box?  That's an FDA area, and so forth.

25          And I would just point out that, under the express

1  preëmption provision in the N.L.E.A., there's a savings clause

2  that says anything that's not expressly preëmpted, is not

3  preëmpted.  There's no implied preëmption in the Act.  So I

4  think those arguments fail on that basis.

5          As far as the Rule 9(b) issue, the purpose of

6  Rule 9(b) is to allow a defendant to answer a complaint; to

7  know what the plaintiff is accusing a defendant of.

8          In this case, we have an answer to a complaint

9  already.  None of the paragraphs allege that it was difficult

10  or impossible for the defendant to answer the allegations.  And

11  I would suggest there's no reason to amend the pleadings on

12  that basis, where there's already an answer.

13          And I think all of the cases on 9(b) cited in their

14  briefs are motion to dismiss; not --

15          **THE COURT:**  Well, you bring up an interesting point.

16  I never really thought of this until you mentioned it, but, you

17  know, is 9(b) really an available argument on a motion for

18  judgment on the pleadings?  Because motion for a judgment on

19  the pleadings -- I'm not even sure it's -- I have to go back

20  and look.  The notion of amending the complaint is really not a

21  live one on a motion for judgment on the pleadings when the

22  answer has already been filed, but I'll have to think through

23  that.

24          **MR. FITZGERALD:**  Yes, your Honor.  And then I would

25  also point out on Rule 9(b) that there's a few cases on point.

```
 1   Von Koenig -- cases like this differ from the Kerns case.  In
 2   Kerns, they didn't actually identify the advertisements that
 3   were misleading.  In Von Koenig and here, we identify the
 4   advertisements.  We put pictures of them in the complaint.  We
 5   state how they're misleading.  I think those things are
 6   sufficient to meet the 9(b) standard.
 7             THE COURT:  Mm-hm.
 8             MR. FITZGERALD:  And finally, I'd just like to
 9   address the point about Rosen -- the Rosen case.  That case was
10   very different than this case.  And I think it has limited
11   applicability.
12             I think the question the Court should ask itself is
13   whether any of the claims fall within the logical syllogisms
14   that Judge Weir set up there.  And I think that nothing here
15   sort of falls to the same logical analysis.
16             There, he said that the secondary premise was -- part
17   of it was --
18             THE COURT:  I'm not going down that path, by the way.
19   So --
20             MR. FITZGERALD:  Yeah.  And, you know, Judge Morrow,
21   in the Yumul decision, questioned whether that the Rosen
22   decision applied the reasonable-consumer standard; whether a
23   reasonable consumer goes through those sort of logistical
24   gymnastics.  We'd suggest that they don't.  They simply look at
25   the advertisements, and make a choice.
```

1          Not only that, but when Judge Weir talked about -- if

2   plaintiffs challenge zero grams trans fat, it would be

3   preëmpted, he specifically identified the regulation at

4   101.9(2)(c)(ii), which is the regulation having to do with

5   inside the nutrition-facts box.  So we're in agreement.  If we

6   challenged inside the nutrition-facts box, that would be

7   preëmpted; but that's not the challenge here.  That's not what

8   Judge Weir was talking about.

9          And, you know, for the reasons discussed, we're going

10  to maintain that zero grams trans fat outside of the box is not

11  preëmpted.

12         Finally, we haven't talked about good source yet.  If

13  the Court would just like to --

14         **THE COURT:**  Go ahead, briefly.  And then --

15         **MR. FITZGERALD:**  -- hear me briefly on good source.

16         Now, good source is one of the 12 defined

17  advertisements --

18         **THE COURT:**  Right.

19         **MR. FITZGERALD:**  -- under Subpart D.  It's regulated

20  under 101.54(c).

21         **THE COURT:**  Right.

22         **MR. FITZGERALD:**  And it allows good source of a

23  nutrient to be used where a product contains 10 to 19 percent

24  of the recommended daily intake.

25         That doesn't end the inquiry.

1          Section 101.54(a) expressly says that, in order to

2     make a good-source claim, not only do you have to meet that

3     definition, but you have to meet the general requirements under

4     101.13, meeting the false and misleading standard.  And that's

5     at 101.54(a)(2).

6          Now, we raised this when we watched the *Mason*

7     decision, which, by the way, found no preëmption, in a case

8     very similar to this.

9          And what -- Quaker's response is that, well, the good

10    source, unlike zero grams trans fat, is subject to

11    101.13(i)(1), not (i)(3).  101.13(i)(1) has to do -- regulates

12    a claim where the use of a statement on a food implicitly

13    characterizes the level of the nutrient.

14          **THE COURT:**  Mm-hm.

