*E-Filed 10/14/10*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

ROBERT CHACANACA, et al.,

              Plaintiffs,

   v.

THE QUAKER OATS COMPANY,

              Defendant.

_____/

No. C 10-0502 RS

**ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR JUDGMENT ON THE PLEADINGS**

## I.   INTRODUCTION

Plaintiffs Robert Chacanaca and Victor Guttmann, acting on behalf of a putative class of California consumers, assert that defendant's Chewy Bars product contains "dangerous amounts of trans fat," but are labeled and marketed to suggest that they are in fact wholesome and healthful. Accordingly, their Complaint raises claims for false advertising under the both the Lanham Act and California law ("FAL"), violations of California's Unfair Competition Law ("UCL"), and violations of California's Consumer Legal Remedies Act ("CLRA"). Plaintiffs do not seek damages. They instead seek an order enjoining the Quaker Oats Company ("Quaker Oats") from including a "0 grams trans fat" statement on the Chewy Bar label, an order compelling "corrective advertising," disgorgement of revenues, and restitution.

At the outset of this action, Quaker Oats requested a temporary stay of discovery and moved

1   immediately for judgment on the pleadings on all of plaintiffs' claims. It argues that the doctrines

2   of express preemption, primary jurisdiction, and Article III standing warrant immediate dismissal of

3   the entire case. In addition, it insists the plaintiffs have not advanced cognizable claims that any

4   statement is misleading as a matter of law.

5         Quaker Oats' motion for judgment on the pleadings is granted with regard to all claims

6   directed at the "0 grams trans fat" statement, the "good source" of calcium and fiber statements, and

7   the statement indicating that the product contains whole grain oats but lacks high fructose corn

8   syrup. As pleaded, plaintiffs' state law claims seek to impose a requirement in *addition* to what is

9   mandated by federal statutes and regulations and therefore fail on preemption grounds. Next,

10  plaintiffs have not pleaded that they are in any way in competition with Quaker Oats and they

11  therefore lack standing to bring their Lanham Act claim. As to this claim, Quaker Oats' motion is

12  granted. As to all plaintiffs' remaining claims, Quaker Oats' motion must be denied. In particular,

13  what remains are claims two, three, and four, at least as they pertain to the term "wholesome," the

14  "smart choices made easy" declaration, and depictions of oats, nuts, and children.[1] The discovery

15  stay shall be lifted and the parties shall attend a Case Management Conference as directed at the end

16  of this Order.

17                  II.  FACTUAL BACKGROUND

18        This case concerns artificial trans fats,[2] a substance which is chemically manufactured

19  through a process called hydrogenation. Manufacturers add hydrogen atoms to normal vegetable oil

20  by heating the oil to temperatures above 400 degrees Fahrenheit in the presence of certain ion donor

21  catalyst metals. In its natural state, fat appears in two chemical varieties: (1) fats that lack carbon

22  double bonds, known as saturated fat; and (2) fats that have carbon double bonds, with hydrogen

23  atoms on the same side of the carbon chain, known as cis fats. Trans fats differ from natural fats in

24  that they have double bonds on opposite sides of the carbon chain. The chemical difference is

25
26  [1] Claim two is grounded on California's Unfair Competition Law; claim three is grounded on
    California's False Advertising Law; claim four is grounded on California's Consumer Legal
    Remedies Act.
27  [2] Where this Order discusses "trans fats," it refers to the artificial variety known also as "partially
    hydrogenated vegetable oil" or "PHVO."

28

meaningful in several respects.  Trans fats boast useful traits characteristic of both types of natural fat: like many vegetable fats occurring in nature, trans fats are legume-based, are relatively inexpensive and, like saturated animal fats, have long shelf-lives in which flavor and texture are maintained.  Plaintiffs therefore characterize trans fats as something of a "wonder product" for the packaged food industry.  As evidence of their seeming ubiquity, plaintiffs cite to a relatively recent study suggesting that trans fats appear in as many as 40 percent of processed, packaged foods.

Artificial trans fat does not exist in nature and plaintiffs contend the human body has not evolved to digest it properly.  They argue the very same chemical properties that make trans fat appealing to the food industry also make it "highly toxic" to human health.  Plaintiffs rely upon a number of scientific studies (private and governmental) that suggest a link between trans fat consumption and serious, negative health effects such as heart disease, diabetes and cancer.  They also point out that certain states and countries have restricted or banned the sale of food products containing trans fats.  In any event, they insist in their Complaint that trans fats are not safe for human consumption in any amount.

Defendant's Chewy Bars include hydrogenated vegetable oil in the ingredient list.  By contrast, in the nutrition label, defendant states that a single bar contains "0 grams trans fats."  The discrepancy arises from federal regulations that govern all statements made in a nutrition box and expressly instruct that any level of trans fat that falls below 0.5 gram per serving must be rounded down to zero.  Plaintiffs accept that the "0 grams" carried on the nutrition box complies with FDA regulations.  They acknowledge that defendant would *violate* FDA regulations if it were to attempt to state a decimal amount smaller than 0.5.  On a side panel of the Chewy Bars box, defendant repeats the 0 grams trans fats statement.  It is this writing—removed as it is from the nutrition facts section but plainly visible to consumers—that plaintiffs insist is false and misleading.

Elsewhere on the box, Quaker Oats also describes Chewy Bars as "wholesome," and "a good source of calcium and fiber."  The box reads that the bars are "made with whole grain oats," contain "no high fructose corn syrup," and are among "smart choices made easy."  This final statement connotes participation in an industry-sponsored "Smart Choices" program.  While plaintiffs

United States District Court
For the Northern District of California

1   acknowledge that these statements are "possibly true," they maintain that the statements imply

2   Chewy Bars are healthful or part of a healthful lifestyle, notwithstanding the hydrogenated oil

3   indisputably contained within them.  They suggest images of oats, nuts and children in soccer

4   uniforms that also appear on the box contribute further to defendant's inaccurate message.

