**THE WESTON FIRM**
GREGORY S. WESTON (239944)
888 Turquoise Street
San Diego, CA 92109
Telephone: (858) 488-1672
Facsimile:   (480) 247-4553
greg@westonfirm.com

JACK FITZGERALD (257370)
2811 Sykes Court
Santa Clara, CA 95051
Telephone: (408) 459-0305
jack@westonfirm.com

**Interim Class Counsel**

**LAW OFFICES OF RONALD A. MARRON, APLC**
RONALD A. MARRON (175650)
3636 4th Avenue, Suite 202
San Diego, CA 92103
Telephone:   (619) 696-9006
Facsimile:    (619) 564-6665
ron.marron@gmail.com

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| VICTOR GUTTMANN, KELLEY BRUNO, SONYA YRENE, and REBECCA YUMUL, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>THE QUAKER OATS COMPANY,<br><br>Defendant. | Case No: 5:10-cv-00502 RS<br>Pleading Type: Class Action<br><br>**FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF:**<br><br>**THE UNFAIR COMPETITION LAW;**<br><br>**FALSE ADVERTISING LAW; AND**<br><br>**CONSUMER LEGAL REMEDIES ACT**<br><br>DEMAND FOR JURY TRIAL |

1       Plaintiffs Victor Guttmann, Kelley Bruno, Sonya Yrene, and Rebecca Yumul

2   ("Plaintiffs"), on behalf of themselves, all others similarly situated, and the general public, by

3   and through undersigned counsel, hereby sue Defendant The Quaker Oats Company, Inc.

4   ("Quaker" or "Defendant") and, upon information and belief and investigation of counsel, allege

5   as follows:

6                                 **PRELIMINARY STATEMENT**

7       1.    This Master Consolidated Complaint is filed pursuant to the Order of the

8   Honorable Richard Seeborg, dated June 14, 2011, consolidating the following actions:

9       *Chacanaca, et al. v. The Quaker Oats Co.*, No. C 10-0502 RS (filed Feb. 3, 2010);

10      *Yrene v. The Quaker Oats Co.*, No. C 10-5389 RS (filed Nov. 29, 2010);

11      *Yumul, et al. v. The Quaker Oats Co.*, No. C 10-5538 RS (filed Dec. 6, 2010); and

12      *Pelobello v. The Quaker Oats Co.*, No. C 11-0093 RS (filed Jan. 7, 2011).

13                             **JURISDICTION AND VENUE**

14      2.    This Court has original jurisdiction under 28 U.S.C. §1332(d)(2) (The Class

15  Action Fairness Act) because the matter in controversy exceeds the sum or value of $5,000,000

16  exclusive of interest and costs and more than two-thirds of the members of the Classes reside in

17  states other than the state of which Defendant is a citizen.

18      3.    Venue is proper in this Court pursuant to 28 U.S.C. §1391 because many of the

19  acts and transactions giving rise to this action occurred in this district, several related actions are

20  pending in this District, and Defendant (1) is authorized to conduct business in this district and

21  has intentionally availed itself of the laws and markets of this district through the promotion,

22  marketing, distribution, and sale of its products in this district; (2) resides in this district; and (3)

23  is subject to personal jurisdiction in this district.

24                                  **INTRODUCTION**

25      4.    Plaintiffs repeatedly purchased packaged food products manufactured by Quaker

26  in California during the Class Period defined herein, which Quaker falsely and misleadingly

27  marketed as healthful although they contain partially hydrogenated vegetable oils ("PHVO"),

28  which have dangerous levels of artificial *trans* fat, a toxic food additive banned in many parts of

1

the world. Artificial *trans* fat causes heart disease, cancer, and diabetes. Quaker nevertheless labels many of its products containing *trans* fat as beneficial to health. For example, Quaker claims that some of its products containing *trans* fat are "Heart Healthy," and that others are "Wholesome."

5. Plaintiffs seek an order compelling Quaker to (1) cease marketing its products using the misleading tactics complained of herein, (2) conduct a corrective advertising campaign, (3) restore the amounts by which Quaker was unjustly enriched, and (4) destroy all misleading and deceptive materials and products.

## PARTIES

13. Defendant The Quaker Oats Company is a New Jersey corporation with its principal place of business in Illinois. Quaker manufactures, markets, distributes and sells Quaker Instant Oatmeal, Quaker Chewy Granola Bars, and Quaker Oatmeal to Go Bars (collectively the "Quaker PHVO Products"), which all contain PHVO and artificial trans fat.

14. Plaintiff Victor Guttmann is a resident of California.

15. Plaintiff Kelley Bruno is a resident of California.

16. Plaintiff Sonya Yrene is a resident of California.

17. Plaintiff Rebecca Yumul is a resident of California.

## FACTUAL ALLEGATIONS

18. Mr. Guttmann purchased Quaker Chewy Granola Bars for himself at least once per month between 2006 and early 2010, at grocery and convenience stores in Berkeley and Danville, California.

19. Ms. Bruno purchased Quaker Instant Oatmeal for herself and her family several times each month between 2006 and 2010. Most of Ms. Bruno's purchases were made at Stater Brothers and Target locations in Hesperia, California, and in southern Orange County, California.

20. Ms. Yrene purchased Quaker Instant Oatmeal for herself and her family about once a week between 2006 and later 2010, primarily at the Food-4-Less located at 660 Palomar Street, Chula Vista, California.

21.     Ms. Yumul regularly purchased Quaker Chewy Granola Bars, Quaker Instant Oatmeal, and Quaker Oatmeal to Go Bars between 2006 and late 2010, at the following grocery stores near her home: (1) Albertsons, 110 East Carson Street, Carson, California; (2) Ralphs, 650 East Carson Street, Carson, California; and (3) Food4Less, 851 Sepulveda Boulevard, Torrance, California. Ms. Yumul also occasionally purchased the Quaker PHVO products at other nearby stores in Carson and Torrance.

### SUMMARY OF THE STRONG EVIDENCE OF ARTIFICIAL TRANS FAT'S HEALTH HAZARDS

**Artificial trans fat is a manufactured food product whose basic chemical structure is different from natural fat molecules.**

22.     Trans fat is naturally found in trace amounts in foods derived from ruminant animals, primarily in cow's milk and red meat.[1] It is also found in small quantities in human breast milk.

23.     Also known as vaccenic acid, natural trans fat has never been linked to any negative health effect in human beings and is chemically different from artificial trans fat.

24.     Initial studies on rats indicate that consumption of vaccenic acid is beneficial to health.[2]

25.     Artificial trans fat, by contrast, is manufactured via an industrial process called partial hydrogenation, in which hydrogen atoms are added to normal vegetable oil by heating the oil to temperatures above 400 degrees Fahrenheit in the presence of ion donor catalyst metals such as rhodium, ruthenium, and nickel.[3]

26.     The resulting product is known as partially hydrogenated vegetable oil or PHVO, which is a major ingredient in the Quaker PHVO products, and is the main source of artificial

[1] Dariush Mozaffarian *et al., Trans Fatty Acids and Cardiovascular Disease*, 354 New Eng. J. Med. 1601, 1608 (2008).

[2] Ye Wang *et al., Trans-11 Vaccenic Acid Dietary Supplementation Induces Hypolipidemic Effects on JCR:LA-cp Rats*, 138 J. Nutrition 2117 (November 2008).

[3] *See* Alice H. Lichtenstein, *Trans Fatty Acids, Plasma Lipid Levels, and Risk of Developing Cardiovascular Disease*, 95 Circulation 2588, 2588-90 (1997).

trans fat in the American diet.[4]

27.    PHVO was invented in 1901 and patented in 1902 by German chemist Wilhelm Normann. PHVO molecules chemically differ from the natural fat molecules in other food products, as shown in the illustrations that follow.

28.    Natural fat, except the trace amounts of natural trans fat from ruminant animals, comes in two varieties: (1) fats that lack carbon double bonds ("saturated fat") and (2) fats that have carbon double bonds with the hydrogen atoms on the same side on the carbon chain ("*cis* fat"). Trans fat, however, has double bonds on opposite sides of its carbon chain.



