1   GIBSON, DUNN & CRUTCHER LLP
    Daniel W. Nelson (*pro hac vice*)
2     DNelson@gibsondunn.com
    Andrew S. Tulumello (*pro hac vice*)
3     ATulumello@gibsondunn.com
    Scott P. Martin (*pro hac vice*)
4     SMartin@gibsondunn.com
    1050 Connecticut Avenue, N.W.
5   Washington, D.C.  20036
    Telephone: 202-955-8500
6   Facsimile:  202-530-4238

7   Christopher Chorba (SBN 216692)
      CChorba@gibsondunn.com
8   333 South Grand Avenue
    Los Angeles, CA  90071
9   Telephone: 213-229-7000
    Facsimile:  213-229-7520

10
    Counsel for Defendant The Quaker Oats Company
11
                    UNITED STATES DISTRICT COURT
12
                 NORTHERN DISTRICT OF CALIFORNIA
13
                     SAN FRANCISCO DIVISION
14

15  VICTOR GUTTMANN, KELLEY BRUNO,            CASE NO.: 5:10-CV-00502-RS
    SONYA YRENE, and REBECCA YUMUL,
16  on behalf of themselves and all others similarly   **DEFENDANT THE QUAKER OATS
    situated,                                  COMPANY'S NOTICE OF MOTION
17                                             AND MOTION TO DISMISS
                          Plaintiffs,          AMENDED CONSOLIDATED
18                                             COMPLAINT**
            v.
19                                             Hearing Date:  January 12, 2012
    THE QUAKER OATS COMPANY,                   Time:  1:30 p.m.
20                                             Place:  Courtroom 3, 17th Floor
                          Defendant.           Judge:  Honorable Richard Seeborg
21                                             Action Filed:  February 3, 2010

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

TO PLAINTIFFS AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT on January 12, 2012, at 1:30 p.m., or as soon thereafter as it may be heard, in Courtroom 3, 17th Floor, of this Court, located at 450 Golden Gate Avenue, San Francisco, CA  94102, Defendant The Quaker Oats Company ("Quaker") will and hereby does move this Court pursuant to Federal Rule of Civil Procedure 12(b)(6) for an order dismissing the Amended Consolidated Complaint filed against it on August 19, 2011.

Quaker makes this motion because the allegations in the Amended Consolidated Complaint fail to state a claim upon which relief can be granted, and because the labeling statements at issue are either preempted by federal law and/or constitute non-actionable puffery.

Quaker seeks dismissal of the Amended Consolidated Complaint without leave to amend and entry of judgment in favor of Quaker.  This Motion is based on this Notice of Motion, the attached Memorandum of Points and Authorities, the accompanying Request for Judicial Notice ("RJN"), the pleadings and papers on file herein, and such other matters as may be presented to the Court at the time of the hearing.

Dated:  October 14, 2011                        GIBSON, DUNN & CRUTCHER LLP


By:   /s/ Christopher Chorba
      Christopher Chorba
      Counsel for Defendant
      The Quaker Oats Company

# TABLE OF CONTENTS

Page

I.     INTRODUCTION AND SUMMARY OF ARGUMENT .........................................................1

II.    STATEMENT OF THE ISSUES TO BE DECIDED...........................................................2

III.   SUMMARY OF ALLEGED FACTS AND RELEVANT REGULATIONS ...........................2

IV.    THE LEGAL STANDARDS GOVERNING THIS MOTION ...................................................7

V.     ARGUMENT ...................................................................................................................8

       A.     Plaintiffs' Allegations Do Not State A Plausible Claim For Relief..............................8

       B.     Federal Law Preempts Plaintiffs' Claims. ..................................................11

       C.     Plaintiffs' Remaining Claims Attempt To Challenge Non-Actionable Puffery. ..........18

VI.    CONCLUSION ...............................................................................................21

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Gibson, Dunn &
Crutcher LLP

1

# TABLE OF AUTHORITIES

2

Page

3

**Cases**

*Ackerman v. Coca-Cola Co.*,
4    No. 09-0395, 2010 WL 2925955 (S.D.N.Y. July 21, 2010).....................................18, 20

5 *Anunziato v. eMachines, Inc.*,
    402 F. Supp. 2d 1133 (C.D. Cal. 2005) ...........................................................22

6 *Ashcroft v. Iqbal*,
7    129 S. Ct. 1937 (2009).........................................................................2, 8, 17

8 *Bank of Am. v. City & County of S.F.*,
    309 F.3d 551 (9th Cir. 2002) .........................................................................13

9 *Bates v. Dow Agrosciences LLC*,
10    544 U.S. 431 (2005) .....................................................................................13

11 *Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) .....................................................................................2, 8

12 *Buckman Co. v. Plaintiffs' Legal Comm.*,
13    531 U.S. 341 (2001).................................................................................13, 19

14 *Chacanaca v. Quaker Oats Co.*,
    752 F. Supp. 2d 1111 (N.D. Cal. 2010) .................................................*passim*

15 *Cipollone v. Liggett Group Inc.*,
16    505 U.S. 504 (1992) .....................................................................................13

17 *Consumer Advocates v. Echostart Satellite Corp.*,
    113 Cal. App. 4th 1351 (2003) ......................................................................22

18 *Cook, Perkiss & Liehe, Inc. v. N. Ca. Collections Serv. Inc.*,
19    911 F.2d 242 (9th Cir. 1990) .............................................................21, 23, 24

20 *Dvora v. General Mills, Inc.*,
    No. 11-1074, 2011 WL 1897349 (C.D. Cal. May 16, 2011)..............................21

21 *Edmunson v. Proctor & Gamble Co.*,
22    No. 10-cv-2256, 2011 WL 1897625 (S.D. Cal. May 17, 2011) ........................23

23 *Fraker v. KFC Corp.*,
    No. 06-cv-01284, 2007 WL 1296571 (S.D. Cal. Apr. 30, 2007) ........................6

24 *Hillborough County v. Automated Med. Labs., Inc.*,
25    471 U.S. 707 (1985)....................................................................................13

26 *In re Epogen & Aranesp Off-Label Mktg. & Sales Practices Litig.*,
    No. MDL 08-1934, 2009 WL 1703285 (C.D. Cal. June 17, 2009)....................19

27 *In re Sony Grand Wega KDF-E A10/A20 Series Rear Projection HDTV Television Litig.*,
28    758 F. Supp. 2d 1077 (S.D. Cal. 2010)............................................................22

*In re XM Satellite Radio Holdings Sec. Litig.*,
   479 F. Supp. 2d 165 (D.D.C. 2007) .................................................................... 24

*K&N Eng'g, Inc. v. Spectre Performance*,
   No. 09-1900, 2011 WL 4387094 (S.D. Cal. Sept. 20, 2011) ............................... 24

*McKinnis v. Kellogg USA*,
   No. 07-2611, 2007 WL 4766060 (C.D. Cal. Sept. 19, 2007) ............................... 21

*Monroe Emps. Ret. Sys. v. Bridgestone Corp.*,
   399 F.3d 651 (6th Cir. 2005) ............................................................................... 23

*Mylan Labs., Inc. v. Matkari*,
   7 F.3d 1130 (4th Cir. 1993) ................................................................................. 19

*Newcal Indus., Inc. v. Ikon Office Solution*,
   513 F.3d 1038 (9th Cir. 2008) ............................................................................. 23

*Pelobello v. Quaker Oats Co.*,
   No. 3:11-CV-00093-RS ........................................................................................ 4

*Peviani v. Hostess Brands, Inc.*
   750 F. Supp. 2d 1111 (C.D. Cal. 2010) .............................................................. 12

*Southland Sod Farms v. Stover Seed Co.*,
   108 F.3d 1134 (9th Cir. 1997) ............................................................................. 22

*Starr v. Baca*,
   652 F.3d 1202 (9th Cir. 2011) ............................................................................... 8

*Tylka v. Gerber Products Co.*,
   No. 96-1647, 1999 WL 495126 (N.D. Ill. July 1, 1999) ....................................... 4

*Whiting v. AARP*,
   701 F. Supp. 2d 21 (D.D.C. 2010) ...................................................................... 24

*Yrene v. Quaker Oats Co.*,
   No. 5:10-CV-5389-RS ........................................................................................... 4

*Yumul v. Quaker Oats Co.*,
   No. 5:10-CV-5538-RS ........................................................................................... 4

