**THE WESTON FIRM**
JACK FITZGERALD (257370)
*jack@westonfirm.com*
2811 Sykes Court
Santa Clara, CA 95051
Telephone: (408) 459-0305

GREGORY S. WESTON (239944)
*greg@westonfirm.com*
MELANIE PERSINGER (275423)
*mel@westonfirm.com*
COURTLAND CREEKMORE (182018)
*courtland@westonfirm.com*
San Diego, CA 92110
1405 Morena Blvd., Suite 201
Telephone: (619) 798 2006
Facsimile: (480) 247 4553

*Interim Class Counsel*

**LAW OFFICES OF RONALD A. MARRON, APLC**
RONALD A. MARRON (175650)
*ron.marron@gmail.com*
3636 4th Avenue, Suite 202
San Diego, CA 92103
Telephone: (619) 696-9006
Facsimile: (619) 564-6665

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

VICTOR GUTTMANN, KELLEY BRUNO, SONYA YRENE, and REBECCA YUMUL, on behalf of themselves and all others similarly situated,

                Plaintiffs,

v.

THE QUAKER OATS COMPANY,

                Defendant.

Case No.: 5:10-cv-00502 RS
CLASS ACTION

**PLAINTIFFS' OPPOSITION TO QUAKER'S MOTION TO DISMISS FIRST AMENDED CONSOLIDATED COMPLAINT**

Hearing Date: January 12, 2012
Time: 1:30 p.m.
Dept. Courtroom 3, 17th Floor
Judge: Honorable Richard Seeborg
Complaint Filed: February 3, 2010

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................ii

INTRODUCTION ...............................................................................................................1

FACTS .............................................................................................................................2

STATEMENT OF ISSUES TO BE DECIDED ........................................................................3

LEGAL STANDARD .........................................................................................................3

PLAINTIFFS' CLAIMS .....................................................................................................4

    A.    UCL and FAL .......................................................................................4

    B.    CLRA ....................................................................................................4

ARGUMENT ....................................................................................................................5

    I.    PLAINTIFFS ALLEGATIONS STATE PLAUSIBLE CLAIMS FOR RELIEF ...........5

    II.    PLAINTIFFS CLAIMS ARE NOT PREEMPTED ...................................................11

        A.    "Adds a Dietarily Insignificant Amount of Trans Fat" ..........................13

        B.    "Helps Reduce Cholesterol" .................................................................14

        B.    "Heart Healthy" and Images/Vignettes of Hearts ...............................17

            1.    Instant Oatmeal ........................................................................17

            2.    Oatmeal to Go Bars ..................................................................20

        D.    "All the Nutrition of a Bowl of Instant Oatmeal!" ..............................21

        E.    Images of Oats, Nuts, Fruits and Brown Sugar ....................................21

    III.    QUAKER'S REMAINING ADVERTISEMENTS ARE NOT MERE PUFFERY ........21

        A.    "Quality" ..............................................................................................22

        B.    "Wholesome" and "Goodness in Every Bowl" ....................................23

        C.    "Help Feel Your Best" ...........................................................................24

        D.    "Smart Choices Made Easy" ..................................................................24

CONCLUSION ..................................................................................................................24

# TABLE OF AUTHORITIES

**Cases**

*Aguayo v. U.S. Bank*,
653 F.3d 912 (9th Cir. 2011) ........................................................................ 12

*Altria Group v. Good*,
555 U.S. 70 (2008) ........................................................................................ 12

*Anunziato v. eMachines, Inc.*,
402 F.Supp.2d 1133 (C.D. Cal. 2005) ......................................................... 23

*Ashcroft v. Iqbal*,
129 S. Ct. 1937 (2009) .................................................................................... 4

*Astiana v. Ben & Jerry's Homemade, Inc.*,
2011 U.S. Dist. LEXIS 57348 (N.D. Cal. May 26, 2011) ........................... 13

*Bates v. Dow Agrosciences, LLC*,
544 U.S. 431 (2005) ...................................................................................... 11

*Chacanaca v. Quaker Oats Co.*,
752 F. Supp. 2d 1111 (N.D. Cal. 2010) ................................................ passim

*Chae v. SLM Corp.*,
593 F.3d 936 (9th Cir. 2010) ........................................................................ 11

*Chavez v. Blue Sky Nat. Bev. Co.*,
268 F.R.D. 365 (N.D. Cal. 2010) ................................................................... 3

*Cipollone v. Liggett Group, Inc.*,
505 U.S. 504 (1992) ...................................................................................... 11

*Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc.*,
911 F.2d 242 (9th Cir. 1990) ........................................................... 21, 22, 24

*Farm Raised Salmon Cases*,
42 Cal. 4th 1077 (2008) ..................................................................... 12, 13, 14

*Fellner v. Tri-Union Seafoods, L.L.C.*,
539 F.3d 237 (3d Cir. 2008) ......................................................................... 14

*Gen. Motors Corp. v. Abrams*,
897 F.2d 34 (2d Cir. 1990) ........................................................................... 12

*Gilligan v. Jamco Dev. Corp.*,
108 F.3d 246 (9th Cir. 1997) .......................................................................... 3

ii

*Guttmann, et al. v. The Quaker Oats Company,* Case No. 5:10-cv-00502 RS
PLAINTIFFS' OPPOSITION TO QUAKER'S MOTION TO DISMISS

*Hansen Bev. Co. v. Innovation Ventures, LLC,*
 2009 U.S. Dist. LEXIS 127605 (S.D. Cal. Dec. 22, 2009)..................................................13

*Henderson v. J.M. Smucker Co.,*
 2011 U.S. Dist. LEXIS 27953 (C.D. Cal. Mar. 17, 2011) ..................................................10

*Holk v. Snapple Bev. Corp.,*
 575 F.3d 329 (3d Cir. 2009).................................................................................................14

*In Re Bluebonnet Nutrition Corp.,*
 SERIAL 77625972, 2010 WL 5522987 (Trademark Tr. & App. Bd. Dec. 22, 2010) ....................23

*In re Ferrero Litig.,*
 2011 U.S. Dist. LEXIS 70629 (S.D. Cal. June 30, 2011) ..................................................22

*Kasky v. Nike, Inc.,*
 27 Cal. 4th 939 (2002) ...........................................................................................................5

*Law v. Gen. Motors Corp.,*
 114 F.3d 908 (9th Cir. 1997) ................................................................................................12

*Lockwood v. Conagra Foods, Inc.,*
 597 F. Supp. 2d 1028 (N.D. Cal. 2009 ................................................................................13

*Medtronic, Inc. v. Lohr,*
 518 U.S. 470 (1996)..............................................................................................................11

*Monroe Emps. Ret. Sys. v. Bridgestone Corp.,*
 399 F.3d 651 (6th Cir. 2005) ................................................................................................24

*Nat'l Council for Improved Health v. Shalala,*
 122 F.3d 878 (10th Cir. 1997) ..............................................................................................12

*Navarro v. Black,*
 250 F.3d 729 (9th Cir. 2001) ..................................................................................................3

*Paulsen v. CNF, Inc.,*
 391 F. Supp. 2d 804 (N.D. Cal. 2005) ...................................................................................4

*Pom Wonderful LLC v. Ocean Spray Cranberries, Inc.,*
 642 F. Supp. 2d 1112 (C.D. Cal. 2009) ...............................................................................13

*Red v. Kraft Foods, Inc.,*
 2011 U.S. Dist. LEXIS 26893 (C.D. Cal. Jan. 13, 2011) ...................................................10

*Red v. Kraft Foods, Inc.,*
 754 F. Supp. 2d 1137 (C.D. Cal. 2010) .......................................................................13, 21

*Red v. Kroger Co.*, 2010 U.S. Dist.
    LEXIS 115238 (C.D. Cal. Sept. 2, 2010) ........................................................... 13

*Retail Clerks v. Schermerhorn*,
    375 U.S. 96 (1963) ............................................................................................. 11

*Rice v. Santa Fe Elevator Corp.*,
    331 U.S. 218 (1947) ........................................................................................... 11

*Siracusano v. Matrixx Initiatives, Inc.*,
    585 F.3d 1167 (9th Cir. 2009) ............................................................................. 5

*Sony Grand Wega KDF–E A10/A20 Series Rear Projection HDTV Television Litig.*,
    758 F. Supp. 2d 1077 (S.D. Cal. 2010) ........................................................ 22, 23

*Southland Sod Farms v. Stover Seed Co.*,
    108 F.3d 1134 (9th Cir. 1997) ...................................................................... 22, 23

*Spiegler v. Home Depot, U.S.A., Inc.*,
    552 F. Supp. 2d, 1036 (C.D. Cal. 2008) .............................................................. 4

*State Farm Mut. Auto. Ins. Co. v. Porter*,
    186 F.2d 834 (9th Cir. 1951) ............................................................................. 10

*Steroid Hormone Product Cases*,
    181 Cal. App. 4th 145 (2010) ............................................................................ 21

*U.S. v. 45/194 Kg. Drums of Pure Vegetable Oil*,
    961 F.2d 808 (9th Cir. 1992) ............................................................................... 3

*U.S. v. Mead Corp.*, 533 U.S. 218 (2001) ............................................................ 14

*Von Koenig v. Snapple Bev. Corp.*,
    713 F. Supp. 2d 1066 (E.D. Cal. 2010) ............................................................. 14

*Williams v. Gerber Prods. Co.*,
    552 F.3d 934 (9th Cir. 2008) ............................................................... 10, 22, 24

*Wright v. Gen. Mills, Inc.*,
    2009 U.S. Dist. LEXIS 90576 (S.D. Cal. Sept. 30, 2009) ................................. 13

*Wyeth v. Levine*, 555 U.S. 555 (2009) ................................................................. 11

*Yumul v. Smart Balance, Inc.*,
    2011 U.S. Dist. LEXIS 109952 (C.D. Cal. Mar. 14, 2011) ............................... 21

*Zeisel v. Diamond Foods, Inc.*,
    2010 U.S. Dist. LEXIS 141941 (N.D. Cal. Sept. 3, 2010) .............................. 3, 13

*Zupnik v. Tropicana*,
    2010 U.S. Dist. LEXIS 142060 (C.D. Cal. Feb. 1, 2010) ........................................................ 3

**Statutes**

21 U.S.C. § 321(g)(1) ........................................................................................................ 15

