GIBSON, DUNN & CRUTCHER LLP
Daniel W. Nelson (*pro hac vice*)
  DNelson@gibsondunn.com
Andrew S. Tulumello (*pro hac vice*)
  ATulumello@gibsondunn.com
Scott P. Martin (*pro hac vice*)
  SMartin@gibsondunn.com
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
Telephone: 202-955-8500
Facsimile:  202-530-4238

Christopher Chorba (SBN 216692)
  CChorba@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA  90071
Telephone: 213-229-7000
Facsimile:  213-229-7520

Counsel for Defendant The Quaker Oats Company

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| VICTOR GUTTMANN, KELLEY BRUNO, SONYA YRENE, and REBECCA YUMUL, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>THE QUAKER OATS COMPANY,<br><br>Defendant. | CASE NO.: 5:10-CV-00502-RS<br><br>**REPLY IN SUPPORT OF DEFENDANT THE QUAKER OATS COMPANY'S MOTION TO DISMISS AMENDED CONSOLIDATED COMPLAINT**<br><br>Hearing Date:  January 12, 2012<br>Time:  1:30 p.m.<br>Place:  Courtroom 3, 17th Floor<br>Judge:  Honorable Richard Seeborg<br>Action Filed:  February 3, 2010 |

**TABLE OF CONTENTS**

Page

I. INTRODUCTION AND SUMMARY OF ARGUMENT ........................................................... 1

II. ARGUMENT ............................................................................................................................... 2

    A. Plaintiffs' Allegations Do Not State A Plausible Claim For Relief ................................. 2

    B. Federal Law Preempts Plaintiffs' Claims ......................................................................... 5

    C. Plaintiffs' Remaining Claims Attempt To Challenge Non-Actionable Puffery ........... 12

III. CONCLUSION .......................................................................................................................... 15

# TABLE OF AUTHORITIES

Page

**Cases**

*Anunziato v. eMachines, Inc.*,
  402 F. Supp. 2d 1133 (C.D. Cal. 2005) ...........................................................................................13

*Ashcroft v. Iqbal*,
  129 S. Ct. 1937 (2009) ......................................................................................................................2

*Bates v. Dow Agrosciences, LLC*,
  544 U.S. 431 (2005) ..........................................................................................................................6

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ..........................................................................................................................2

*Chacanaca v. Quaker Oats Co.*,
  752 F. Supp. 2d 1111 (N.D. Cal. 2010) ...............................................................................3, 6, 8, 15

*Cipollone v. Liggett Group Inc.*,
  505 U.S. 504 (1992) ..........................................................................................................................6

*Cook, Perkiss, & Liehe v. N. Cal. Collection Serv., Inc.*,
  911 F.2d 242 (9th Cir. 1990) ...........................................................................................12, 13, 14, 15

*Dvora v. General Mills, Inc.*,
  No. 11-1074, 2011 WL 1897349 (C.D. Cal. May 16, 2011) .........................................................12

*Holk v. Snapple Bev. Corp.*,
  575 F.3d 329 (3d Cir. 2009) .............................................................................................................7

*In re Countrywide Fin. Corp. Mortg. Marketing & Sales Practices Litig.*,
  601 F. Supp. 2d 1201 (S.D. Cal. 2009) ..........................................................................................15

*In re Sony Grand Wega KDF-E A10/A20 Series Rear Projection HDTV Television Litig.*,
  758 F. Supp. 2d 1077 (S.D. Cal. 2010) ....................................................................................13, 14

*Newcal Indus. v. Ikon Office Solution*,
  513 F.3d 1038 (9th Cir. 2008) ...................................................................................................12, 13

*Oestreicher v. Alienware Corp.*,
  544 F. Supp. 2d 964 (N.D.Cal. 2008) ............................................................................................13

*Red v. Kraft Foods, Inc.*,
  754 F. Supp. 2d 1137 (C.D. Cal. 2010) .........................................................................................11

*Whiting v. AARP*,
  701 F. Supp. 2d 21 (D.D.C. 2010) .................................................................................................15

**Statutes**

21 U.S.C. § 343(a) ................................................................................................................................2

21 U.S.C. § 343(r)(3)(A)(ii) ..................................................................................................................8

| | |
|---|---|
| 21 U.S.C. § 343(r)(3)(C) | 7, 8 |
| 21 U.S.C. § 343(r)(3)(C)(ii)(III) | 7 |
| 21 U.S.C. § 343(r)(3)(C)(iii) | 8 |
| 21 U.S.C. § 343(r)(3)(C)(iv) | 9 |
| 21 U.S.C. § 343(r)(3)(D)(i)(II) | 8 |
| 21 U.S.C. § 343-1(a)(4) | 6, 7 |
| 21 U.S.C. § 343-1(a)(5) | 5, 6 |

**Regulations**

| | |
|---|---|
| 21 C.F.R. § 101.9(b) | 5 |
| 21 C.F.R. § 101.9(c) | 7 |
| 21 C.F.R. § 101.9(c)(2)(ii) | 3, 6 |
| 21 C.F.R. § 101.9(f) | 6 |
| 21 C.F.R. § 101.9(f)(1) | 3, 6 |
| 21 C.F.R. § 101.14(d)(2)(iii) | 8 |
| 21 C.F.R. § 101.14(d)(2)(iv) | 9 |
| 21 C.F.R. § 101.14(d)(2)(v) | 8 |
| 21 C.F.R. § 101.22(i) | 11, 12 |
| 21 C.F.R. § 101.65(c)(2) | 11 |
| 21 C.F.R. § 101.81(c)(2) | 9 |
| 21 C.F.R. § 101.81(c)(2)(E) | 11 |
| 21 C.F.R. § 101.81(d)(2) | 9 |
| 21 C.F.R. § 170.3(i) | 2 |
| 21 C.F.R. § 182.1(a) | 2 |