15          **MR. FITZGERALD:**  Now, they give an example there:

16    Less than 3 grams of fat per serving.

17          Now, we would argue that good source does not

18    characterize the level of a nutrient there.  It simply says

19    that it's a good source.  So, for that reason, it doesn't

20    implicitly characterize the level of the nutrient.  It's

21    subject to 101.13(i)(3), and that false or misleading standard.

22          **THE COURT:**  Okay.  Mr. Garganta, a few brief

23    comments?

24          **MR. GARGANTA:**  Yes.  I'll try.

25          Let me address good source first, because --

1          **THE COURT:**  Okay.

2          **MR. GARGANTA:**  -- that may be freshest in the Court's

3   mind.

4          It is expressly regulated by 101.54(c) and (d).  (C)

5   is for calcium.  (D) is for fiber.  And the reference to 101.13

6   includes (h)(1), which is the general regulation of good-source

7   claims.

8          And if you look at that -- if the Court looks at

9   that, it contains a series of disclaimers where you make a good

10   source claim, but it has other types of nutrients that the FDA

11   considers disqualifying, and then you should have a disclaimer.

12   And then (d) itself, with respect to fiber, also contains a --

13   what you might call a "disqualifying criteria," and that is

14   this if the product is not low in fat.

15          So what they're complaining of here is that our

16   good-source disclaimer or our good-source statement does not

17   disclaim that the product has trans fat.  So they are

18   effectively adding to the FDA labeling requirement.

19          Now they're saying, "No, we're not.  We're just

20   enforcing the general prohibition on false and misleading"; but

21   I submit, your Honor, if that's what they're doing, the general

22   prohibition would gut the specific, and the preëmption

23   provision would have no meaning.  They say the general

24   prohibition in the FDA regs is identical to the false and

25   misleading standard under the U.C.L., the F.A.L., and the

C.L.R.A.

I haven't seen any authority for that anywhere.  In fact, all of the cases that they cite where the courts have held that it is appropriate and there's no preëmption to pursue a state law enforcement -- for example, the *Bates* case.  In the *Bates* case, there wasn't a specific FDA regulation addressing the challenged statement, which was something about safe for -- to quote, "Recommended in all areas where peanuts are grown." That was not regulated.

The *Mason* case involved the use of the term "plus" by Coca-Cola -- again, specifically regulated --

**THE COURT:**  Right.

**MR. GARGANTA:**  -- and found that the FDA had been violated.

Some of the other arguments that have been made, to move on:  The *Cel-Tech* point.

**THE COURT:**  The New Jersey case -- the Coca-Cola plus case -- that case simply is that you violated the FDA reg.

**MR. GARGANTA:**  Ergo, you violated the state false-advertising law.

**THE COURT:**  So there's no derogation of FDA's turf, if you will.

**MR. GARGANTA:**  It's as if a violation of the F.D.A. regulations were alleged here, and said that's an unlawful claim under the U.C.L.; a very different situation.

```
1              With respect to Cel-Tech, I think your Honor hit the
2    point right on the head.  The competitor limitation had to do
3    with the definition if that -- of what constitutes unfair
4    competition; not the issue of safe harbor.
5              The argument that we are somehow misleading consumers
6    by forcing them to look at the ingredient panel to figure out
7    if the product has partially hydrogenated vegetable oils -- it
8    makes no sense, when you consider that what consumers would be
9    looking at, you know, if they were comparing that Nature Valley
10   bar to the Quaker product would most likely be the
11   nutrition-facts panel.  And both of those would say zero.
12             And the reason ours says zero -- it's because it's
13   required by the FDA.
14             So, to repeat, I don't see how repeating the exact
15   same thing outside of it is any more misleading.
16             THE COURT:  Well, the plaintiffs make the point,
17   which is an interesting one, that -- that -- and I know you
18   said the serving size this instance happens to be one bar,
19   which may be somewhat lessens the effect of the argument, but
20   it is, indeed, true that the nutrition box is confined by that
21   limitation.  So one could see, if you transport the exact same
22   information and you repeat it in a different point in the box,
23   in the appropriate circumstance, one might say that there is a
24   reason to believe it's a different kettle of fish.
25             MR. GARGANTA:  But that is not 101.13(i)(3) says.
```

1              What 101 point -- whoa.  It's a tongue twister.  What

2    101.13(i)(3) -- what it says is it gives an example.  And it

3    really -- in a way, this is something of a matter of statutory

4    interpretation.  The parenthetical "(e.g., 100 calories,

5    5 grams)" comes after the -- the level -- the statement of the

6    level -- or the content or level of a nutrient that is not

7    characterized or is not otherwise false or misleading does not

8    require a disclaimer.

9              Now, that parenthetical does not say "per serving."

10   And I think the reason is that it's fairly well understood.

11   And it's certainly well understood in the -- in FDA regs.  This

12   wasn't raised anywhere in their briefs.  We'd be happy to brief

13   it if that's necessary, but I don't think it is; that when you

14   put out those calorie statements or you put out those fact

15   statements or whatever, I mean, it's fairly well understood

16   that's -- that what that's referring to is servings.  That's

17   certainly what FDA requires.