5          The named plaintiffs allege they repeatedly purchased defendant's Chewy Bars for personal

6   consumption in numerous California stores.  Absent defendant's "material deceptions,

7   misstatements, and omissions," relating to the presence of trans fats in defendant's product,

8   plaintiffs insist they would not have made those purchases.

9                                     III.  LEGAL STANDARD

10         Federal Rule of Civil Procedure 12(c) provides that, "[a]fter the pleadings are closed[,] . . . a

11  party may move for judgment on the pleadings."  A court accepts all factual allegations in the

12  complaint as true and construes them in the light most favorable to the non-moving party.  *See*

13  *Turner v. Cook*, 362 F.3d 1219, 1225 (9th Cir. 2004).  "A judgment on the pleadings is properly

14  granted when, taking all the allegations in the pleading as true, the moving party is entitled to

15  judgment as a matter of law."  *Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 978 (9th Cir.

16  1999).

17                                      IV.  DISCUSSION

18         A.  The Statutory Framework.

19         The Federal Food, Drug, and Cosmetic Act ("FDCA") was enacted in 1938.  It prohibits the

20  misbranding of food.  In 1990, Congress amended the FDCA through the passage of the Nutrition

21  Labeling and Education Act ("NLEA").  The NLEA aimed to "clarify and . . . strengthen the Food

22  and Drug Administration's legal authority to require nutrition labeling on foods, and to establish the

23  circumstances under which claims may be made about nutrients in foods."  H.R. Rep. No. 101-538,

24  at 7 (1990), *reprinted in* 1990 U.S.C.C.A.N. 3336, 3337.  The many subsections of 21 U.S.C. § 343

25  establish the conditions under which food is considered "misbranded."  Generally, food is

26  misbranded under 21 U.S.C. § 343(a)(1) if "its labeling is false or misleading in any particular."

27  Two statutory sections—343(q) and (r)—impose more specific labeling requirements and are

28

No. C 10-0502 RS
ORDER

4

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

directly in issue here.  Respectively, these sections regulate the information that goes into the "nutrition box" section on all packaged products and nutrient content claims that appear elsewhere on the label.

Section 343(q) governs "nutrition information" and discusses information that *must* be disclosed about certain nutrients in food products.  It is principally in the nutrition box area that a food manufacturer must inform consumers of, for example, the total number of calories per serving or the quantities of various nutrients contained in a food product.  *See* 21 U.S.C. § 343(q); *New York State Rest. Ass'n v. New York City Bd. of Health*, 556 F.3d 114, 118 (2d Cir. 2009).  An accompanying regulation, 21 C.F.R. § 101.9, further requires "[a] statement of the number of grams of trans fat in a serving, defined as the sum of all unsaturated fatty acids that contain one or more isolated (i.e., nonconjugated) double bonds in a trans figuration . . . ." 21 C.F.R. § 101.9(c)(2)(ii). More simply, this regulation requires a declaration of trans fat content, at least where trans fat is meaningfully present in a food.  The regulation states that "[t]rans fat content shall be indented and expressed as grams per serving to the nearest 0.5 gram increment below 5 grams and to the nearest gram increment above 5 grams.  If the serving contains less than 0.5 gram, the content, when declared shall be expressed as zero." *Id.*  Where a product contains less than 0.5 gram, the manufacturer need *not* include the zero gram statement at all unless a nutrient content claim is made elsewhere about fat, fatty acid or cholesterol content.  *Id.*  In a final rule issued in 1993, the FDA described this rounding down regulation as follows: "[t]he nutrition labeling regulation prescribed levels for nutrients that are nutritionally trivial, i.e., those nutrients that are present in a food at insignificant amounts and that consequently are declared as zero on the nutrition label (e.g., less than 5 calories and less than 0.5 g total fat)." 58 Fed. Reg. 44020-01, 44024 (Aug. 18, 1993).[3]

Section 343(r) discusses "nutrition levels and health-related claims" about a food product made anywhere on a product label.  This provision governs all *voluntary* statements about nutrient

---

[3] Generally speaking, a nutrient content claim (explained in further detail below) indicating that a food is "free" of a particular nutrient (such as the claim that a food is "sodium free") also employs the same rounding down feature.  As the Agency has explained, "[b]ecause these values are nutritionally trivial, they are also the defining values for 'free' claims." 58 Fed. Reg. at 44024.

No. C 10-0502 RS
ORDER

United States District Court

For the Northern District of California

content or health information a manufacturer chooses to include on a food label or packaging. Specifically, the section covers claims that "expressly or by implication," "characterize[] the level of any nutrient," or "characterize[] the relationship of any nutrient . . . to a disease or health related condition . . . ." 21 U.S.C. § 342(r)(1). The FDA has promulgated regulations regarding three specific kinds of claims: express nutrient content claims; implied nutrient content claims; and health claims. *See* 21 C.F.R. §§ 101.13, 101.14. An express nutrient content claim is a direct statement about the level or range of a nutrient in a food, like "100 calories." A purveyor may include such a claim so long as it "does not in any way implicitly characterize the level of the nutrient in the food and it is not false or misleading in any respect (e.g., '100 calories' or '5 grams of fat'), in which case no disclaimer is required." 21 C.F.R. § 101.13(i)(3).