29.    PHVO was initially a "wonder product" attractive to the packaged food industry because it combines the low cost of unsaturated *cis* fat with the flexibility and long shelf life of saturated fat. Like *cis* fat, PHVO is manufactured from lower-cost legumes,[5] while saturated fat is derived from relatively expensive animal and tropical plant sources.[6]

30.    The industrial process that adds hydrogen ions to normal vegetable oil improves food texture and permits food products to withstand heavy mechanical processing and high

---

[4] *See* Mozaffarian, 354 New Eng. J. Med. at 1608.
[5] e.g., corn oil, soybean oil, peanut oil
[6] e.g., butter, cream, tallow, coconut oil

temperatures.[7] Given its versatility, PHVO was recently used in 40 percent of processed packaged foods.[8]

31. Artificial trans fat does not exist in nature, and the human body has not evolved to digest it. The same unusual and unnatural chemical structure that gives artificial trans fat properties attractive from an industrial perspective makes it highly toxic to human health.

**ARTIFICIAL TRANS FAT CAUSES CARDIOVASCULAR DISEASE, TYPE 2 DIABETES, AND CANCER.**

- **Coronary Heart Disease, Atherosclerosis, and Chronic Cardiac Inflammation**

32. In a joint Dietary Guidelines Advisory Committee Report, the U.S. Department of Health and Human Services and the U.S. Department of Agriculture recognized **"[t]he relationship between trans fatty acid intake and LDL cholesterol is direct and progressive, increasing the risk of cardiovascular disease."**[9] This "direct and progressive" relationship means even small amounts of artificial trans fat increase LDL blood cholesterol levels and damages the cardiovascular system.

33. Food products with artificial trans fat harm the heart by "rais[ing] the concentration of the most dangerous form of serum cholesterol (LDL cholesterol)" and "lower[ing] a protective form of serum cholesterol (HDL cholesterol)."[10]

34. The American Heart Association notes **"trans fats raise your bad (LDL) cholesterol levels and lower your good (HDL) cholesterol levels. Eating trans fats increases**

---

[7] *See* Alberto Ascherio *et al.*, *Trans Fatty Acids & Coronary Heart Disease*, 340 New Eng. J. Med. 94, 94-8 (1999). *See also* Ctr. for Food Safety & Applied Nutrition, U.S. Food & Drug Admin., Questions & Answers About Trans Fat Nutrition Labeling (Update 2006) (2003), *available at* http://www.cfsan.fda.gov/%7Edms/qatrans2.html

[8] Mary Carmichael, *The Skinny on Bad Fat*, Newsweek, Dec. 1, 2003, at 66. *See also* Kim Severson, *Hidden Killer. It's Trans Fat. It's Dangerous. And It's In Food You Eat Every Day*, S.F. Chron., Jan. 30, 2002.

[9] Dep't of Health & Human Serv. & U.S. Dep't of Agric., 2005 Dietary Guidelines Advisory Committee Report, Section 10 (2005).

[10] *Id.*

1 **your risk of developing heart disease."**[11]

2     35.    After an extensive evaluation of the scientific literature on the trans fat/Coronary

3 Heart Disease ("CHD") connection, the FDA concluded:

4     [B]ased on the consistent results across a number of the most persuasive types of
study designs (i.e., intervention trials and prospective cohort studies) that were
5     conducted using a range of test conditions and across different geographical
regions and populations . . . the available evidence for an adverse relationship
6     between *trans* fat intake and CHD risk is strong.[12]

7     36.    Trans fat raises the risk of CHD more than any other known nutritive product.[13]

8     37.    Removing 2 percent of daily calories from trans fat from the American diet

9 "would prevent approximately 30,000 premature coronary deaths per year, and epidemiologic

10 evidence suggests this number is closer to 100,0000 premature deaths annually."[14]

11     38.    A study on the impact of trans fatty acids on heart health provides evidence that:

12     [E]ven the lower estimates from the effects [of PHVO] on blood lipids would
suggest that more than 30,000 deaths per year may be due to the consumption of
13     partially hydrogenated vegetable fat. Furthermore, the number of attributable
cases of nonfatal coronary heart disease will be even larger.[15]
14

15     39.    Since "the adverse effect of trans fatty acids is stronger than that of saturated fatty

16 acids," saturated fat consumption would need to be reduced by 10 percent of caloric intake to

17 have the same impact.[16]

18     40.    "10 to 19 percent of CHD events in the United States could be averted by

19 reducing the intake of trans fat."[17]

20

---

21 [11] Am. Heart Ass'n., *Trans Fat Overview*, *available at*
http://www.americanheart.org/presenter.jhtml?identifier=3045792.
22 [12] Ctr. for Food Safety & Applied Nutrition, U.S. Food & Drug Admin., Questions & Answers
23 About Trans Fat Nutrition Labeling.
[13] Mozaffarian, 354 New Eng. J. Med. at 1603.
24 [14] Alberto Ascherio *et al.*, *Trans Fatty Acids & Coronary Heart Disease*, 340 New Eng. J. Med.
25 94, 94-8 (1999).
[15] W.C. Willett *et al., Trans Fatty Acids: Are the Effects only Marginal?* 84 Am. J. Pub. Health
26 722, 723 (1994).
27 [16] Mozaffarian, 354 New Eng. J. Med. at 1609.
[17] Mozaffarian, 354 New Eng. J. Med. at 1611.
28

1    41.    By raising LDL levels and lowering HDL levels, trans fat causes a wide variety of

2    dangerous heart conditions, including low flow-mediated vasodilation, coronary artery disease,

3    and primary cardiac arrest.

4    42.    After conducting a crossover diet trial, Danish researchers determined that healthy

5    men and women who maintained a high-trans fat diet had 21 percent lower protective HDL

6    levels and 29 percent lower flow-mediated vasodilation ("FMD") than those on a high-saturated

7    fat diet. FMD measures the percent increase between the diameter of the artery at ordinary and at

8    maximum dilation, and low FMD is "a risk marker of coronary heart disease.[18]

9    43.    Australian researchers observed that heart attack patients possess elevated

10    amounts of trans fat in their adipose tissue, strongly linking heart disease with long-term

11    consumption of trans fat.[19]

12    44.    By taking blood samples from 179 survivors of cardiac arrest and 285 randomly-

13    selected control patients and comparing the top fifth with the bottom fifth of participants by trans

14    fat intake, another study published in the American Heart Association's *Circulation* found that

15    the largest consumers of trans fat have three times the risk of suffering primary cardiac arrest,

16    even after controlling for a variety of medical and lifestyle risk factors.[20]

17    45.    Trans fat also causes heart disease because it interferes with the normal operation

18    of the endothelial cells that line, regulate, and protect the heart and arteries.[21]

19    46.    Artificial trans fat further damages the heart and other vital organs by causing

20

21    [18] Nicole M. De Roos *et al*., *Replacement of Dietary Saturated Fatty Acids by Trans Fatty Acids*

22    *Lowers Serum HDL Cholesterol and Impairs Endothelial Function in Healthy Men and Women*,
21 Am. Heart Assoc. 1233, 1233-37 (2001).

23    [19] Peter M. Clifton *et al*., *Trans Fatty Acids In Adipose Tissue And The Food Supply Are*
*Associated With Myocardial Infarction*. 134 J. of Nutrition 874, 874-79 (2004).

24    [20] Rozenn N. Lemaitre *et al*., *Cell Membrane Trans-Fatty Acids and the Risk of Primary Cardiac*

25    *Arrest*, 105 Circulation 697, 697-701 (2002).

26    [21] *See* Zapolska-Downar et al., *Trans Fatty Acids Induce Apoptosis in Human Endothelial Cells*,
56 J. Phys. And Pharm. 4, 611-625 (2005); Lopez-Garcia et al., *Consumption of Trans Fat is*

27    *Related to Plasma Markers of Inflammation and Endothelial Dysfunction*, 135 J. of Nutr. 562-66

28    (2005).

1  chronic systemic inflammation, where the immune system becomes persistently overactive,

2  damages cells, and causes organ dysfunction.[22]

3        47.   In June 2009, scientists found that mice fed a controlled diet "did not exhibit

4  appreciable atherosclerotic plaque formation," but adding trans fat to their diet stimulated

5  atherosclerotic development on its own, "which is an event not normally observed in [mice]."

6  Further, "the higher the circulating [trans fat] was, the more extensive were the atherosclerotic

7  lesions," thus showing trans fat consumption "can directly induce atherosclerosis."[23]

8  • **Type 2 Diabetes and Diabetes-Induced Cognitive Decline**

9        48.   Artificial trans fat causes type 2 diabetes.[24]

10        49.   In particular, trans fat disrupts the body's glucose and insulin regulation system

11  by incorporating itself into cell membranes, causing the insulin receptors present on cell walls to

12  malfunction, elevating blood glucose levels and stimulating further release of insulin.