**Constitutional Provisions**

U.S. Const. art. VI, cl. 2 ............................................................................................ 11

**Statutes**

21 U.S.C. § 301 *et seq.* ............................................................................................... 6

21 U.S.C. § 321(g)(1) ................................................................................................ 19

21 U.S.C. § 321(g)(1)(B) .......................................................................................... 18

21 U.S.C. § 331(a) ....................................................................................................... 6

21 U.S.C. § 337(a) ......................................................................................... 13, 17, 19

DEFENDANT'S MOTION TO DISMISS AMENDED CONSOLIDATED COMPLAINT, NO. 5:10-CV-00502-RS

21 U.S.C. § 341-1(a)(5) .................................................................................................. 13

21 U.S.C. § 343 ................................................................................................................ 6

21 U.S.C. § 343(a)(1) ...................................................................................................... 6

21 U.S.C. § 343(q)(1) ...................................................................................................... 6

21 U.S.C. § 343(r)(1)(A)–(B) .......................................................................................... 7

21 U.S.C. § 343(r)(1)(B) ................................................................................................ 19

21 U.S.C. § 343(r)(3)(C) ....................................................................................... 8, 15, 16

21 U.S.C. § 343(r)(3)(D) ............................................................................................. 8, 17

21 U.S.C. § 343(r)(3)(D)(ii) .......................................................................................... 17

21 U.S.C. § 343-1(a)(4) ................................................................................................. 13

21 U.S.C. § 343-1(a)(5) ............................................................................................ 2, 18

Cal. Bus. & Prof. Code § 17200 *et seq.* ........................................................................ 5

Cal. Bus. & Prof. Code § 17500 *et seq.* ........................................................................ 5

Cal. Civ. Code § 1750 *et seq.*....................................................................................... 5

Cal. Health & Safety Code § 114377(d) ........................................................................ 11

**Regulations**

21 C.F.R. § 101.13 ........................................................................................................... 7

21 C.F.R. § 101.14 ........................................................................................................... 7

21 C.F.R. § 101.14(a)(1) ............................................................................................. 7, 15

21 C.F.R. § 101.14(a)(4) ................................................................................................ 10

21 C.F.R. § 101.22 ......................................................................................................... 20

21 C.F.R. § 101.65(2)(2) ................................................................................................. 8

21 C.F.R. § 101.65(c)(2) ................................................................................................ 20

21 C.F.R. § 101.81 ......................................................................................................... 18

21 C.F.R. § 101.81(c)(2)(i) .............................................................................................. 7

21 C.F.R. § 101.81(d)(2) ............................................................................................. 7, 18

21 C.F.R. § 101.9 ............................................................................................................. 6

21 C.F.R. § 101.9(c)(2)(ii) .......................................................................................... 7, 14

Gibson, Dunn &
Crutcher LLP

21 C.F.R. § 101.9(f)(1) .................................................................................................... 7, 14

21 C.F.R. § 170.3(i) ...................................................................................................... 9, 11

21 C.F.R. § 170.30(a) ......................................................................................................... 9

21 C.F.R. § 170.30(g) ......................................................................................................... 9

**Rules**

Fed. R. Civ. P. 12(b)(6)....................................................................................................... 7

**Other Authorities**

Baltimore Health Code § 6-507(a)(2) ............................................................................... 11

Food and Nutrition Bd., Inst. of Med., *Dietary Reference Intakes for Energy, Carbohydrates, Fiber, Fat, Fatty Acids, Cholesterol, Protein, and Amino Acids* (2005) ......................... 11

*Food Labeling: Trans Fatty Acids in Nutrition Labeling, Nutrient Content Claims, and Health Claims*,
    68 Fed. Reg. 41,434 (July 11, 2003).......................................................................... 6, 10

*Guidance for Industry: A Labeling Guide for Restaurants and Other Retail Establishments Selling Away-From-Home Foods* (Apr. 2008), *available at* http://www.fda.gov/Food/GuidanceComplianceRegulatoryInformation/GuidanceDocuments/FoodLabeling/Nutrition/ucm053455.htm ............................................................................................ 15

H.R. Rep. 101-538 (1990), *reprinted in* 1990 U.S.C.C.A.N. 3336 ...................................... 6

Montgomery County Bd. Health Res. 16-134(a)(2) .......................................................... 11

New York City Health Code § 81.08(b) ............................................................................ 11

Philadelphia Health Code § 6-307(2)................................................................................ 11

*Requirements for Foods Named by Use of a Nutrient Content Claim*,
    58 Fed. Reg. 44,020 (Aug. 18, 1993) ...................................................................... 10, 14

Select Comm. on GRAS Substances, *Report No. 70* ......................................................... 9

Stamford Municipal Code § 132-24.1(b) .......................................................................... 11

Gibson, Dunn & Crutcher LLP

DEFENDANT'S MOTION TO DISMISS AMENDED CONSOLIDATED COMPLAINT, NO. 5:10-CV-00502-RS

## I.      INTRODUCTION AND SUMMARY OF ARGUMENT

All of Plaintiffs' consumer protection and false advertising claims against The Quaker Oats Company ("Quaker") are based on the implausible allegation that *trans* fat is "toxic to human health" and that there is "no safe level" of *trans* fat consumption.  The United States Food and Drug Administration ("FDA") disagrees with Plaintiffs' theory.  After careful review, the FDA has determined that partially hydrogenated vegetable oils ("PHVOs")—the source of the *trans* fats at issue here—are recognized as safe under federal law for use as a food additive.  As a result, the responsible agency charged by Congress with regulating this field has already thoroughly evaluated and rejected the key scientific premises underlying Plaintiffs' lawsuit.  Indeed, the FDA has concluded that the amounts of *trans* fat allegedly present in Quaker's products—less than 0.5 grams per serving—are nutritionally insignificant and mandates that such amounts be reported as *zero*.  Because all of Plaintiffs' claims about allegedly false and misleading marketing are based on the assumption that *trans* fat is unsafe at any level—a conclusion that is implausible because it is directly contrary to the considered judgment of the expert administrative agency—the Amended Consolidated Complaint should be dismissed.

In addition to the facial implausibility of Plaintiffs' theory, the Federal Food, Drug, and Cosmetic Act ("FDCA") expressly preempts many of their claims.  This law preempts any attempt to impose state-law labeling requirements that are "not identical" to those prescribed by federal law.  Yet several statements challenged by Plaintiffs as false or misleading—that Quaker's products "ad[d] a dietarily insignificant amount of trans fat," are "heart healthy," "hel[p] reduce cholesterol," and contain "[a]ll the nutrition of a bowl of oatmeal"—are specifically permitted by the FDA.  By attempting to impose state-law liability for federally approved statements, Plaintiffs are asking this Court to impose labeling requirements for Quaker that are "not identical" to—indeed, that are flatly inconsistent with—the federal standard.  As this Court already ruled, "[e]ssentially, plaintiffs' claim asks this Court to *ascribe* disqualifying status to trans fats where the Agency has at least so far declined to do so."  *Chacanaca v. Quaker Oats Co.*, 752 F. Supp. 2d 1111, 1122 (N.D. Cal. 2010).

After two opportunities to amend their pleadings, Plaintiffs' core theory remains the same, but it is expressly preempted by the FDCA.

Finally, Plaintiffs assert that labeling statements on newly challenged product labels, such as "wholesome, great tasting goodness in every bowl" and Quaker's assertions regarding its products' "quality," are misleading because they imply the general "healthiness" of Quaker's products. But generalized, unverifiable assertions of product superiority are unlikely to mislead consumers as a matter of law and cannot support a consumer-fraud claim. From Quaker's perspective, its products are, indeed, "quality" and "wholesome, great tasting goodness," but the puffery doctrine does not permit Plaintiffs to base this putative class action lawsuit on such claims.

Plaintiffs' claims rest on implausible factual assertions and are either preempted by federal law or seek to challenge only non-actionable puffery. For these reasons, the Court should dismiss the Amended Consolidated Complaint with prejudice.

## II.   STATEMENT OF THE ISSUES TO BE DECIDED

1.   **Failure to Show a Plausible Claim for Relief**: Whether Plaintiffs fail to state a plausible claim for relief under *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949–50 (2009), and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–58 (2007).