21 U.S.C. § 321(n) ........................................................................................................... 18

21 U.S.C. § 321(p) ........................................................................................................... 16

21 U.S.C. § 321(s) ............................................................................................................. 6

21 U.S.C. § 343 ................................................................................................................ 11

21 U.S.C. § 343(a) ..................................................................................................... 2, 5, 18

21 U.S.C. § 343(r)(3)(c) ................................................................................................... 17

21 U.S.C. § 343(r)(3)(C)(ii)(III) ................................................................................. 17, 19

21 U.S.C. § 343(r)(3)(C)(iii) ...................................................................................... 17, 18

21 U.S.C. § 343(r)(3)(C)(iv) ............................................................................................ 18

21 U.S.C. § 343-1 ............................................................................................................. 12

21 U.S.C. § 352(f)(1) ....................................................................................................... 16

21 U.S.C. § 355(a) ........................................................................................................... 16

21 U.S.C. § 392(b)(2)(A) ................................................................................................. 11

21 U.S.C. §§ 301 *et seq.* .................................................................................................. 11

21 U.S.C. §§ 331(a)-(c), (g), (k) ...................................................................................... 11

Cal. Bus. & Prof. Code §§ 17200 *et seq* ........................................................................... 4

Cal. Bus. & Prof. Code §§ 17500 *et seq.* ........................................................................... 4

Cal. Civ. Code § 1750 ....................................................................................................... 4

Cal. Civ. Code § 1760 ....................................................................................................... 4

Cal. Civ. Code § 1761(c) and (e) ...................................................................................... 4

Cal. Civ. Code § 1770(a) ................................................................................................... 4

Pub. L. No. 101-535, § 6(a), 104 Stat. 2353 (1990) ....................................................... 11

*Guttmann, et al. v. The Quaker Oats Company,* Case No. 5:10-cv-00502 RS
PLAINTIFFS' OPPOSITION TO QUAKER'S MOTION TO DISMISS

Pub. L. No. 101-535, § 6(c)(1), 104 Stat. 2353 (1990) .................................................................. 13

**Regulations**

21 C.F.R. §§ 7 *et seq.* .................................................................................................................. 11

21 C.F.R. § 101.13(b) ..................................................................................................................... 8

21 C.F.R. § 101.14 ....................................................................................................................... 17

21 C.F.R. § 101.14(a)(1) ......................................................................................................... 14, 17

21 C.F.R. § 101.14(d)(2)(iii) ................................................................................................... 18, 20

21 C.F.R. § 101.14(d)(2)(iv) ....................................................................................................... 18

21 C.F.R. § 101.14(d)(2)(v) ................................................................................................... 18, 20

21 C.F.R. § 101.14(e) ....................................................................................................... 15, 17, 20

21 C.F.R. § 101.22 ....................................................................................................................... 21

21 C.F.R. § 101.62 ....................................................................................................................... 13

21 C.F.R. § 101.65(c)(2) ............................................................................................................. 21

21 C.F.R. § 101.81 ................................................................................................................. 15, 20

21 C.F.R. § 101.81(d)(2) ............................................................................................................. 15

21 C.F.R. § 101.9(c) .................................................................................................................... 21

21 C.F.R. § 101.9(c)(2)(ii) ............................................................................................................. 7

21 C.F.R. § 182 ............................................................................................................................. 6

21 C.F.R. § 184 ............................................................................................................................. 6

21 C.F.R. § 184.14 ......................................................................................................................... 6

21 C.F.R. § 184.1472(b) ................................................................................................................ 6

21 C.F.R. § 186 ............................................................................................................................. 6

21 C.F.R. §§ 101.13(b)-(c) ......................................................................................................... 21

21 C.F.R. §§ 101.54-101.69 .......................................................................................................... 8

21 C.F.R. § 101.14(d)(2)(iv) ....................................................................................................... 20

Cal. Code Regs. tit. 3, § 400 ...................................................................................................... 23

**Rules**

Fed. R. Civ. P. 12(b)(6).................................................................................................3

Fed. R. Civ. P. 43(a) ....................................................................................................10

Fed. R. Civ. P. 8(b)(4)-(6).............................................................................................10

**Other Authorities**

1990 U.S.C.C.A.N. 3336 ................................................................................................12

56 Fed. Reg. 60421 (Nov. 27, 1991).................................................................................8

58 Fed. Reg. 44020 (Aug. 18, 1993).............................................................................7, 8

62 Fed. Reg. 18938 (Apr. 17, 1997) .................................................................................6

64 Fed. Reg. 62746 (Nov. 17, 1999)............................................................................7, 8

67 Fed. Reg. 69171 (Nov. 15, 2002).................................................................................9

68 Fed. Reg. 41434 (July 11, 2003)...........................................................................7, 8, 9

75 Fed. Reg. 76526 (Dec. 8, 2010).......................................................................5, 6, 7, 20

Center for Science in the Public Interest, *Petition for Rulemaking to Revoke the Authority*
   *for Industry to Use Partially Hydrogenated Vegetable Oils in Foods* (May 13, 2004).........................6

Dariush Mozaffarian, M.D., M.P.H., Martijn B. Katan, Ph.D., Alberto Ascherio, M.D.,
   Dr.P.H., Meir J. Stampfer, M.D., Dr.P.H., and Walter C. Willett, M.D., Dr.P.H., *Trans*
   *Fatty Acids and Cardiovascular Disease*, N. Engl. J. Med. 354:1601-13 (2006)..............................10

FDA, *History of the GRAS List and SCOGS Reviews* (Feb. 13, 2009)........................................6

Fed'n of Am. Soc'ys for Experimental Biology, *Evaluation of Aspects of Hydrogenated*
   *Soybean Oil as a Food Ingredient* (1976) ............................................................................6

Food and Nutrition Board of the National Research Council, *Diet and Health:*
   *Implications for Reducing Chronic Disease Risk* (1989) .....................................................19

H.R. Rep. No. 101-538 (1990).........................................................................................12

Julie Louise Gerberding, MD, MPH, *Safer Fats for Healthier Hearts: The Case for*
   *Eliminating Dietary Artificial Trans Fat Intake*, Ann. Intern. Med., 151:137-138 (2009)..................9

Remarks of Rep. Waxman, 136 Cong. Rec. 5840 (daily ed. July 30, 1990), debate on
   H.R. No. 3562, 101st Cong., 2d Sess. ...............................................................................12

Webster's New Collegiate Dictionary (9th ed. 1989)..........................................................22

Plaintiffs Victor Guttman, Kelley Bruno, Sonya Yrene and Rebecca Yumul respectfully oppose Quaker's Motion to Dismiss the First Amended Consolidated Complaint (the "Complaint" or "FACC").[1]

## INTRODUCTION

Quaker challenges Plaintiffs' allegations on three limited grounds: plausibility, preemption, and puffery. None is availing. <u>First</u>, Plaintiffs' claims do not rest on a premise undermined by FDA regulations. A critical analysis shows that the FDA has never opined, much less passed regulations, that trans fat becomes "nutritionally insignificant" once a manufacturer formulates a food to contain 0.49 grams instead of 0.51 grams of trans fat per serving. Where such language has been used in rulemaking, it does not relate to trans fat. Instead, FDA comments expressly support Plaintiffs' allegations that the consumption of trans fat at any level is directly and progressively linked to disease.

But even if it were true that FDA regulations somehow implied that sub-0.5 gram-per-serving trans fat amounts were "nutritionally insignificant," so long as Plaintiffs' claims are not preempted under the NLEA, whether the trans fat in Quaker's products is harmful is an issue of fact, as Quaker pled in its Answer. Under non-preempted state law, the FDA's purported opinion on trans fat is not determinative of whether Plaintiffs state plausible claims, particularly where the FDA is hampered by an arduous regulatory process that lags behind modern science. At best, the FDA is one source of trial evidence, as are the modern studies Plaintiffs cite.

Moreover, Plaintiffs did not purchase a single serving of the products, and Quaker's health and wellness advertisements do not concern a single serving. Just as Plaintiffs bought and consumed many packages, each containing several servings, they challenge the products and representations as a whole; any issue of the implication of consuming a single sub-0.5 gram serving of trans fat must be balanced against the cumulative effects of the repeated consumption that Quaker's advertisements urge. Thus, as this Court recognized, at least implicitly, non-preempted claims premised on the presence of trans fat in Quaker's products state plausible claims under California's Unfair Competition Law, False Advertising

---

[1] This action was originally styled *Chacanaca et al. v. Quaker Oats Co.* Because Mr. Chacanaca is not named in the Complaint, in order to avoid confusion and acknowledge the consolidation of several actions, Plaintiffs respectfully request the action be restyled, *In re Quaker Oats Labeling Litigation.*

1

*Guttmann, et al. v. The Quaker Oats Company,* Case No. 5:10-cv-00502 RS
PLAINTIFFS' OPPOSITION TO QUAKER'S MOTION TO DISMISS

Law, and Consumer Legal Remedies Act. *See Chacanaca v. Quaker Oats Co.*, 752 F. Supp. 2d 1111, 1123-24 (N.D. Cal. 2010).

Even if Plaintiffs' claims that Quaker's advertising is misleading *were* implausible, they allege that several advertisements violate the Federal Food, Drug and Cosmetic Act (and corollary California Sherman Law), rendering the products *misbranded* and actionable under the UCL's "unlawful" prong. Quaker has not challenged these claims on any ground aside from preemption.

<u>Second</u>, following the Court's decision in *Chacanaca*, Plaintiffs carefully drafted their Complaint to state only claims that are not preempted because they challenge statements that are not nutrient content or health claims subject to NLEA preemption, or because they violate FDCA regulations themselves. <u>Third</u>, Plaintiffs' remaining claims should not be dismissed as "mere puffery" because each comprises a definite statement intended to induce consumer reliance and contributes to the deceptive packaging as a whole.

Accordingly, the Court should deny Quaker's Motion.

### <u>FACTS</u>

Artificial trans fat does not exist in nature and the human body has not evolved to digest it. FACC ¶ 31. The unnatural chemical structure of artificial trans fat makes it highly toxic to human health. *Id.* Partially hydrogenated vegetable oil, or PHVO, contains artificial trans fat, which damages the human heart by raising levels of harmful (LDL) cholesterol and lowering levels of good (HDL) cholesterol. *Id.* ¶¶ 25-67, 69-73, 75-77. High amounts of refined sugar and starch also harm the body's organs, including the heart, and place individuals at risk of developing type-2 diabetes, obesity, and heart disease. *Id.* ¶¶ 71-73, 82, 95, 101.