**Other Authorities**

| | |
|---|---|
| Food and Nutrition Bd., Inst. of Med., *Dietary Reference Intakes for Energy, Carboyhydrates, Fiber, Fat, Fatty Acids, Cholesterol, Protein, and Amino Acids* (2005) | 4 |
| *Food Labeling: Trans Fatty Acids in Nutrition Labeling; Nutrient Content Claims*, 64 Fed. Reg. 62,746 (Nov. 17, 1999) | 3, 6 |
| *Food Labeling:* Trans *Fatty Acids in Nutrition Labeling, Nutrient Content Claims, and Health Claims*, 68 Fed. Reg. 41,434 (July 11, 2003) | 3, 4, 6 |

*Food Labeling; Health Claim; Phytosterols and Risk of Coronary Heart Disease*,
 75 Fed. Reg. 76,526 (Dec. 8, 2010) .................................................................................1, 2, 3, 4

Julie Louis Gerberding, Editorial, *Safer Fats for Healthy Hearts: The Case for Eliminating
 Dietary Artificial Trans Fat Intake*, 151 Ann. Intern. Med. 137 (2009) .........................4, 5

N.Y.C. Health Code § 81.08(b) ......................................................................................................5

*Webster's New Collegiate Dictionary* (9th ed. 1989) ...................................................................14

## I. INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiffs have alleged that Quaker defrauded consumers by including an allegedly dangerous toxin in its products. To pursue this theory, Plaintiffs must identify *facts* pleaded in the complaint that could plausibly support the assertion that small amounts of *trans* fat—less than 0.5 grams per serving—are harmful. They have none. To the contrary, the materials before this Court, including most significantly the Food and Drug Administration's ("FDA") previous pronouncements on the issue, undermine any assertion that *trans* fat is harmful in the amounts at issue here.

Plaintiffs' opposition resorts to selective quotation of the FDA's regulatory guidance, inexplicably omitting its acknowledgment just last year that "there have been no reports issued by authoritative sources that provide a level of *trans* fat in the diet above which there is a known increased risk of coronary heart disease." *Food Labeling; Health Claim; Phytosterols and Risk of Coronary Heart Disease*, 75 Fed. Reg. 76,526, 76,542 (Dec. 8, 2010). Indeed, Plaintiffs appear to recognize that their allegations are deficient, quickly retreating to the argument that "the Quaker products are sold with the intention that many servings be consumed." Dkt. Entry 121 ("Opp'n"), at 10. Plaintiffs do not identify any allegations in the complaint to support this assertion, and in any event they ignore that Quaker's products are marketed and labeled, consistent with FDA regulations, with respect to an appropriate serving size.

Yet even if Plaintiffs' claims could somehow be characterized as plausible, those claims are nonetheless foreclosed by federal preemption and the puffery doctrine. Several labeling statements challenged by Plaintiffs, such as the claim that Quaker's products are "heart healthy," are expressly permitted and regulated by federal law. Under both the Supremacy Clause and the Federal Food, Drug and Cosmetic Act ("FDCA"), states cannot impose different labeling requirements. Plaintiffs are evidently dissatisfied with the FDA's approach to regulating *trans* fat; they devote much of their opposition to questioning the FDA, including its decisions to permit "heart healthy" claims for foods with less than 0.5 grams of *trans* fat and that such quantities of *trans* fat are an "insignificant amount." But the FDCA preempts any attempt to impose labeling requirements that differ from federal law, even where—as here—plaintiffs assert that the federal requirements are incorrect.

The remaining statements, such as the claim that Quaker's products are "quality," are not actionable because they are matters of subjective opinion. Although Plaintiffs protest that this Court should not resolve the issue at this stage of the proceedings, the Ninth Circuit has repeatedly emphasized that the decision whether a particular statement is puffery can be resolved as a matter of law in ruling on a motion to dismiss.

## II.   ARGUMENT

**A.   Plaintiffs' Allegations Do Not State A Plausible Claim For Relief.**

Plaintiffs have not alleged—and indeed cannot allege—"sufficient factual matter" that, if "accepted as true," would "'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Rather, Plaintiffs' theory that *trans* fat is inherently dangerous, in any quantity, cannot be reconciled with the FDA's treatment of *trans* fat as safe for use as a food additive, and its conclusion that small amounts of *trans* fat are so insignificant that they must be listed as zero in the Nutrition Facts box.[1]

Plaintiffs apparently dispute that partially hydrogenated vegetable oils ("PHVOs") are generally recognized as safe ("GRAS") for use as a food additive, which is appropriate only where there is "reasonable certainty in the minds of competent scientists that the substance is not harmful under the intended conditions of use." 21 C.F.R. § 170.3(i). As Plaintiffs note, "[n]one of [the relevant] C.F.R. sections list PHVO as GRAS." Opp'n 6 & n.3. But Plaintiffs ignore that the applicable regulation provides, *in its very first sentence*, that "[i]t is impracticable to list all substances that are generally recognized as safe for their intended use." 21 C.F.R. § 182.1(a). There is, however, no doubt that FDA considers PHVOs to be GRAS; indeed, it acknowledged "the GRAS status of partially hydrogenated oils" as recently as *last year*. *See* 75 Fed. Reg. at 76,543.[2]

---

[1] According to Plaintiffs, "[e]ven if [their] claims that Quaker's advertising is misleading *were* implausible," they could nonetheless pursue "allegations of violations under 21 U.S.C. § 343(a) or under California's Sherman Law." Opp'n 2 & n.2. This is incorrect. Both Section 343(a) and the Sherman Act prohibit labeling that is false or misleading. But the only alleged basis for concluding that Quaker's labeling is false or misleading is that it contains purportedly unhealthy amounts of *trans* fats. Because it is implausible to conclude that *trans* fats are inherently unhealthy at the small levels in Quaker's products, *all* of Plaintiffs' claims must be dismissed.