18             **THE COURT:**  Well, although you -- I don't

19   particularly want additional briefing on the subject, but I

20   certainly could see the argument being made that -- you know,

21   take something as basic as how many servings of vegetables or

22   whatever that we're all supposed to get each day -- five or

23   whatever -- one would argue in a particular product, perhaps,

24   that, you know, the suggestion being:  The more you consume,

25   the better it is for you; and that would be a very different

1  proposition than the per serving.

2          So I'm not sure I agree with you that any

3  representation outside of the nutrient box carries with it the

4  implication that we only want -- it's only healthy if you do

5  this per serving.

6          **MR. GARGANTA:**  That's not what I'm saying.

7          **THE COURT:**  Okay.

8          **MR. GARGANTA:**  What I'm saying is that when you make

9  a nutrition-content representation -- in other words, when you

10  say a numerical number like that; like a hundred calories or

11  something like that -- the clear implication is that it's per

12  serving.  And that's the reason why you don't see in the

13  parenthetical in 101.13(i)(3) --

14          **THE COURT:**  I see.

15          **MR. GARGANTA:**  -- a qualifier of per serving.

16          **THE COURT:**  Okay.

17          **MR. GARGANTA:**  Finally, let me just address the other

18  couple of cases.

19          I don't have and I wasn't given a copy of the *Chavez*

20  case that was referred to, so it's kind of hard for me to say

21  anything about it, unless you'd like me to take --

22          **THE COURT:**  I've got extra copies for you.

23          **MR. GARGANTA:**  Take a look?

24          **THE COURT:**  If you feel that you -- first of all --

25  and refresh my memory.  That's the unpublished decision.  I

1  know you went through and described how there's some reference

2  to an unpublished decision, or what have you.  My short

3  question is:  Is that unpublished, or not unpublished -- the

4  *Chavez* case?

5           **MR. FITZGERALD:**  Yeah.  That's the Ninth Circuit

6  decision.

7           **THE COURT:**  The Fed. App. decision -- Appendix

8  decision, which usually means it's not published.

9           **MR. FITZGERALD:**  It's unpublished; that's correct,

10 but it's citable under the new rule in the Ninth Circuit rule

11 in federal --

12          **THE COURT:**  The post 2007 rule?

13          **MR. FITZGERALD:**  Right.  Exactly.

14          **THE COURT:**  I'll take a look at it.

15          If you feel, Mr. Garganta, that you need to address

16 it, you can send me a no-more-than-three-page letter that

17 addresses that case, and that case only.  And if you could, do

18 that by a week from today.

19          **MR. GARGANTA:**  Thank you.

20          And then I did review the *Yumul versus Smart Balance*

21 case, because they did lodge that.  And that was a case where

22 the whole -- it's very different case from this case.  It was

23 certainly not a preëmption case.  The issue wasn't even raised

24 there.  I'm not sure they raised it for preëmption.

25          It was a case that was -- where Judge Morrow, our

1   former partner, actually, took issue with Judge Weir's

2   reasoning in *Rosen*.  And we don't think that you have to adopt

3   that reasoning here.

4          The proposition being advanced is very different.

5   It's basically the notion that what we're being punished for

6   doing here, or what we're -- what they would punish us for

7   doing, is basically making true statements based on a matter

8   that has been determined by the FDA not to be significant.

9          Now, I think your Honor was also kind of leaning in

10  the correct direction when you said, "You know, a lot of these

11  statements you're making are making me reconsidering primary

12  jurisdiction and abstention."

13         And I would urge that, to the extent that you are,

14  you do that seriously, because I think this is an appropriate

15  case for both, if you're not going to find preëmption.  It is a

16  complex area.  It is an area that FDA has regulated.  And it's

17  an area that at least my client has -- has done its best to be

18  lawful in.

19         **THE COURT:**  Just so that I am clear on what your

20  position was before -- and I thought you had indicated -- and I

21  was in tentative agreement with this -- you just said, "Well,

22  you know, consider primary-jurisdiction arguments if you're not

23  going to find preëmption."  I thought you had acknowledged that

24  there is no express preëmption outside of the area.