An implied nutrient content claim describes food or an ingredient in a manner that suggests that a nutrient is absent or present in a certain amount, such as "high in oat bran." An implied content claim might also make a comparative statement, like "contains as much fiber as an apple," or might suggest that the product is consistent with a nutritional or healthy diet. *See* 21 C.F.R. § 101.13(b)(2)(i)-(ii). Notably, the section prohibits the use of certain terms—such as "free," "low," or "good source"—that characterize the level or range of any nutrient in a food unless these terms conform to definitions established by the Secretary. 21 C.F.R. § 101.13(b)(1). Finally, a health claim is one that specifically "characterizes the relationship of any substance to a disease or health-related condition." 21 C.F.R. § 101.14. A food purveyor *may* include implicit content claims so long as they are "consistent with a definition for a claim," as provided in a federal regulation.

Section 343(r) adds that, "[a] statement of the type required by [Section 343(q)] that appears as part of the nutrition information required or permitted by such paragraph is not a claim which is subject to this paragraph." 21 U.S.C. § 343(r)(1). As it appears in the Chewy Bar nutrition box, therefore, "0 grams trans fat" is a classic example of a statement that is *not* a nutrient content claim. An accompanying regulation, 21 C.F.R. § 101.13, further instructs, however, that "[i]f such information is declared elsewhere on the label or in labeling, it *is* a nutrient content claim and is subject to the requirements for nutrient content claims." 21 C.F.R. § 101.13(c) (emphasis added).

No. C 10-0502 RS
ORDER

6

United States District Court

For the Northern District of California

B.  <u>Federal Preemption.</u>

Pursuant to the Supremacy Clause, federal law preempts state law when: (1) Congress enacts a statute that explicitly preempts state law; (2) federal law occupies a legislative field to such an extent that it is reasonable to conclude that Congress left no room for state regulation in that field; or (3) state law actually conflicts with federal law.  *Chae v. SLM Corp.*, 593 F.3d 936, 941 (9th Cir. 2010).  The first circumstance is principally at issue here.  The "purpose of Congress is the ultimate touchstone in every preemption case."  *Altria Group, Inc. v. Good*, 129 S. Ct. 538, 543 (2008) (internal quotation marks omitted).  The Supreme Court has also instructed that a court must "start with the assumption that the historic police powers of the States were not to be superseded by [a] Federal Act unless that was the clear and manifest purpose of Congress."  *United States v. Locke*, 529 U.S. 89, 107 (2000) (internal quotation marks omitted).  This presumption against preemption is heightened where "federal law is said to bar state action in fields of traditional state regulation." *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995).  In light of the historical "primacy of state regulation of matters of health and safety," *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996), courts can assume that "state and local regulation related to [such] matters . . . can normally coexist with federal regulations."  *Hillsborough County v. Automated Med. Labs., Inc.*, 471 U.S. 707, 718 (1985).  Where Congress does provide for express preemption, the presumption against preemption requires courts to read the clause narrowly. *Medtronic*, 518 U.S. at 485.

The NLEA states that it "shall not be construed to preempt any provision of State law, unless such provision is expressly preempted under [21 U.S.C. § 343-1(a)] of the [FDCA]."  Pub. L. No. 101-535, § 6(c)(1), 104 Stat. 2353, 2364.  *See also In re Farm Raised Salmon Cases*, 42 Cal. 4th 1077, 1091 (2008) ("Congress made clear that the preemptive scope of section 343-1 was to sweep no further than the plain language of the statute itself.").  It does contain two express preemption provisions relating to sections 343(q) and (r).  Section 343-1(a)(4) expressly preempts any state or local "requirement for nutrition labeling of food that is not identical to the requirement of section 343(q)."  Section 343-1(a)(5), in turn, preempts state or local governments from imposing any

United States District Court

For the Northern District of California

requirement on nutrient content claims made by a food purveyor "in the label or labeling of food that is not identical to the requirement of section 343(r)." The Supreme Court has clarified that, in the context of express preemption provisions, the term "requirements" reaches beyond positive enactments like statutes and regulations, to embrace common-law duties and judge-made rules. *See Bates v. Dow Agrosciences, LLC*, 544 U.S. 431, 443 (2005). Where a requirement imposed by state law effectively parallels or mirrors the relevant sections of the NLEA, courts have repeatedly refused to find preemption. *See, e.g., New York State Rest. Ass'n*, 556 F.3d at 123; *Chavez v. Blue Key Natural Beverage Co.*, 268 F.R.D. 365, 370 (N.D. Cal. 2010). The FDA itself appears to endorse this approach. *See* Final Rule, 60 Fed. Reg. 57076, 57120 (Nov. 13, 1995) ("[I]f the State requirement does the same thing that the Federal law does . . . then it is effectively the same requirement as the Federal requirement . . . . [T]he only State requirements that are subject to preemption are those that are affirmatively different from the Federal requirements on matters that are covered by section 403A(a) of the act.").

This means that plaintiffs' claims need not fail on preemption grounds if the requirements they seek to impose are either identical to those imposed by the FDCA and the NLEA amendments or do not involve claims or labeling information of the sort described in sections 343(r) and 343(q). *See Ackerman v. Coca-Cola Co.*, No. 09-0395, 2010 WL 2925955, at *6 (E.D.N.Y. July 21, 2010) (reviewing NLEA's preemptive effect where plaintiffs challenged as misleading content claims made with regard to labeling of Vitamin Water). That is, if the statements at issue are nutrient content claims as contemplated by subsection (r), plaintiffs' deception claims may only go forward if they can show that the statements would also be "misbranded" under the terms of the Act. If the statements are not nutrient claims, then the NLEA's express preemption provision would not in the ordinary circumstance come into play.

1.   "0 Grams Trans Fat."