13  Researchers at Northwestern University's medical school found mice show multiple markers of

14  type 2 diabetes after eating a trans fat diet for only four weeks. By the eighth week of the study,

15  mice fed the diet high in trans fat showed a 500 percent increase compared to the control group

16  in hepatic interleukin-1β gene expression, indicating the extreme stress trans fat places on the

17  body.[25]

18        50.   A 14-year study of 84,204 women found that for every 2 percent increase in

19  energy intake from trans fat, the relative risk of type 2 diabetes was 1.39. In other words, each 2

20

_____

21  [22] *See id.*; *see also* Baer et al., *Dietary fatty acids affect plasma markers of inflammation in healthy men fed controlled diets: a randomized crossover study*, 79 Am. J. Clin. Nutr. 969-73

22  (2004); Mozaffarian & Clarke, *Quantitative effects on cardiovascular risk factors and coronary heart disease risk of replacing partially hydrogenated vegetable oils with other fats and oils*, 63

23  Euro. J. of Clin. Nutr. S22-S33 (2009); Mozaffarian et al., *Trans Fatty acids and systemic inflammation in heart failure*, 80 Am. J. Clin. Nutr. 1521-25 (2004).

24

25  [23] Am. Heart Ass'n., *Trans Fat Overview*.

   [24] *Id.*

26  [25] Sean W. P. Koppe *et al.*, *Trans fat feeding results in higher serum alanine aminotransferase and increased insulin resistance compared with a standard murine high-fat diet*, 297 Am. J.

27  Physiol. Gastrointest Liver Physiol. G378-84 (2009).

28

FIRST AMENDED CONSOLIDATED COMPLAINT

1   percent of calories from artificial trans fat increases the risk of type 2 diabetes by 39 percent.[26]

2   51.   Further, in addition to *causing* type 2 diabetes, artificial trans fat also *accelerates*

3   diabetes-related health decline. *See* Devore et al., *Dietary fat intake and cognitive decline in*

4   *women with type 2 diabetes*, 32 Diabetes Care 635-340 (2009). This study covered 1,486

5   participants and carefully controlled for body mass index, physical activity, diabetes severity,

6   depression, vitamin E supplement use, alcohol intake, smoking status, and history of high blood

7   pressure, high cholesterol, or myocardial infarction.

8   52.   Even after controlling for these factors, the tertile of women who consumed the

9   largest amount of artificial trans fat suffered cognitive decline equivalent to 7 years of added

10   aging compared to the tertile of women who consumed the lowest amount, yet this difference in

11   consumption between these two carefully controlled groups amounted to about 2.1g per day. *Id*

12   at 637. This result was statistically significant at a 99.8 percent level. *Id* at 637, Table 2. The

13   authors further noted that their results are consistent with other studies showing trans fat causes

14   Alzheimer's disease, as "insulin resistance, high insulin levels, and cholesterol are all implicated

15   in the β-amyloid accumulation in the brain—the pathologic hallmark of Alzheimer's disease." *Id*

16   at 693.

17   • **Breast, Prostate, and Colorectal Cancer**

18   53.   *Trans* fat is a carcinogen and causes breast, prostate, and colorectal cancer.

19   54.   A 13-year study of 19,934 French women showed 75 percent more women

20   contracted breast cancer in the highest quintile of trans fat consumption than did those in the

21   lowest.[27]

22   55.   In a 25-year study of 14,916 U.S. physicians, the doctors in the highest quintile of

23   trans fat intake had over a 100 percent greater risk of developing prostate cancer than the doctors

24

25
     _____

26   [26] Jorge Salmeron *et al.*, *Dietary Fat Intake and Risk of Type 2 Diabetes in Women*, 73 Am. J. of
     Clinical Nutrition 1019, 1023 (2001).

27   [27] Véronique Chajès *et al.*, *Association between Serum Trans-Monounsaturated Fatty Acids and*
     *Breast Cancer Risk in the E3N-EPIC Study.* 167 Am. J. of Epidemiology 1312, 1316 (2008).

28

1   in the lowest quintile.[28]

2       56.    A study of 1,012 American males observing trans fat intake and the risk of

3   prostate cancer found "[c]ompared with the lowest quartile of total trans-fatty acid consumption,

4   the higher quartiles gave odds ratios (ORs) equal to 1.58," meaning those in the highest quartile

5   are 58% more likely to contract prostate cancer than those in the lowest.[29]

6       57.    A 600-person study found an 86 percent greater risk of colorectal cancer in the

7   highest trans fat consumption quartile.[30]

8       58.    A 2,910-person study found "*trans*-monounsaturated fatty acids . . . were dose-

9   dependently associated with colorectal cancer risk," which showed "the importance of type of fat

10   in the etiology and prevention of colorectal cancer."[31]

11       59.    The serious health conditions caused by trans fat consumption only occur from

12   consuming artificial trans fat, not the trace natural trans (vaccenic acid) fat found in ruminant

13   sources:

> Of four prospective studies evaluating the relation between the intake of trans
> fatty acids from ruminants and the risk of CHD, none identified a significant
> positive association, whereas three identified nonsignificant trends toward an
> inverse association. . . . [T]he sum of the current evidence suggests that the
> public health implications of consuming trans fats from ruminant products are
> relatively limited.[32]

18   **The grave, concrete risks of artificial trans fat consumption far outweigh any**
19   **conceivable benefits of Quaker's conduct.**

20       60.    There is no health benefit to artificial trans fat consumption and "no safe level" of

---

[28] Jorge Chavarro *et al.*, *A Prospective Study of Blood Trans Fatty Acid Levels and Risk of Prostate Cancer.*, 47 Proc. Am. Assoc. of Cancer Research 95, 99 (2006).

[29] Xin Liu *et al.*, *Trans-Fatty Acid Intake and Increased Risk of Advanced Prostate Cancer: Modification by RNASEL R462Q Variant*, 28 Carcinogenesis 1232, 1232 (2007).

[30] L.C. Vinikoor *et al.*, *Consumption of Trans-Fatty Acid and its Association with Colorectal Adenomas*, 168 Am. J. of Epidemiology 289, 294 (2008).

[31] Evropi Theodoratou *et al.*, *Dietary Fatty Acids and Colorectal Cancer: A Case-Control Study*, 166 Am. J. of Epidemiology 181 (2007).

[32] Mozaffarian, 354 New Eng. J. Med. at 1608-1609.

1  artificial trans fat intake.[33]

2      61.    According to the established consensus of the scientific community, consumers

3  should keep their consumption of trans fat "as low as possible." *Id.*

4      62.    As Dr. Dariush Mozaffarian writes in the New England Journal of Medicine:

5      [F]rom a nutritional standpoint, the consumption trans fatty acids results in
       considerable potential harm but no apparent benefit. . . . Thus, complete or near-

6      complete avoidance of industrially produced trans fat—a consumption of less than
       0.5 percent of the total energy intake—may be necessary to avoid adverse effects

7      and would be prudent to minimize health risks.[34]

8  **Trans fat is so inherently dangerous that it is being banned in an increasing**

9  **number of American states and European countries.**

10     63.    In 2008, California became the first state to ban all restaurant food with artificial

11 trans fat, a law affecting approximately 88,000 eating establishments. Trans fats are now banned

12 in restaurants, with temporary limited exceptions, as of January 1, 2010.

13     64.    New York City banned all trans fat in its 20,000 food establishments in 2006.

14 Similar laws exist in Philadelphia; Baltimore; Stamford, Connecticut; and Montgomery County,

15 Maryland.

16     65.    A 2004 Danish law restricted all foods to under 2 percent of calories from trans

17 fat. Switzerland made the same restriction in 2008.[35] Thus many of the Quaker PHVO Products,

18 prominently touted as heart healthy products on their packages, are illegal in these nations

19 because they raise LDL cholesterol levels, inflame blood vessels, and cause heart disease.

20     66.    After conducting a surveillance study of Denmark's trans fat ban, researchers

21 concluded the change "did not appreciably affect the quality, cost or availability of food" and did

22 not have "any noticeable effect for the consumers."[36]

23

24 [33] Food & Nutrition Bd., Inst. of Med., Dietary Reference Intakes For Energy, Carbohydrate, Fiber, Fat, Fatty Acids, Cholesterol, Protein, and Amino Acids (2005).

25 [34] Mozaffarian, 354 New Eng. J. Med. at 1608-1609.

26 [35] Andrew Collier, *Deadly Fats: Why Are We still Eating Them?*, The Independent (UK), June 10, 2008.