2.   **Preemption**: Whether Plaintiffs' claims regarding statements such as "adds a dietarily insignificant amount of trans fat," "heart healthy," "helps reduce cholesterol," and "[a]ll the nutrition of a bowl of oatmeal," as well as images that include oats, nuts, fruits, and brown sugar, are preempted by the FDCA because they seek to impose requirements for product labeling that are "not identical" to those mandated by federal law. 21 U.S.C. § 343-1(a)(5).

3.   **Non-Actionable Puffery**: Whether Plaintiffs' claims regarding "wholesome, great-tasting goodness in every bowl," "quality," "help you feel your best," and "smart choices made easy," taken in context, are non-actionable puffery.

## III.   SUMMARY OF ALLEGED FACTS AND RELEVANT REGULATIONS

A.   <u>Procedural History and Plaintiffs' Amended Consolidated Complaint.</u>  Plaintiffs Victor Guttmann and Robert Chacanaca's initial complaint in this action challenged statements and images on Quaker Chewy Granola Bars as false and misleading because the products contained *trans* fat.

*See, e.g.*, Dkt. Entry 1 ¶ 6.  Specifically, these plaintiffs asserted that "the trans fat content of Quaker Chewy granola bars renders them unfit for human consumption," and they challenged labeling statements that the granola bars contained "0 grams trans fat," were a "good source" for calcium and fiber, were made with whole grain oats but lacked high fructose corn syrup (HFCS), were "wholesome" and "smart choices made easy," and came with pictures of healthy children, oats, and nuts.  *See id.* ¶¶ 57–61.

On October 14, 2010, this Court granted in part and denied in part Quaker's motion for judgment on the pleadings.  *See Chacanaca*, 752 F. Supp. 2d at 1127.  The Court held that the FDCA preempted the challenges to the "0 grams trans fat," "good source," and HFCS statements.  *Id.* at 1119–23 (holding that the FDCA expressly preempts lawsuits under state law predicated on nutrient content claims seeking to impose any requirement "in the label or labeling of food that is not identical to the requirement[s]" of the FDCA).  The Court cited the FDA's requirement that amounts of *trans* fat alleged to be present in Quaker Chewy Granola bars—less than 0.5 grams per serving— be reported on the side panel "Nutritional Facts" box as zero grams because it constituted a "nutritionally insignificant amoun[t]."  *Id.* at 1116.  For this reason, federal law preempted Plaintiffs' challenge to the "0 grams trans fat" label.

Similarly, the Court found that federal law preempted Plaintiffs' claims related to statements asserting the presence of whole grain oats, the absence of HFCS, and that the products are a "good source" of calcium because FDA regulations do not establish that *trans* fat is so unhealthy that products containing the nutrient may not make *unrelated* health claims:  "As a matter of federal law, then, the presence of trans fats alone is not a 'disqualifying' nutrient which would prevent Quaker Oats from emphasizing whatever other health benefits are available from the Bars' other ingredients or because it lacks certain ingredients."  752 F. Supp. 2d at 1122.

Next, the Court determined that, "at this juncture" and "on this motion," it could not determine whether the statements "wholesome" and "smart choices made easy," and the graphic depictions on Quaker boxes, were non-actionable puffery.  752 F. Supp. 2d at 1125–26.  It reasoned that, depending on the context, a statement like "wholesome" may not be puffery, and distinguished other cases where "wholesome" had been found to be puffery based on the larger context and

packaging.  *Id.* at 1125 ("The use of the word 'wholesome,' however, was only part of the phrase deemed puffery in *Tylka* [*v. Gerber Products Co.*, No. 96-1647, 1999 WL 495126, at *2 (N.D. Ill. July 1, 1999)].")  The Court based its conclusion that these claims should be permitted to proceed on accepting Plaintiffs' allegation that *trans* fats are not safe in any amount.  *See id.* at 1115 ("[Plaintiffs] insist in their Complaint that trans fats are not safe for human consumption in any amount."); *id.* at 1126 ("Taking plaintiffs' allegation that trans fats are not safe in any amount as true . . . .").

After this Court ruled on the motion, three additional suits containing similar allegations were filed against Quaker in this District.[1]  On June 24, 2011, interim class counsel filed a Consolidated Complaint.  *See* Dkt. Entry 95.[2]  This Consolidated Complaint added allegations regarding additional products (Instant Quaker Oatmeal and Quaker Oatmeal to Go Bars) and challenged additional labeling statements that were allegedly deceptive.  Quaker filed a motion to dismiss on July 29, 2011, *see* Dkt. Entry 98, but rather than respond to the motion to dismiss, Plaintiffs filed an Amended Consolidated Complaint on August 19, 2011, *see* Dkt. Entry 102.

Plaintiffs' Amended Consolidated Complaint alleges that they are repeat purchasers of Quaker Instant Oatmeal, Quaker Chewy Granola Bars, and Quaker Oatmeal to Go Bars.  *See* Dkt. Entry 102 ("Am. Compl.") ¶ 4.  Plaintiffs allege that, in purchasing these products, they were "seeking, for themselves and their families, products of particular qualities."  *Id.* ¶ 115.  In pursuit of this goal, Plaintiffs assert that they read and relied on statements written on Quaker's packaging, including the statement that ingredients in these products add trace amounts of *trans* fat.  *See id.* ¶ 116 & App'x A.  This allegation contradicts Plaintiffs Guttmann and Chacanaca's initial complaint, which alleged that they were unaware of the presence of *trans* fat.  See Dkt. Entry 1 ¶¶ 75, 88. Plaintiffs now claim that Quaker's products did not meet their standards because, unbeknownst to them, *trans* fat is harmful.  *See*, *e.g*, Am. Compl. ¶¶ 126–127.

---

[1]  *See Yrene v. Quaker Oats Co.*, No. 5:10-CV-5389-RS; *Yumul v. Quaker Oats Co.*, No. 5:10-CV-5538-RS; *Pelobello v. Quaker Oats Co.*, No. 3:11-CV-00093-RS.

[2]  The initial Consolidated Complaint did not identify Robert Chacanaca, an originally named plaintiff in this action, as a plaintiff.  *See* Dkt. Entry 95.  Similarly, Mr. Chacanaca is not identified as a plaintiff in the Amended Consolidated Complaint.

Plaintiffs further allege that they were misled into buying Quaker's products by the following supposedly false and misleading statements and images on Quaker's product labels: (1) "Smart Choices Made Easy" (Am. Compl. ¶¶ 70–77); (2) "heart-healthy" (*id.* ¶¶ 82, 85–94); (3) "quality" (*id.* ¶ 95); (4) "part of a heart healthy diet" (*id.* ¶¶ 99, 108–112); (5) "help your family fuel their busy days" (*id.* ¶ 78); (6) "wholesome, great tasting goodness in every bowl" (*id.* ¶ 95 & Ex. B); (7) a "wholesome way to keep your family going" (*id.* ¶ 69 & Ex. A); (8) "adds a dietarily insignificant amount of trans fat" (*id.* ¶¶ 79–80, 96–97, 113–114); (9) will "help you feel your best" (*id.* ¶ 99); (10) "Helps Reduce Cholesterol!" (*id.* ¶¶ 99, 102–107); (11) the Quaker Oatmeal to Go Bars contain "All the Nutrition of a Bowl of Instant Oatmeal" (*id.* ¶ 99); and (12) graphical depictions of hearts, oats, nuts, natural brown sugar, and children in soccer uniforms (*id.* ¶¶ 78, 82, 95). Plaintiffs claim that these statements and images are false and misleading because the products contained PHVOs, which, in turn, contain *trans* fat. *See id.* ¶ 4. They also allege that Quaker's products are unhealthy because they contain "highly refined sugar and simple starches." *Id.* ¶¶ 71–72, 78, 82, 95, 101. Based on these purportedly false and misleading statements, Plaintiffs assert causes of action for alleged violations of (1) California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.* (Counts 1 and 2); (2) violations of California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500 *et seq.* (Count 3); and (3) violations of California's Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750 *et seq.* (Counts 4 and 5). Am. Compl. ¶¶ 142–176. In an effort to address the arguments raised in Quaker's previous motion to dismiss, Plaintiffs now acknowledge the federal statutes and FDA regulations governing many of the claims at issue and attempt to assert violations of those provisions. *See id.* ¶¶ 86–93, 106–107, 109–111.