Quaker Chewy Granola Bars, Instant Oatmeal, and Oatmeal to Go Bars contain PHVO and high amounts of refined sugar and starch. They are junk food harmful to health. *Id.* Yet, Quaker advertises them as healthy. *Id.* In addition, Quaker Instant Oatmeal and Oatmeal to Go Bars are misbranded under the FDCA because each violates regulations promulgated under the Act. *See id.* ¶¶ 85-93, 102-112, 145. Moreover, all three products are misbranded within the meaning of 21 U.S.C. § 343(a),[2] which prohibits label advertising "false or misleading in any particular," and which "Congress presumably

---

[2] Quaker's Motion does not challenge Plaintiffs' allegations of violations under 21 U.S.C. § 343(a), *see* FACC ¶ 145(a), or under Califorina's Sherman Law, *see id.* ¶ 146.

chose to include . . . in the statutory scheme in order to allow the FDA to target specific false or misleading labels without having promulgated regulations that address the specific false or misleading aspect of the particular label." *Zupnik v. Tropicana*, 2010 U.S. Dist. LEXIS 142060, at *6 (C.D. Cal. Feb. 1, 2010) (citing *U.S. v. 45/194 Kg. Drums of Pure Vegetable Oil*, 961 F.2d 808, 811 (9th Cir. 1992) ("The statute condemns every statement, design, and device which may mislead or deceive." (citation omitted)); *see also Chavez v. Blue Sky Nat. Bev. Co.*, 268 F.R.D. 365, 372 (N.D. Cal. 2010) (even with specific regulations relating to the challenged conduct, plaintiff's state law claims for false origination labeling were "governed by section 343(a) which do[es] not fall within express preemption provision of section 343-1"); *Zeisel v. Diamond Foods, Inc.*, 2010 U.S. Dist. LEXIS 141941, at *2-9 (N.D. Cal. Sept. 3, 2010) (representations actionable under § 343(a)).

Plaintiffs purchased Quaker Chewy Granola Bars, Instant Oatmeal and Oatmeal to Go Bars relying on statements and images that expressly or impliedly tell consumers, especially when taken as a whole, that the products are healthy, particularly for the human heart. FACC ¶¶ 4, 18-21, 68-85, App. A.

## STATEMENT OF ISSUES TO BE DECIDED

**1.     Plausibility:** Whether the Complaint states plausible claims for relief under California's UCL, FAL and CLRA.

**2.     Preemption:** Whether Plaintiffs' claims are preempted under the NLEA where Complaint either challenges advertisements that are not nutrient content or health claims, or alleges that challenged advertisements violate the FDCA and its implementing regulations.

**3.     Puffery:** Whether challenged advertisements suggesting the products' healthful qualities are so vague, generalized, outrageous or exaggerated that no consumer could have reasonably relied on them in making a purchasing decision.

## LEGAL STANDARD

Motions to dismiss under Rule 12(b)(6) are "viewed with disfavor" and "rarely granted." *Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 249 (9th Cir. 1997) (internal quotations omitted); *Navarro v. Black*, 250 F.3d 729, 732 (9th Cir. 2001). A Rule 12(b)(6) motion only tests the sufficiency of the complaint and not any extrinsic evidence. *Paulsen v. CNF, Inc.*, 391 F. Supp. 2d 804, 807 (N.D. Cal.

3

2005). "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009).

## PLAINTIFFS' CLAIMS

### A.    UCL and FAL

The UCL prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code §§ 17200 *et seq.* Similarly, the FAL prohibits any "unfair, deceptive, untrue or misleading advertising." *Id.* §§ 17500 *et seq.* A trade practice is unfair "when it offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Spiegler v. Home Depot, U.S.A., Inc.*, 552 F. Supp. 2d, 1036, 1045 (C.D. Cal. 2008). If the challenged advertising violates any law, such as the FDCA, Sherman Law, FAL or the CLRA, *see* FACC ¶¶ 144-147, the UCL's unlawful prong is met. If a reasonable consumer would find that the use of PHVO and high amounts of refined sugar is at odds with Quaker's assertions of heart health, *see id.* ¶¶ 154, 157-58, then Quaker's conduct is immoral, unscrupulous, oppressive, unethical, or substantially injurious, and meets the UCL's unfairness prong. Finally, if a reasonable consumer would find that Quaker knew or should have known that the presence of PHVO and high amounts of refined sugar in the products made them more dangerous to consumers' health than advertised, *see id.* ¶¶ 155-159, the UCL's "fraudulent" prong is met, and the FAL is violated, *see id.* ¶¶ 163-64. A wealth of available evidence, *see, e.g.*, FACC ¶¶ 25-67, 69-73, 75-77, sufficed to give Quaker notice that the challenged representations are fraudulent.

### B.    CLRA

The CLRA prohibits unfair or deceptive conduct in any transaction intended to result in sale of goods to a consumer. Cal. Civ. Code §§ 1750, 1770(a), 1761(c) and (e). It should be "liberally construed and applied to promote its underlying purposes," of protecting consumers "against unfair and deceptive business practices." *Id.* § 1760. Plaintiffs are consumers, and the Quaker products are goods. FACC ¶¶ 18-21, 168. The Complaint contains a detailed list of marketing statements, enumerated by product, that Plaintiffs challenge as deceptive, false, or unfair. *Id.* App. A. Plaintiffs also set out the scientific basis for why PHVO and highly refined sugar are not wholesome or part of a heart healthy

4

*Guttmann, et al. v. The Quaker Oats Company,* Case No. 5:10-cv-00502 RS
PLAINTIFFS' OPPOSITION TO QUAKER'S MOTION TO DISMISS

diet, and allege they relied on Quaker's representations in purchasing the products, suffering injury in fact. *Id.* ¶¶ 4, 13, 18-21, 25-62, 69-124. Plaintiffs notified Quaker in writing, and Quaker did not respond. *Id.* ¶ 173. Accepting plaintiffs' allegations as true, the Complaint states a plausible claim for relief under the CLRA. *Id.* ¶¶ 25-67, 69-73, 75-77. Even if the challenged product statements and images are true, and even if they comply with federal regulations regarding food labels, the overall sales pitch may nevertheless be deceptive under state law, and false and misleading under the FDCA. *See Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 951 (2002); 21 U.S.C. § 343(a).

## ARGUMENT

Taking all of the facts in the Complaint as true for purposes of Quaker's Motion, Plaintiffs have set forth plausible, non-preempted claims that the Quaker's representations are deceptive and misleading to the average consumer, *see Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1177 (9th Cir. 2009), and misbranded under the FDCA.

## I.    PLAINTIFFS ALLEGATIONS STATE PLAUSIBLE CLAIMS FOR RELIEF

Quaker's argument that Plaintiffs' misrepresentation claims are implausible depends upon the erroneous premise that, according to the FDA, trans fat amounts below 0.5 grams per serving are "nutritionally insignificant." Mot. at 8-10. Quaker asserts that "[t]he FDA . . . had decided that the scientific evidence does not support Plaintiffs' [allegation]" that the consumption of artificial trans fat is detrimental to human health at any level. *Id.* at 8. This is wrong.

Less than a year ago, the FDA explained that, "[t]o date, there have been no reports issued by authoritative sources that provide a level of *trans* fat in the diet . . . below which there is no risk of [Coronary Heart Disease]." 75 Fed. Reg. 76526, 76542 (Dec. 8, 2010). Rather, there "is a positive linear trend between *trans* fatty acid intake and LDL cholesterol concentration, and therefore there is a positive relationship between *trans* fatty acid intake and the risk of CHD." *Id.* (citation omitted); *accord* FACC ¶ 32 (according to the U.S. Department of Health and Human Services, the "relationship between trans fatty acid intake and LDL cholesterol is direct and progressive, increasing the risk of cardiovascular disease."). In addition, "*trans* fatty acids are not essential and provide no known benefit to human health." 75 Fed. Reg. at 76542.; *accord* FACC ¶ 60. Thus, while "the [Institute of Medicine] sets tolerable upper intake levels (UL) for the highest level of daily nutrient intake that is likely to pose

no risk of adverse health effects to almost all individuals in the general population[,] . . . the IOM does *not* set a UL for *trans* fatty acid because *any* incremental increase in *trans* fatty acid intake increases the risk of CHD." *Id.* (emphasis added). In addition, while "*trans* fats are naturally occurring in some foods that contribute essential nutrients . . . [such that] consuming zero percent of energy as *trans* fat would require substantial adjustments to the diet that may have undesirable effects," the FDA's "[r]ecommendations are for Americans to limit *trans* fat consumption as much as possible while consuming a nutritionally adequate diet." *Id.* (citations omitted).

These *recent* statements of the FDA *directly* supporting Plaintiffs' allegations about the detrimental health effects of trans fat, *see generally* FACC ¶¶ 22-67, stand in stark contrast to Quaker's convoluted arguments and inferences drawn from inapt regulations and ancient, off-topic commentary.

Quaker's contention that the listing of PHVO as GRAS renders Plaintiffs' claims implausible, for example, is unavailing. Mot. at 8. If a substance is generally recognized as safe, or "GRAS," then it is not a "food additive" and does not need FDA preapproval. 21 U.S.C. § 321(s) (added by Pub. L. No. 85–929 (1958)). Contrary to Quaker's assertion, however, PHVO is *not* separately listed as GRAS,[3] but has been permitted only with its indirect approval in 1976 for use in salad dressings, mayonnaise, and margarines that happened to contain PHVO. *See generally* CSPI Petition at 3-6.[4] Today the FDA "is in the process of reevaluating the GRAS status of partially hydrogenated vegetable oils in response to" the

----

[3] Quaker's citation to a 1976 review of hydrogenated soybean oil by the Select Committee on GRAS Substances, Mot. at 8, is misplaced. The FDA first published a list of GRAS substances in the Federal Register of December 9, 1958, and the current GRAS list appears at 21 C.F.R. §§ 182, 184, 186. *See* FDA, *History of the GRAS List and SCOGS Reviews* (Feb. 13, 2009), *available at* http://www.fda.gov/Food/FoodIngredientsPackaging/GenerallyRecognizedasSafeGRAS/GRASSubstancesSCOGSDatabase/ucm084142.htm. None of those C.F.R. sections list PHVO as GRAS. Rather, in July 1976, the FDA gave "unpublished approval" for the use of hydrogenated soybean oil as a GRAS ingredient because the FDA (then) considered it to be safe and had approved its use in food dressings and margarine. Center for Science in the Public Interest, *Petition for Rulemaking to Revoke the Authority for Industry to Use Partially Hydrogenated Vegetable Oils in Foods*, at 5 (May 13, 2004) [hereinafter "CSPI Petition"] (citing Fed'n of Am. Soc'ys for Experimental Biology, *Evaluation of Aspects of Hydrogenated Soybean Oil as a Food Ingredient*, at 4 (1976)), *available at* http://www.cspinet.org/transfat/PDF/CSPI_trans_fat_petition.pdf.