[2] Plaintiffs attempt to dismiss the FDA's recognition that PHVOs are GRAS as "ancient," Opp'n 6, but they acknowledge that the FDA received citizen petitions in 2004 and 2009 seeking to remove

The FDA's treatment of PHVOs as GRAS is consistent with its position that amounts of *trans* fats below 0.5 grams per serving are nutritionally insignificant. Plaintiffs dispute that the FDA holds this view, arguing that the decision to require such amounts to be reported as zero was simply a "practical" consideration, Opp'n 7, because "there are no unambiguous methods for confirming . . . very low levels" of *trans* fat, *Food Labeling:* Trans *Fatty Acids in Nutrition Labeling, Nutrient Content Claims, and Health Claims*, 68 Fed. Reg. 41,434, 41,463 (July 11, 2003). Even if this were so, Plaintiffs nowhere explain how they could advance a plausible claim for *fraud* based on the presence of such small amounts of *trans* fats that they cannot reliably be measured. But in any event, the governing regulation expressly provides that amounts of *trans* fats that "allo[w] a declaration of zero in nutrition labeling"—that is, "less than 0.5 gram" per serving, 21 C.F.R. § 101.9(c)(2)(ii)—are "insignificant." *Id.* § 101.9(f)(1); *see also Chacanaca v. Quaker Oats Co.*, 752 F. Supp. 2d 1111, 1121 (N.D. Cal. 2010) (same). Consistent with this regulation, the FDA has repeatedly explained that "less than 0.5 g" of *trans* fat is an "insignificant leve[l]." *Food Labeling: Trans Fatty Acids in Nutrition Labeling; Nutrient Content Claims*, 64 Fed. Reg. 62,746, 62,758 (Nov. 17, 1999).

Against this unambiguous regulatory background, Plaintiffs cite recent FDA releases that, they maintain, show the FDA's "greater understanding of PHVO's link" to coronary heart disease ("CHD"). Opp'n 7. But these releases do not even remotely suggest that Plaintiffs' claims are plausible. Instead, Plaintiffs are forced to engage in selective quotation, omitting material information that undermines their theory in this litigation. For instance, Plaintiffs insist that, "[b]ecause of the dangers the FDA has acknowledged in consuming trans fat at *any* level," "'the agency is evaluating current analytical methods for the detection of *trans* fats in foods and is working on improving the sensitivity of these methods so that *trans* fat may be reliably detected at lower levels in foods.'" *Id.* (quoting 75 Fed. Reg. at 76,543). But the FDA has never "acknowledged" any "dangers . . . in consuming trans fat at *any* level." The passage quoted by Plaintiffs contains no such acknowledgement, let alone—as Plaintiffs maintain—any suggestion that those supposed dangers provide the rationale for improving measuring techniques for *trans* fats. Rather, the FDA has

---

the GRAS designation, *see id.* at 6–7. That the FDA has not removed the GRAS designation in the seven years since receiving the first petition undermines Plaintiffs' argument that the FDA *now* understands the purported "dangers . . . in consuming trans fat at *any* level." *Id.* at 7.

emphasized that "the scientific evidence is *not sufficient* to support the establishment of a [daily reference value ('DRV')] for *trans* fat at this time," 68 Fed. Reg. 41,456 (emphasis added). The FDA specifically *declined* to require a footnote on labels stating that "[i]ntake of trans fat should be as low as possible" because the footnote might have suggested to consumers "a de facto [DRV] of zero" or provided a "warning statement that they should avoid all *trans* fat." *Id.* at 41,459.

Plaintiffs similarly engage in selective quotation when they claim that, "[l]ess than a year ago, the FDA explained that, '[t]o date, there have been no reports issued by authoritative sources that provide a level of trans fat in the diet . . . below which there is no risk of [CHD].'" Opp'n 5 (quoting 75 Fed. Reg. at 76,542) (omission in original). The ellipsis does all the work in this quotation. The FDA *actually* said: "To date, there have been no reports issued by authoritative sources that provide a level of *trans* fat in the diet *above which there is a known increased risk of* [*CHD*] and below which there is no risk of [CHD]." 75 Fed. Reg. at 76,542 (emphasis added). Because there is no level of *trans* fat "above which there is a known increased risk of CHD," it follows that Plaintiffs cannot show that even the small amounts of *trans* fat present in Quaker's products are harmful.

Unable to muster any FDA support for their claims, Plaintiffs instead invoke a supposed "scientific consensus on trans fat." Opp'n 9. Even though the Amended Consolidated Complaint cites numerous studies on the effects of *trans* fat, the primary authority Plaintiffs now invoke is an editorial that appears nowhere in the complaint. *See id.* (quoting Julie Louis Gerberding, Editorial, *Safer Fats for Healthy Hearts: The Case for Eliminating Dietary Artificial Trans Fat Intake*, 151 Ann. Intern. Med. 137–38 (2009)). This is undoubtedly because the articles cited in the complaint do not provide Plaintiffs with any support for the proposition that *trans* fats are unsafe at any level. *See* Food and Nutrition Bd., Inst. of Med., *Dietary Reference Intakes for Energy, Carbohydrates, Fiber, Fat, Fatty Acids, Cholesterol, Protein, and Amino Acids* 835 (2005) ("There are no known risks of chronic disease from consuming low intakes of saturated fatty acids, trans fatty acids, or cholesterol."), *cited in* Dkt. Entry 102 ("Am. Compl.") ¶ 60 & n.33. Plaintiffs do not cite any authority that would allow this Court to consider supposed "scientific evidence" that was not incorporated by reference in their complaint. And even if the Court were to consider the editorial, it does not assert that *trans* fats are harmful in any amount. *See* Gerberding, *supra*, at 138 ("it seems

premature to advocate for across-the-board federal regulations to require elimination of artificial trans fats"). To the contrary, it praises New York's *trans* fat "ban," *id.* at 137, which equates a serving of less than 0.5 grams of *trans* fat with zero, *see* N.Y.C. Health Code § 81.08(b).[3]