25         **MR. GARGANTA:**  My slip-up.  My slip-up.  My slip-up.

```
 1              I think that if you're going to find it for the two
 2    statements, that's great.  You still should consider it for the
 3    others, because they're all based on the same issue -- the same
 4    complex scientific issue.
 5              That, I think, is a lot more complicated than -- than
 6    it could appear on its face.
 7              THE COURT:  Okay.
 8              MR. FITZGERALD:  Just a few brief points.  Two
 9    minutes.
10              THE COURT:  Very brief.
11              MR. FITZGERALD:  On the primary-jurisdiction issue,
12    I'd just point out that every case that's dealt with labeling
13    issues and FDA regulations has declined primary jurisdiction.
14    These are issues of misleading advertisements, which are in the
15    Court's cabin, undoubtedly.
16              And also, Quaker hasn't identified a threshold issue
17    to be raised and resolved at the FDA that we could then come
18    back to the Court with that issue being resolved in order to
19    move forward on this case.  It's simply not appropriate for
20    primary-jurisdiction reference.
21              On the issue of zero grams trans fat on the front
22    means severing size, I would argue that manifestly that's a
23    jury question.  We would certainly dispute that fact.
24              And I would also point out that many products --
25    actually put "per-serving size" in the advertisement.  Quaker
```

1  doesn't do that.  And I think that their advertisement suggests

2  that the whole box -- if you ate every bar in that box you

3  wouldn't take any trans fat.  I mean, that's absolutely false.

4          Finally, I would just point out that in the

5  nutrition-facts box, you can say zero, but it's right up --

6  four or five lines under the serving size, and then, you know,

7  five or six lines under that is an ingredient list.  So you

8  have all of that stuff right there.

9          On the advertisement, all you have is, in big, bold,

10  green letters, "zero grams trans fat."  It's much more

11  prominent.  That's used as an advertisement.

12          **THE COURT:**  Okay.  I will go back; work hard.

13          **MR. FITZGERALD:**  Your Honor, I'm sorry.  Could I make

14  one more point?

15          **THE COURT:**  One more.

16          **MR. FITZGERALD:**  Quaker argues that if the

17  false-and-misleading standard were applied the way plaintiffs

18  want to apply it, it would gut the specific -- the specific

19  standards under the definition; but I would argue that the

20  specific definitions are there so that those specific things

21  are preëmpted.

22          So, in other words, if I wanted to say "good source

23  of calcium" is false and misleading because it only has

24  12 percent, and I think it should be 20 percent, well -- well,

25  that's preëmptive, because you could say "good source" when

1   it's 10 to 19 percent; but if I'm saying it's false and

2   misleading in the context of a nutrient that isn't even in that

3   section, or in the context of trans fat, or let's say if there

4   were arsenic in those granola bars, and I'm saying it's false

5   misleading because there's arsenic there, and it suggests that

6   they're good for you, that stuff can differ.

7           And it's because the FDA can't anticipate all of the

8   contexts in which those things might be juxtaposed that it has

9   this false-and-misleading standard.  And again, if it just

10  rubber-stamped the number inside of it, that language, false

11  and misleading in any respect, would simply be rendered

12  meaningless.

13          Not only that, but 101.54 expressly says both the

14  specific disqualifying criteria and 101.13 apply.  So 101.13

15  can't be equivalent to the specific criteria.  If you just meet

16  the specific criteria, that can't be enough to meet the

17  specific criteria, because both apply separately.

18          **MR. GARGANTA:**  Your Honor.

19          **THE COURT:**  Yes.

20          **MR. GARGANTA:**  Quick response to that.  Just look at

21  101.13(h)(1), which are, you know, general disqualifying

22  criteria for good-source claims.

23          (Reporter interruption)

24          **MR. GARGANTA:**  For nutrition-content claims, which a

25  good-source claim is, as they pointed out on something that we

1  don't disagree with, but has never been in dispute.  The

2  New York Restaurant Association makes the distinction between

3  claims, and the information inside the box.

4          So this is a claim.  Claims are subject to a series

5  of specific criteria, where you have to make disclosures.

6          It's true the FDA doesn't require you to make a

7  disclosure if a product contains arsenic; but it does for a

8  number of nutrients that are included.  For all of the

9  nutrients that are included in the nutrition-fact box that the

10  FDA cares to require disclosure for, it does not include such a

11  disclosure for trans fats.  So what they are basically doing is

12  adding a requirement to FDA's laundry list of required

13  disqualifying disclosures when you make these kinds of

14  nutrient-content claims like good source.

15          Thank you, your Honor.

16          **THE COURT:**  Thank you.  Thank you very much.  Very

17  useful argument.  I appreciate it.  And I'll go to work.

18          (The proceedings were adjourned at 3:27 p.m.)

19

20

21

22

23

24

25

### CERTIFICATE OF REPORTER

I, LYDIA ZINN, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing proceedings in C. 10-00502 RS, Robert Chacanaca v. The Quaker Oats Company, were reported by me, a certified shorthand reporter, and were thereafter transcribed under my direction into typewriting; that the foregoing is a full, complete and true record of said proceedings as bound by me at the time of filing.

The validity of the reporter's certification of said transcript may be void upon disassembly and/or removal from the court file.

_____

/s/ Lydia Zinn, CSR 9223, RPR

Tuesday, July 27, 2010