The threshold question is whether the "0 grams trans fat" statement that appears on the side label of the Chewy Bars box (but outside the nutrition box) is a nutrient content claim. The answer is yes, subsection (r) (and its regulations) controls, and the express preemption provision of section

United States District Court

For the Northern District of California

343-1 is implicated.  Specifically, the statement is an express nutrient content claim, or a "direct statement about the level (or range) of a nutrient in [a] food . . . ."  21 C.F.R. § 101.13(b)(1).  *See also New York State Rest. Ass'n*, 556 F.3d at 126 (reading regulation 101.13(c) as an "unequivocal" instruction that quantitative statements should be understood as express nutrient content claims); 58 Fed. Reg. 2302-01, 2303-04 (1994) ("FDA stated in the general principles proposal (56 Fed. Reg. 60421 at 60424), that the legislative history of [section 343(r)(1)] specifically states that the identical information will be subject to the descriptor requirements if it is included in a statement in another portion of the label . . . .").  As detailed above, a food purveyor can make an "express" content claim so long as it does not "in any way implicitly characterize the level of the nutrient in the food and it is not false or misleading in any respect . . . ."  It is beyond dispute that, at least as it appears in the nutrition box, the "0 grams trans fat" statement must be rounded down to zero.  The question which then arises is whether an express content claim that repeats the "0 grams" language elsewhere can be "misleading"—and would therefore be misbranded—within the meaning of section (r).  If it can, plaintiffs' claims are not expressly preempted.

Plaintiffs argue that their state law claim asserts only that, removed from the nutrition box, the 0 grams trans fat statement is misleading because it implies that Chewy Bars contain no trans fats *whatsoever* (as opposed to the "0 grams" that appears in the nutrition box, which means instead anywhere from none to "nutritionally insignificant amounts" of trans fat, not exceeding 0.5 gram per serving).  As an initial matter, the parties agree that the side-panel statement is voluntary.  Nothing in the FDA statutes or regulations *requires* Quaker Oats to declare the trans fat level in this manner.[4]  Moreover, plaintiffs' claim asks for an order *prohibiting* the statement; they do not necessarily argue that Quaker Oats must make any affirmative, different statement.  To support their argument that the side-panel statement is misleading, plaintiffs point out that the nutrition box statement is positioned in close proximity to the Chewy Bars ingredient list, which does include partially hydrogenated vegetable oil.  The nutrition box also includes serving size information and consumers can

---

[4] Technically, Quaker Oats was required to declare the "0 grams" trans fat in the nutrition box only *because* it made the content claim elsewhere.  *See* 21 C.F.R. § 101.9(c)(2)(ii).

**United States District Court**
For the Northern District of California

1   presumably infer that, while each Chewy Bar contains at most trivial amounts of trans fat,

2   consumption of *several* bars could entail non-trivial amounts (that is, amounts that exceed 0.5

3   gram).[5]

4          Defendant cannot point to any instruction in section (r) or any nutrient content regulation

5   that specifically *requires* that express content claims must reference the rounded figures that appear

6   in the nutrition labeling section.  An express content claim, rather, must "not in any way implicitly

7   characterize the level of the *nutrient* in the food" and must not be "false or misleading in any

8   respect."  21 C.F.R. § 101.13(i)(3) (emphasis added).  What the regulation does not address is

9   whether or not an express claim must refer to the rounded level that appears in the nutrition box or if

10  it instead should refer to the *actual* nutrient level.

11         Reference to another subsection of regulation 101.13 sheds some light on the agency's

12  approach to content claims in the context of rounding.  Section 101.13(j) generally governs

13  "reference" claims, or claims that compare the nutrient level of a product to a reference product.

14  Take for example a food purveyor who has reduced the level of fat in its own product by 25 percent.

15  Imagine the purveyor wishes to highlight the reduction by adopting a "reference" claim.  As

16  originally codified, section 101.13(j)(1)(ii)(B) required that the purveyor reference "the value

17  declared in the nutrition labeling of the [prior version of the] product, i.e., the rounded value."  The

18

19  [5] Defendant reads the regulation outlining the manner in which a purveyor may make an express
20  content claim as a statement that an express claim *cannot* be misleading if it simply restates the
    information in the nutrition box.  This is not necessarily so.  The regulation states, in relevant part,
21  that, "the label or labeling of a product may contain a statement about the amount or percentage of a
    nutrient if: (3) The statement does not in any way implicitly characterize the level of the nutrient in
22  the food and it is not false or misleading in any respect (e.g., '100 calories' or '5 grams of fat'), in
    which case no disclaimer is required . . . ."  21 C.F.R. § 101.13(i)(3).  The position of "5 grams of
23  fat" or "100 calories" in the sentence, defendant theorizes, operates as an example of a categorically
    non-misleading, express content claim.  The FDA's Final Rule describing this particular section
24  acknowledges, however, that even express claims can be misleading: "The agency believes that
    statements concerning the amount and percentage of nutrients in food can provide useful
25  information to consumers and flexibility to the food manufacturer in stating the nutritional attributes
    of a food.  However, FDA recognizes that these statements can be misleading."  58 Fed. Reg. 2302-
26  01, 2308-09 (Jan. 6, 1993).
27

28                                                                No. C 10-0502 RS
                                                                  Order

10

United States District Court

For the Northern District of California

regulation did not specify, however, whether the values used to determine compliance with the 25 percent claim were to be the rounded or actual values.  In a subsequent notice and comment period, the Agency received comments voicing concern over the possibility of consumer confusion where, for example, the claimed change reflected actual values but did not match the rounded values identified in the label.  In response, the Agency modified subsection (j) so that reference claims may employ either the rounded or actual values, so long as the label is internally consistent.  58 Fed. Reg. 44020-01 at 44024.  The Agency also made the following observation on "absolute" claims that helps resolve the dilemma here:

> [B]ecause there is no need to specify the actual amount of the nutrient in the food relative to the claim and, as discussed in the mandatory nutrition labeling final rule, because there is no nutritional difference between rounded and unrounded values of a nutrient in a food, the agency does not see a need to specify which value should be used in determining whether or not a food qualifies to make a nutrient content claim.  *Id.*