27 [36] Mozaffarian, 354 New Eng. J. Med. at 1610; *see also* High Levels of Industrially Produced

28 Trans Fat in Popular Fast Food, 354 New Eng. J. Med. 1650, 1652 (2006).

67.     In 2006, a trans fat task force co-chaired by Health Canada and the Heart and Stroke Foundation of Canada recommended capping trans fat content at 2 percent of calories for tub margarines and spreads and 5 percent for all other foods. On September 30, 2009, British Columbia became the first province to impose these rules on all restaurants, schools, hospitals, and special events.[37]

## SPECIFIC MISREPRESENTATIONS, MATERIAL OMISSIONS, & DECEPTIVE ACTS

### Quaker Chewy Granola Bars

68.     During the Class Period, Quaker Chewy Granola bars were made with PHVO yet contained deceptive health and wellness claims, including at least the following varieties: Chewy Granola Bars with Protein and Chewy Granola Bars 25% Less Sugar. Photos of the packaging of each product are attached hereto as **Exhibit A**.

69.     **Misleading "Wholesome" Claim:** Quaker misleads consumers into believing Quaker Chewy Granola Bars are healthy by making misleading claim on the products' packaging that the products are "wholesome," which misleadingly implies that Quaker Chewy granola bars are healthy despite containing artificial trans fat, a toxic additive that causes heart disease, cancer, and type 2 diabetes.

70.     **False and Misleading "Smart Choices Made Easy" Claim:** The package of Quaker Chewy Granola Bars bears the phrase "SMART CHOICES MADE EASY" and includes a brief paragraph listing some of the products' attributes. This is false and misleading, as the implication of the statements, taken in context, is that Quaker Chewy Granola Bars are a good decision for one's health. In fact, the trans fat content of Quaker Chewy granola bars renders them extremely unhealthy, and by no means a "smart [food] choice."

71.     Furthermore, because it is made with of highly refined sugar and simple starches, Quaker Chewy Granola Bars are hardly "wholesome" or a "smart choice" for healthy human consumption, and are no better than more typical junk foods that do not make such claims to

---

[37] *Province Restricts Trans Fat in B.C.*, British Columbia Ministry of Healthy Living and Sport Press Release (2009), *available at* http://www2.news.gov.bc.ca/news_releases_2005-2009/2009HLS0013-000315.htm.

1    wholesomeness. These ingredients are digested into simple sugar and immediately released into

2    the blood stream. High levels of blood sugar are toxic to a number of organs; as a result, the

3    body releases the hormone insulin as a response to reduce blood sugar to safe levels. This

4    process, over time, weakens the normal ability of cells to react to insulin and leads to partial

5    insulin resistance. This process is the hallmark of pre-diabetes and the eventual onset of type 2

6    diabetes.

7         72.    The levels of sugars and simple starches give Quaker Chewy Granola Bars a high

8    glycemic index, making Quaker Chewy Granola Bars a product which promotes not only insulin

9    resistance and diabetes, but overall metabolic dysfunction, childhood obesity, and heart disease.

10   There is nothing "wholesome" about the significant risk of such negative health conditions.

11        73.    The immediate risks presented by the consumption of Quaker Chewy granola bars

12   are the resulting spikes and crashes in emotional mood and bodily energy, which can leave

13   people feeling tired, moody, irritable, and even depressed. In the context of human nutrition, a

14   source of calories with these resultant characteristics could hardly be labeled a "Smart Choice"

15   or a "Wholesome" one.

16        74.    Moreover, the Smart Choices program itself is highly misleading, and is wielded

17   by Quaker to deceive consumers.

18        75.    The Smart Choices Program is an industry-funded initiative created by a coalition

19   of market giants including Quaker, Kraft, Kellogg's, General Mills, Unilever, ConAgra, Tyson

20   Foods, and PepsiCo. Products that have received the "Smart Choices" checkmark include Froot

21   Loops, Lucky Charms, Cocoa Crispies, Ritz Bitz Peanut Butter Chocolatey Blast Crackers,

22   mayonnaise, and Fudgesicles. Froot Loops contains 41% sugar by weight—more than many

23   popular brands of cookies.

24        76.    Walter Willett, chair of the nutrition department at the Harvard School of Public

25   Health, called Smart Choice's criteria "seriously flawed," and "not credible."[38] New York

26

27   [38] William Neuman, *For Your Health, Froot Loops*, N.Y. Times, September 4, 2009, *available at*
     http://www.nytimes.com/2009/09/05/business/05smart.html.

28

1    University nutrition professor Marion Nestle said, "[t]he object of this is to make highly-

2    processed foods appear as healthful as unprocessed foods, which they are not." *Id.* Michael

3    Jacobson, executive director of the Center for Science in the Public Interest, was previously part

4    of the Smart Choices panel responsible for devising nutritional criteria, but quit because it was

5    dominated by members of the food industry, which skewed the panel's decisions. *Id.* Those

6    criteria, for example, designate as a "Smart Choice" frozen meals and sandwiches containing 600

7    milligrams of sodium, a quarter of the recommended daily maximum intake. *Id.*

8        77.    So dubious is the Smart Choices program that Connecticut's Attorney General

9    initiated an investigation into whether it represents a form of consumer deception in September,

10   2009, calling the program "nutritionally suspect."[39] In the light of extensive criticism and

11   following a letter from the FDA, Smart Choices voluntarily suspended its program on October

12   23, 2009. Following that suspension, PepsiCo cut ties with the program and Kellogg's

13   announced it would phase out packaging bearing the Smart Choices label. But Quaker has kept

14   the Smart Choice label, continuing to deceive consumers.

15       78.    **Misleading Images Used in Advertising:** Quaker also labels Quaker Chewy

16   Granola Bars with images of oats, nuts, and children in soccer uniforms (juxtaposed with text

17   telling the consumer to use Quaker Chewy Granola Bars to "help your family fuel their busy

18   days." The obvious implication of this is that Quaker Chewy granola bars are, like oats, nuts, and

19   exercise, part of a healthy lifestyle, and can provide healthy "fuel" for that lifestyle. In fact,

20   Quaker Chewy Granola Bars contain artificial *trans* fat, which renders them extremely

21   unhealthy, as well as substantial amounts of nutritionally empty sugars and simple starches,

22   which are incommensurate with goals of maintaining a healthy lifestyle.

23       79.    **Misleading Characterization of Trans Fat:** The Quaker Granola Bars'

24   Ingredients List includes an asterisk after the PHVO ingredient, appearing as follows:

25               Partially hydrogenated soybean and cottonseed oils*

26

27   [39] *See* Connecticut Attorney General's Office Press Release, dated October 20, 2009, *available at*
     http://www.ct.gov/ag/cwp/view.asp?Q=449216&A=3673.

28

FIRST AMENDED CONSOLIDATED COMPLAINT

Below the ingredient list, next to another asterisk, the following appears:

* Adds a dietarily insignificant amount of trans fat

80.     In light of the pernicious effects of even small amounts of trans fat on human health, this claim is both false and highly misleading, in part because the statement, by its appearance alongside the FDA-mandated ingredient list, implies endorsement by the FDA under the FDCA, which is false.

Quaker Instant Oatmeal

81.     During the Class Period, Quaker Instant Oatmeal was made with PHVO yet contained deceptive health and wellness claims, including at least the following varieties: Instant Oatmeal Fruit & Cream Variety Pack (containing packets of Strawberries & Cream, Blueberries & Cream, Peaches & Cream, and Bananas & Cream), Instant Oatmeal Strawberries & Cream, and Instant Oatmeal Peaches & Cream. Photos of the packaging of each product are attached hereto as **Exhibit B**.

82.     **False and Misleading "Heart Healthy" Claim & Image:** Quaker labels the front of Quaker Instant Oatmeal "Heart Healthy" and provides a prominent image of a heart. This claim is misleading because the product is made with PHVO, which harms the heart by raising LDL cholesterol relative to HDL cholesterol levels, and which Quaker deceptively omits. Further, the product is laden with multiple forms of highly refined sugar, which also damage the heart and increase the risk and severity of type 2 diabetes. Quaker deceptively omits that the products are made with PHVO, which is in no way beneficial to heart health, and actually harms the heart by raising LDL cholesterol relative to HDL cholesterol levels. Further, the product is laden with multiple forms of highly refined sugar, which also damage the heart and increase the risk and severity of type 2 diabetes.

83.     Quaker's "Heart Healthy" advertisement includes an asterisk instructing the consumer to see the side panel. That side panel features a photo of oatmeal shaped in a heart, containing several lines of text, including a statement that Quaker Instant Oatmeal "part of a delicious *heart healthy* breakfast" (emphasis added).