B. Regulatory Background. The FDA has long regulated food labeling under the FDCA. *See* 21 U.S.C. § 301 *et seq.* Enacted in 1938, the FDCA prohibits the misbranding of food. *See id.* § 331(a). Congress passed the Nutrition Labeling and Education Act in 1990 to "clarify and to strengthen the [FDA's] legal authority to require nutrition labeling on foods, and to establish the circumstances under which claims may be made about nutrients in foods." H.R. Rep. 101-538, at 7 (1990), *reprinted in* 1990 U.S.C.C.A.N. 3336, 3337. Together, these provisions establish "a comprehensive regulatory scheme of branding and labeling of food products." *Fraker v. KFC Corp.*,

1   No. 06-cv-01284, 2007 WL 1296571, at *4 (S.D. Cal. Apr. 30, 2007).

2          The term "misbranded" as it relates to food is defined by various provisions of 21 U.S.C.

3   § 343 and accompanying FDA regulations.  In general, food is misbranded if "its labeling is false or

4   misleading in any particular."  21 U.S.C. § 343(a)(1).  Section 343 also imposes specific

5   requirements on the information contained on food labels.  Under Section 343(q), food labels must

6   bear "nutrition information" that indicates the level of particular nutrients present per serving of the

7   food.  *See id.* § 343(q)(1).  Food labels disclose this information in a "Nutrition Facts" box.  *See* 21

8   C.F.R. § 101.9.

9          Since 2006, FDA regulations have required food labels to disclose nutrient information for

10  *trans* fat.  *See Food Labeling: Trans Fatty Acids in Nutrition Labeling, Nutrient Content Claims, and*

11  *Health Claims*, 68 Fed. Reg. 41,434 (July 11, 2003); *see also* 21 C.F.R. § 101.9(c)(2)(ii).  These

12  regulations require the *trans* fat content to be "expressed as grams per serving to the nearest 0.5 (1/2)-

13  gram increment below 5 grams and to the nearest gram increment above 5 grams.  If the serving

14  contains less than 0.5 gram, the content, when declared, shall be expressed as zero."  21 C.F.R.

15  § 101.9(c)(2)(ii).  The FDA defines as an "insignificant amount" any nutrient present "in an amount

16  that allows a declaration of zero in nutrition labeling."  *Id.* § 101.9(f)(1).

17         Section 343(r) imposes requirements for voluntary statements made on food labeling that,

18  "expressly or by implication," "characterizes the level of any nutrient . . . of the food" (*i.e.*, a

19  "nutrient content claim"), or "characterizes the relationship of any nutrient . . . to a disease or a

20  health-related condition" (*i.e.*, a "health claim").  21 U.S.C. § 343(r)(1)(A)–(B); *see also* 21 C.F.R.

21  § 101.13 ("Nutrient content claims—general principles"); *id.* § 101.14 ("Health claims: general

22  requirements").  In addition to written statements, the definition of "health claims" includes "symbols

23  (e.g., a heart symbol), or vignettes."  *Id.* § 101.14(a)(1).

24         The FDA has adopted regulations governing certain approved nutrient content and health

25  claims, which expressly permit the health claims made on Quaker's labeling.  *First*, the FDA permits

26  food labels for products that meet specific FDA nutritional standards to make health claims

27  "associating diets that are low in saturated fat and cholesterol and that include soluble fiber from

28  certain foods with reduced risk of heart disease."  21 C.F.R. § 101.81(c)(2)(i).  This statement may

include information that the "reduced risk of heart disease is through the intermediate link of" cholesterol. *Id.* § 101.81(d)(2). *Second*, the FDA permits food labels to compare its nutrient contents with that of other food by reference, such as by claiming that a product has "as much fiber as an apple." 21 C.F.R. § 101.65(2)(2). Plaintiffs have not refuted—and cannot refute—that the Quaker products carrying these types of claims meet the FDA's nutritional standards for making these claims.

Even where the FDA has not authorized a particular health claim by regulation, the FDCA permits companies to provide the FDA with notice of a proposed claim regarding a particular nutrient, along with scientific literature discussing the relationship between that nutrient and the health-related condition at issue. *See* 21 U.S.C. § 343(r)(3)(C). After submission of such a notice, manufacturers are authorized to include the claim on their food labels unless the FDA issues a regulation prohibiting it, determines that the submission was inadequate, or successfully pursues an enforcement proceeding that the submission requirements were not satisfied. *See id.* § 343(r)(3)(D).

## IV.  THE LEGAL STANDARDS GOVERNING THIS MOTION

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), Plaintiffs' complaint must "contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 570). To meet the plausibility standard, a complaint must contain facts from which the court can draw a "reasonable inference" that the defendant is liable for the alleged misconduct. *Id.* Although the Court must accept factual allegations as true for purposes of a motion to dismiss, this tenet is "inapplicable to legal conclusions." *Id.* After stripping away the "conclusory statements" in the complaint, the remaining factual allegations must do more than "create a suspicion of a legally cognizable right of action"; they must "raise a right to relief above the speculative level." *Id.* In making this determination, the Court must "draw on its judicial experience and common sense." *Id.* at 1950. This analysis provides an important gatekeeper function, because Plaintiffs' claims must be sufficiently plausible such "that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). Here, Plaintiffs' allegations fall far short of stating a plausible entitlement to relief.

1

## V.     ARGUMENT

2

**A.     Plaintiffs' Allegations Do Not State A Plausible Claim For Relief.**

3       All of Plaintiffs' claims depend on their core theory that *trans* fat is "toxic," Am. Compl. ¶ 4,

4 and unsafe for human consumption in any amount, *see id.* ¶ 60 (asserting that there is "'no safe level'

5 of trans fat intake"). This allegation is implausible in light of the FDA regulations, municipal

6 ordinances, and other materials before the Court. Plaintiffs' claims should therefore be dismissed.

7       The FDA has carefully reviewed similar arguments, and it has decided that the scientific

8 evidence does not support Plaintiffs' conclusion. The agency has long listed PHVOs—the source of

9 *trans* fat at issue here, *see* Am. Compl. ¶ 26—in its database of food additives that are "generally

10 recognized as safe" ("GRAS"). *See* Select Comm. on GRAS Substances, *Report No. 70, available at*

11 www.accessdata.fda.gov/scripts/fcn/fcnDetailNavigation.cfm?rpt=scogsListing&id=154 (last updated

12 Oct. 31, 2006). The GRAS designation "may be based only on the views of experts qualified by

13 scientific training and experience to evaluate the safety of substances directly or indirectly added to

14 food." 21 C.F.R. § 170.30(a). Listing a food additive as GRAS means there is "reasonable certainty

15 in the minds of competent scientists that the substance is not harmful under its intended conditions of

16 use," *id*. § 170.3(i), and that manufacturers are permitted to include the additive in their products

17 without first obtaining FDA approval, *see, e.g., id*. § 170.30(g).

18       Moreover, as this Court has already acknowledged, the FDA *requires* companies to list the

19 amounts of *trans* fat allegedly present in Quaker's products at issue in this litigation—less than 0.5

20 grams per serving—as 0 grams. *See Chacanaca,* 725 F. Supp. 2d at 1121 (citing 21 C.F.R.

21 § 101.9(c)(2)(ii)). The FDA enacted this requirement because, in its view, less than 0.5 grams of

22 *trans* fats "means the same thing" as "nutritionally insignificant amounts." *Id.*; *see also, e.g.,*

23 *Requirements for Foods Named by Use of a Nutrient Content Claim,* 58 Fed. Reg. 44,020, 44,024

24 (Aug. 18, 1993) (noting that "nutritionally trivial" amounts of given nutrients are "declared as zero on

25 the nutrition label"). Consistent with this view, the FDA permits companies to assert in their labeling

26 that PHVOs add a "dietarily insignificant amount of *trans* fat," so long as the product would

27 otherwise be entitled to report its *trans* fat values as zero grams. *See* RJN Ex. 1. (Letter from Felicia

28

1   B. Satchell, Director, Food Label and Standards Staff, FDA, to Richard S. Silverman (Mar. 18,

2   2004)).

3          Indeed, the FDA specifically considered—and rejected—a rule that would have banned food

4   purveyors from making unqualified health claims about its products that contain *trans* fat.  *See*

5   21 C.F.R. § 101.14(a)(4).  Pursuant to FDA regulations, if a food product contains certain nutrients

6   above specified levels, then the food is disqualified from making any claims characterizing the food's

7   effect on a health-related condition (*i.e.*, health claims).  The FDA carefully evaluated a proposed rule

8   setting disqualifying levels for *trans* fat—but it ultimately withdrew the proposal because it could not

9   support such a rule with "scientifically-based definitions and levels" of *trans* fat.  *See*, *e.g.*, 68 Fed.