[4] Moreover, "it is the use of a substance, rather than the substance itself, that is eligible for the GRAS exemption." 62 Fed. Reg. 18938, 18939 (Apr. 17, 1997). The closest the FDA has come to designating PHVO as GRAS is its designation of hydrogenated and partially hydrogenated *menhaden* oil as GRAS. *See* 21 C.F.R. § 184.1472(b); CSPI Petition at 6 & n. 28. Mendhaden oil, however, "is prepared from fish," 21 C.F.R. § 184.14, and is not partially hydrogenated *vegetable* oil.

CSPI Petition and another petition received in 2009. 75 Fed. Reg. at 76543. Thus, the indirect approval of the use of PHVO in unrelated foods more than three decades ago based on bad science that the FDA has since acknowledged was wrong, does not render Plaintiffs' claims implausible.

Quaker's assertion that the FDA supposedly enacted 21 C.F.R. § 101.9(c)(2)(ii) because "in its view, less than 0.5 grams of grams of *trans* fat 'means the same thing' as 'nutritionally insignificant amounts[,]'" Mot. at 8, is also erroneous. It was, in fact, the greater understanding of PHVO's link to CHD after 1976 that led the FDA to require, beginning in 2006, that trans fat be disclosed in all foods. *See* 64 Fed. Reg. 62746, 62746-825 (Nov. 17, 1999) (stating, "under conditions of use in the United States, consumption of trans fatty acids contributes to increased . . . LDL levels, which increases the risk of CHD. . . . [and] warrants serious attention from a public health perspective," and concluding that requiring trans fat disclosures for packaged foods could save 2,500 to 5,600 lives each year). Moreover, in its Final Rule, the FDA explained that the rounding proscription was a practical one:

> A few comments recommended that FDA consider listing amounts of *trans* fat to the nearest tenth or hundredth of a gram, rather than to the nearest 0.5 g. One of these comments stated that Canada has established a rounding limit of 0.1 g for food labeling indicating that analytical methods are capable of detecting that amount. FDA disagrees with these recommendations. FDA notes that while these recommended levels might be quantifiable by laboratories using GC methodology . . . , they will pose a problem for laboratories that are set up to quantify *trans* fatty acids by infrared spectroscopy (IR) methodology because the detection limits of the currently available IR methods are higher than those of the GC methods. More importantly, however, there are no unambiguous methods for confirming the very low levels suggested by the comment. Moreover, FDA notes that the increment for listing *trans* fat is consistent with increments used for listing total fat and saturated fat. Therefore, the agency is finalizing § 101.9(c)(2)(ii) to state that *trans* fat shall be expressed, as proposed, to the nearest 0.5 g increment below 5 g and to the nearest gram increment above 5 g.

68 Fed. Reg. 41434, 41463 (July 11, 2003) (citation omitted). Because of the dangers the FDA has acknowledged in consuming trans fat at *any* level, however, "the agency is evaluating current analytical methods for detection of *trans* fat in foods and is working on improving the sensitivity of these methods so that *trans* fat may be reliably detected at lower levels in foods." 75 Fed. Reg. at 76543.

Quaker's reliance on 58 Fed. Reg. 44020-01 (Aug. 18, 1993), Mot. at 8, is misplaced. When the FDA noted, thirteen years before requiring trans fat disclosures, that "those nutrients that are present in a food at insignificant amounts . . . are declared as zero," it was referring to a specific set of nutrients

7

for which it had prescribed "[nutrient] free" claims: total fat, cholesterol, sodium, sugars and calories—but not trans fat. *Id.* at 44024 (citing 56 Fed. Reg. 60421 (Nov. 27, 1991)); *see* 56 Fed. Reg. at 60432. At that time, however, there was "a lack of consensus on the dietary implications of *trans* fatty acids intake." 64 Fed. Reg. at 62746. Nevertheless, the FDA opined that "it would be misleading" to label products with a "Saturated Fat Free" claim if they "contain measure amounts of *trans* fatty acids because consumers would expect such products to be 'free' of other components that significantly raise serum cholesterol." 64 Fed. Reg. at 62747. That nearly twenty years later, the FDA does not consider trans fat to be "nutritionally trivial," 58 Fed. Reg. at 44024, simply because of the existence of a regulation permitting rounding down, is exemplified by what is *missing* in the modern regulations: *any* permissible trans fat nutrient content claim.[5] Quaker's assertion that the FDA "specifically considered—and rejected—a rule that would have . . . set[] disqualifying levels for *trans* fat . . . because it could not support such a rule with 'scientifically-based definitions and levels' of *trans* fat[,]" Mot. at 9 (citing 68 Fed. Reg. at 41465), is similarly inapt because the FDA was not commenting, as Quaker implies, that science holds the consumption of trans fat amounts below 0.5 grams per serving to be innocuous. Rather, the effects of trans fat were simply not well understood in 2003, as they are today. For example, in proposing disqualifying levels of trans fat, some commentators

> believed that the agency is acting in advance of sufficient scientific justification, while others stated that the agency should have acted sooner. There was disagreement as to whether the adverse effects of *trans* fat are comparable to that of saturated fat. Some comments stated that the proposed definitions assume that *trans* fat and saturated fat are "bioequivalent[,]" [and] objected to changing the disclosure and disqualifying level of 4 g of saturated fat to 4 g of saturated fat and *trans* fat combined . . . [because] the effects of saturated fat and *trans* fat have not been proven to be the same on a gram-for-gram basis and, therefore, should not be treated interchangeably. Other comments stated that there is no scientific evidence showing any adverse effects on serum cholesterol levels or cardiovascular health from *trans* fat . . . .

---

[5] Under the FDCA, "a nutrient content claim[] may not be made on the label or in the labeling of foods unless the claim is made in accordance with this regulation and with the applicable regulations in subpart D of this part . . . ." 21 C.F.R. § 101.13(b). Subpart D prescribes requirements for a handful of specific, itemized nutrient claims, but does not include a definition for any trans fat claim. *See id.* §§ 101.54-101.69. Any product that claims to have "No Trans Fat" or be "Trans Fat Free" therefore "bears an unauthorized nutrient content claim ('No Trans Fat') which has not been defined by FDA." FDA Warning Letter to BestLife International, dated February 4, 2008 [hereinafter the "BestLife Letter"], RJN Ex. A. *See also* RJN Ex. B (FDA Warning Letter to Cytosport, dated June 29, 2011) ("trans-fat free" is an unauthorized nutrient content claim).

68 Fed. Reg. at 41464. Ultimately, the FDA found "insufficient scientific information at this point in time to support a decision on the appropriate definition" for disqualifying trans fat levels. The FDA explained that, while

> [i]n the past, the . . . establishment of disclosure and disqualifying levels generally have been dependent upon scientific agreement of appropriate qualitative reference values for daily consumption of the nutrient that is the subject of the claim[,] . . . [and] the agency has limited the proposed definitions to nutrients for which there are proposed [Daily Recommended Values] or [Recommended Daily Intakes][,] . . . [t]he agency does not believe that the current level of scientific evidence supports the establishment of such a value for *trans* fat at this time.

*Id.* at 41464-65.[6] As demonstrated by the FDA's more recent language, today there is no question what is the scientific consensus on trans fat:

> The scientific rationale for eliminating exposure to artificial trans fatty acids in foods is rock solid. There is no evidence that they provide any health benefit, and they are certainly harmful. These compounds adversely affect both low- and high-density lipoprotein cholesterol levels and increase the risk for coronary heart disease, even at relatively low levels of dietary intake. Gram for gram, trans fats are far more potent than saturated fats in increasing the risk for heart disease, perhaps because they also have pro-inflammatory properties and other adverse effects on vascular endothelium. The strong evidence of harm motivated the Institute of Medicine to issue recommendations that the intake of trans fats be minimized and prompted the [FDA] to require the addition of information about trans fat content to food labels beginning in 2006. Eliminating exposure to these dangerous fats could have a powerful population impact—potentially protecting 30,000 to 100,000 Americans from death related to heart disease each year.

Julie Louise Gerberding,[7] MD, MPH, *Safer Fats for Healthier Hearts: The Case for Eliminating Dietary Artificial Trans Fat Intake*, Ann. Intern. Med., 151:137-138 (2009). Similarly, Dr. Walter Willett, Professor of Medicine at Harvard Medical School, concluded:

---

[6] Nevertheless, in 2002, when the FDA extended the comment period on the 1999 proposed rulemaking in the face of "new scientific reports to limit the intake of *trans* fat and to provide consumers with label information that may better assist them in understanding the quantitative declaration of *trans* fat," 68 Fed. Reg. at 41436 (citing 67 Fed. Reg. 69171 (Nov. 15, 2002)), the FDA proposed and provided support for requiring an asterisk in the % Daily Value column for trans fat, tied to a note at the bottom warning consumers that "[i]ntake of trans fat should be ***as low as possible***." *See id.* (emphasis added).

[7] Director of the Center for Disease Control and Prevention from 2002 to 2009, current President of Merck Vaccines unit of Merck & Co., and Professor of Medicine at University of California, San Francisco.