Finally, Plaintiffs attempt to bypass the issue altogether by asserting that "the Quaker products are sold with the intention that many servings be consumed." Opp'n 10. Plaintiffs do not allege any facts to support this conclusory statement. They also ignore that they are challenging the *labeling* of those products. The FDA specifically requires that "all nutrient and food component quantities shall be declared in relation to a serving." 21 C.F.R. § 101.9(b). Many foods are packaged to contain more than an individual should eat in a single sitting, even where (unlike the specific products at issue here) the servings are not individually packaged. The only way for an individual even potentially to ingest an amount of *trans* fat exceeding the levels deemed insignificant by the FDA in Quaker's products would be to consume several servings at once—something contrary to the product's serving size label and packaging, and that Plaintiffs do not claim to have done. Plaintiffs cannot overcome their lack of plausible allegations that small amounts of *trans* fat labeled in accordance with FDA regulations are harmful simply by speculating that consumers will unwittingly overeat.[4]

**B.    Federal Law Preempts Plaintiffs' Claims.**

The FDCA includes a broad preemption provision that prohibits a state from imposing "any requirement respecting any [nutrient content and health claims] made in the label or labeling of food that is not identical to the requirement" provided by federal law. 21 U.S.C. § 343-1(a)(5); *see also id.*

---

[3] Plaintiffs also incorrectly claim that "Quaker stated" in its answer "that whether PHVO poses 'health dangers' is subject to expert opinion and testimony." Opp'n 10. Quaker specifically and categorically "denie[d] that trans fat is in all cases 'highly toxic to human health.'" Dkt. Entry 11 ¶ 25. Quaker's assertion that *other* issues regarding *trans* fat are subject to expert testimony, including whether *trans* fats may become harmful at any level, is hardly a statement that *trans* fat is harmful in the low levels present in the challenged products.

[4] As Quaker explained in its opening brief, the Amended Consolidated Complaint's occasional references to "highly refined sugar and simple starches" are inadequately developed and implausible. *See* Dkt. Entry 118 ("Mot."), at 10. Plaintiffs do not attempt to defend the plausibility of any claims involving sugar or starches; to the contrary, the focus of their opposition, like the complaint, is *trans* fat. Thus, to the extent that any of Plaintiffs' claims depend on allegations involving sugar or starches, they should also be dismissed.

§ 343-1(a)(4). Because Plaintiffs' challenges to the statements "ad[d] a dietarily insignificant amount of trans fat," "heart healthy," "hel[p] reduce cholesterol," and "[a]ll the nutrition of a bowl of oatmeal" seek to impose requirements that differ from federal law, they are preempted.

Plaintiffs seek to limit the scope of the FDCA's preemption provision by invoking the "presumption against preemption." Opp'n 11. Although that presumption might be relevant where a court is forced to choose among "plausible alternative reading[s]" of a preemption provision, *Bates v. Dow Agrosciences, LLC*, 544 U.S. 431, 449 (2005), no such issue is presented here: Congress adopted a preemption provision that "sweeps broadly," *Cipollone v. Liggett Group Inc.*, 505 U.S. 504, 521 (1992), to foreclose "any requirement" for nutrient content and health claims under state law that is "not identical" to federal law, 21 U.S.C. § 343-1(a)(4)–(5); *see also, e.g.*, *Chacanaca*, 752 F. Supp. 2d at 1114. Because states are "preempted from imposing any nutritional labeling requirements for trans fat that are not identical to those required by [the FDA's] rule," 68 Fed. Reg. at 41,498, the only issue for this Court is whether Plaintiffs' claims seek to impose requirements that are "not identical" to federal law. That is precisely what Plaintiffs are attempting to do.

1. <u>"Adds a dietarily insignificant amount of trans fat."</u>  Plaintiffs' challenge to the statement that Quaker products "ad[d] a dietarily insignificant amount of trans fat" is preempted because it would impose a different definition of dietary significance than required by federal law.

Plaintiffs claim it is "untrue" that FDA regulations consider a *trans* fat content of less than 0.5 grams per serving to be an "insignificant amount." Opp'n 13. But the regulation speaks for itself: It provides that an "'insignificant amount' shall be defined as that amount that allows a declaration of zero in nutrition labeling." 21 C.F.R. § 101.9(f)(1). Although Plaintiffs claim that the FDA was referring only to a "specific set of nutrients" other than *trans* fat, Opp'n 7, the regulation expressly applies in determining "insignificant amounts of . . . *trans* fat," 21 C.F.R. § 101.9(f). Because the *trans* fat content "shall be expressed as zero" when "the serving contains less than 0.5 gram," *id.* § 101.9(c)(2)(ii), an "insignificant amount" of *trans* fat is defined by FDA regulation as less than 0.5 grams per serving. Indeed, by requiring *trans* fat content of less than 0.5 grams to be reported as "zero," the FDA has concluded that such amounts of *trans* fat are not just "insignificant," but are equivalent to *none*. *See, e.g.*, 64 Fed. Reg. at 62,755 ("product does not contain *trans* fats" when it

"contains less than 0.5 g of *trans* fat per reference amount"). For Plaintiffs to successfully challenge the assertion that Quaker's products "ad[d] a dietarily insignificant amount of trans fat," they would be required to persuade this Court that amounts of *trans* fat less than 0.5 grams per serving are nonetheless significant. They cannot do so without imposing labeling requirements that are "not identical" to—indeed, are squarely foreclosed by—federal law. 21 U.S.C. § 343-1(a)(4).