Thus, the Agency has not explicitly required that express content claims employ the rounded figure that appears in the nutrition box, reasoning instead that the difference between actual and rounded values are "nutritionally insignificant."  The Agency has urged that the use of *either* value functionally relays identical information.  That said, the Agency has also at least in response to comments expressed a preference for internal consistency between the nutrition box and the rest of the label.  In the context of reference claims, the Agency opined, "it is more important to prevent consumer confusion by having consistency on the food label than to be prescriptive as to the method by which nutrient values for relative claims are determined and used."  *Id.*[6]  Accordingly, if

---

[6] Subsection (o) of the nutrient content regulation also appears to provide some support for defendant's preemption claim.  It instructs that, "[e]xcept as provided in § 101.10, compliance with the requirements for nutrient content claims in this section and in the regulations in subpart D of this part, will be determined using the analytical methodology prescribed for determining compliance with nutrition labeling in § 101.9."  Section 101.9 relates to mandatory nutrition information under section 343(q)'s ambit.  It also instructs that trans fat content must be "expressed as grams per serving to the nearest 0.5 gram increment," and "[i]f the serving contains less than 0.5 gram, the content, when declared, shall be expressed as zero."  21 C.F.R. § 101.9(c)(2)(ii).  The "analytical methodology" phrase refers to the Agency's preferred mechanism for measuring actual nutrient levels in food products.  Because this method apparently cannot reliably calculate nutrient levels below 0.5 gram, these low levels are rounded to zero.  In short, section 101.13(o) at least

"nutritionally insignificant amounts" of less than 0.5 gram trans fats means the same thing, according to Agency regulations, as "0 grams," then the use of the latter language in an express nutrient content claim would *not* be misleading within the meaning of section (r) or any of its regulations. The statement would not be misbranded under subsection (r) and the plaintiffs' state law claims therefore seek to impose a non-identical burden. It is for this reason that plaintiffs' claims relying on the use of this particular statement are preempted.

    2.  Made With Whole Grain Oats but *Not* With High Fructose Corn Syrup.

Plaintiffs also attack the inclusion in the label of an ingredient (contains whole grain oats) and a statement proclaiming the absence of another (no high fructose corn syrup). As to oats, a simple statement of an ingredient need not necessarily count as a nutrient content claim. The FDA has instructed, however, that it may function as such a claim under some circumstances. The court in *Ackerman v. Coca-Cola* in fact relied on the statement "high in oat bran" as an example of an implied nutrient content claim because it also suggested a high dietary fiber content. 2010 WL 2925955, at *3. Plaintiffs, for their part, insist that the oat claim *is* an implied content claim intended to convey that Chewy Bars are part of a healthful diet, notwithstanding the fact that they contain hydrogenated vegetable oil. The high fructose corn syrup claim is also a content claim. Section 101.13 regulates the manner in which a purveyor may claim the absence of any nutrient. A label may do so only where the food has been "specially processed" or "formulated" to remove the nutrient. If it is a food that in its natural state lacks the nutrient, the purveyor must also so indicate. *See* C.F.R. § 101.13(e)(1)-(2).

Plaintiffs do not contend that either statement is directly false; they acknowledge that Chewy Bars contain whole grain oats and lack high fructose corn syrup. Instead, they suggest that the presence of hydrogenated vegetable oil makes these claims, to the extent they suggest Chewy Bars are nutritionally healthful, misleading. The federal regulatory statute provides for this precise scenario: that is, it categorizes as misleading and therefore prohibited even true nutrient content

---

tangentially supports defendant's argument that express content claims should employ rounded values.

1    claims if the presence of another "disqualifying" nutrient exceeds an amount established by

2    regulation.[7]  The Agency has by regulation imposed "disqualifying" levels for only four nutrients:

3    total fat, saturated fat, cholesterol, and sodium.  21 C.F.R. §§ 101.13(h)(1), 101.14(a)(4).

4          It is important to note how disqualifying claims work.  A disqualifying level of, say,

5    saturated fat is four grams per "reference amount customarily consumed."  21 C.F.R. §

6    101.13(h)(1).  If this level is exceeded, a food purveyor is *prohibited* from making an unqualified

7    claim touting the health benefits of another nutrient in the food.  This is because the Agency has

8    reasoned that the beneficent claim, standing alone, would be misleading.  Notably, the FDA in a

9    recent final rule declined to set disqualifying levels for trans fats.  It expressed an intent to "continue

10   to evaluate the evolving science and, when the science has evolved to a point where the agency

11   believes it can proceed with scientifically-based definitions and levels for these claims, it will

12   proceed to do so through a new rulemaking." 68 Fed. Reg. 41434-01, 41465 (July 11, 2003).

13         As a matter of federal law, then, the presence of trans fats alone is not a "disqualifying"

14   nutrient which would prevent Quaker Oats from emphasizing whatever other health benefits are

15   available from the Bars' other ingredients or because it lacks certain ingredients.  Because the

16   Agency has expressly decided *not* to recognize trans fats as a disqualifying nutrient, plaintiffs' state

17   law claim is inconsistent with subsection (r) and its regulations to the extent it depends on the

18   presence of trans fats to render the content claims misleading.  *See Ackerman v. Coca-Cola Co.*,

19   2010 WL 2925955, at *8 (finding plaintiff's claim that high sugar content in beverage made health

20   claims misleading preempted where FDA failed to establish sugar as a disqualifying nutrient).

21   Essentially, plaintiffs' claim asks this Court to *ascribe* disqualifying status to trans fats where the

22   Agency has at least so far declined to do so.

23         3.   Good Source Claims.