84.     At the bottom of the packaging, in the smallest sized font on the package, Quaker

15

1    includes the statement, "diets rich in whole grain foods and other plant foods and low in

2    saturated fat and cholesterol may help reduce the risk of heart disease" (the "Plant Food Claim").

3    While this claim has been authorized pursuant to 21 U.S.C. § 343(r)(3)(C), in order to use the

4    claim, a manufacturer must comply with all legal requirements in order to use it.

5        85.    **Misbranded "Heart Healthy" Claims & Vignettes.** In order to use health

6    claims like "heart healthy," or heart graphic/vignettes, such claims must be made in connection

7    with a health claim authorized under either Subpart E of title 21 of the Code of Federal

8    Regulations, or 21 U.S.C. § 343(r)(3)(C). *See* 21 C.F.R. § 101.14. Thus, in order to use the

9    challenged "Heart Healthy" advertisements and graphics, two conditions must be met: First, the

10   claim to which the "Heart Healthy" advertisement is connected must meet the requirements of 21

11   U.S.C. § 343(r)(3)(C). Second, the "Heart Healthy" advertisement must meet the requirements of

12   21 C.F.R. § 101.14. Quaker's "Heart Healthy" advertisements on Quaker Instant Oatmeal fail in

13   this respect in several regards.

14       86.    First, the Plant Food Claim does not meet the requirements of 21 U.S.C. §

15   343(r)(3)(C)(ii)(III) because the submission on which it is based failed to present "a balanced

16   representation of the scientific literature relating to the relationship between a nutrient and a

17   disease or health-related condition to which the claim refers."

18       87.    Second, the Plant Food Claim does not meet the requirements of 21 U.S.C. §

19   343(r)(3)(C)(iii) because the claim is not in compliance with 21 U.S.C. § 343(r)(3)(A)(ii), which

20   provides that a claim of this type may only be made if Quaker Instant Oatmeal "does not contain,

21   as determined by the Secretary by regulation, any nutrient in an amount which increases to

22   persons in the general population the risk of a disease or health-related condition which is diet-

23   related . . . ." In promulgating regulations relating to artificial *trans* fat, the Secretary determined

24   trans fat, in the amount present in Quaker Instant Oatmeal, increases to persons in the general

25   population the risk of disease.

26       88.    Third, the Plant Food Claim does not meet the requirements of 21 U.S.C. §

27   343(r)(3)(C)(iii) because it is not "otherwise in compliance with [21 U.S.C. § 343]a)," which

28   prohibits representations that are "false or misleading in any particular."

89.     Fourth, the Plant Food Claim does not meet the requirements of 21 U.S.C. § 343(r)(3)(C)(iii) because it is not "otherwise in compliance with . . . section 201(n)," which provides:

> If an article is alleged to be misbranded because the labeling or advertising is misleading, then in determining whether the labeling or advertising is misleading there shall be taken into account (among other things) not only representations made or suggested by statement, word, design, device, or any combination thereof, but also the extent to which the labeling or advertising fails to reveal facts material in the light of such representation or material with respect to consequences which may result from the use of the article to which the labeling or advertising related under the conditions of use prescribed in the labeling or advertising thereof or under such conditions of use as are customary or usual.

21 U.S.C. § 321(n).

90.     Fifth, the Plant Food Claim does not meet the requirements of 21 U.S.C. § 343(r)(3)(C)(iv), because it is not stated in a manner so that the claim is an accurate representation of the authoritative statement on which it relies.

91.     Sixth, the "Heart Healthy" advertisements and heart graphics on the front panel of Quaker Instant Oatmeal violates 21 C.F.R. § 101.14(d)(2)(iii), which requires any such claim to be "complete, truthful, and not misleading." For the reasons discussed in this Complaint, the artificial *trans* fat in Quaker Instant Oatmeal renders the claim that the product is "heart healthy" incomplete, untruthful, and misleading.

92.     Seventh, the heart graphic on the side of Quaker Instant Oatmeal also violates 21 C.F.R. § 101.14(d)(2)(iv) because it includes prohibited intervening material.

93.     Eighth, Quaker's "heart healthy" advertisements on Quaker Instant Oatmeal also violate 21 C.F.R. § 101.14(d)(2)(v), because the claim does not enable the public to comprehend the information provided and to understand the relevant significance of such information in the context of a total daily diet, where Quaker misleadingly omits the offsetting effect of the trans fat in the product on the effect claimed.

94.     Quaker's "heart healthy" representations may violate other regulations under the FDCA and California Sherman Law, as well.

95.     **False and Misleading "Wholesome," "Quality" and "Goodness in Every**

17

1    **Bowl" Claims and Images:** Quaker labels its Instant Oatmeal "wholesome," "quality," and

2    "goodness in every bowl." These claims are *not complete*, *not truthful*, and *highly misleading*.

3    Quaker did and intended to convey with these statements that its oatmeal products are

4    wholesome and good for heart health. In fact, Quaker Instant Oatmeal is made with PHVO, a

5    toxic ingredient that will cause death and disease for many who regularly consume it. Further,

6    the product is laden with multiple forms of highly refined sugar, which also damage the heart

7    and increase the risk and severity of type 2 diabetes. Quaker's misleading health claims are

8    reinforced by deceptive images of fruit, oats, and natural brown sugar.

9        96.    **False and Misleading Characterization of Trans Fat as "Dietarily**

10   **Insignificant":** The Quaker Instant Oatmeal Ingredients Lists includes a double asterisk after the

11   PHVO ingredient, appearing as follows:

12             Partially hydrogenated soybean oil**

13       Below the ingredient list, next to another double asterisk, the following appears:

14             ** Adds a dietarily insignificant amount of trans fat

15       97.    In light of the pernicious effects of even small amounts of *trans* fat on human

16   health, this claim is both false and highly misleading, in part because the statement, by its

17   appearance alongside the FDA-mandated ingredient list, implies endorsement by the FDA under

18   the FDCA, which is false.

19                              Quaker Oatmeal to Go Bars

20       98.    During the Class Period, Quaker Oatmeal to go Bars were made with PHVO yet

21   contained deceptive health and wellness claims, including at least the following varieties:

22   Oatmeal to Go Bars Brown Sugar Cinnamon, Oatmeal to Go Bars Banana Bread, Oatmeal to Go

23   Bars High Fiber Maple Brown Sugar. Photos of the packaging of each product are attached

24   hereto as **Exhibit C**.

25       99.    **False and Misleading Heart Health and "Helps Reduce Cholesterol!" Claims**

26   **and Images:** Quaker claims its Oatmeal to Go Bars are "part of a heart healthy diet," contain

27   "heart healthy oats," will "help you feel your best," contains "All the Nutrition of a Bowl of

28   Instant Oatmeal!," and that Oatmeal to Go "Helps Reduce Cholesterol!" These claims are

1  reinforced by deceptive images of fruits and oats, large, prominent heart graphics and vignettes.

2  In fact, Oatmeal to Go Bars contain dangerous amounts of artificial *trans* fat, which is

3  detrimental to heart health. These claims are *not complete*, *not truthful*, and *highly misleading*.

4      100.    Quaker makes Oatmeal to Go with artificial *trans* fat, which has the worst

5  possible effect on blood cholesterol levels of any nutrient, because artificial *trans* fat raises LDL

6  cholesterol levels in the body while diminishing protective HDL cholesterol.

7      101.    Quaker also uses highly refined sugars and starches in Oatmeal to Go Bars,

8  including high-fructose corn syrup, sucrose, and rice flour. These ingredients damage the heart

9  and increase the risk and severity of type 2 diabetes.

10      102.    **Misbranded Unapproved New Drug.** Moreover, Quaker's claim that "Quaker

11  Oatmeal Helps Reduce Cholesterol!" is a therapeutic claim that renders Quaker Oatmeal to Go

12  bars a drug within the meaning of 21 U.S.C. § 321(g)(1)(B).

13      103.    Because Quaker Oatmeal to Go Bars are not generally recognized as safe and

14  effective when used as labeled, the product is a new drug as defined in 21 U.S.C. § 321(p). New

15  drugs may not be legally marketed in the United States without prior approval from the FDA as

16  described in 21 U.S.C. § 355(a).

17      104.    Quaker Oatmeal to Go Bars are also misbranded under 21 U.S.C. § 352(f)(1)

18  because the product's labeling fails to bear adequate directions for use for the condition for

19  which it is offered, i.e., hypercholesterolemia.