10  Reg. 41,434, 41,465 (July 11, 2003).[3]

11         As the foregoing indicates, the FDA has concluded that the presence of *trans* fat in food—in

12  amounts less than 0.5 grams per serving—does not make the use of the nutrient content and health

13  claims they have authorized false or misleading.  Perhaps recognizing that the FDA's conclusion

14  raises serious plausibility problems for their allegations, Plaintiffs instead turn to *state* and *local*

15  regulations regarding *trans* fat.  *See* Am. Compl. ¶¶ 63–64.  But these regulations are entirely

16  consistent with the FDA's view.  Indeed, *every* example of purported "bans" cited in the complaint—

17  including under California law—contains an exception for foods with less than 0.5 grams of *trans* fat

18  per serving.  *See* Cal. Health & Safety Code § 114377(d) (equating less than 0.5 grams trans fat per

19  serving with no trans fat); New York City Health Code § 81.08(b) (same); Philadelphia Health Code

20  § 6-307(2) (same); Baltimore Health Code § 6-507(a)(2) (same); Montgomery County Bd. Health

21  Res. 16-134(a)(2) (same); Stamford Municipal Code § 132-24.1(b) (same).

22         Plaintiffs also rely on a handful of studies that, they claim, suggest that *trans* fat at any level is

23  unhealthy.  It is hardly clear that this is correct,[4] but again the FDA has reviewed and analyzed the

24  _____

25  [3]  As explained below, the FDA has set certain disqualifying levels of *trans* fat for some specific
         health claims.  *See*, *e.g.*, *infra* at pp. 14.  There is, however, no *general* disqualifying level of
26       *trans* fat.  *See Chacanaca*, 725 F. Supp. 2d at 1121.  Plaintiffs have not alleged that the amount of
         *trans* fat in Quaker's products would put it in out of compliance with the requirements for these
27       specific claims.

28  [4]  Even one of the studies cited by Plaintiffs, for instance, establishes that there are no adverse
         health effects associated with consumption of small amounts of *trans* fat.  *See* Food and Nutrition

Gibson, Dunn &
Crutcher LLP

                                          9

relevant scientific research and it has specifically concluded that *trans* fat quantities of less than

0.5 grams per serving are indistinguishable from zero for nutritional purposes. Although Plaintiffs

repeatedly insist that *trans* fats are harmful in any quantity, the FDA's regulatory regime and relevant

statutory sources illustrate the implausibility of this assertion.

Plaintiffs' further allegations that Quaker's products are unhealthy because they contain

"highly refined sugar and simple starches" (Am. Compl. ¶ 71) are similarly implausible. These

threadbare allegations are never developed in the complaint; Plaintiffs do not allege that they were

deceived about the sugar content of Quaker's products, or that they were unaware of the health

effects of sugar consumption. Even if they *had* done so, any such allegations would be implausible—

and, indeed, flatly inconsistent with claims some of these very same plaintiffs have asserted in other

recent lawsuits. For example, in *Peviani v. Hostess Brands, Inc.,* Plaintiff Guttmann alleged that he

was a consumer of Hostess Products such as Cinnamon Streusel Coffee Cakes, Twinkie Bites Golden

Sponge Cake with Creamy Filling, Chocolate Cake with Creamy Filling, Lemon Golden Cake with

Creamy Filling, Strawberry Cake with Cream Cheese Icing and Creamy Filling, and Carrot Cake

with Cream Cheese Icing and Creamy Filling. 750 F. Supp. 2d 1111, 1113 n.1 (C.D. Cal. 2010). Yet

in this action, Guttmann claims that he was harmed by buying products laden with sugar when he was

actually looking for "products made with natural, healthy ingredients." Am. Compl. ¶ 115. These

contradictory allegations make clear why Plaintiffs have not alleged—and could not plausibly

allege—that they were misled about the sugar content of Quaker's products.[5]

---

Bd., Inst. of Med., *Dietary Reference Intakes for Energy, Carbohydrates, Fiber, Fat, Fatty Acids, Cholesterol, Protein, and Amino Acids* 835 (2005) ("There are no known risks of chronic disease from consuming low intakes of saturated fatty acids, trans fatty acids, or cholesterol."), *cited in* Am. Compl. ¶ 60 & n.33. This is consistent with the FDA's view that there is "reasonable certainty in the minds of competent scientists" that small amounts of *trans* fat are "not harmful." 21 C.F.R. § 170.3(i).

[5] Other inconsistencies further undermine the plausibility of Plaintiffs' allegations. Plaintiffs assert that they were deceived as to the allegedly unhealthy nature of the *trans* fat content in Quaker's products. *See* Am. Compl. ¶ 117. But in stark contrast to their prior pleadings, Plaintiffs no longer allege they were unaware that the products contained *trans* fat. *See* Dkt. Entry 1 ¶¶ 75, 88 (alleging that Plaintiffs were deceived into believing that Quaker's products contained "'no' . . . trans fat"). Instead, they now admit that they "read and relied upon" the statement that products contained *trans* fat. Am. Compl. ¶¶ 79, 96, 113, 116, App'x A. Plaintiffs are simply shifting theories in the hopes that they will eventually find a viable claim.

**B.     Federal Law Preempts Plaintiffs' Claims.**

Alternatively, the FDA's extensive regulations preempt Plaintiffs' claims.  The FDA has established extensive standards for food labeling, and many of the statements challenged by Plaintiffs as violations of state law—that Quaker's products "ad[d] a dietarily insignificant amount of trans fat," are "heart healthy," "hel[p] reduce cholesterol," and contain "[a]ll the nutrition of a bowl of oatmeal"—are governed by these standards.  Because Congress preempted state law in this area, Plaintiffs' challenges to these statements must fail.[6]

Under the Supremacy Clause, "the Laws of the United States . . . shall be the supreme law of the land," U.S. Const. art. VI, cl. 2, and preempt all state laws to the contrary, *see*, *e.g.*, *Bank of Am. v. City & County of S.F.*, 309 F.3d 551, 557–58 (9th Cir. 2002).  There is no private right of action to enforce the FDCA or FDA regulations.  *See* 21 U.S.C. § 337(a); *see also Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 349 n.5 (2001).  Plaintiffs have therefore attempted to plead their challenges to Quaker's labeling under California law.  However, the FDCA, as amended by the Nutritional Labeling and Education Act, contains a broad preemption provision:  As relevant here, the statute preempts "any requirement for the labeling of food that is not identical" to federal requirements for nutrition information, nutrient content, and health-related claims.  21 U.S.C. § 343-1(a)(4); *see id.* § 341-1(a)(5).  The term "requirements" "sweeps broadly," *Cipollone v. Liggett Group Inc.*, 505 U.S. 504, 521 (1992), and includes "positive enactments, such as statutes and regulations, [as well as] common-law duties" and judge-made rules, *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449 (2005); *see also Hillborough County v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713 (1985) (same).

As this Court has already concluded, the FDCA expressly prevents Plaintiffs from seeking to impose requirements in addition to those mandated by federal statutes and regulations.  *See Chacanaca*, 752 F. Supp. 2d at 1114.  This ruling forecloses several of Plaintiffs' allegations.

1.  "Adds a dietarily insignificant amount of trans fat."  This statement accompanies the Ingredients List item for the PHVOs present in Quaker Chewy Granola Bars, Quaker Instant

---

[6]  As discussed below, the remaining statements should be dismissed because they challenge only non-actionable puffery.  *See infra* pp. 19–21.

DEFENDANT'S MOTION TO DISMISS AMENDED CONSOLIDATED COMPLAINT, NO. 5:10-CV-00502-RS

Gibson, Dunn & Crutcher LLP

1   Oatmeal, and Quaker Oatmeal To Go bars.  Am. Compl. ¶¶ 79–80, 96–97, 113–14.  According to

2   Plaintiffs, the statement is false and misleading in "light of the pernicious effects of even small

3   amounts of *trans* fat" and because the statement implies endorsement by the FDA.  *Id.* ¶¶ 80, 97, 114.

4           These claims are preempted for the same reason this Court has *already* rejected other

5   allegations in the original complaint:  The FDA considers *trans* fat content of less than 0.5 grams per

6   serving to be an "insignificant amount."  FDA regulations provide that, "[i]f a serving contains less

7   than 0.5 gram [of *trans* fat], the content, when declared, shall be declared as zero."  21 C.F.R.