*Guttmann, et al. v. The Quaker Oats Company,* Case No. 5:10-cv-00502 RS
PLAINTIFFS' OPPOSITION TO QUAKER'S MOTION TO DISMISS

Given the adverse effects of trans fatty acids on serum lipid levels, systemic inflammation, and possibly other risk factors for cardiovascular disease and the positive associations with the risk of CHD, sudden death from cardiac causes, and possibly diabetes, the potential for harm is clear. The evidence and the magnitude of adverse health effects of trans fatty acids are in fact far stronger on average than those of food contaminants or pesticide residues, which have in some cases received considerable attention. Furthermore, trans fats from partially hydrogenated oils have no intrinsic health value above their caloric value. Thus, from a nutritional standpoint, the consumption of trans fatty acids results in considerable potential harm but no apparent benefit.[8]

Even if the isolated consumption of a single serving of a single food item containing less than 0.5 grams of trans fat were "nutritionally insignificant," though, that would not render Plaintiffs' claims implausible; the Quaker products are sold with the intention that many servings be consumed,[9] and the challenged claims relate to the products as a whole, not just a single serving. That Plaintiffs' claims are plausible is underscored by the Court's earlier decision upholding Plaintiffs' non-preempted claims on the same theory. *Chacanaca*, 752 F. Supp. 2d at 1123-24. Other California courts have upheld similar challenges. *See, e.g., Henderson v. J.M. Smucker Co.*, 2011 U.S. Dist. LEXIS 27953 (C.D. Cal. Mar. 17, 2011); *Red v. Kraft Foods, Inc.*, 2011 U.S. Dist. LEXIS 26893 (C.D. Cal. Jan. 13, 2011).[10]

Finally, Quaker's own admissions illustrate the plausibility of Plaintiffs' claims. In its Verified Answer, Dkt. No. 11, Quaker stated that whether PHVO poses "health dangers" is subject to expert opinion and testimony. Answer ¶¶ 17-21.[11] Even if the Court accepted Quaker's plausibility argument,

---

[8] Dariush Mozaffarian, M.D., M.P.H., Martijn B. Katan, Ph.D., Alberto Ascherio, M.D., Dr.P.H., Meir J. Stampfer, M.D., Dr.P.H., and Walter C. Willett, M.D., Dr.P.H., *Trans Fatty Acids and Cardiovascular Disease*, N. Engl. J. Med. 354:1601-13 (2006).

[9] Each Chewy Granola Bar package contains eight to ten servings (*see* FACC Ex. A); each Instant Oatmeal package contains ten servings (*see id.* Ex. B); and each Oatmeal to Go package contains six servings (*see id.* Ex. C).

[10] The *Red* decision was the result of several rounds of briefing and tentative orders that were either adopted or integrated by reference into later final orders. In one such tentative, the Honorable George H. Wu wrote: "Defendant also argues that, because the FDA allows trans fat to be included in food products, and requires amounts of trans fat less than 0.5 grams per serving to be disclosed as "0g trans fat," statements about the healthfulness of the products cannot be 'misleading.' This argument has already been rejected by the Court" under the precedent announced in *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008). *See Red v. Kraft*, No. 10-cv-1028 (C.D. Cal.), Dkt. No. 59 at 2 n.2.

[11] *See State Farm Mut. Auto. Ins. Co. v. Porter*, 186 F.2d 834, 840, 843 (9th Cir. 1951) (Fed. R. Civ. P. 43(a) and California evidence law apply to "statement made in [] former answer" and the statement is "admissible as substantive evidence," without any limitation); *see also* Fed. R. Civ. P. 8(b)(4)-(6) (a responsive pleading that claims a party "lacks knowledge or information sufficient to

10

1   though, that would not subject the case to dismissal since Plaintiffs' claims under the UCL's

2   "unlawful" prong do not depend upon a showing that Quaker's advertising is misleading, only that

3   Quaker violated the FDCA or some other law.

4   **II.     PLAINTIFFS CLAIMS ARE NOT PREEMPTED**

5          Pursuant to the Supremacy Clause, federal law preempts state law when Congress enacts a

6   statute that explicitly preempts state law. *See Chae v. SLM Corp.*, 593 F.3d 936, 941 (9th Cir. 2010)

7   (citation omitted). There are two "cornerstones" of preemption jurisprudence:

8          First, the purpose of Congress is the ultimate touchstone in every pre-emption case. . . .
9          Second, in all pre-emption cases, and particularly in those in which Congress has
           legislated in a field which the States have traditionally occupied, we start with the
10         assumption that the historic police powers of the States were not to be superseded by the
           Federal Act unless that was the clear and manifest purpose of Congress.
11

12  *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (internal quotations, citations and alterations omitted) (citing

13  *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996); *Retail Clerks v. Schermerhorn*, 375 U.S. 96, 103

14  (1963); *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). In short, "Congress does not

15  cavalierly pre-empt state-law causes of action." *Medtronic*, 518 U.S. at 485.

16         This strong presumption against preemption demands courts give preemption statutes "narrow

17  reading[s]." *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 518 (1992). Moreover, where there are

18  "plausible alternative reading[s]" of an express preemption provision, courts "have a duty to accept the

19  reading that disfavors pre-emption." *Bates v. Dow Agrosciences, LLC*, 544 U.S. 431, 449 (2005).

20         The FDCA, 21 U.S.C. §§ 301 *et seq.*, empowers the FDA to (a) protect public health by

21  ensuring that "foods are safe, wholesome, sanitary, and properly labeled," 21 U.S.C. § 392(b)(2)(A);

22  (b) promulgate regulations to implement the statute; and (c) enforce its regulations through

23  administrative proceedings. *See* 21 C.F.R. §§ 7 *et seq.* The Act prohibits the distribution and sale of

24  misbranded foods. *See* 21 U.S.C. §§ 331(a)-(c), (g), (k). Foods are misbranded when they meet one of

25  the definitions for being misbranded pursuant to 21 U.S.C. § 343.

26         Congress enacted the Nutrition Labeling and Education Act, Pub. L. No. 101-535, § 6(a), 104

27  Stat. 2353 (1990), to "clarify and to strengthen [the FDA's] authority to require nutrition labeling on

28  form a belief" operates as a denial, but denying "only part of an allegation" requires admission as to the
    rest, and failure to deny is an admission).

foods, and to establish the circumstances under which claims may be made about the nutrients in foods." *Nat'l Council for Improved Health v. Shalala*, 122 F.3d 878, 880 (10th Cir. 1997) (quoting H.R. Rep. No. 101-538, at 7 (1990), reprinted in 1990 U.S.C.C.A.N. 3336, 3337). In passing the NLEA, Congress sought to "create uniform national standards regarding the labeling of food and to prevent states from adopting inconsistent requirements with respect to the labeling of nutrients." *Farm Raised Salmon Cases*, 42 Cal. 4th 1077, 1086 (2008) (citing Remarks of Rep. Waxman, 136 Cong. Rec. 5840 (daily ed. July 30, 1990), debate on H.R. No. 3562, 101st Cong., 2d Sess.). To meet the goal of consistent nationwide labeling, the NLEA introduced the now-familiar Nutrition Facts panel and amended the FDCA to preempt state labeling requirements not identical to those promulgated under some portions of § 343, *see* 21 U.S.C. § 343-1.

The strong presumption against preemption "applies with particular force when Congress has legislated in a field traditionally occupied by the States." *Altria Group v. Good*, 555 U.S. 70, 77 (2008) "[C]laims[] rooted in California's consumer-protection laws[] fall in an area that is traditionally within the state's police powers to protect its own citizens. 'Because consumer protection law is a field traditionally regulated by the states, compelling evidence of an intention to preempt is required in this area.'" *Aguayo v. U.S. Bank*, 653 F.3d 912, 917 (9th Cir. 2011) (quoting *Gen. Motors Corp. v. Abrams*, 897 F.2d 34, 41-42 (2d Cir. 1990)); *see also Law v. Gen. Motors Corp.*, 114 F.3d 908, 909-10 (9th Cir. 1997) ("Given the importance of federalism . . . we entertain a strong presumption that federal statutes do not preempt state laws; particularly those directed at subjects—like health and safety—'traditionally governed' by the states." (citations omitted)); *Farm Raised Salmon Cases*, 42 Cal. 4th at 1087-88 ("[C]onsumer protection laws such as the UCL, false advertising law, and CLRA, are within the states' historic police powers and are therefore subject to the presumption against preemption. Laws regulating the proper marketing of food, including the prevention of deceptive sales practices, are likewise within states' historic police powers." (internal quotations, citation and alterations omitted)).

The purpose of the NLEA is to ensure that consumers receive complete and truthful nutrition and disease claims on food packages so they can use that information "to maintain a balanced and healthful diet." 1990 U.S.C.C.A.N. at 3338. Consumer claims for deception that are identical to the NLEA (i.e., misbranding) are not preempted. *Chacanaca*, 752 F. Supp. 2d at 1119. If a package

advertisement is not a nutrient or disease claim, then the NLEA is not implicated and preemption does not apply. *Id.*

### A.    "Adds a Dietarily Insignificant Amount of Trans Fat"

Quaker argues that Plaintiffs' challenge to this claim is preempted in two respects: first, that the FDA supposedly considers the trans fat in Quaker's products "nutritionally insignificant," and second because the FDA sent a letter, Quaker RJN Ex. 1 (the "Satchell Letter"), to a Hogan & Hartson attorney in 2004 stating that it would "not object" to the use of the claim.