Any conceivable doubt on the meaning of the FDA regulations is eliminated by the FDA's conclusion that, "[o]n foods that declare '0 g *trans* fat' in nutrition labeling, in accordance with 21 CFR 101.9(c) as amended, FDA will not object to a firm voluntarily identifying ingredients that are generally understood by consumers to contain *trans* fat . . . with an asterisk that refers to a statement below the list of ingredients which states 'adds a trivial (or negligible or dietarily insignificant) amount of *trans* fat.'" Letter from Felicia B. Satchell, Director, Food Label and Standards Staff, FDA, to Richard S. Silverman (Mar. 18, 2004) (Def.'s RJN Ex. 1). Although Plaintiffs note that this letter was not the result of notice-and-comment rulemaking, it is nonetheless "entitled to deference as an agency's interpretatio[n] of its regulations." *Holk v. Snapple Bev. Corp.*, 575 F.3d 329, 342 n.6 (3d Cir. 2009). Plaintiffs have a different reading of the regulation, but their view is foreclosed by the FDA's own interpretation.

2. "Heart Healthy"/Images of Hearts.  Instant Quaker Oatmeal and Oatmeal To Go combine heart vignettes with the statement that "diets rich in whole grain foods and other plant foods and low in saturated fat and cholesterol may help reduce the risk of heart disease." Plaintiffs acknowledge that this claim has been authorized by the FDA under 21 U.S.C. § 343(r)(3)(C). *See* Am. Compl. ¶ 85. They instead mount a broadside attack on the FDA's authorization, which simply confirms that they are attempting to impose labeling requirements that are "not identical" to federal law.

According to Plaintiffs, the requirements for approval of a health claim under Section 343(r)(3)(C) were not satisfied because "the Kraft submission on which the [claim] is based failed to present 'a balanced representation of the scientific literature.'" Opp'n 17 (quoting 21 U.S.C. § 343(r)(3)(C)(ii)(III)). But the statute vests the Secretary of Health and Human Services with the authority to determine whether the statutory requirements are satisfied: "A claim submitted under the requirements of [Section 343(r)(3)(C)] may be made until . . . such time as the Secretary issues a

regulation . . . finding that the requirements of [Section 343(r)(3)(C)] have not been met, *including finding that the petitioner has not submitted all the information required . . . .*" 21 U.S.C. § 343(r)(3)(D)(i)(II) (emphasis added). The Secretary not only declined to object to the health claim proposed by Kraft but expressly approved the claim for foods that "contain . . . 0.5 gram or less *trans* fat per RACC." *Health Claim Notification for Whole Grain Foods with Moderate Fat Content* (Dec. 9, 2003).[5] The claim challenged by Plaintiffs thus "may be made," 21 U.S.C. § 343(r)(3)(D)(i)(II), regardless of whether Plaintiffs believe it should not have been approved by the FDA.

Plaintiffs also argue that Quaker's use of the claim is inappropriate because the products "contai[n] a nutrient—trans fat—that the FDA has determined, in the amount present in the product, increases to persons in the general population the risk of disease." Opp'n 17 (paraphrasing 21 U.S.C. § 343(r)(3)(A)(ii)). For similar reasons, Plaintiffs insist, the claim is false or misleading under 21 U.S.C. § 343(r)(3)(C)(iii); fails to reveal material facts under 21 U.S.C. § 321(n); is not complete, truthful, and not misleading under 21 C.F.R. § 101.14(d)(2)(iii); and does not enable the public to comprehend the information provided under 21 C.F.R. § 101.14(d)(2)(v). Opp'n 17–18 (Instant Quaker Oatmeal); *see also id.* at 20 (Oatmeal to Go). Although Plaintiffs divide these arguments into purportedly separate respects in which Quaker's products are allegedly misbranded, they are instead variations on the same flawed theme: Plaintiffs are arguing that the "presence of trans fats alone" is sufficient to "prevent Quaker Oats from emphasizing whatever other health benefits are available." *Chacanaca*, 752 F. Supp. 2d at 1122. This Court has rejected such arguments, emphasizing that *trans* fat is "not a 'disqualifying' nutrient," *id.*, and it should do the same here. Indeed, Plaintiffs' arguments are particularly flawed because the FDA considered the issue in approving the Kraft claim and concluded that the claim could appropriately be made for foods that "contain . . . 0.5 gram or less *trans* fat" per serving. *Health Claim Notification for Whole Grain Foods with Moderate Fat Content* (Dec. 9, 2003). If Plaintiffs were correct that the presence of such amounts of *trans* fats rendered the FDA-approved claim improper, that would simply eliminate the FDA's approval. The FDCA's preemption provision does not allow such state-law challenges to labeling authorized by federal law.

---

[5] *See* http://www.fda.gov/Food/LabelingNutrition/LabelClaims/FDAModernizationAct FDAMAClaims/ucm073634.htm.

Finally, Plaintiffs insist that "the heart graphic on the side of Quaker Instant Oatmeal includes intervening material" in violation of 21 C.F.R. § 101.14(d)(2)(iv). Opp'n 18; *see also id.* at 20 (same for Oatmeal to Go). Plaintiffs apparently misunderstand the relevant regulatory requirements. Under Section 101.14(d)(2)(iv), "[a]ll information required to be included in the [health] claim" must "appea[r] in one place without other intervening material, *except* that the principal display panel of the label or labeling may bear the reference statement, 'See ___ for information about the relationship between ___ and ___,' with the blanks filled in with the location of the labeling containing the health claim, the name of the substance, and the disease or health-related condition . . . , with the entire claim appearing elsewhere on the other labeling" (emphasis added). That is precisely what Quaker has done: The assertion that Quaker's products are "Heart Healthy / Whole Grains" is immediately followed by the direction to "[s]ee side panel for information about the relationship between whole grains and heart disease." Am. Compl. Ex. B, at 1. There is nothing "intervening" between these two statements, and nothing improper about Quaker's use of a "reference statement."[6]