24         Next, Quaker Oats contends its claims that Chewy Bars are a "good source" of calcium and

25   fiber are implied nutrient content claims regulated by section 343(r).  It suggests any argument that

26

27   _____
     [7] The statutory framework generally requires that a "disclaimer" accompany the content claim,
     rather than prohibit the content claim entirely.

28                                                                              No. C 10-0502 RS
                                                                               ORDER

13

United States District Court

For the Northern District of California

these claims are misleading in light of some amount of trans fats in the product similarly is also expressly preempted.  In 21 C.F.R. § 101.54, the Agency defined "good source" nutrient content claims.  A good source claim uses only those terms defined by the Secretary, is made in accordance with the general requirements for all nutrient content claims in section 101.13, and the food for which the claim is made is labeled in accordance with, among others, section 101.9.  21 C.F.R. § 101.54(a)(1)-(3).  Generally, a food purveyor may tout its product as a "good source" of a nutrient where that food contains 10 to 19 percent of the recommended daily intake "per reference amount customarily consumed."  21 C.F.R. § 101.54(c)(1).  Fiber claims contain an additional limitation: unless the food is "low" in fat (defined as "low" in the context of total fat by the relevant regulations), a "good source" fiber claim must also disclose the level of fat per serving.  21 C.F.R. § 101.54(d)(1).

Plaintiffs argue that, even if it is true that Chewy Bars qualify as a "good source" of these two nutrients, inclusion of the claims "falsely" implies that the product is healthy.  As explained above, the FDA has at least so far declined to include trans fat as a disqualifying ingredient and food purveyors need not disclose trans fat levels whenever they tout the existence of other nutrients.  As plaintiffs have presented no other evidence to support their claim that these two good source claims violate the NLEA amendments or attendant regulations, their state law deception claims are preempted.

4.   Wholesome, Smart Choices Made Easy, Photographs of Healthy Children, Oats, and Nuts.

Finally, plaintiffs attack photographic depictions of oats, nuts, and children in soccer uniforms, the inclusion of a "smart choices made easy" decal, and the general descriptor "wholesome" as all being deceptive.  These words, decals, and figures, plaintiffs argue, generally depict Chewy Bars as a "smart" diet choice or as a product that would contribute to a healthy and wholesome lifestyle.  Neither the decal nor the children are appropriately categorized as nutrient content claims, and defendant's contention that the NLEA preempts the charge that they are misleading is without support.  The NLEA does not regulate "front of the box" symbols such as the

smart choices decal or the photographs.  Defendant has submitted a copy of a Notice from the

Agency, dated April of 2010, expressing an interest in determining whether regulation in this arena

would be helpful to consumers.  *See* 75 Fed. Reg. 22602-01 (Apr. 29, 2010).  Until the Agency

brings "front of the box" symbols and photographs into its regulatory ambit, however, it appears a

state law claim that seeks only to prohibit false or misleading statements would not contravene

federal law.

The word "wholesome" could, of course, be interpreted implicitly to characterize the bars'

nutrients.  It is, however, a word with broader meaning than typical claims implying healthfulness

and does not describe any particular nutrient.  While neither party presents any case law interpreting

the word "wholesome" against a NLEA preemption argument, courts often address the word

"natural."  The analysis typically employed in that context is instructive here.  In a case involving a

label for the beverage Snapple, it was touted as being "all natural," despite the fact that high fructose

corn syrup appeared in the ingredient list.  *Holk v. Snapple Beverage Corp.*, 575 F.3d 329 (3d Cir.

2009).  High fructose corn syrup is not a "naturally" occurring substance and the plaintiffs insisted

that descriptor was therefore misleading.  In rejecting the beverage maker's preemption argument,

the Third Circuit observed that the FDA had expressly declined to define "natural."  *Id.* at 341.

While the Agency had articulated an "informal policy" construing the term, and had agreed that a

formal definition would be beneficial, it invoked resource constraints and refused for the time being

to settle on a definition.  The Third Circuit reasoned that the informal policy was not entitled to

preemptive effect and allowed plaintiffs' state law deception claims to proceed.  *Id.*  Here, the

Agency has not developed even an informal policy governing or defining the word "wholesome."

While the term appears in the FDCA statute itself (the FDCA gives the FDA the responsibility to

promulgate regulations to ensure that "foods are safe, wholesome, sanitary, and properly labeled,"

21 U.S.C. § 393(b)(2)(A)), the Agency has not otherwise entered the fray.  Based on this record and

in light of the presumption against preemption, plaintiffs' state claims arguing that "wholesome" is

misleading as used here is not preempted.

C.  Primary Jurisdiction.

No. C 10-0502 RS
Order

"Primary jurisdiction" is a "prudential doctrine under which courts may, under appropriate circumstances, determine that the initial decision-making responsibility should be performed by the relevant agency rather than the courts." *Syntek Semiconductor Co., Ltd. v. Microchip Technology, Inc.*, 307 F.3d 775, 780 (9th Cir. 2002). Dismissal on primary jurisdiction grounds "does not speak to the jurisdictional power of the federal courts," but rather "structures the proceedings as a matter of judicial discretion, so as to engender an orderly and sensible coordination of the work of agencies and courts." *United States v. Bessemer & L.E.R. Co.*, 717 F.2d 593, 599 (D.C. Cir. 1983). The doctrine applies when a court's jurisdiction over a matter overlaps with the jurisdiction of an administrative agency. *United States v. Western Pac. R.R. Co.*, 352 U.S. 59, 63-64 (1956). To justify application of the primary jurisdiction doctrine, "[t]he particular agency deferred to must be one that Congress has vested with the authority to regulate an industry or activity such that it would be inconsistent with the statutory scheme to deny the agency's power to resolve the issues in question." *United States v. Gen. Dynamics Corp.*, 828 F.2d 1356, 1363 (9th Cir. 1987). Traditionally, a court weighs four factors when applying the doctrine: "(1) the need to resolve an issue that (2) has been placed by Congress within the jurisdiction of an administrative body having regulatory authority (3) pursuant to a statute that subjects an industry or activity to a comprehensive regulatory authority that (4) requires expertise or uniformity in administration." *Syntek*, 307 F.3d at 781.