20      105.    Moreover, because Quaker's claim that Oatmeal to Go bars "Helps Reduce

21  Cholesterol!" lacks substantiation, it is misbranded within the meaning of 21 U.S.C. §§

22  343(a)(1).

23      106.    Although the FDA has issued a regulation authorizing a health claim associating

24  soluble fiber from whole grain oats with a reduced risk of coronary heart disease, 21 C.F.R. §

25  101.81, the regulation provides for the claim to include an optional statement, *as part of* the

26  authorized health claim, that the substance reduces the risk of coronary heart disease through the

27  intermediate link of "blood cholesterol" or "blood total- and LDL- cholesterol." *See* 21 C.F.R.

28  101.81(d)(2)-(3).

FIRST AMENDED CONSOLIDATED COMPLAINT

107.    Although the packaging of Oatmeal to Go Bars contains a health claim authorized under 21 C.F.R. § 101.81, the claim that "Quaker Oatmeal Helps Reduce Cholesterol" is not made as part of that claim but rather is presented as a separate, stand-alone claim through its location on the package and other label design features, such as its prominent placement on a heart in the center of the back label, together with its much larger font size and other text effects, which clearly distinguish it from the health claim barely readable at the bottom of the box.

108.    **Misbranded Heart and "Heart Healthy" Messaging and Imaging**. Oatmeal to Go's "Heart Healthy" messaging and imaging violates the FDCA in several ways.

109.    First, the "Heart Healthy" advertisements and heart graphics on the front and reverse panels of Quaker Oatmeal to Go Bars violate 21 C.F.R. § 101.14(d)(2)(iii), which requires any such claim to be "complete, truthful, and not misleading." For the reasons discussed in this Complaint, the artificial trans fat in Quaker Oatmeal to Go Bars renders the claim that the product is "heart healthy" incomplete, untruthful, and misleading.

110.    Second, the heart graphic on the reverse panel of Quaker Instant Oatmeal to Go Bars also violates 21 C.F.R. § 101.14(d)(2)(iv) because it includes prohibited intervening material.

111.    Third, Quaker's "heart healthy" advertisements on Quaker Oatmeal to Go Bars also violate 21 C.F.R. § 101.14(d)(2)(v), because the claim does not enable the public to comprehend the information provided and to understand the relevant significance of such information in the context of a total daily diet, where Quaker misleadingly omits the offsetting effect of the *trans* fat in the product on the effect claimed.

112.    Quaker's "heart healthy" representations may violate other regulations under the FDCA and California Sherman Law, as well.

113.    **Misleading Characterization of Trans Fat:** The Quaker Oatmeal to Go Bars' Ingredients Lists includes a double asterisk after the PHVO ingredient, appearing as follows:

Partially hydrogenated soybean oil**

Below the ingredient list, next to another asterisk, the following appears:

** Adds a dietarily insignificant amount of trans fat

114.    In light of the pernicious effects of even small amounts of *trans* fat on human health, this claim is both false and highly misleading, in part because the statement, by its appearance alongside the FDA-mandated ingredient list, implies endorsement by the FDA under the FDCA, which is false.

## **RELIANCE AND INJURY**

115.    When purchasing the Quaker PHVO Products, Plaintiffs were seeking, for themselves and their families, products of particular qualities, including products that did not negatively affect blood cholesterol levels or the health of their cardiovascular system, and products made with natural, healthy ingredients.

116.    Plaintiffs read and relied on, for each purchase of the Quaker PHVO Products made during the Class Period, *inter alia*, Quaker's false and misleading "Heart Healthy," "may help reduce the risk of heart disease," "wholesome," "part of a delicious heart healthy breakfast," "smart choices made easy," "part of a heart healthy diet," "heart healthy oats," "help you feel your best," and "helps reduce cholesterol!" claims. Plaintiffs further saw and relied on reinforcing images of fruits, oats, natural sugars, and hearts. For a complete list of challenged representations on which Plaintiffs relied, by product, see Appendix A.

117.    Plaintiffs purchased the Quaker PHVO Products believing they had the qualities they sought based on its deceptive labeling, but the products were actually unsatisfactory to them for the reasons described herein.

118.    The Quaker PHVO Products cost more than similar products without misleading labeling, and would have cost less absent the false and misleading statements.

119.    Plaintiffs paid more for the Quaker PHVO Products, and would have only been willing to pay less, if anything at all, had they not been mislead by the false and misleading labeling complained of herein. Plaintiffs would not have purchased the Quaker PHVO Products at the prices they did absent these advertisements.

120.    For these reasons, the Quaker PHVO Products were worth less than what Plaintiffs paid for them.

121.    Plaintiffs purchased the Quaker PHVO Products instead of competing products

1    based on the false statements and misrepresentations described herein.

2          122.    Instead of receiving products that have the advantages inherent in being free of

3    artificial *trans* fat and comprised of natural, healthy ingredients, Plaintiffs received products that

4    contained artificial *trans* fat and were comprised of highly-refined, highly-processed, and

5    nutritionally empty ingredients.

6          123.    Plaintiffs lost money as a result of Quaker's deception in that Plaintiffs did not

7    receive what they paid for.

8          124.    Plaintiffs altered their position to their detriment and suffered damages in an

9    amount equal to the amount they paid for the PHVO Products.

10                                **DELAYED DISCOVERY**

11          125.    Plaintiff Guttmann did not discover Quaker's labeling of the Quaker PHVO

12   Products was false, deceptive or misleading until shortly before filing his Complaint in February,

13   2010. Plaintiffs Yrene, Bruno and Yumul did not discover that Quaker's labeling of the Quaker

14   PHVO Products was false, deceptive, or misleading until November 2010.

15          126.    Plaintiffs were unaware of the grave health consequences of consuming products

16   like the Quaker PHVO Products before that time, or of the connection between the consumption

17   of such artificial *trans* fat and disease such as coronary heart disease, type 2 diabetes, cancer, and

18   death. Plaintiffs were also unaware that the consumption of artificial *trans* fat affects blood

19   cholesterol levels far more than dietary cholesterol or saturated fat.

20          127.    Plaintiffs are not nutritionists, food experts, or food scientists; they are lay

21   consumers who did not possess the specialized knowledge Quaker had which otherwise would

22   have enabled them to associate partially hydrogenated oil with artificial *trans* fat, and artificial

23   *trans* fat with disease.

24          128.    Plaintiffs, in the exercise of reasonable diligence, could not have discovered

25   Quaker's deceptive practices earlier because, like nearly all consumers, they do not read

26

27

28

FIRST AMENDED CONSOLIDATED COMPLAINT

1  scholarly publications such as The Journal of Nutrition,[40] The European Journal of Clinical

2  Nutrition,[41] and The New England Journal of Medicine.[42]

3       129.    Further, even today knowledge of the extensive use of artificial *trans* fats,

4  including that they are necessarily present whenever partially hydrogenated oil is used as an

5  ingredient in a food product, is generally unknown to the average consumer.

6       130.    Moreover, many of the unlawful labeling practices complained of herein were of

7  the nature of omissions and violations of federal law, and like members of the Classes and nearly

8  all consumers, Plaintiffs not experts on FDA regulations, and could not detect Quaker's

9  omissions of material fact.

10  **CLASS ACTION ALLEGATIONS**

11       131.    Plaintiffs bring this action on behalf of themselves and the following Classes in

12  accordance with Rule 23 of the Federal Rules of Civil Procedure:

13       132.    The Classes are defined as:

14  **Restitution and Damages Class**

15  All persons (excluding officers, directors, and employees of Quaker) who purchased, on

16  or after February 3, 2006, one or more of the Quaker PHVO Products in the United States

17  for their own use rather than resale or distribution.

18  **Injunctive Relief Class**

19  All persons (excluding officers, directors, and employees of Quaker) who commonly

20  purchase or are in the market for the Quaker PHVO Products in the United States for

21  their own use rather than resale or distribution.

22  _____

23  [40] Peter M. Clifton *et al*., *Trans Fatty Acids In Adipose Tissue And The Food Supply Are Associated With Myocardial Infarction*. 134 J. of Nutrition 874, 874-79 (2004).

24  [41] A. Tavani *et al*. *Margarine intake and risk of nonfatal acute myocardial infarction in Italian women*. Eur. J. Clin. Nutr. 51: 30–32 (1997) (estimating a 50% greater risk of heart attack in

25  women with high consumption of margarine, an association "independent of body mass index,

26  history of hypertension and hyperlipidemia.").

27  [42] "10 to 19 percent of CHD events in the United States could be averted by reducing the intake of trans fat." 354 New Eng. J. Med. at 1611.