8   § 101.9(c)(2)(ii).  The same regulation defines an "'insignificant amount'" of a particular nutrient, in

9   turn, as "that amount that allows a declaration of zero in nutrition labeling."  *Id.*  § 101.9(f)(1).  Thus,

10  as this Court has concluded, amounts of *trans* fat less than 0.5 grams per serving are deemed by the

11  FDA to be nutritionally insignificant.  *See Chacanaca*, 752 F. Supp. 2d at 1117 (citing *Requirements*

12  *for Foods Named by Use of a Nutrient Content Claim*, 58 Fed. Reg. 44,020, 44,024 (Aug. 18, 1993)).

13          Similarly, the Court should reject Plaintiffs' assertion that the "dietarily insignificant"

14  statements falsely imply endorsement by the FDA.  In addition to the FDA regulations that explicitly

15  define less than 0.5 grams of *trans* fat per serving as an "insignificant amount," the FDA has also

16  expressly endorsed the *very statement* at issue here:  It has concluded that, where a food's labeling

17  declares "0 g *trans* fat," the manufacturer may "voluntarily identif[y] ingredients that are generally

18  understood by consumers to contain *trans* fat . . . with an asterisk that refers to a statement below the

19  list of ingredients which states '*adds a trivial (or negligible or dietarily insignificant) amount of* trans

20  *fat*.'"  RJN Ex. 1 (Letter from Felicia B. Satchell, Director, Food Label and Standards Staff, FDA, to

21  Richard S. Silverman (Mar. 18, 2004)) (emphasis added).  This is precisely what Quaker did:

22  Because PHVOs are "generally understood by consumers to contain *trans* fat," but Quaker's products

23  nonetheless contain "0 g *trans* fat" as determined by FDA regulations, Quaker included the FDA-

24  permitted statement that the PHVOs "ad[d] a . . . dietarily insignificant . . . amount of *trans* fat."

25  Contrary to Plaintiffs' assertions, therefore, the challenged statements have expressly been permitted

26  by the FDA in this context.

27          2.  <u>"Heart Healthy"/Images of Hearts.</u>  Plaintiffs allege that the label of Quaker Instant

28  Oatmeal is false and misleading because it states, on the front panel, "Heart Healthy" surrounded by a

"prominent image of a heart."  Am. Compl. ¶ 82.  This statement and image appears directly above an asterisk stating "See side panel for information about the relationship between whole grains and heart disease."  *Id.* ¶ 83.  The side panel of the packaging states, in turn, "*diets rich in whole grain oats and other plant foods and low in saturated fat and cholesterol may help reduce the risk of heart disease."  *Id.* ¶ 84.  Under FDA regulations, statements and images such as these are considered "implied health claims" governed by the FDCA.  21 C.F.R. § 101.14(a)(1) ("Implied health claims include those statements, symbols, vignettes, or other forms of communications that suggest . . . that a relationship exists between the presence or level of a substance in the food and a disease or health-related condition"); *Guidance for Industry: A Labeling Guide for Restaurants and Other Retail Establishments Selling Away-From-Home Foods* (Apr. 2008) at Nos. 40–41, 45–46, 55, 60 (explaining that the statement "heart healthy" and heart images on food labeling are regulated by the FDA as an implied health claim), *available at* http://www.fda.gov/Food/GuidanceComplianceRegulatoryInformation/GuidanceDocuments/FoodLabelingNutrition/ucm053455.htm.  Plaintiffs' challenges to these health claims are preempted for several reasons.

*First,* as even Plaintiffs concede, the Heart Healthy statements and images are "authorized pursuant to 21 U.S.C. § 343(r)(3)(C)."  Am. Compl. ¶ 85.  Section 343(r)(3)(C) permits companies to submit to the FDA notice of a proposed health claim, along with scientific literature discussing the relationship between the proposed claim and the health-related condition at issue; after 120 days, companies are entitled to use the claim unless FDA disapproves.  In 2003, Kraft Foods submitted a notification for the precise language at issue here.  *See* RJN Ex. 2 (Letter from Jean E. Spence, Senior Vice President, Research and Development, Kraft Foods, to Division of Nutrition Programs and Labeling, FDA (Aug. 8, 2003)) ("Kraft Letter") (attaching report titled "Notification of Health Claim Based on Authoritative Statement: Whole Grain Foods and Heart Disease").[7]  The Kraft Letter alone

---

[7]  After engaging in discussions with the FDA about the proposed claim, Kraft submitted additional letters on November 3 and 26 and attached revised reports.  *See* RJN Ex. 3 (Letter from Sheryl A. Marcouiller, Senior Food Law Counsel, Kraft Foods, to Julie Scrimpf, Division of Nutrition Programs and Labeling, FDA (Nov. 3, 2003)); RJN Ex. 4 (Letter from Sheryl A. Marcouiller, Senior Food Law Counsel, Kraft Foods, to Julie Scrimpf, Division of Nutrition Programs and Labeling, FDA (Nov. 26, 2003)).  These subsequent submissions do not alter Quaker's ability to make the "Heart Healthy" claim.

1   would be sufficient to permit Quaker to use the health claim challenged by Plaintiffs unless the FDA

2   disapproved that claim, which it did not.  But in this case, the FDA specifically *considered* and

3   *approved* use of the statement.  *See Health Claim Notification for Whole Grain Foods with Moderate*

4   *Fat Content* (Dec. 9, 2003), *available at* http://www.fda.gov/Food/LabelingNutrition/LabelClaims/

5   FDAModernizationActFDAMAClaims/ucm073634.htm.  The FDA issued detailed guidance to

6   determine when the presence of *trans* fat might bar a label from containing the health claims at

7   issue—it required that the food contain "0.5 gram or less *trans* fat" per reference amount customarily

8   consumed.  *See id.*

9          Plaintiffs do not—and cannot—allege that Quaker Instant Oatmeal is not in compliance with

10  this guidance.  Their arguments are therefore a direct attack on the FDA's approval of the very health

11  claims at issue here.  To recognize those claims would add a state-law requirement in addition to

12  those imposed by the FDCA in contravention of the express preemption clause in Section 343-1.

13         *Second*, Plaintiffs' attempts to circumvent the preemptive effect of Section 343(r)(3)(C) are

14  meritless.  For example, they allege that:  (a) the Kraft submission did not present a "balanced

15  representation of the scientific literature"; (b) Quaker may only make such a claim if its Instant

16  Oatmeal "does not contain, as determined by the Secretary by regulation, any nutrient in an amount

17  which increases" risk of disease or other health-related condition; (c) the statements fail to be

18  "complete, truthful, and not misleading"; and (d) the statements are interrupted by "intervening

19  material."  Am. Compl. ¶¶ 87–94.  Plaintiffs provide no factual support for these legal conclusions,

20  and therefore the Court need not accept them for purposes of a motion to dismiss.  *See Iqbal*, 129

21  S. Ct. at 1949–50 ("the tenet that a court must accept as true all of the allegations contained in a

22  complaint is inapplicable to legal conclusions").

23         More importantly, the decision to permit the health claims at issue here is vested by Congress

24  in the FDA, and the agency has considered and rejected the same arguments now advanced by

25  Plaintiffs.  *See Health Claim Notification for Whole Grain Foods with Moderate Fat Content* (Dec. 9,

26  2003), *available at* http://www.fda.gov/Food/LabelingNutrition/LabelClaims/

27  FDAModernizationActFDAMAClaims/ucm073634.htm.  Once the FDA receives notice of the

28  proposed health claim and the time period elapses, manufacturers are authorized to make the claim

until the FDA issues a regulation prohibiting it, determines that the submission was inadequate, or successfully pursues an enforcement proceeding that the submission requirements were not satisfied. *See* 21 U.S.C. § 343(r)(3)(D). The FDA has not issued any such regulation, and a private litigant may not bring an enforcement proceeding to overturn the health claim. *See* 21 U.S.C. § 343(r)(3)(D)(ii); *see also id.* § 337(a). Until one of these events occurs, Quaker is authorized to make this health claim, and any state law requirement that would impose liability for the claim is preempted.