Quaker's first argument is unavailing for two reasons. First, as described in the plausibility section, it is untrue. Second, even if it were true, Quaker is arguing a species of preemption categorically prohibited under the NLEA: implied preemption. "The NLEA's rule of construction concerning the scope of preemption excludes implied preemption, providing in relevant part, '[t]he [NLEA] shall not be construed to preempt any provision of State law, unless such provision is expressly preempted under section 403A of the [FDCA].'" *Red v. Kraft Foods, Inc.*, 754 F. Supp. 2d 1137, 1139 (C.D. Cal. 2010) (citing Pub. L. No. 101-535, § 6(c)(1), 104 Stat. 2353, 2364; *Farm Raised Salmon Cases*, 42 Cal. 4th at 1091 ("Congress made clear that the preemptive scope of section 343-1 was to sweep no further than the plain language of the statute itself.")).[12] In inferring from the FDA's regulatory scheme that trans fat amounts below 0.5 grams per serving are "nutritionally insignificant," Quaker impermissibly substitutes implication for statute, overstepping the well-drawn boundaries of the NLEA.[13]

Quaker's second argument is unavailing because the FDA's agreement to "not object" does not have preemptive force. "[I]t is federal *law* which preempts contrary state law; nothing short of federal

---

[12] *See also Zeisel*, 2010 U.S. Dist. LEXIS 141941, at *10-11 ("The Court need not resort to inferences"); *Red v. Kroger Co.*, 2010 U.S. Dist. LEXIS 115238, at *10-11 n.3 (C.D. Cal. Sept. 2, 2010) ("there is no implied preemption under the NLEA"); *Astiana v. Ben & Jerry's Homemade, Inc.*, 2011 U.S. Dist. LEXIS 57348, at *22 (N.D. Cal. May 26, 2011); *Hansen Bev. Co. v. Innovation Ventures, LLC*, 2009 U.S. Dist. LEXIS 127605, at *34 (S.D. Cal. Dec. 22, 2009); *Wright v. Gen. Mills, Inc.*, 2009 U.S. Dist. LEXIS 90576, at *6 (S.D. Cal. Sept. 30, 2009); *Pom Wonderful LLC v. Ocean Spray Cranberries, Inc.*, 642 F. Supp. 2d 1112, 1123 (C.D. Cal. 2009); *Lockwood v. Conagra Foods, Inc.*, 597 F. Supp. 2d 1028, 1031-33 (N.D. Cal. 2009).

[13] Moreover, that there *is* a regulation permitting similar claims for fat, saturated fat and cholesterol, but not for trans fat, bolsters the argument that the claim is not expressly permitted under the FDCA. *See* 21 C.F.R. § 101.62.

law can have that effect." *Fellner v. Tri-Union Seafoods, L.L.C.*, 539 F.3d 237, 243 (3d Cir. 2008). "It is well-established that both federal statutes and federal regulations properly adopted in accordance with statutory authorization form the basis of federal law." *Von Koenig v. Snapple Bev. Corp.*, 713 F. Supp. 2d 1066, 1074 (E.D. Cal. 2010) (citations omitted). While "in appropriate circumstances, federal agency action taken pursuant to statutorily granted authority short of formal[] notice and comment rulemaking may also have preemptive effect over state law," *Holk v. Snapple Bev. Corp.*, 575 F.3d 329, 340 (3d Cir. 2009) (citing *Fellner*, 539 F.3d at 243), that is limited to situations where Congress "provides for a relatively formal administrative procedure tending to foster the fairness and pronouncement of such force," *see Von Koenig*, 713 F. Supp. 2d at 1074 (quoting *U.S. v. Mead Corp.*, 533 U.S. 218, 230 (2001)). *See also Holk*, 575 F.3d at 342 (inquiry into whether agency action has force of law is focused predominantly "on the process by which the agency arrived at its decision, rather than on what happened after the decision was made"). In *Holk*, the Third Circuit rejected the argument that something like the Satchell Letter could preempt state law:

> We also reject Snapple's arguments that a letter from a FDA official from July 2008 is entitled to weight. The letter was not issued as part of any formal rulemaking or adjudication and was not subject to notice and comment. Additionally, the FDA issued the letter in response to a question from interested parties,[14] rather than doing so in an enforcement action. Under *Fellner*, this letter does not have the force of law.

575 F.3d at 342. Rather, when Quaker chose to make a claim not expressly permitted under federal law—even if it did so because the FDA told food manufacturers it would "not object" to the use of the claim—Quaker ran the risk that the claim would offend non-preempted state law; "while allowing private remedies based on violations of state laws identical to the FDCA may arguably result in actions that the FDA itself might not have pursued, Congress appears to have made a conscious choice not to preclude such actions." *Farm Raised Salmon Cases*, 42 Cal. 4th at 1098.

## B.      "Helps Reduce Cholesterol"

The claim that a food "Helps Reduce Cholesterol" is a health claim because it "expressly or by implication . . . characterizes the relationship of any substance to a disease or health-related condition." 21 C.F.R. § 101.14(a)(1).

---

[14] *Accord* Satchell Letter at 1 ("This acknowledges receipt of your January 29, 2004 letter on behalf of several of your food industry clients.").

No expressed or implied health claim may be made on the label or in labeling for a food . . . unless: (1) The claim is specifically provided for in subpart E of this part; and (2) The claim conforms to all general provisions of this section as well as to all specific provisions in the appropriate section of subpart E of this part . . . .

*Id.* § 101.14(e). Thus, Quaker may only claim its Oatmeal to Go Bars "Help Reduce Cholesterol" in accordance with a regulation set out in 21 C.F.R. Subpart E, governing Specific Requirements for Health Claims.

The FDA permits a health claim that states, "diets that are low in saturated fat and cholesterol and that include soluble fiber from certain foods" may reduce heart disease. *Id.* § 101.81. Section 101.81 also provides: "*Optional information*. . . . The claim may state that the relationship between intake of diets that are low in saturated fat and cholesterol and that include soluble fiber from the eligible food sources from paragraph (c)(2)(ii) of this section and reduced risk of heart disease is through the intermediate link of 'blood cholesterol' or 'blood total and LDL cholesterol.'" 21 C.F.R. § 101.81(d)(2). The regulation does ***not*** authorize Quaker's ***advertisement*** that Oatmeal to Go Bars "Help Reduce Cholesterol," which ***no FDA regulation authorizes*** and § 101.14(e) ***expressly prohibits***. Moreover, because the regulation provides "the *claim* may state" the optional information, Quaker violates § 101.81(d)(2) by giving the optional information "prominent placement on a banner," appearing in "much larger font size . . . and [with] other text effects" than the health claim, thereby "clearly distinguish[ing]" the "Helps Reduce Cholesterol" advertisement from the health claim. *See* FDA Warning Letter to General Mills, Inc., dated May 5, 2009 [herein after the "Cheerios Letter"], RJN Ex. C. Accordingly, the NLEA does not expressly preempt Plaintiffs' claims.

By misbranding Oatmeal to Go Bars in this manner, Quaker further violates the FDCA. Pursuant to 21 U.S.C. § 321(g)(1), products that are intended to affect the structure or function of the body, or for use in the diagnosis, cure, mitigation, treatment, or prevention of disease, are drugs. The FDA has held that the labeling or advertising of all the following products rendered them drugs under the Act: oat cereal,[15] soy milk,[16] olive oil,[17] walnuts,[18] tea,[19] bread,[20] juice,[21] and sprouts.[22] In determining these foods were unlawfully-marketed new drugs, the FDA cited advertisements like:

---

[15] *See* Cheerios Letter, RJN Ex. C.

[16] *See* BestLife Letter, RJN Ex. A.

15

- "*green tea: . . . **reduces total cholesterol and LDL (bad cholesterol)***" RJN Ex. I (Ten Ren Tea Company Letter);

- Product's Vitamin B3 content is "***Known to . . . reduce the cholesterol level in the blood***," RJN Ex. L (FUZE Beverages Letter);

- "***Helps lower high cholesterol***," RJN Ex. N (Shemshad Letter); and

- Product "*is a natural cholesterol controller which **helps to reduce bad cholesterol***," RJN Ex. O (Universal Taste Letter).

Like these products, Oatmeal to Go Bars' label demonstrates that it is promoted for use in the prevention, mitigation and treatment of hypercholesterolemia. *See* FACC ¶¶ 99, 102-107. But Oatmeal to Go Bars are not generally recognized as safe and effective in treating hypercholesterolemia. Therefore, they are a new drug pursuant to 21 U.S.C. § 321(p). New drugs, besides being misbranded, may not be legally marketed in the United States without prior approval from the FDA as described in 21 U.S.C. § 355(a). When such products are unlawfully marketed, like Oatmeal to Go Bars, they are also misbranded pursuant to 21 U.S.C. § 352(f)(1) because their labeling necessarily fails to bear adequate directions for use.

Quaker's argument that the FACC should be "dismissed with prejudice" because its "'misrepresentation' claims are 'nothing more than a proxy' for allegations of regulatory violations," Mot. at 16 n.8 (citation omitted), misses the import of the Complaint. Plaintiffs challenge the therapeutic labeling of Oatmeal to Go Bars as *misbranded*, not solely as *misleading*. FACC ¶ 145(d).

---

[17] *See* RJN Ex. D (FDA Warning Letter to Pompeian, dated February 22, 2010).

[18] *See* RJN Ex. E (FDA Warning letter to Diamond Food, dated February 22, 2010).

[19] *See* RJN Ex. F (FDA Warning Letter to Diaspora Tea & Herb Co., dated April 20, 2011); Ex. G (FDA Warning Letter to Grinalat Foods Corporation, dated July 13, 2006); Ex. H (FDA Warning Letter to Redco Foods, dated Feb. 22, 2010); Ex. I (FDA Warning Letter to Ten Ren Tea Company of San Francisco, dated May 6, 2011); Ex. J (FDA Warning Letter to Unilever, dated August 23, 2010).

[20] *See* RJN Ex. K (FDA Warning Letter to French Meadow Bakery, dated April 13, 2005).

[21] *See* RJN Ex. L (FDA Warning Letter to FUZE Beverages dated December 18, 2006); Ex. M (FDA Warning Letter to POM Wonderful, dated February 23, 2010); Ex. N (FDA Warning Letter to Shemshad Food Products, dated March 11, 2011); Ex. O (FDA Warning Letter to Universal Taste, dated August 7, 2009).

[22] *See* RJN Ex. P (FDA Warning Letter to Jonathan's Sprouts, dated March 24, 2011).

### B.    "Heart Healthy" and Images/Vignettes of Hearts

Heart symbols and vignettes are implied health claims, 21 C.F.R. § 101.14(a)(1), and must be used in connection and compliance with an authorized health claim, *id.* § 101.14(e). A health claim may be authorized in two ways—either expressly, under Subpart E of Title 21 of the C.F.R, or pursuant the procedure prescribed in 21 U.S.C. § 343(r)(3)(c).[23] In addition, any health claim must comply with the general regulations for such claim prescribed in 21 C.F.R. § 101.14. Accordingly, a product whose label bears a "Heart Healthy" claim or heart vignette is misbranded under three conditions: (1) if it is not used in conjunction with an authorized health claim; (2) if it is used in conjunction with a health claim that, itself, is not compliant with applicable regulations; or (3) if the manner in which the claim is used in conjunction with a compliant health claim is nevertheless improper, as when there is intervening material between the "Heart Healthy" claim or heart vignette and authorized health claim.