3. <u>"Helps Reduce Cholesterol."</u> Plaintiffs claim that FDA regulations "d[o] *not* authorize Quaker's *advertisement* that Oatmeal to Go bars 'Help Reduce Cholesterol,' which no regulation authorizes and Section 101.14(e) *expressly prohibits*." Opp'n 15. This ignores the FDA regulations. As Plaintiffs concede, "[t]he FDA permits a health claim that states, 'diets that are low in saturated fat and cholesterol and that include soluble fiber from certain foods' may reduce heart disease." *Id.* (quoting 21 C.F.R. § 101.81(c)(2)). Plaintiffs further acknowledge that "'[t]he claim may state that th[is] relationship . . . is through the intermediate link of 'blood cholesterol' or 'blood total and LDL cholesterol.'" *Id.* (quoting 21 C.F.R. § 101.81(d)(2)). Quaker complies with these requirements by stating both that, "[a]s part of a heart healthy diet, the soluble fiber in Quaker Oatmeal Helps Reduce Cholesterol!*" and that "*3 grams of soluble fiber from oatmeal daily in a diet low in saturated fat and cholesterol may reduce the risk of heart disease." Am. Compl. Ex. C, at 4. Plaintiffs' challenge

---

[6] Plaintiffs assert in passing that Quaker's claim is "not stated in a manner so that it is an accurate representation of the authoritative statement on which it relies," purportedly in violation of 21 U.S.C. § 343(r)(3)(C)(iv). Plaintiffs do not elaborate, but in any event Quaker's claim precisely tracks the FDA-approved statement that "[d]iets rich in whole grain foods and other plant foods, and low in saturated fat and cholesterol, may help reduce the risk of heart disease." *Health Claim Notification for Whole Grain Foods with Moderate Fat Content* (Dec. 9, 2003).

to these FDA-approved statements seeks to impose state-law labeling requirements that are "not identical" to federal law, and their claims are therefore preempted.

Plaintiffs apparently believe that Quaker has violated the regulatory requirements "by giving the optional information" more "'prominent placement'" than the health claim itself. Opp'n 15 (quoting the FDA Minneapolis District Office's May 5, 2009 warning letter to General Mills regarding Cheerios ("Cheerios Letter") (Pls.' RJN Ex. C)). Plaintiffs' reliance on the Cheerios Letter is curious given their insistence elsewhere that FDA letters do not have the force of law. *Id.* at 13–14. And it is particularly perplexing since they do not allege that *Quaker* has received any such letter. In any event, the Cheerios Letter has no bearing on this litigation. The Cheerios box contained two separate claims stating that individuals could lower their cholesterol by 4% in 6 weeks; it also contained a soluble fiber claim that complied with the governing regulations. Rather than view the three claims as one, the FDA considered them as "separate, standalone claims through their location on the package and other label design features." Cheerios Letter at 1. Unlike the Cheerios packaging, where one of the cholesterol claims appeared on the opposite side of the box from the soluble fiber claim, Quaker's entire health claim is located on the bottom half of the Oatmeal to Go box. And Quaker's claim is framed by a graphical heart, which (in contrast to Cheerios) unites the statements as "part of [the same] claim." *Id.* at 1. For added clarity, Quaker has an asterisk linking the statement "Quaker Oatmeal Helps Reduce Cholesterol" with the statement explaining the role of soluble fiber. The packaging thus makes clear that the statements are not "separate, standalone claims" but instead part of the same FDA-authorized health claim.

Because Quaker's health claim has been authorized by FDA regulation, it cannot support Plaintiffs' argument that "Oatmeal to Go Bars' label demonstrates that [they] are promoted for use in the prevention, mitigation and treatment of hypercholesterolemia," and therefore are an unapproved new drug. Opp'n 16. The Cheerios Letter cited by Plaintiffs recognizes as much: It concluded that Cheerios was an unapproved new drug only *after* concluding that the "cholesterol-lowering claims" were not "part of an otherwise permissible claim." Cheerios Letter at 1. The same is not true here.[7]

---

[7] The FDA's decision to treat Cheerios as an unapproved new drug was influenced, moreover, by General Mills's claims that the cereal could reduce cholesterol by a specific, defined amount: 4% over 6 weeks. *See* Cheerios Letter at 1. This assertion allegedly violated the "requirement that the

4. <u>"All the nutrition of a bowl of instant oatmeal."</u>  The phrase "all the nutrition of a bowl of instant oatmeal" is a relative nutrient content claim governed by 21 C.F.R. § 101.65(c)(2).  Plaintiffs do not dispute that Section 101.65(c)(2) allows the phrase "'contains the same amount of [nutrient] as a [food]' and "as much [nutrient] as a [food]'" to be included on product labels.  They maintain, however, that "Quaker's label . . . states 'all the *nutrition* of'" instant oatmeal, which does not identify a 'nutrient' in oatmeal that is also contained in Oatmeal to Go bars."  Opp'n 21.  Plaintiffs never explain why, if Quaker could compare particular nutrients present in the products, it could not also compare *all* nutrients, nor do they dispute that Quaker To Go contains as much nutrients as instant oatmeal.  Indeed, Plaintiffs do not identify even a single nutrient present in *instant oatmeal* that is not also present in Oatmeal to Go.  Rather, they assert only that "it is false and misleading to claim that Oatmeal to Go Bars . . . provid[e] 'all the nutrition' of a bowl of *plain rolled oats*."  *Id.* at 21 (emphasis added).  Plaintiffs cannot demonstrate that Quaker's relative nutrient content claim is inaccurate simply by changing the subject of the comparison.  Because Quaker's use of the phrase "all the nutrition of a bowl of instant oatmeal" fully complies with the governing regulation, Plaintiffs cannot challenge that labeling under state law; their attempt to do so in this case is thus preempted.