Without question, the FDA has extensively regulated food labeling in the context of a labyrinthine regulatory scheme. Nonetheless, plaintiffs advance a relatively straightforward claim: they assert that defendant has violated FDA regulations and marketed a product that could mislead a reasonable consumer. As courts faced with state-law challenges in the food labeling arena have reasoned, this is a question "courts are well-equipped to handle." *See, e.g.*, *Lockwood v. Conagra Foods, Inc.*, 597 F. Supp. 2d 1028 (N.D. Cal. 2009). Moreover, the issues that survive defendant's preemption arguments—whether or not the "smart choices made easy" decal, the photographs of oats, nuts, and children in soccer uniforms, or the term "wholesome" are misleading—do not entail technical questions or require agency expertise. Accordingly, it would be neither necessary nor

No. C 10-0502 RS
ORDER

16

1   appropriate to invoke the primary jurisdiction doctrine here, especially in that it is unclear what form

2   of relief plaintiffs might hope to obtain from referral to the Agency.  Defendant's motion to for

3   judgment on the pleadings on the basis of primary jurisdiction must therefore be denied, along with

4   their corresponding "abstention" defense.

5        D.  Standing under the UCL, state FAL laws, and the CLRA.

6        Quaker Oats argues that plaintiffs have not established an injury in fact and therefore lack

7   Article III standing to bring their UCL, FAL, or CLRA claims.  Specifically, defendant argues

8   plaintiffs have categorically failed to plead any health-related ailment or impact from consumption

9   of the trans fat-laden snacks.  Plaintiffs correctly point out that the particular harm for which they

10  seek redress is not health related.  Rather, their claims sound in deception, unfairness and false

11  advertising.  As for their UCL claims, a plaintiff suffers "injury in fact" for the purposes of standing

12  under Sections 17200 and 17500 when he or she has: (1) expended money due to the defendant's

13  acts of unfair competition; (2) lost money or property; or (3) been denied money to which he or she

14  has a cognizable claim.  *Hansen Beverage Co. v. Innovation Ventures*, No. 08-1166, 2009 WL

15  6597891, at *15 (Dec. 23, 2010) (*citing Hall v. Time Inc.*, 158 Cal. App. 4th 847 (2008)).  As for the

16  FAL and CLRA, courts in California require that plaintiffs demonstrate the purchase of products as

17  a result of deceptive advertising.  *See, e.g.*, *Laster v. T-Mobile Untied States, Inc.*, 407 F. Supp. 2d

18  1181, 1194 (S.D. Cal. 2005).  The injury alleged here is the *purchase* of food products that contain

19  an ingredient the plaintiffs find objectionable.  Had they known about the trans fat content, they

20  insist, they would not have purchased the product.  Defendant's health-based harm argument misses

21  the mark, as plaintiffs have adequately alleged an injury directly related to the redress they seek.

22       E.  A Cognizable Claim For Relief or Non-Actionable Puffery?[8]

23

24  _____

[8] Defendant also relies on *Cel-Tech Communications, Inc. v. Los Angeles Cellular*, 20 Cal. 4th 163,
25  182 (1999), to argue that plaintiffs' California UCL, FAL and CLRA claims must be dismissed.  In
    *Cel-Tech*, the California Supreme Court instructed that, "Courts may not simply impose their own
26  notions of the day as to what is fair or unfair."  *Id.*  "If the Legislature has permitted certain conduct
    or considered a situation and concluded no action should lie, courts may not override that
27  determination.  When legislation provides a 'safe harbor,' plaintiffs may not use the general unfair
    competition law to assault that harbor."  *Id.*  Quaker Oats' safe harbor defense argues merely that
28  the "0 grams trans fat" statement is permitted by section 343(r) (and required by section 343(q), at

As to those statements noted above that are not subject to preemption, defendant makes the additional argument that, because they are entirely truthful or, at best, represent non-actionable puffery, plaintiffs cannot as a matter of law establish that any of them are misleading.  Puffery involves "outrageous generalized statements, not making specific claims, that are so exaggerated as to preclude reliance by consumers."  *Cook, Perkiss and Liehe, Inc. v. N. Cal. Collection Serv. Inc.*, 911 F.2d 242, 246 (9th Cir. 1990).  "[A]dvertising which merely states in general terms that one product is superior is not actionable."  *Id.* (*quoting Smith-Victor Corp. v. Sylvania Elec. Prods., Inc.*, 242 F. Supp. 302, 308 (N.D. Ill. 1965).  On the other hand, "misdescriptions of specific or absolute characteristics of a product are actionable."  *Cook*, 911 F.2d at 246.

As to "wholesome," Quaker Oats insists that the term is so vague and general that a reasonable consumer would not be misled.  For support, Quaker Oats relies upon a district court decision finding that the phrase, "[the] most wholesome nutritious safe foods you can buy anywhere in the world," constituted non-actionable puffery.  *Tylka v. Gerber Products Company*, No. 96-1647, 1999 WL 495126, at *2 (N.D. Ill. July 1, 1999).  The use of the word "wholesome," however, was only part of the phrase deemed puffery in *Tylka*.  It was surely the idea that there were no more nutritious, safe, or wholesome products available *anywhere* else around the globe that rose to the level of unbelievable exaggeration.  The insistence that a product with (allegedly) dangerous additives is nonetheless "wholesome," by contrast, arguably *could* mislead a reasonable consumer.  Accordingly, at this juncture, the term "wholesome" cannot be deemed to constitute non-actionable puffery.