28

133.   Questions of law and fact common to Plaintiffs and the Classes include:

    a.   Whether Quaker contributed to, committed, and/or is responsible for the conduct alleged herein;

    b.   Whether Quaker's conduct constitutes the violations of laws alleged herein;

    c.   Whether Quaker acted willfully, recklessly, negligently, or with gross negligence in the violations of law alleged herein;

    d.   Whether Class members are entitled to injunctive relief; and

    e.   Whether Class members are entitled to restitution.

134.   By purchasing and/or using the Quaker PHVO Products, all members of the Classes were subjected to the same wrongful conduct.

135.   Absent Quaker's material deceptions, misstatements, and omissions, Plaintiffs and other members of the Classes would not have purchased the Quaker PHVO Products.

136.   Plaintiffs' claims are typical of the Classes' claims. Plaintiffs will fairly and adequately protect the interests of the Classes, have no interests that are incompatible with the interests of the Classes, and have retained counsel competent and experienced in class litigation.

137.   The Classes are sufficiently numerous, as they include at least hundreds of thousands of individuals who purchased the Quaker PHVO Products throughout the United States during the Class Period.

138.   Class representation is superior to other options for the resolution of the controversy. The relief sought for each Class member is small. Absent the availability of class action procedures, it would be infeasible for Class members to redress the wrongs done to them.

139.   Quaker has acted on grounds applicable to the Classes, thereby making appropriate final injunctive relief or declaratory relief concerning the Classes as a whole.

140.   Questions of law and fact common to the Classes predominate over any questions affecting only individual members

141.   Class treatment is appropriate under FRCP 23(a) and both 23(b)(2) and 23(b)(3). Plaintiffs do not contemplate class notice if the classes are certified under FRCP 23(b)(2), which does not require notice, and notice via publication if the classes are certified under FRCP 23(b)(3) or if the Court determines class notice is required notwithstanding that notice is not

24

required under FRCP 23(b)(2). Plaintiffs will, if notice is required, confer with Defendant and seek to present the Court with a stipulation and proposed order on the details of a class notice plan.

## FIRST CAUSE OF ACTION
### Violations of the California Unfair Competition Law,
### Bus. & Prof. Code §§ 17200 *et seq.*
### (Unlawful)

142.    Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth in full herein.

143.    Bus. & Prof. Code § 17200 prohibits any "unlawful, unfair or fraudulent business act or practice."

144.    The acts, omissions, misrepresentations, practices, and non-disclosures of Quaker as alleged herein constitute "unlawful" business acts and practices in that Quaker's conduct violates the False Advertising Law and the Consumer Legal Remedies Act.

145.    Quaker's conduct is further "unlawful" because it violates the following provisions of the Federal Food, Drug, and Cosmetic Act ("FFDCA") and its implementing regulations:

a.    21 U.S.C. § 343(a), which deems food misbranded when the label contains a statement that is "false or misleading in any particular";

b.    21 U.S.C. § 343(r)(3)(C), which provides the requirements for a health claim submitted pursuant to that section;

c.    21 U.S.C. § 321(n), which defines the nature of a false and misleading advertisements;

d.    21 U.S.C. § 355(a), which prohibits the marketing and sale of unapproved new drugs;

e.    21 U.S.C. § 352(f)(1), which provides that a drug is misbranded if it fails to bear adequate directions for use for the condition for which it is offered;

f.    21 C.F.R. § 101.14(d)(2), which prescribes the requirements for health claims; and

g.     21 C.F.R. § 1.21, which prohibits true statements about ingredients that are misleading in light of the presence of other ingredients.

146.    Quaker's conduct also violates The California Sherman Food, Drug, and Cosmetic Law, Cal. Health & Saf. Code §§ 109875, *et seq.* ("Sherman Law"), including at least the following sections:

- § 110100 (adopting all FDA regulations as state regulations);

- § 110290 ("In determining whether the labeling or advertisement of a food . . . is misleading, all representations made or suggested by statement, word, design, device, sound, or any combination of these shall be taken into account. The extent that the labeling or advertising fails to reveal facts concerning the food . . . or consequences of customary use of the food . . . shall also be considered.");

- § 110390 ("It is unlawful for any person to disseminate any false advertisement of any food . . . . An advertisement is false if it is false or misleading in any particular.");

- § 110395 ("It is unlawful for any person to manufacture, sell, deliver, hold, or offer for sale any food . . . that is falsely advertised.");

- § 110398 ("It is unlawful for any person to advertise any food, drug, device, or cosmetic that is adulterated or misbranded.");

- § 110400 ("It is unlawful for any person to receive in commerce any food . . . that is falsely advertised or to deliver or proffer for delivery any such food . . . .");

- § 110660 ("Any food is misbranded if its labeling is false or misleading in any particular.");

- § 110670 ("Any food is misbranded if its labeling does not conform with the requirements for nutrient content or health claims as set forth in Section 403(r) (21 U.S.C. Sec. 343(r)) of the federal act and the regulations adopted pursuant thereto.");

- § 110680 ("Any food is misbranded if its labeling or packaging does not conform to the requirements of Chapter 4 (commencing with Section 110290).");

- § 110705 ("Any food is misbranded if any word, statement, or other information required pursuant to this part to appear on the label or labeling is not prominently placed upon the label or labeling and in terms as to render it likely to be read and understood by the ordinary individual under customary conditions of purchase and use.");

- § 110760 ("It is unlawful for any person to manufacture, sell, deliver, hold, or offer for sale any food that is misbranded.");

- § 110765 ("It is unlawful for any person to misbrand any food."); and

- § 110770 ("It is unlawful for any person to receive in commerce any food that is

26

1    misbranded or to deliver or proffer for delivery any such food.").

2    147.    Each of the challenged statements made by Quaker, by violating the FFDCA and

3    Sherman Law, further violate the "unlawful" prong of the UCL.

4    148.    Quaker leveraged its deception to induce Plaintiffs and members of the Classes to

5    purchase products that were of lesser value and quality than advertised.

6    149.    Plaintiffs suffered injury in fact and lost money or property as a result of Quaker's

7    deceptive advertising: they were denied the benefit of the bargain when they decided to purchase

8    the Quaker PHVO Products over competitor products, which are less expensive and/or contain

9    no artificial *trans* fat. Had Plaintiffs been aware of Quaker's false and misleading advertising

10   tactics, they would have paid less than what they did for the Quaker PHVO Products or not

11   purchased them at all.

12   150.    In accordance with Bus. & Prof. Code § 17203, Plaintiffs seek an order enjoining

13   Quaker from continuing to conduct business through unlawful, unfair, and/or fraudulent acts and

14   practices and to commence a corrective advertising campaign.

15   151.    Plaintiffs also seek an order for the disgorgement and restitution of all monies

16   from the sale of the Quaker PHVO Products, which were unjustly acquired through acts of

17   unlawful, unfair, and/or fraudulent competition.

18                              **SECOND CAUSE OF ACTION**

19                    **Violations of the California Unfair Competition Law**
                        **Bus. & Prof. Code §§ 17200 *et seq.***

20                              **(Unfair and Fraudulent)**

21   152.    Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if

22   set forth in full herein.

23   153.    Bus. & Prof. Code § 17200 prohibits any "unlawful, unfair or fraudulent business

24   act or practice."

25   154.    The false and misleading labeling of the Quaker PHVO Products, as alleged

26   herein, constitutes "unfair" business acts and practices because such conduct is immoral,

27   unscrupulous, and offends public policy. Further, the gravity of Quaker's conduct outweighs any

28   conceivable benefit of such conduct.

155.    Defendant placed the Quaker PHVO Products into the stream of commerce with knowledge that, through the intended use of such products, individuals, including young children, would be exposed to artificial *trans* fat.

156.    Defendants know or should have known that artificial *trans* fat causes heart disease, type 2 diabetes, cancer, and death.

157.    The acts, omissions, misrepresentations, practices, and non-disclosures of Quaker as alleged herein constitute "fraudulent" business acts and practices because Quaker's conduct is false and misleading to Plaintiffs, members of the Classes, American consumers, and the general public.

158.    Defendant's labeling and marketing of the Quaker PHVO Products using claims such as "heart healthy," "wholesome," and "helps reduce cholesterol", which are likely to create expectations of safety and well-being among consumers, is likely to deceive Class members and the general public about the safety of Defendant's products.

159.    Defendant either knew or reasonably should have known that the claims on the labels of the Quaker PHVO Products were untrue and misleading.