*Third*, Plaintiffs separately allege that "'Heart Healthy' messaging and imaging" on Oatmeal To Go bars is false and misleading. Am. Compl. ¶¶ 108–112. The sole reason Plaintiffs allege that the statement is misleading is that the bars contain *trans* fat and refined sugars and starches. This Court has already rejected the argument that the presence of *trans* fat "would prevent Quaker Oats from emphasizing whatever other health benefits are available from" other ingredients in its products. *Chacanaca*, 752 F. Supp. 2d at 1122. It did so because FDA regulations provide a list of nutrients and amounts that "disqualify" a product label from bearing health claims—none of which is *trans* fat. *See id.* This Court's reasoning applies with equal force to the presence of refined sugars and starches, because those ingredients *also* have not been recognized as disqualifying by the FDA. Plaintiffs' claims based on heart healthy messages and images are preempted. *Ackerman v. Coca-Cola Co.*, No. 09-0395, 2010 WL 2925955, at *8 (S.D.N.Y. July 21, 2010) ("[A]ny claim under state law solely premised on the notion that vitaminwater's high sugar content made its health or implied nutrient content claims misleading is preempted by the FDA's express decision to not recognize sugar as a disqualifying nutrient.").

3. "Helps Reduce Cholesterol." Plaintiffs' challenge the labeling of Quaker's Oatmeal To Go Bars because it contains the statements "As part of a heart healthy diet, the soluble fiber in Quaker Oatmeal Helps Reduce Cholesterol!*" and "Get your heart healthy oats in a variety of ways." Am. Compl. ¶¶ 99–112. Just below these statements appears an asterisk referencing the cholesterol statement, which is accompanied by the statement "3 grams of soluble fiber from oatmeal daily in a diet low in saturated fat and cholesterol may reduce the risk of heart disease. Quaker Old Fashioned Oats provide 2g per serving. Quaker Instant Oatmeal, Oatmeal Squares, and Oatmeal to Go bars

provide 1g per serving." *Id.* Ex. C.  According to Plaintiffs, these statements are false and misleading because the presence of *trans* fat, as well as highly refined sugars and starches, "damage the heart and increase the risk and severity of type 2 diabetes." *Id.* ¶ 101.  These claims, too, are expressly preempted.

Plaintiffs admit that FDA regulations authorize a health claim associating soluble fiber from whole grain oats with a reduced risk of coronary heart disease.  *See* Am. Compl. ¶ 106 (citing 21 C.F.R. § 101.81).  This regulation allows the label to contain "optional information" that the "reduced risk of heart disease is through the intermediate link of" cholesterol.  21 C.F.R. § 101.81(d)(2).  The FDA has expressly permitted Quaker to make the statement challenged here, and thus Plaintiffs' claim would impose a requirement "not identical" to federal law.  *See* 21 U.S.C. § 343-1(a)(5).

In an attempt to escape this conclusion, Plaintiffs assert that the link between Oatmeal To Go bars and lowering cholesterol is a "therapeutic claim" that renders the product "a drug within the meaning of 21 U.S.C. § 321(g)(1)(B)."  Am. Compl. ¶ 102.  But Plaintiffs do not explain how Quaker's inclusion of an FDA-approved *health* claim could simultaneously function as a *therapeutic* claim transforming oatmeal into an unapproved drug.  To the contrary, the statutory provision invoked by Plaintiffs, which defines the term "drug" under the FDCA, provides that a food "is not a drug solely because the label or the labeling" of the food contains a health-related claim under 21 U.S.C. § 343(r)(1)(B).  *See id.* 21 U.S.C. § 321(g)(1).  For this reason, Plaintiffs' claim that Quaker Oatmeal To Go bars are a "misbranded unapproved new drug" fails.[8]

---

[8]  In any event, Plaintiffs' unapproved-drug argument is not an assertion that Quaker has violated any labeling provision of the FDCA but instead that it has violated *separate* provisions of the FDCA governing approval of new drugs.  But "the FDCA leaves no doubt that it is the Federal Government rather than private litigants who are authorized to file suit for noncompliance" with those provisions.  *Buckman*, 531 U.S. at 349 n.5; *see also* 21 U.S.C. § 337(a) ("[A]ll such proceedings for the enforcement, or to restrain violations, of this Act . . . shall be by and in the name of the United States.").  Thus, when a plaintiff's "misrepresentation" claims are "nothing more than a proxy" for allegations of regulatory violations, the complaint must be dismissed with prejudice.  *See In re Epogen & Aranesp Off-Label Mktg. & Sales Practices Litig.*, No. MDL 08-1934, 2009 WL 1703285, at *5 (C.D. Cal. June 17, 2009) (rejecting claims for implied misrepresentations of safety and effectiveness where the only "standard of proof of efficacy that plaintiffs point to is FDA approval," *e.g.*, allegations that the product "has not been proven to be effective in the treatment of [a particular disease] as the FDA has not approved it for such use");

4.  "All the nutrition of a bowl of oatmeal."  Plaintiffs also fault the labels of Oatmeal To Go Bars because they contain the phrase "All the nutrition of a bowl of instant oatmeal" on its side panel, near a depiction of a bowl of oatmeal.  *See* Am. Compl. ¶ 99 & Ex. C.  Plaintiffs assert that this statement is "not complete, not truthful, and highly misleading."  *Id.* ¶ 99 (emphases omitted).  As with their other claims, the only support for these legal conclusions is that Oatmeal To Go Bars contain *trans* fat.  *Id.*  This claim, however, is preempted by federal law.

The statement that a food "contains as much" nutrition as another food is an implied nutrient content claim governed by express FDA regulations.  *See, e.g.*, 21 C.F.R. § 101.65(c)(2).  Under these regulations, the phrase "'contains . . . as much [nutrient] as a [food]' may be used on the label or in the labeling of foods," so long as the two foods contain equivalent nutrients.  *Id.*  No FDA regulation or requirement applicable to this provision disqualifies Quaker from making an implied nutrient content claim because the products being referenced contain *trans* fat; the FDA has expressly decided *not* to recognize *trans* fat as a disqualifying nutrient.  *See supra* p. 9; *see also Chacanaca*, 752 F. Supp. 2d at 1122.  Accordingly, any attempt to ascribe disqualifying status to the presence of *trans* fat is "inconsistent with [the FDCA] and its regulations," and is therefore preempted.  *Chacanaca*, 752 F. Supp. 2d at 1122; *see Ackerman*, 2010 WL 2925955, at *8.

5.  Images of Oats, Nuts, Fruits, and Brown Sugar.  Plaintiffs also allege that images of oats, nuts, fruits, and natural brown sugar on the label for Quaker Chewy Granola[9] bars and Instant Oatmeal are misleading because they falsely imply that the products are consistent with a healthy lifestyle.  These claims, too, would impose labeling requirements that depart from federal law, and they are therefore preempted.

---

*see also Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1139 (4th Cir. 1993) (dismissing a federal false advertising claim under the Lanham Act as an attempt to evade the prohibition on private enforcement of the FDCA "by ingenious pleading.").

[9]  This Court has already ruled that claims based on "photographic depictions of oats, nuts, and children in soccer uniforms, the inclusion of a 'smart choices made easy' decal, and the general descriptor 'wholesome'" on Quaker Chewy Granola bars labels were not preempted because the "NLEA does not regulate 'front of the box' symbols."  *Chacanaca*, 752 F. Supp. 2d at 1123.  That ruling did not extend to Plaintiffs' new claims regarding Quaker Instant Oatmeal and, in any event, did not consider the grounds for preemption asserted herein.  *See id.*

The FDA has promulgated specific standards for labels that depict or characterize the flavors present in a food.  *See* 21 C.F.R. § 101.22.  This regulation applies to labels that make "any direct or indirect representations with respect to the primary recognizable flavor(s), by word, vignette, e.g., *depiction of a fruit*, or other means."  *Id.* § 101.22(i) (emphasis added).  The images of oats, nuts, fruits, and brown sugar challenged by Plaintiffs are paradigmatic examples of depictions identifying the flavors of the Quaker products.  *See, e.g.*, *Dvora v. General Mills, Inc.*, No. 11-1074, 2011 WL 1897349, at *5–6 (C.D. Cal. May 16, 2011) (holding that California consumer deception and false advertising claims predicated on depictions of blueberries are preempted by 21 C.F.R. § 101.22(i)); *McKinnis v. Kellogg USA*, No. 07-2611, 2007 WL 4766060, at *4 (C.D. Cal. Sept. 19, 2007) (holding that depictions of fruit were permissible under 21 C.F.R. § 101.22(i), even though the product contained none of those fruits).  Plaintiffs have not alleged that Quaker violated these federal requirements, and they cannot do so because the products actually contain the ingredients depicted. *See* Am. Compl. Ex. A, B.  Their claims predicated on these images are therefore preempted.  *See Dvora*, 2011 WL 1897349, at *6.