#### 1.    Instant Oatmeal

The "Heart Healthy" advertisements and heart vignettes on Instant Oatmeal are used in conjunction with the health claim that "diets rich in whole grain foods and other plant foods and low in saturated fat and cholesterol may help reduce the risk of heart disease" (the "Plant Food Claim"), which is not expressly provided in Subpart E, but came about as a result of the process prescribed in 21 U.S.C. § 343(r)(3)(c). *See* FACC ¶ 84 & Ex. B. As described in the Complaint, FACC ¶¶ 85-93, Instant Oatmeal's use of "Heart Healthy" advertisements and heart vignettes in conjunction with the Plant Food Claim renders the product misbranded in eight respects: (a) the Kraft submission on which the Plant Food Claim is based failed to present "a balanced representation of the scientific literature," 21 U.S.C. § 343(r)(3)(C)(ii)(III);[24] (b) Instant Oatmeal contains a nutrient—trans fat—that the FDA has determined, in the amount present in the product, increases to persons in the general population the risk of disease, thereby violating 21 U.S.C. § 343(r)(3)(C)(iii); (c) for the reasons alleged in the Complaint, the claim is "false or misleading in [some] particular[s]," and therefore violates 21 U.S.C. §

---

[23] *See generally* FDA, *Guidance for Industry: Notification of a Health Claim or Nutrient Content Claim Based on an Authoritative Statement of a Scientific Body* (June 11, 1998) (describing process and requirements under this section), *available at* http://www.fda.gov/Food/GuidanceCompliance RegulatoryInformation/GuidanceDocuments/FoodLabelingNutrition/ucm056975.htm.

[24] The Complaint erroneously refers to this regulation as 21 U.S.C. § 343(r)(3)(C)(ii)(*III*), *see* FACC ¶ 86.

17

343(r)(3)(C)(iii), which requires that the claim is "otherwise complia[nt]" with 21 U.S.C. § 343(a); (<u>d</u>) the claim is not in compliance with 21 U.S.C. § 321(n) because the advertising "fails to reveal facts material in light of such representation or material with respect to consequences which may result from the use of the article," i.e., that it contains heart disease-inducing artificial trans fat, thereby violating 21 U.S.C. § 343(r)(3)(C)(iii); (<u>e</u>) the Plant Food Claim on Instant Oatmeal is not stated in a manner so that it is an accurate representation of the authoritative statement on which it relies, in violation of 21 U.S.C. § 343(r)(3)(C)(iv); (<u>f</u>) the "Heart Healthy" advertisements and heart vignettes violate 21 C.F.R. § 101.14(d)(2)(iii) because the Plant Food Claim, as used on Instant Oatmeal, is not "complete, truthful, and not misleading"; (<u>g</u>) the heart graphic on the side of Instant Oatmeal includes intervening material, violating 21 C.F.R. § 101.14(d)(2)(iv); and (<u>h</u>) the use of the Plant Food Claim on Instant Oatmeal does not enable the public to comprehend the information provided and understand the relevant significance of such information in the context of a total daily diet because Quaker omits the offsetting effects of trans fat on the claimed effect, the reduction of the risk of contracting heart disease, and thereby violates 21 C.F.R. § 101.14(d)(2)(v). If Plaintiffs are correct with respect to even a single challenge, Instant Oatmeal is misbranded and Plaintiffs' claims are not preempted.[25]

Quaker asserts that four challenges ((a), (b), (f) and (g)) comprise "legal conclusions," Mot. at 14, but does not contest the remaining challenges. Nor could it. Taking the allegations as true and construing them in the most favorable light, a fact-finder could easily find that the claim is "false or misleading in any particular." Similarly, there is ample factual support in the Complaint for a fact-finder's conclusion that the use of the Plant Food Claim and accompanying "Heart Healthy" language and heart vignettes "fail[] to reveal facts material in light of such representation or material with respect to consequences which may result from the use of the article," e.g., that the artificial trans fat in the product counteracts any benefits derived from plant foods in Instant Oatmeal. Correspondingly, a fact finder could easily hold the use of the claim and advertisements does not enable the public to comprehend the information provided and understand the relevant significance of such information in

---

[25] Preemption is a purely legal issue where an undisputed label's compliance with applicable regulations can be determined on the face of the label and regulation. Some of these challenges, however, present issues of fact inappropriate for resolution at the pleading stage, such as whether the claim, as used on Instant Oatmeal, is "false or misleading in any respect," "fails to reveal" material facts, or is "complete, truthful, and not misleading."

18

the context of a total daily diet. Finally, Instant Oatmeal's statement of the "authoritative statement" on which the Plant Food Claim relies[26] could be determined to be inaccurate, as discussed below.

As for Quaker's argument that the remaining challenges are "legal conclusions," this is also wrong. <u>First</u>, accepting the Complaint's allegations as true, a fact-finder could easily find that Kraft's submission, Quaker RJN Ex. 2, did not present a "balanced representation" of the scientific literature. For example, while Kraft discusses the effect of total fat, saturated fat and cholesterol consumption on the risk of disease—and concludes that the amount of each should be limited as a prerequisite to using the Plant Food Claim—it does not discuss the effect of trans fat or call for any limitation, instead only requiring that foods using the claim bear trans fat disclosures. *See id.* at 19-21, 24. Yet, even if Kraft's 2004 submission is evaluated with respect to the 1989 Diet & Health publication, rather than with the hindsight of scientific knowledge in 2004 or today, Kraft's treatment was not balanced: Diet & Health noted that "the large increase in usage of partially hydrogenated vegetable oils has resulted in increases in *trans* isomers in foods during the past decades, raising questions concerning possible adverse effects of these isomers." Diet & Health at 57. It goes on to state that "hydrogenation was found to raise serum cholesterol levels. . . . [and] hydrogenated coconut oil elevated serum cholesterol more than other plant oils . . . ." *Id.* at 186. Diet & Health discusses specific experiments finding "oils with high proportions of *trans* isomers produced higher serum levels of cholesterol and triglycerides than did native oils" and "margarines produced higher serum TC levels" than corn oil and butter.[27] *Id.* at 187. Diet & Health also notes that "CHD subjects had a higher proportion of short chain *trans* fatty acids [in their adipose tissues] than did non-CHD subjects." *Id.* at 193. It recommended "[m]ore systemic study of the effects of *trans* fatty acids on health." *Id.* at 230. While Diet & Health, in 1989, was anything but settled on the science, Kraft failed to provide *any* discussion, from either that publication or the scientific understanding developed over the next 14 years, of the effects of trans fat on the risk of heart disease. Thus, a fact-finder could determine the Plant Food Claim violates 21 U.S.C. § 343(r)(3)(C)(ii)(III).

---

[26] The statement was made by the Food and Nutrition Board of the National Research Council in 1989, in a publication entitled *Diet and Health: Implications for Reducing Chronic Disease Risk* [hereinafter "Diet & Health"], *available at* http://www.nap.edu/catalog.php?record_id=1222. *See* Quaker RJN Ex. 2 at 1, 8.

[27] "Epidemiologic evidence shows that serum TC levels are positively associated with risk of CHD," Diet & Health at 195.

<u>Second</u>, as described above, in regulating a health claim for foods containing plant sterol/stanol esters, the FDA determined that trans fat, in any amount, increases the risk of CHD. *See supra* Point I (citing 75 Fed. Reg. at 76542). <u>Third</u>, the issue of whether the claims as used on Instant Oatmeal are "complete, truthful and not misleading" is an issue of fact, and the allegations are sufficient to support Plaintiffs' assertion that they are not. <u>Fourth</u>, Plaintiffs only need the undisputed label, FACC Ex. B, and the regulation to show that the label contains prohibited intervening material, similar to the discussion of Quaker's unlawful use of "Helps Reduce Cholesterol," described *supra* in Point II(B).

### 2. *Oatmeal to Go Bars*

The "Heart Healthy" advertisements and heart vignettes on Instant Oatmeal are used in conjunction with the health claim that "3g of soluble fiber daily as part of a diet low in saturated fat and cholesterol may reduce the risk of heart disease" (the "Soluble Fiber Claim"). *See* FACC Ex. C. The Soluble Fiber Claim is regulated by 21 C.F.R. § 101.81. Oatmeal to Go Bars' use of the claim, and therefore its use of "Heart Healthy" and heart vignettes in relation to the claim, violates the FDCA in at least three respects, *see* FACC ¶¶ 109-11: (<u>a</u>) the claim is not "complete, truthful and not misleading," and accordingly violates 21 C.F.R. § 101.14(d)(2)(iii); (<u>b</u>) as with the "Helps Reduce Cholesterol" claim discussed above, the large heart graphic on the reverse panel of Oatmeal to Go Bars includes prohibited intervening material in violation of 21 C.F.R. §101.14(d)(2)(iv);[28] and (<u>c</u>) the use of the claim does not enable the public to comprehend the information provided and understand the relevant significance of such information in the context of a total daily diet because Quaker omits the offsetting effects of trans fat on the claimed effect—the reduction of the risk of contracting heart disease—and thereby violates 21 C.F.R. § 101.14(d)(2)(v). For reasons similar to those discussed in the previous sections, these challenges render Plaintiffs' claims not preempted, and actionable.[29]

---

[28] By using a heart graphic in connection with the improper "Helps Reduce Cholesterol" claim, Quaker also violates 21 C.F.R. § 101.14(e).