5. <u>Images of Oats, Nuts, Fruits, and Brown Sugar.</u>  Plaintiffs' challenges to the depictions of oats, nuts, fruits, and natural brown sugar on certain Quaker labels are preempted because those depictions are "direct or indirect representations with respect to the *primary recognizable flavor(s)*" of the products.  21 C.F.R. § 101.22(i) (emphasis added).  Plaintiffs claim that they are instead "'representations about the products' ingredients and not their characterizing flavor.'"  Opp'n 21 (quoting *Red v. Kraft Foods, Inc.*, 754 F. Supp. 2d 1137, 1143 (C.D. Cal. 2010)).  This allegation nowhere appears in the Consolidated Amended Complaint, which alleges only that they are "images."  *See, e.g.*, Am. Compl. ¶ 95 & App'x A.  In any event, unlike the labeling at issue in *Red*, Quaker's packaging makes clear that the depicted foods are flavor cues.  Plaintiffs attempt to recharacterize the images by contrasting them with nearby references to "ingredients," Opp'n 21, but they are again engaged in selective quotation.  The statement that Quaker "use[s] delicious ingredients like apples,

---

[health] claim not attribute any degree of risk reduction for coronary heart disease to diets that include foods eligible to bear the claim."  *Id.* (citing 21 C.F.R. § 101.81(c)(2)(E)).

raisins, brown sugar and cinnamon" in its Instant Oatmeal is immediately followed by "to give you lots of flavors to choose from." Am. Compl. Ex. B, at 4. And the text immediately above the images reads: "TRY ALL OF OUR FLAVORS!" *Id.* In the statement that Plaintiffs characterize as "Chewy Granola Bars are '[m]ade with . . . ingredients like peanut butter,'" Opp'n 21, Plaintiffs use the ellipsis to conceal the word "yummy," which is accompanied by the claim that Quaker's products have "[g]reat taste" and are "great-tasting." Am. Compl. Ex. A, at 3. Because Plaintiffs have not alleged that Quaker's use of these images violates the federal requirements for characterizing flavor, their challenges to the images should be dismissed as preempted by federal law.[8]

## C. Plaintiffs' Remaining Claims Attempt To Challenge Non-Actionable Puffery.

Plaintiffs' challenges to the remaining statements—"quality," "wholesome, great tasting goodness in every bowl," "help you feel your best," and "smart choices made easy"—should be dismissed because they challenge only non-actionable puffery. Plaintiffs claim that it is "rarely appropriate to dismiss [false advertising claims] on grounds of puffery." Opp'n 21. But the case they cite for this supposed proposition says exactly the opposite: "District courts often resolve whether a statement is puffery when considering a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) and we can think of no sound reason why they should not do so." *Cook, Perkiss, & Liehe v. N. Cal. Collection Serv., Inc.*, 911 F.2d 242, 245 (9th Cir. 1990). As the Ninth Circuit has explained, "the determination of whether an alleged misrepresentation is a statement of fact or is instead mere puffery is a *legal question* that may be resolved on a Rule 12(b)(6) motion." *Newcal Indus. v. Ikon Office Solution*, 513 F.3d 1038, 1053 (9th Cir. 2008) (emphasis added; internal quotation marks omitted).

---

[8] Moreover, in both of the examples cited by Plaintiffs, any food characterized as an "ingredient" in the text of the packaging is *actually present* in the product, and thus dismissal would be warranted even if the images were viewed as characterizing ingredients. Indeed, although the FDA's decision to permit "representations" of the "primary recognizable flavor(s)" using a "depiction of a fruit," 21 C.F.R. § 101.22(i), necessarily means that product labels may represent flavors by depicting ingredients they do not contain, *see, e.g.*, *Dvora v. General Mills, Inc.*, No. 11-1074, 2011 WL 1897349, at *5–6 (C.D. Cal. May 16, 2011), the *only* images of ingredients in the exhibits to the complaint that are not present in Quaker's products are the fruit images for the Fruit and Cream varieties of Instant Quaker Oatmeal—and they are clearly marked as "Artificial" and "Flavors." *E.g.*, Am. Compl. Ex. B, at 3.

The issue before this Court is the legal question whether the statements challenged by Plaintiffs "mak[e] a claim as to the 'specific or absolute characteristics of a product,'" and thus may be "actionable statement[s] of fact," or instead are "general, subjective claim[s] about a product" that constitute "non-actionable puffery." *Newcal*, 513 F.3d at 1053 (quoting *Cook*, 911 F.2d at 245). Each of the relevant statements falls into the latter category, and dismissal is therefore warranted.

1. "Quality." Plaintiffs' attempt to challenge Quaker's characterization of its products as "quality" is foreclosed by the well-established rule that "generalized and vague statements of product superiority" are "non-actionable puffery." *In re Sony Grand Wega KDF-E A10/A20 Series Rear Projection HDTV Television Litig.*, 758 F. Supp. 2d 1077, 1089 (S.D. Cal. 2010) (internal quotation marks omitted). Plaintiffs have no meaningful response to *Sony Grand Wega* or the numerous other California cases rejecting similar challenges to assertions of product "quality."

Plaintiffs claim *Sony Grand Wega* is distinguishable because "the court was determining puffery in light of a Rule 9(b) motion to dismiss for failure to plead with particularity." Opp'n 22. But the basis for the court's decision was that, *as a matter of law*, "[v]ague or highly subjective claims about product superiority amount to non-actionable puffery." *Sony Grand Wega*, 758 F. Supp. 2d at 1089. That decision has nothing to do with the particularity requirements of Rule 9(b); indeed, the decision on which *Sony Grand Wega* principally relied—*Oestreicher v. Alienware Corp.*, 544 F. Supp. 2d 964, 973 (N.D. Cal. 2008), *aff'd*, 322 F. App'x 489 (9th Cir. 2009)—was decided under Rule 12(b)(6).