Similarly, Quaker Oats insists the "smart choices made easy" decal is either true or constitutes puffery.  Either way, Quaker Oats contends a reasonable consumer could not find the symbol or any of its possible implications to be misleading.  According to plaintiffs, the smart choices program itself is "deceitful," and is a product of an "industry-funded initiative created by a coalition of market giants."  (Pls.' Opp'n at 23:2-4.)  Plaintiffs argue the decal is "nutritionally

least as it appears in the nutrition box).  As noted above, all claims addressing the "0 grams trans fat" statement are expressly preempted.  Accordingly, defendant's safe harbor argument is moot.

suspect" and is designed to make "highly processed foods appear as healthful as unprocessed foods." (*Id.* at 10-11.) As with "wholesome," a determination of whether or not the decal is non-actionable owing to its status as either true or harmless puffery cannot be determined on this motion.

Finally, Quaker Oats asks the Court to reject plaintiffs' argument that photographic depictions of oats, nuts, and children in soccer uniforms are misleading. Taking plaintiffs' allegation that trans fats are not safe in any amount as true, and crediting the inference plaintiffs draw from the box (that is, that active, healthy children are fueled with Chewy Bars), the Court cannot resolve at this juncture the issue of whether or not a reasonable consumer might be duped by these depictions.

F. Pleading with Particularity: Federal Rule of Civil Procedure 9(b).

Defendant argues that plaintiffs' claims sound in fraud and therefore must satisfy the particularity requirement of Rule 9(b). *See Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103-04 (9th Cir. 2003). Rule 9(b) requires that plaintiffs allege circumstances constituting the alleged fraud that are "specific enough to give defendants notice of the particular misconduct . . . so that they can defend against the charge and not just deny that they have done anything wrong." *Id.* at 1106 (*quoting Bly-Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001)).

In the context of a 12(b)(6) motion to dismiss, failure to plead with adequate particularity typically affords a plaintiff the ability to amend the complaint. Defendant wishes to avoid that result here and instead terminate this action. Even assuming defendant's Rule 9(b) arguments are relevant to the consideration of a motion for judgment on the pleadings, plaintiffs have identified the particular statements they allege are misleading, the basis for that contention, where those statements appear on the product packaging, and the relevant time period in which the statements were used. As such, they have satisfied the requisite "who, what, when, where, and how" of the misconduct charged. *See Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009).

G. Standing to bring the Lanham Act / False Advertising Claim.

Defendant seek judgment as a matter of law on plaintiffs' Lanham Act claims and again raises a standing argument, this time pointing out that the Lanham Act governs unfair competition

only between competitive entities.  Because plaintiffs are private individuals (indeed, consumers), defendant insists they lack standing to sue for false advertising under the Act.  Under the Lanham Act, any person who uses a "false description or representation" that is "in connection with any goods" is liable to another "who believes he is or is likely to be damaged by the use of any such false description or representation." 15 U.S.C. § 1125(a).  *See generally Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 835 (9th Cir. 2002) (*citing Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997)).  The Lanham Act is primarily intended to protect commercial interests from unfair competition.  *See Mut. Pharm. Co. v. Ivax Pharms., Inc.*, 459 F. Supp. 2d 925, 934-34 (C.D. Cal. 2006) (*citing Sandoz Pharm. Corp. v. Richardson-Vicks, Inc.*, 902 F.2d 222, 230 (3rd Cir. 1990)).

In *Jack Russell Terrier Network of Northern California v. American Kennel Club*, 407 F.3d 1027, 1037 (9th Cir. 2005), the Court clarified that "different causes of action alleged pursuant to the different subsections of 15 U.S.C. § 1125(a) have different standing requirements."  "[F]or standing pursuant to the 'false advertising' prong of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), a plaintiff must show: (1) a commercial injury based upon a misrepresentation about a product; and (2) that the injury is "competitive," or harmful to the plaintiff's ability to compete with the defendant." *Id.* (citations omitted).  Plaintiffs here do not argue that they mean to compete in any way with Quaker Oats and therefore cannot satisfy the second prong of the standing requirement.  Instead, they counter by pointing out that they seek only injunctive relief under the Act, pursuant to section 1116, where the standing requirements are more relaxed.  *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, (9th Cir. 1997) ("First of all, a competitor need not prove injury when suing to enjoin conduct that violates section 43(a).") (internal quotation marks and citation omitted).  *Southland Sod Farms*, however, does not stand for the proposition that a non-competitor otherwise without standing may bring a false advertising claim if only injunctive relief is requested.  In short, plaintiffs have not shown that they have standing to sue under the Lanham Act and judgment must therefore be entered against them on this claim.

V.  CONCLUSION

No. C 10-0502 RS
ORDER

For the reasons stated above, plaintiffs' state law claims targeting the "0 grams trans fat," "good source," "made with whole grain oats," and "no high fructose corn syrup" declarations must fail on preemption grounds. As plaintiffs lack standing under the Lanham Act, judgment is entered for defendants on this claim also. Insofar as Quaker Oats seeks a favorable judgment at this juncture on all state claims that focus on the term "wholesome," on images of children, nuts, or oats, or the "smart choices made easy" language or decal, its motion is denied. A Further Case Management Conference shall be held on **December 16, 2010 at 10:00 a.m.** in Courtroom 3, on the 17th Floor of the United States Courthouse, 450 Golden Gate Avenue, San Francisco, California. The parties shall submit a Joint Case Management Statement at least one week prior to the Conference.

IT IS SO ORDERED.

Dated: 10/14/10

_____
RICHARD SEEBORG
UNITED STATES DISTRICT JUDGE

**United States District Court**
For the Northern District of California

No. C 10-0502 RS
ORDER