160.    In accordance with Bus. & Prof. Code § 17203, Plaintiffs seek an order enjoining Quaker from continuing to conduct business through unlawful, unfair, and/or fraudulent acts and practices and to commence a corrective advertising campaign.

161.    Plaintiffs also seek an order for the disgorgement and restitution of all monies from the sale of the Quaker PHVO Products, which were unjustly acquired through acts of unlawful, unfair, and/or fraudulent competition.

**THIRD CAUSE OF ACTION**

**Violations of the California False Advertising Law,**
**Bus. & Prof. Code §§ 17500 *et seq.***

162.    Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth in full herein.

163.    In violation of Bus. & Prof. Code §§ 17500 *et seq.*, the advertisements, labeling, policies, acts, and practices described herein were designed to, and did, result in the purchase and

28

1   use of the products without the knowledge that the Quaker PHVO Products contain toxic

2   artificial *trans* fat.

3       164.    Quaker either knew or reasonably should have known that the labels on the

4   Quaker PHVO Products were false and misleading.

5       165.    As a result, Plaintiffs, the Classes, and the general public are entitled to injunctive

6   and equitable relief, restitution, and an order for the disgorgement of the funds by which Quaker

7   was unjustly enriched.

8                           **FOURTH CAUSE OF ACTION**
                        **Violations of the Consumer Legal Remedies Act,**
9                              **Civ. Code §§ 1750 *et seq.***
                                  **(Injunctive Relief)**
10

11      166.    Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if

12   set forth in full herein.

13      167.    The CLRA has adopted a statutory scheme prohibiting various deceptive practices

14   in connection with the conduct of a business providing goods, property, or services primarily or

15   personal, family, or household purposes.

16      168.    Quaker's policies, acts, and practices were designed to, and did, result in the

17   purchase and use of the products primarily for personal, family, or household purposes, and

18   violated and continue to violate the following sections of the CLRA:

19          a.      § 1770(a)(5): representing that goods have characteristics, uses, or benefits
                    which they do not have.
20

21          b.      § 1770(a)(7): representing that goods are of a particular standard, quality,
                    or grade if they are of another.

22
            c.      § 1770(a)(9): advertising goods with intent not to sell them as advertised.
23
            d.      § 1770(a)(16): representing the subject of a transaction has been supplied
24                  in accordance with a previous representation when it has not.

25      169.    As a result, Plaintiffs and the Classes have suffered irreparable harm and are

26   entitled to injunctive relief.

27   //

28   //

**FIFTH CAUSE OF ACTION**
**Violations of the Consumer Legal Remedies Act,**
**Civ. Code § 1750 *et seq.***
**(Actual Damages and Punitive Damages)**

170.   Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth in full herein.

171.   The CLRA prohibits deceptive practices in connection with the conduct of a business that provides goods, property, or services primarily for personal, family, or household purposes.

172.   Quaker's policies, acts, and practices were designed to, and did, result in the purchase and use of the products primarily for personal, family, or household purposes, and violated and continue to violate the following sections of the CLRA:

    a.   § 1770(a)(5): representing that goods have characteristics, uses, or benefits which they do not have.

    b.   § 1770(a)(7): representing that goods are of a particular standard, quality, or grade if they are of another.

    c.   § 1770(a)(9): advertising goods with intent not to sell them as advertised.

    d.   § 1770(a)(16): representing the subject of a transaction has been supplied in accordance with a previous representation when it has not.

173.   In compliance with Civ. Code § 1782, Plaintiffs have sent written notice to Quaker of their claims. Quaker has received this notice and failed to respond to Plaintiffs' demand and rectify their conduct on behalf of the Plaintiff Classes within 30 days of receiving Plaintiffs' § 1782 notice.

174.   Quaker's failure to respond is ineffective to avoid the range of remedies available to Plaintiffs and the Classes under the CLRA. Quaker failed to (1) rectify its conduct and (2) offer to compensate Plaintiffs and the Classes for out-of-pocket expenses, interest, and damages incurred as a result of purchasing the Quaker PHVO Products, which would not have been purchased had Quaker disclosed their actual *trans* fat content and pose serious health consequences for those who consume them when used as intended.

175.   Quaker's conduct is immoral, unscrupulous, and offends public policy. Further,

1   the gravity of Quaker's conduct outweighs any conceivable benefit of such conduct.

2   176.   In accordance with Civ. Code §1780(a)(2), Plaintiffs and the Classes seek and are

3   entitled to an award of actual damages, punitive damages, costs, attorneys fees, and any other

4   relief deemed necessary, appropriate, and proper by the court pursuant to Civ. Code § 1780.

5   **PRAYER FOR RELIEF**

6   WHEREFORE, Plaintiffs, on behalf of themselves, all others similarly situated, and the

7   general public, pray for judgment and relief against Quaker as follows:

8   A.   An order declaring this action to be a proper class action and requiring Quaker to

9   bear the cost of class notice.

10   B.   An order enjoining Quaker from using any of the claims identified in Appendix A

11   when the products for which the claims are made contain PHVO, or otherwise marketing foods

12   as beneficial to human health, and heart health in particular, when they contain PHVO.

13   C.   An order compelling Quaker to conduct a corrective advertising campaign to

14   inform the public that its products contain unsafe amounts of *trans* fat at consumers' actual

15   consumption levels.

16   D.   An order requiring Quaker to disgorge or return all monies, revenues, and profits

17   obtained by means of any wrongful act or practice.

18   E.   An order compelling Quaker to destroy all misleading and deceptive advertising

19   materials and products.

20   F.   An order requiring Quaker to pay restitution to restore all funds acquired by

21   means of any act or practice declared by this Court to be an unlawful, unfair, or fraudulent

22   business act or practice, untrue or misleading advertising, or a violation of the UCL, FAL or

23   CLRA, plus pre-and post-judgment interest thereon.

24   G.   Actual and punitive damages under the CLRA.

25   H.   Costs, expenses, and reasonable attorneys' fees.

26   I.   Any other and further relief the Court deems necessary, just, or proper.

27   //

28   //

31

1

## JURY DEMAND

2

Plaintiffs demand a trial by jury on all causes of action so triable.

3

DATED: August 18, 2011                    Respectfully Submitted,

4

5                                         /s/ Jack Fitzgerald
                                          Jack Fitzgerald
6                                         **THE WESTON FIRM**
                                          GREGORY S. WESTON
7                                         888 Turquoise Street
                                          San Diego, CA 92109
8                                         Telephone:    858 488 1672
                                          Facsimile:     480 247 4553
9
                                          JACK FITZGERALD
10                                        2811 Sykes Court
                                          Santa Clara, CA 95051
11                                        Telephone: 408 459 0305
12
                                          **LAW OFFICES OF RONALD A.**
13                                        **MARRON**
                                          RONALD A. MARRON
14                                        3636 4th Avenue, Suite 202
                                          San Diego, CA 92103
15                                        Telephone:    (619) 696-9006
                                          Facsimile:     (619) 564-6665
16

17                                        **Interim Class Counsel**

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED CONSOLIDATED COMPLAINT

## APPENDIX A

### Challenged Advertising Claims by Product & Complaint Paragraph Number

| Quaker Chewy Granola Bars | Quaker Instant Oatmeal | Quaker Oatmeal to Go Bars |
|---|---|---|
| • "wholesome" (¶ 69) <br><br> • "Smart Choices Made Easy" (¶¶ 70-77) <br><br> • Images of oats, nuts, and children in soccer uniforms (¶ 78) <br><br> • "help your family fuel their busy days" (¶ 78) <br><br> • "adds a dietarily insignificant amount of trans fat" (¶¶ 79-80) | • "Heart Healthy" (¶ 82, 85-94) <br><br> • Graphic images/vignettes of hearts (¶ 82) <br><br> • "wholesome" (¶ 95) <br><br> • "quality" (¶ 95) <br><br> • "goodness in every bowl" (¶ 95) <br><br> • Images of fruit, oats, and natural brown sugar (¶ 95) <br><br> • "adds a dietarily insignificant amount of trans fat" (¶¶ 96-97) | • "part of a heart healthy diet" (¶ 99, 108-12) <br><br> • "heart healthy oats" (¶ 99, 108-12) <br><br> • "will help you feel your best" (¶ 99) <br><br> • "All the Nutrition of a Bowl of Instant Oatmeal!" (¶ 99) <br><br> • Helps Reduce Cholesterol!" (¶¶ 99, 102-107) <br><br> • Graphic images/vignettes of hearts (¶ 99) <br><br> • "adds a dietarily insignificant amount of trans fat" (¶¶ 113-14) |