## C.     Plaintiffs' Remaining Claims Attempt To Challenge Non-Actionable Puffery.

The remaining statements challenged by Plaintiffs—"quality," "wholesome, great tasting goodness in every bowl," "help you feel your best," and "smart choices made easy"—are non-actionable puffery.  "General assertions of superiority," as opposed to factual assertions, are deemed "puffery" that is unlikely to deceive as a matter of law.  *Cook, Perkiss & Liehe, Inc. v. N. Ca. Collections Serv. Inc.*, 911 F.2d 242, 246 (9th Cir. 1990).  Plaintiffs' remaining challenged statements fall into this category of non-actionable puffery.[10]

_____

[10]  In its earlier ruling, this Court determined that "at this juncture" and "on this motion" it could not determine that the term "wholesome," standing alone, the "smart choices made easy" decal, and the photographic depictions of oats, nuts, and children in soccer uniforms were non-actionable puffery.  *Chacanaca*, 752 F. Supp. 2d at 1126.  At that time the Plaintiffs had not challenged any of Quaker's product labels for bearing the word "quality."  The Court's ruling with respect to the term "wholesome" was limited to Quaker Chewy Granola Bars, and considered the term in isolation, while it distinguished cases considering the term in context.  Quaker's arguments in this motion relate to a newly challenged product (Quaker Instant Oatmeal) and provide the necessary additional context to their earlier argument relating to Quaker Chewy Granola Bars.  *See Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997) ("When evaluating whether an advertising claim . . . the claim must always be analyzed in full context.").

Gibson, Dunn &
Crutcher LLP

1    1. "Quality."  Plaintiff challenges as false and misleading Quaker's statement that its product

2    is "quality."  This argument runs counter to a long line of California cases holding that assertions of

3    quality are not actionable.  *See*, *e.g.*, *In re Sony Grand Wega KDF-E A10/A20 Series Rear Projection*

4    *HDTV Television Litig.*, 758 F. Supp. 2d 1077, 1089 (S.D. Cal. 2010) ("generalized and vague

5    statements of product superiority such as 'superb, uncompromising quality' . . . are non-actionable

6    puffery" (internal quotation marks omitted)); *Anunziato v. eMachines, Inc.*, 402 F. Supp. 2d 1133,

7    1140 (C.D. Cal. 2005) ("The Court finds that the word 'quality' is non-actionable puffery.");

8    *Consumer Advocates v. Echostar Satellite Corp.*, 113 Cal. App. 4th 1351, 1361 (2003) ("'Crystal

9    clear' and 'CD quality' are not factual representations that a given standard is met.  Instead, they are

10   boasts, all-but-meaningless superlatives.").  As these cases squarely hold, calling a product "quality"

11   is not the kind of objective, factual assertion that may be the predicate for liability under consumer

12   protection laws.  Plaintiffs' claims based on assertion of quality should therefore be rejected.

13   2. "Wholesome, great tasting goodness in every bowl."  In an apparent attempt to wrench the

14   word completely out of context, Plaintiffs assert that the word "wholesome," on its own, is

15   misleading.  Am. Compl. ¶¶ 69, 95.  Taken in context, however, that characterization of Quaker's

16   products conveys only "generalized and vague statements of product superiority."  *In re Sony Grand*

17   *Wega*, 758 F. Supp. 2d at 1089.

18   The "wholesome" statements appear on the labels of Quaker Chewy Granola Bars and Quaker

19   Instant Oatmeal.  *See* Am. Compl. ¶¶ 69, 95 & Exs. 1–2.  The label for Chewy Granola Bars says, in

20   context, "Made with the goodness of whole grain Quaker® oats and yummy ingredients like peanut

21   butter or chocolate chips, they're a great tasting, wholesome way to help keep your family going."

22   Am. Compl. Ex. 1.  The full statement on the Instant Oatmeal label states, "With wholesome, great-

23   tasting goodness in every bowl, our instant oatmeal is sure to give everyone in your family something

24   to smile about!"  *See* Am. Compl. Ex. B.

25   Viewed in the full context in which they appear, these statements are analytically identical to

26   assertions of high quality.  Quaker's references to its "wholesome" products are surrounded by

27   assertions that the products are "great-tasting goodness," made with "yummy ingredients," and are

28   "something to smile about."  These statements are "generalized assertions of superiority," *Cook*, 911

F.2d at 246, and they make clear that the packaging uses "wholesome" in the same way.  The

assertion that Quaker's products are "wholesome" is thus "extremely unlikely to induce consumer

reliance," *Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1053 (9th Cir. 2008), and

accordingly non-actionable.

3.  <u>"Help you feel your best."</u>  The label of Quaker Oatmeal To Go Bars contains the phrase

"Great taste with extra fiber to help you feel your best!"  *See* Am. Compl. ¶ 99 & Ex. C.  Plaintiffs

allege this statement is "not complete, not truthful, and highly misleading" solely because the bars

contain *trans* fat.  *Id.* at ¶ 99.  This statement is precisely the kind of "general assertion of

superiority" that courts have consistently found to be non-actionable puffery, because the statement is

not a "factual assertion" upon which a consumer could reasonably rely.  *See Cook*, 911 F.2d at 247.

Indeed, numerous courts have dismissed claims relying on similar assertions ("best") because those

assertions can only be viewed as puffery.  *See, e.g., Edmunson v. Proctor & Gamble Co.*, No. 10-cv-

2256, 2011 WL 1897625, at *6 (S.D. Cal. May 17, 2011) ("statements related to obtaining 'best

results' . . . are non-actionable puffery"); *see also Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399

F.3d 651, 671 (6th Cir. 2005) (statement that products were "the best" are non-actionable puffery);

*Cook*, F.2d at 246 (statements such as "best technology" are non-actionable puffery); *K&N Eng'g,

Inc. v. Spectre Performance*, No. 09-1900, 2011 WL 4387094, at *15 (S.D. Cal. Sept. 20, 2011).

Here, the assertion that a food will "help you feel your best" is a "highly subjective" "general

assertion" that cannot be interpreted as a factual claim.  *Cook*, F.2d at 246.  It is therefore non-

actionable puffery.

4.  <u>"Smart Choices Made Easy."</u>  Finally, Plaintiffs challenge the phrase "smart choices made

easy" as it appears on the labels of Quaker Chewy Granola bars because, they claim, it suggests that

the product is "a good decision for one's health."  Am. Compl. ¶ 70.  Calling a product a "smart

choice"—similar to calling it "quality"—is a subjective and unverifiable opinion.  *See Whiting v.

AARP*, 701 F. Supp. 2d 21, 30 n.7 (D.D.C. 2010) (statement that a product is "a smart option" is "too

general and subjective in nature to be considered [a] misrepresentation"), *aff'd*, 637 F.3d 355 (D.C.

Cir. 2011); *In re XM Satellite Radio Holdings Sec. Litig.*, 479 F. Supp. 2d 165, 180 (D.D.C. 2007)

("generalized positive statements about . . . 'smart' . . . growth are vague and incapable of objective

1 | verification" and are therefore puffery).  For this reason, the references to "smart choices" on

2 | Quaker's packaging constitute non-actionable puffery.

3 | **VI.   <u>CONCLUSION</u>**

4 |        Plaintiffs' claims rest on the implausible assertion that *trans* fat is "toxic" and cannot be

5 | safely consumed at any level—an assertion that is completely foreclosed by the FDA's many

6 | contrary pronouncements on the issue.  Their claims also are either preempted by federal law or seek

7 | to challenge only non-actionable puffery.  For these reasons, the Court should dismiss the Amended

8 | Consolidated Complaint with prejudice.

9 |                                                           Respectfully submitted,

11 | Dated:  October 14, 2011                    GIBSON, DUNN & CRUTCHER LLP

12 |                                             By:   <u>/s/ Christopher Chorba</u>
                                                      Christopher Chorba
13 |                                                   Counsel for Defendant
                                                      The Quaker Oats Company

15 | 101164562.16

DEFENDANT'S MOTION TO DISMISS AMENDED CONSOLIDATED COMPLAINT, NO. 5:10-CV-00502-RS