[29] Quaker's argument based on the absence of disqualifying criteria for trans fat is misplaced. *See* Mot. at 15. Quaker is correct that if its "Heart Healthy" claims and heart vignettes comply with all applicable FDCA regulations, they are not actionable based solely on the presence of trans fat, since the FDA has not established disqualifying criteria for trans fat. Plaintiffs allege, however, that Quaker's products are misbranded, in which case they are actionable, either under the UCL's unlawful prong, or because *any* misbranded food is *inherently* misleading (and so *also* actionable under the UCL's "fraudulent" and "unfair" prongs, the FAL, and the CLRA). *See* FACC ¶¶ 85, 108, 145-46, 154, 157-58, 163-64, 168, 172; *accord Yumul v. Smart Balance, Inc.*, 2011 U.S. Dist. LEXIS 109952, at *45

20

### D.    "All the Nutrition of a Bowl of Instant Oatmeal!"

Contrary to Quaker's assertion, this is not a nutrient content claim governed by 21 C.F.R. §§ 101.13(b)-(c) because "all the nutrition of a bowl of instant oatmeal" does not refer to a required element for nutrition labeling. *See* 21 C.F.R. § 101.9(c). Thus, NLEA preemption does not apply. *Chacanaca*, 752 F. Supp. 2d at 1119. Even if the phrase could be considered an implied nutrient content claim as Quaker urges, however, Oatmeal to Go Bars' packaging is not in compliance. The FDCA permits the statement that a product "contains the same amount of [nutrient] as a [food]" or "as much [nutrient] as a [food]." 21 C.F.R. § 101.65(c)(2). Quaker's label, by contrast, states "all the *nutrition* of," which deviates from the FDCA language and does not identify a "nutrient" in oatmeal that is also contained in Oatmeal to Go Bars, much less explain how Oatmeal to Go Bars contain "all the nutrition of" the unidentified nutrients in "a bowl of instant oatmeal," by reference to "the labeled food, on a per serving basis." *Id.*; FACC ¶¶ 99-101, Ex. 3. Moreover, it is false and misleading to claim that Oatmeal to Go Bars, containing artificial trans fat and 13 grams of sugar per 60-gram serving, provides "all the nutrition" of a bowl of plain rolled oats.

### E.    Images of Oats, Nuts, Fruits and Brown Sugar

Quaker's assertion that these images are permitted by the FDCA's "characterizing flavor" regulation, 21 C.F.R. § 101.22, is unavailing because the images of oats, nuts, fruits and brown sugar are "representations about the products' ingredients and not their characterizing flavor." " *Red*, 754 F. Supp. 2d at 1139. *Compare* FACC Ex. A at 3 (Chewy Granola Bars are "[m]ade with . . . ingredients like peanut butter," juxtaposed with images of peanuts); Ex. B at 4 (in Instant Oatmeal "we use ingredients like apples, raisins, brown sugar and cinnamon").

## III.   QUAKER'S REMAINING ADVERTISEMENTS ARE NOT MERE PUFFERY

As a general rule, UCL, FAL and CLRA claims involve fact-based standards of inquiry, and it is rarely appropriate to dismiss them on grounds of puffery. *Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc.*, 911 F.2d 242, 245 (9th Cir. 1990) ("[i]t is well-established that questions of fact

---

(C.D. Cal. Mar. 14, 2011) (permitting leave to amend complaint where "it appears that Yumul may be able to allege violations of the FDCA or Sherman Law"); *c.f. Steroid Hormone Product Cases*, 181 Cal. App. 4th 145, 157 (2010) (materiality established because "a reasonable person would find it important when determining whether to purchase a product that it is unlawful to sell or possess that product.").

cannot be resolved or determined on a motion to dismiss for failure to state a claim upon which relief can be granted"); *Williams*, 523 F.3d at 939. Puffery means sales hyperbole that is generalized rather than specific, and so outrageous or exaggerated that no consumer could assert they reasonably relied on it in making a purchasing decision. *Cook*, 911 F.2d at 246; *Williams*, 523 F.3d at 939 n.3. A claim of product superiority might constitute non-actionable puffery if it is "vague or highly subjective," but "misdescriptions of specific or absolute characteristics of a product are actionable." *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1145 (9th Cir. 1997) (citations omitted). Even if a word, by itself, might be considered puffery, the relevant inquiry is whether it contributes "to the deceptive context of the packaging as a whole." *In re Ferrero Litig.,* 2011 U.S. Dist. LEXIS 70629, at *17 (S.D. Cal. June 30, 2011) (citing *Williams*, 523 F.3d at 939 n.3).

### A.    "Quality"

Plaintiffs assert that "quality," *along with* "wholesome goodness in every bowl" and "heart healthy," *plus* images of "fruit, oats, and natural brown sugar," *and* heart graphics, is deceptive to consumers in light of Instant Oatmeal's trans fat content and high levels of refined sugar. FACC ¶ 95; *see also id.* ¶¶ 81-93, 96-97. *Sony Grand Wega* is not on point because the court was determining puffery in light of a Rule 9(b) motion to dismiss for failure to plead with particularity. *Sony Grand Wega KDF–E A10/A20 Series Rear Projection HDTV Television Litig.*, 758 F. Supp. 2d 1077, 1089 (S.D. Cal. 2010). Further, the HDTVs in *Sony* failed after a warranty period expired, which led the court to conclude that the plaintiffs did not rely on quality assertions in purchasing the products. *Id.* That is not the case here, since plaintiffs relied on Quaker's assertions of quality and heart health at the time they purchased and consumed Instant Oatmeal.

"Quality" has more than one meaning, including a measure of excellence, and that a thing bears specific characteristics. Webster's New Collegiate Dictionary (9th ed. 1989) (defining "quality" first, as "a peculiar and essential character" or "an inherent feature;" second, as "a degree of excellence;" and third, as "a distinguishing attribute"). This case concerns representations of "specific or absolute characteristics" of Instant Oatmeal, meaning the representations do not concern puffery. *Sony Grand Wega*, 758 F. Supp. 2d at 1089. First, the ingredient list only states "sugar" and does not state "natural brown sugar," suggesting the quality of the product is not as absolutely represented via the image of a

22

*Guttmann, et al. v. The Quaker Oats Company,* Case No. 5:10-cv-00502 RS
PLAINTIFFS' OPPOSITION TO QUAKER'S MOTION TO DISMISS

bowl of natural brown sugar elsewhere on the box. *See id.*; FACC Ex. B (image of brown sugar; ingredient lists; and claim that "Quaker means high quality"). This is a misdescription of an absolute characteristic. *See Southland Sod Farms*, 108 F.3d at 1145. Second, sugar is the second ingredient in each of the Instant Oatmeal flavors, meaning the inherent features of the food for purposes of a wholesome or heart healthy diet is not as claimed, as a factual matter, because excessive sugar leads to diabetes and heart complications. FACC ¶ 82. Quaker's quality claim, taken in context and with the high value consumers place on health (something that cannot be replaced, like an HDTV) is therefore more analogous to the quality claim in *Anunziato v. eMachines, Inc.* that the court held was not puffery. 402 F.Supp.2d 1133, 1139–41 (C.D. Cal. 2005) (assertions that a product contained "brand-name components" and was subject to "quality control test[s]" referred to absolute facts and not superiority).

### B.     "Wholesome" and "Goodness in Every Bowl"

"Wholesome" and "goodness in every bowl" are also factual claims that are misleading. Wholesome is not a statement of superiority but refers to the inherent characteristics of a food as something direct from nature and not consisting of just its parts, due to processing, which strips nutrients from foods. *See In Re Bluebonnet Nutrition Corp.*, SERIAL 77625972, 2010 WL 5522987, at *4 (Trademark Tr. & App. Bd. Dec. 22, 2010) (defining wholesome as "conducive to bodily health; healthful; salubrious: wholesome food; wholesome air; wholesome exercise" in trademark registration claim). In context, Quaker admits that the word "wholesome" appears next to the words "made with the goodness of whole grain Quaker® oats," demonstrating that defendant is using "wholesome" to denote a food that is healthy and will aid bodily health. Mot. at 19. Plaintiffs allege that any goodness derived from the oats in the products is adulterated by the high levels of refined sugar and artificial PHVO. FACC ¶ 95; *see also id.* ¶¶ 81-93, 96-97. Wholesome in the context of animal feed means the food "will nourish and not impair the health of the animals." Cal. Code Regs. tit. 3, § 400. The same applies here, as food for human beings. Wholesome goodness that will nourish human beings, and not impair human health, is a factual assertion and not puffery. *Accord Chacanaca*, 752 F. Supp. 2d at 1123-24 ("The word 'wholesome' could, of course, be interpreted implicitly to characterize the bars' nutrients.").

23

### C.    "Help Feel Your Best"

The key word here is not "best," but all of the words, taken in context, as a whole. *Williams,* 523 F.3d at 939 n.3. "Help you feel your best" asserts that, as a factual matter, Oatmeal to Go Bars will help a person feel better than he or she would by not eating Oatmeal to Go Bars. The word "best" is also modified by "your," meaning it is not like the puffery at issue in the cases Quaker cites, which concern claims that a *product* was the best of its kind. *E.g., Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 671 (6th Cir. 2005) (claim that the products were the "best" compared to competing products); *Cook*, 911 F.2d at 246 (concerning the "best technology").

### D.    "Smart Choices Made Easy"

This Court and another have already held "Smart Choices Made Easy" is an actionable, non-puffery claim. *See Chacanaca*, 752 F. Supp. at 1123-24; *Red v. Kraft*, No. 10-cv-1028, Dkt. No. 36, slip op. at 10 & n.4 (C.D. Cal. June 24, 2010). That is because the relevant language here is not just the word "smart," but that Quaker and a purported expert panel is making a "smart choice" easier for you, by vetting the healthiness of the product and standing behind its goodness. *See Williams*, 552 F.3d at 939 n.3; FACC ¶¶ 70-77. In fact, the entire purpose of the Smart Choices program was to use "scientific" support for selling Quaker's products. *Id.* ¶¶ 75-77. Thus, Quaker's puffery claim is unavailing.

### <u>CONCLUSION</u>

Quaker's Motion to Dismiss should be denied.

24

Dated: November 14, 2011

By: /s/ Jack Fitzgerald

Jack Fitzgerald

**THE WESTON FIRM**
JACK FITZGERALD
2811 Sykes Court
Santa Clara, CA 95051
Tel.: (408) 459-0305

GREGORY S. WESTON
MELANIE PERSINGER
COURTLAND CREEKMORE
San Diego, CA 92110
1405 Morena Blvd., Suite 201
Telephone: (619) 798 2006
Facsimile: (480) 247 4553

**LAW OFFICES OF RONALD A.
MARRON, APLC**
RONALD A. MARRON
3636 4th Avenue, Suite 202
San Diego, CA 92103
Telephone: (619) 696-9006
Facsimile: (619) 564-6665

***Interim Class Counsel***

25

*Guttmann, et al. v. The Quaker Oats Company,* Case No. 5:10-cv-00502 RS
PLAINTIFFS' OPPOSITION TO QUAKER'S MOTION TO DISMISS