Nor are Plaintiffs correct that "Quaker's quality claim" is "more analogous to the quality claim in *Anunziato v. eMachines, Inc.* that the court held was not puffery." Opp'n 23 (citing 402 F. Supp. 2d 1133 (C.D. Cal. 2005)). *Anunziato* specifically held that "the word 'quality' is non-actionable puffery," 402 F. Supp. 2d at 1140, and that conclusion applies with equal force here. What Plaintiffs characterize as the "quality claim" in *Anunziato* was the *different* assertion that the products at issue had undergone the "most stringent quality control tests," which the court believed was a "specific factual assertion" that "could be established or disproved through discovery." *Id.* at 1140–41. But Quaker's packaging did not make any assertions about whether the products had been

subject to quality control testing; they asserted only that the products were "quality," and that assertion—*Anunziato* recognized—is not actionable.[9]

2. "Wholesome, great tasting goodness in every bowl." Quaker's statement that its Chewy Granola Bars and Instant Oatmeal are "wholesome" is similarly a "generalized and vague statemen[t] of product superiority." *Sony Grand Wega*, 758 F. Supp. 2d at 1089. Plaintiffs redefine the claim as asserting variously that the products are "something direct from nature and not consisting of just its parts, due to processing, which strips nutrients from food," or that the products "will nourish human beings, and not impair human health." Opp'n 23. That Plaintiffs cannot advance a consistent definition of "wholesome" is strong evidence that the term is not the "kind of detailed or specific factual assertio[n]" that is "necessary to state a false advertising cause of action." *Cook*, 911 F.2d at 246. Moreover, Plaintiffs ignore that Quaker surrounds the description of its products as "wholesome" with assertions that those products are "great-tasting goodness" and are made with "yummy ingredients." *See* Mot. 19–20. This context leaves no room for Plaintiffs to argue that, by characterizing its products as "wholesome," Quaker is asserting that they are "healthy and will aid bodily health," Opp'n 23, as opposed to making a non-actionable assertion of product superiority.

3. "Help you feel your best." Plaintiffs do not dispute that courts routinely dismiss attempts to challenge advertising that a particular product is the "best." Mot. 19. They claim, however, that "[t]he word 'best' is also modified by 'your,'" which they believe distinguishes this case from those involving "claims that a *product* was the best of its kind." Opp'n 24. As another court in this Circuit

---

[9] Stripped of any support for their position in the caselaw, Plaintiffs attempt misdirection: They claim that "quality" is not only a "measure of excellence," but also an assertion "that a thing bears specific characteristics." Opp'n 22. Quaker's packaging did not assert that the products had any *particular* "quality," but instead that they *were* "quality." The only definition of "quality" that could conceivably apply to such an assertion is "'a degree of excellence.'" *Id.* (quoting *Webster's New Collegiate Dictionary* (9th ed. 1989)). This is puffery. Similarly, Plaintiffs are mistaken in arguing that, because "the ingredient list only states 'sugar' and does not state 'natural brown sugar,'" then the "quality of the product is not as absolutely represented via the image of a bowl of natural brown sugar elsewhere on the box." *Id.* at 22–23. The issue here is not whether images of *brown sugar* are misleading, but instead whether the word "*quality*" is non-actionable puffery. Plaintiffs nowhere explain how any reasonable consumer could possibly understand the word "quality" to imply anything at all about whether the product contains brown sugar. Plaintiffs' attempt to transform Quaker's use of the word "quality" into a description of the "'specific or absolute characteristics' of Instant Oatmeal," *id*. at 22, is thus fundamentally misguided.

has noted, "[w]hether made to the general public or specific individuals," statements about what is "best" are "too prevalent to constitute actionable misrepresentations." *In re Countrywide Fin. Corp. Mortg. Marketing & Sales Practices Litig.*, 601 F. Supp. 2d 1201, 1218 (S.D. Cal. 2009). Quaker's assertion that its products will "help you feel your best" cannot be understood as claiming that individuals eating those products will feel better than they ever have before, just as the assertion that a product is the "best" is not understood as a factual claim that it is better than every other product on the market. Rather, it is a "highly subjective" and "general assertion." *Cook*, 911 F.2d at 246.

    4. <u>"Smart Choices Made Easy."</u>  Finally, Quaker's use of the phrase "Smart Choices Made Easy" is—like the claim that a product is a "smart option"—"too general and subjective in nature to be considered [a] misrepresentatio[n]." *Whiting v. AARP*, 701 F. Supp. 2d 21, 30 n.7 (D.D.C. 2010), *aff'd*, 637 F.3d 355 (D.C. Cir. 2011). Plaintiffs interpret this claim as implying that "a purported expert panel" has "vett[ed] the healthiness of the product" and is "standing behind its goodness." Opp'n 24. This Court concluded last year that, at least with respect to the Quaker products then at issue, "a determination of whether or not the decal is non-actionable owing to its status as either true or harmless puffery cannot be determined on this motion" for judgment on the pleadings. *Chacanaca*, 752 F. Supp. 2d at 1126. Such a determination is now appropriate: The challenged statements did not assert that Quaker's products were "vet[ted]" for healthiness by an "expert panel," but instead that they are a "smart choice"—the type of unverifiable assertion that is routinely regarded as puffery.

### III.  CONCLUSION

For the foregoing reasons, as well as those discussed in Quaker's motion, the Court should dismiss the Amended Consolidated Complaint with prejudice.

                                                        Respectfully submitted,

Dated:  November 30, 2011                  GIBSON, DUNN & CRUTCHER LLP

                                        By:  <u>/s/ Christopher Chorba</u>
                                              Christopher Chorba
                                              Counsel for Defendant
                                              The Quaker Oats Company