| | |
|---|---|
| **GIBSON, DUNN & CRUTCHER LLP**<br>Daniel W. Nelson (pro hac vice)<br>DNelson@gibsondunn.com<br>Scott P. Martin (pro hac vice)<br>SMartin@gibsondunn.com<br>1050 Connecticut Avenue, N.W.<br>Washington, D.C. 20036<br>Telephone: (202) 955-8500<br>Facsimile: (202) 530-4238<br><br>**Counsel for Defendant**<br>**The Quaker Oats Company** | **THE WESTON FIRM**<br>JACK FITZGERALD (257370)<br>jack@westonfirm.com<br>GREGORY S. WESTON (239944)<br>greg@westonfirm.com<br>MELANIE PERSINGER (275423)<br>mel@westonfirm.com<br>PAUL K. JOSEPH (287057)<br>paul@westonfirm.com<br>San Diego, CA 92110<br>1405 Morena Blvd., Suite 201<br>Telephone: (619) 798 2006<br>Facsimile: (480) 247 4553<br><br>**LAW OFFICES OF RONALD A. MARRON, APLC**<br>RONALD A. MARRON (175650)<br>ron@consumersadvocates.com<br>B. SKYE RESENDES (278511)<br>skye@consumersadvocates.com<br>ALEXIS WOOD (270200)<br>alexis@consumersadvocates.com<br>651 Arroyo Drive<br>San Diego, CA 92103<br>Telephone: (619) 696-9006<br>Facsimile: (619) 564-6665<br><br>**Interim Class Counsel** |

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE QUAKER OATS LABELING LITIGATION | CASE No. 5:10-cv-0502-RS<br>Pleading Type: Class Action<br>Action Filed: February 3, 2010<br><br>**DECLARATION OF GAJAN RETNASABA IN SUPPORT OF JOINT MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT**<br><br>Judge: The Honorable Richard Seeborg<br>Time: 1:30 p.m.<br>Location: Courtroom 3, 17th Floor |

-1-

DECLARATION OF GAJAN RETNASABA

I, Gajan Retnasaba, declare as follows:

1. I am employed by Classaura LLC, located at 1718 Peachtree St #380, Atlanta, Georgia. Classaura was appointed as the Claims Administrator in this matter. I am over 21 years of age and am not a party to this action. I have personal knowledge of the facts set forth herein and, if called as a witness, could and would testify competently thereto.

**NOTICE PUBLICATION**

2. Two advertisements were placed in the USA Today newspaper on Thursday, April 3, 2014, and Monday, April 7, 2014, respectively. A copy of the advertisement and a certification of publication from the publisher are included in Appendix A.

3. An advertisement was placed in Prevention Magazine in their May 2014 issue which was distributed to readers on or about April 24, 2014. A copy of the advertisement and a certification of publication from the publisher are included in Appendix B.

**INFORMATION PHONE LINE**

4. A dedicated toll-free number was set up on February 17, 2014, providing pre-recorded information and access to a live operator to answer further questions. To date we have received 401 calls, of which 186 callers elected to speak to a live operator.

**WEBSITE AND EMAIL**

5. A website was set up on February 17, 2014, providing information on the lawsuit and access to case documents. The website includes a summary of the case, a list of important dates, answers to frequently asked questions, key case filings (the operative complaint, motion for preliminary approval, preliminary approval order, long and short form notice, and motion for attorney fees), and contact information. A Spanish translation of both the short and long form notice was also provided. To date the website has been visited 3,192 times.

6. A dedicated email address was set up on February 17, 2014, to answer questions from potential class members. To date we have received and answered 43 emails.

### POSTAL CORRESPONDENCE

7. We have received four (4) items of postal mail correspondence from class members.

8. In response to telephone, email, and mail requests, and also requests via phone, letter, and e-mail from Class Counsel, we have mailed a copy of the long-form notice of settlement to fifty-four (54) individuals.

### OBJECTIONS

9. The Court's preliminary approval order requires objections to the settlement to be served on Classura and postmarked on or before May 27, 2014. To date we have received one objection to the settlement from Amy X. Yang. A copy of the Ms. Yang's objection is included in Appendix C.

### OPT-OUTS

10. The Court's preliminary approval order requires written requests for exclusion from the class (opt-outs) to be mailed to Classura and postmarked on or before May 27, 2014. To date we have received no requests for exclusion (opt-outs) from the settlement.

### COSTS

11. The costs incurred to provide notice of the settlement ($80,000.00) plus the costs to administer the settlement ($6,083.50) to class members totals $86,088.00.

I declare under penalty of perjury of the laws of the State of California that the foregoing is true and correct and that this declaration was executed this 10th day of June, 2014, at Atlanta, Georgia.

_____
GAJAN RETNASABA

# Appendix A



## VERIFICATION OF PUBLICATION

**COMMONWEALTH OF VIRGINIA**
**COUNTY OF FAIRFAX**

Being duly sworn, Toussaint Hutchinson says that he is the principal clerk of USA TODAY, and is duly authorized by USA TODAY to make this affidavit, and is fully acquainted with the facts stated herein: on **Thursday, April 3, 2014** and **Monday, April 7, 2014** the following legal advertisement – **Quaker Class Action Settlement** - was published in the national edition of **USA TODAY**.

*[signature]*

Principal Clerk of USA TODAY
June 6, 2014

This ___10th___ day of ___June___ month ___2014___ year.

*[signature]*
Notary Public

*[Notary seal: KIRA SHEREEN BAKER, NOTARY PUBLIC, REG. #7510493, MY COMMISSION EXPIRES 8/31/2015, COMMONWEALTH OF VIRGINIA]*

USA TODAY   ·   7950 Jones Branch Drive, McLean, VA 22108   ·   www.usatoday.com

## HEALTH & SCIENCE

# How to be 10% happier: Meditate

As co-anchor of *Nightline* and weekend editions of *Good Morning America*, ABC newsman Dan Harris is proud to call himself a professional skeptic. Meditation was one of the things he used to be skeptical about.

"I always thought meditation was uniquely ridiculous and annoying. It was for people who live in yurts or collect crystals or listen to Cat Stevens," he says. "I am definitely not cut from that cloth."

And yet, after a years-long quest that took him to self-help gurus, spiritual leaders and brain scientists, Harris took up meditation. He's now written a book extolling its life-changing power. It's called *10% Happier: How I Tamed the Voice in My Head, Reduced Stress Without Losing My Edge, and Found Self-Help that Actually Works – A True Story.*

He spoke with USA TODAY contributor Kim Painter.

**Q: About a decade ago, you had some life problems that culminated in an on-air panic attack. How did that lead to your interest in meditation?**
A: After 9/11, I spent many years covering wars overseas. When I came home, I got depressed and did a really stupid thing, which is that I self-medicated with recreational drugs, including cocaine and Ecstasy. While I wasn't doing it at work and I definitely wasn't doing it while I was on the air, I later learned from my doctor that (the drugs) primed me to have a panic attack on *Good Morning America*. It was extremely embarrassing, and that realization of what a moron I'd been kind of set me off on this strange journey.

**Q: What finally turned you to meditation?**
A: The science. It does everything from lowering your blood pressure to boosting your immune system. ... It can produce significant changes in your brain, like doing neurosurgery on yourself, in a positive way. It was hard to resist that. And, I was told by people I respected that this was the best way to deal with that voice in our heads that can yank us around so much.

**Q: Explain for the layperson: What is this meditation thing?**
A: When I say meditation, I'm talking about mindfulness meditation. It's completely secular. There's nothing to join, no dues to pay. It is, in essence, a form of exercise for your brain. It has three very simple steps. One, sit down with your spine straight and close your eyes. Second, try to notice where the feeling of your breath is most prominent, and try to focus on what it feels like every time it comes in and goes out. And the third step is the key. Every time you catch your mind wandering, forgive yourself and bring your attention back to the breath. That moment is the bicep curl for the brain. You are breaking a lifetime habit of just letting your mind run around in useless repetitive and unproductive ways and getting back to focusing on what's happening right now.

**Q: Early on, you found meditation hard. Why?**
A: Because it's like holding a live fish in your hand. Wrestling a mind to the ground is an extremely difficult thing to do. There's this constant yammering narrator that is wanting, not wanting, judging, comparing ourselves to other people, thinking about the future and past.

**Q: You say meditation needs a PR makeover. What are some of the misconceptions?**
A: One is that it's baloney.
Another is that people think, 'OK, I get it, meditation is a good thing, but it's not for me, I can't do it. My mind is too crazy.'
Another misconception people share is that their lives are too busy to do this. I tell people five minutes is enough.
Everybody has five minutes.

**Q: Who are some devotees of meditation that we've heard of?**
A: Bill Ford, who was until recently the head of Ford Motor Co. At least one of the founders of Twitter, Jack Dorsey.
Congressman Tim Ryan from Ohio.
Phil Jackson, the new general manager for the New York Knicks, George Stephanopoulos and Diane Sawyer.


IDA MAE ASTUTE, ABC
Dan Harris says meditation helps you train your mind to focus. "Just imagine how useful that is in an age of multitasking."

**Q: *10% Happier* is a great title. Why did you settle on that rather precise, but modest, number?**
A: One day I was talking with a colleague who asked, 'What is it with you and this meditation thing?' and I blurted out that I do it because it makes me 10% happier. And I noticed this look of skepticism and scorn on her face immediately vanished and was replaced by a look of sincere interest. It just seemed like the right answer for skeptics. We're bombarded in American culture by all these gurus who tell you that you can fix all your problems by the power of positive thinking. That's baloney. There are no miracle cures. But there is something you can do that will make you significantly happier. Obviously 10% is just a jokey estimate, but it's in the ballpark.

**Q: What advice would you give someone who is as skeptical as you were but might want to give meditation a try?**
A: Give it five minutes a day, no matter how woo-woo you think it is. You may have 17 children and two full-time jobs, but everybody has five minutes. Tell yourself you are never going to do more, and let it grow organically. If it doesn't work for you, if you don't notice a changed relationship with the voice in your head after a couple of weeks, send me a note on Twitter and let me know.

---

# New allergy pills mean no more shots for some

### FDA approves oral immunotherapy for certain grass pollens

**Kim Painter**
Special for USA TODAY

The first pill that could replace allergy shots for some people has been approved by the Food and Drug Administration.

Oralair, from the French company Stallergenes, only works against certain grass pollens and, like shots, takes several months to start working. So it won't help people allergic to other things or reach grass-allergy sufferers in time to ward off early summer symptoms this year.

But it does signal a shift in immunotherapy — the practice of exposing allergy sufferers to small amounts of the substances that trigger symptoms in order to decrease sensitivity and reduce symptoms when sufferers encounter the real thing.

Up to now, that has usually meant returning to allergists' offices many times over months or years to get shots. Some allergists also offer custom-made drops that can be placed under the tongue, but those have never been approved by the FDA.

Immunotherapy in take-home pill form "is a significant advance and certainly one of the few brand new products we've had in quite a long time," says James Li, chairman of the division of allergy and immunology at Mayo Clinic in Rochester, Minn.

Patients will place the new grass pollen pills under their tongues — the first time in a doctor's office, just in case of severe allergic reactions. After that, the pills will be taken once a day at home.

The pills can cause some side effects: In studies, one-third of patients developed itchy mouths, and some reported throat irritation.

FDA says the pills reduced symptoms and the need for allergy medication by 16% to 30% in studies.

That's somewhat lower than the effectiveness of shots in studies, but the two kinds of therapies have not been compared head to head, Li says.

One big drawback of the new pill is that it treats just one kind of allergy, says Stanley Fineman, an Atlanta allergist and past president of the American College of Allergy, Asthma and Immunology.

"Most patients with allergies that we see here are allergic to grass pollens, tree pollens, ragweed and environmental allergens like dust mite and animal dander," he says. A typical allergy shot contains all those extracts, he says.

But he says the tablets will give some patients a welcome new option. "We are going to have to get some hands-on experience before we say where it's going."

The Stallergenes pill works against five types of grass pollen common in the United States: Sweet Vernal; Orchard; Perennial Rye; Timothy; and Kentucky Blue Grass.

It's been approved for people ages 10 to 65. The company says the pills, which will be available in May, should be started four months before grass allergy season and continued through the season — a time period that differs by geographic region. It did not immediately release a price.

Additional immunotherapy pills are in the pipeline. FDA is expected to approve a second grass pollen pill, from Merck. That pill works against just one variety, Timothy grass. FDA also is reviewing a ragweed pill from Merck and the company has a dust mite pill in studies.


DANNY DRAKE, AP
Evelyn Roldan, left, receives a series of shots for tree, grass and weed pollen from Danielle Gosner in Linwood, N.J.

---

**MARKETPLACE TODAY**

For advertising information: 1.800.397.0070   www.russelljohns.com/usat

**NOTICES**

**LEGAL NOTICE**

### LEGAL NOTICE
**If You Bought An Eligible Quaker Product At Any Time From February 3, 2006 To April 18, 2014, You May Be Part Of This Lawsuit.**

There is a class action Settlement of a lawsuit challenging the labeling and marketing of certain Quaker Chewy bars, Oatmeal To Go, and Instant Quaker Oatmeal products. Quaker denies that it did anything wrong and stands by its products and marketing. The Court did not rule in favor of either party.

**WHO IS INCLUDED IN THE SETTLEMENT?**
**Anyone** who bought an eligible Quaker product at any time from February 3, 2006 to April 18, 2014. A full list of these Products is available at www.QuakerLawsuit.com or by calling 1-(888) 963-9429.

**WHAT DOES THIS SETTLEMENT PROVIDE?**
**The** Products at issue in the Litigation include varieties of Quaker Chewy bars, Oatmeal To Go, and Instant Quaker Oatmeal. Currently, none of the Quaker Chewy bars named in the lawsuit contains any partially hydrogenated oil ingredient(s) ("PHOs"), and all other Products contain either no PHOs or an amount that the United States Food and Drug Administration requires to be declared on the Products' Nutrition Facts boxes as "0 grams" trans fat. Under the Settlement agreement, Quaker has agreed that, no later than December 31, 2015, it will remove PHOs from the Oatmeal To Go and Instant Quaker Oatmeal Products that currently contain them. Quaker also agrees not to re-introduce PHOs into those products for at least 10 years thereafter. Quaker agrees not to introduce PHOs into Quaker Chewy bars, or the Instant Quaker Oatmeal Products that do not currently contain PHOs, for a period of 10 years. Finally, Quaker agrees that, by December 31, 2014, it will cease making the statement "contains a dietarily insignificant amount of trans fat" on the labels of any of the Products that contain 0.2 grams or more of artificial trans fat per serving. The Settlement Agreement provides that, in exchange for Quaker's agreement to make these changes, Class Members will release claims against Quaker that were or could have been asserted in this lawsuit. Full details about the Settlement, including the Release, are contained in a Settlement Agreement called the "Class Action Settlement Agreement," which is available at www.QuakerLawsuit.com.

**WHAT ARE YOUR OPTIONS?**
If you are a Class Member, you may (1) do nothing; (2) exclude yourself; (3) object to the settlement; and/or (4) attend a hearing about the fairness of the Settlement. If you do nothing, the Settlement (if approved) will release all claims asserted in the lawsuit, including those for injunctive relief or damages. The Release is set forth in the Settlement Agreement, available at www.QuakerLawsuit.com.

If you do not want to be bound by the Settlement Agreement, you must exclude yourself by letter postmarked by May 27, 2014. If you exclude yourself, you can be part of another lawsuit against Quaker about the claims in this case. If you do not exclude yourself, and therefore remain a Class Member, you may object to the Settlement Agreement, but you may not be part of another lawsuit or seek additional relief related to the claims in this case. Objections must be filed with the Court and served on Class Counsel and Defense Counsel by May 27, 2014.

PLEASE SEE THE DETAILED NOTICE at www.QuakerLawsuit.com or call 1-(888) 963-9429 for complete instructions on how to object or exclude yourself, and other important information. On June 26, 2014, at 1:30pm the Court will hold a Fairness Hearing at the United States District Court for the Northern District of California, before the Honorable Richard Seeborg, District Judge, in Courtroom 3, Phillip Burton Federal Building and United States Courthouse, 17th Floor, 450 Golden Gate Avenue, San Francisco, California 94102, to consider approval of the Settlement, payment of attorneys' fees and **expenses** of up to $760,000 to lawyers for the Class (Ronald A. Marron of the Law Office of Ronald Marron, and Gregory S. Weston and Jack Fitzgerald of The Weston Firm), payments of up to $750 for each of the Representative Plaintiffs, and related issues. The motion(s) by Class Counsel for those fees, costs, and incentive awards will be available on the settlement website discussed above after they are filed with the Court and before the deadline for Objections or Requests for Exclusion. You may appear at the hearing, but you do not have to do so.

**HOW CAN YOU GET MORE INFORMATION?**
Visit www.QuakerLawsuit.com or call 1-(888) 963-9429; write to interim Class Counsel, Gregory S. Weston, the Weston Firm, 1405 Morena Blvd., Suite 201, San Diego, CA 92110; or e-mail interim Class Counsel, Gregory S. Weston, greg@westonfirm.com.

---

Send your sales through the roof with an ad in **Marketplace Today**.

For more information on how to place your ad call: **1-800-397-0070**

---

**NOTICE OF AVAILABILITY**

Programmatic Individual Environmental Report #37 (PIER #37), titled, "West Bank and Vicinity (WBV) Hurricane and Storm Damage Risk Reduction System (HSDRRS) Mitigation, Jefferson, Lafourche, Plaquemines and St. Charles Parishes, Louisiana," prepared by the U.S. Army Corps of Engineers, New Orleans District, is available for your review and comment. This notice is being posted per alternative National Environmental Policy Act (NEPA) arrangements implemented on March 12, 2007.

The PIER evaluates alternatives for mitigating unavoidable habitat impacts incurred during construction of the WBV HSDRRS and identifies the tentatively selected mitigation plan alternative (TSMPA) for mitigating those impacts. Only certain features of the TSMPA are being proposed for implementation at this time, namely the purchase of mitigation bank credits for bottomland hardwoods general impacts. The other features of the TSMPA would be recommended for implementation in subsequent NEPA documents that would tier off this PIER. Impacts from construction of the WBV HSDRRS are described in IERs 12-17 and their associated Supplemental IERs.

Copies of PIER #37 and supporting documents are available at http://www.nolaenvironmental.gov, or upon request. Please contact Ms. Elizabeth Behrens; U.S. Army Corps of Engineers; Regional Planning and Environmental Division South; Environmental Planning Branch; CEMVN-PDN; P.O. Box 60267; New Orleans, Louisiana 70160-0267; to request a copy. Requests also can be made by calling (504) 862-2025, e-mailing mvnenvironmental@usace.army.mil, or by fax to (504) 862-1892. The 30-day public review and comment period for PIER #37 will begin on April 4, 2014, and end on May 5, 2014. All comments should be sent to Ms. Elizabeth Behrens.

# MARKET TRENDS
A WEEKLY LOOK BEHIND THE USA'S STOCK MARKET MOVEMENT

| | Dow Jones industrial average | Wilshire 5000 | S&P 500 Large companies | Nasdaq composite index |
|---|---|---|---|---|
| week | ↑0.5% | ↑0.3% | ↑0.4% | ↓0.7% |
| month | ↑0.3% | ↑1.3% | ↓0.5% | ↓5.3% |
| 3 months | ↓0.3% | ↑1.7% | ↑1.8% | ↓0.1% |

## FINANCIAL MARKETS AT A GLANCE
Major market, S&P 500 sector and other indexes' performance during the past four and 13 weeks.



1 – Other indexes include International: Morgan Stanley Capital International Europe, Australasia, Far East Index; and Emerging markets: MSCI Emerging Markets.  Source: Standard & Poor's
JIM SERGENT AND KARL GELLES, USA TODAY

**MARKET LEADER: Utilities** — Investors looking for some shelter from markets turbulence are racing into utilities stocks.

**MARKET LAGGARD: Consumer discretionary** — Fears the economy and job creation aren't as bright as hoped are cooling consumer stocks.

## The week's top stocks
Top stocks in each industry group from the S&P 500, 400 and 600

**Consumer discretionary** W: 0.4% M: -3.8% Q: -2.6%
- Autos: Month -1.0%, Quarter -0.4% — Peugeot 9.1%, Fiat 8.0%, Porsche 7.4%, Daimler 6.0%, Renault 5.2%
- Consumer goods: Month -2.8%, Quarter -2.7% — M/I Schottenstein 6.3%, Ellis Perry 6.2%, Sturm Ruger 5.7%, Meritage 5.6%, Electrolux 5.1%
- Consumer services: Month -0.8%, Quarter -0.1% — Sands China 12.0%, Galaxy Entrmt 10.9%, Multimda Compa 6.7%, Marcus 6.0%, Matthews 4.9%
- Media: Month -3.3%, Quarter -0.3% — Sizmek 6.5%, Mediaset 6.3%, WPP 4.2%, 21st Century Fox 4.0%, Cablevision Sys. 3.7%
- Retailing: Month -5.6%, Quarter -5.0% — Staples 7.0%, Best Buy 6.3%, Cato 6.1%, LKQ 6.1%, Sonic Automotive 6.1%

**Consumer staples** W: 0.3% M: 1.0% Q: 0.8%
- Food retailing: Month -0.1%, Quarter 2.5% — Supervalu 5.0%, Carrefour 4.7%, MEetro 4.3%, Delhaize 3.3%, Spartan Stores 2.3%
- Food & beverage: Month 1.0%, Quarter 1.3% — Darling 7.4%, Cal Maine Foods 7.2%, Dean Foods 6.9%, B&G Foods 5.7%, Heineken 4.8%
- Household goods: Month 2.0%, Quarter -0.7% — Medifast 8.6%, Avon Products 4.9%, CentralGarden&Pet 4.2%, Henkel 3.3%, SCA-Svenska Cell. 1.3%

**Energy** W: 1.0% M: 4.0% Q: 2.8%
- Energy[1]: Month 4.0%, Quarter 3.0% — Anadarko Ptrlm 19.0%, AMEC 11.4%, WPX Energy 8.6%, Alpha Nat. Res. 7.0%, Peabody Energy 6.8%

**Financials** W: 0.2% M: 0.5% Q: 1.3%
- Banks: Month 1.3%, Quarter 5.4% — Bc. Monte Paschi 17.1%, Intesa SanPaolo 11.6%, Commerzbank 11.4%, Bank of Ireland 11.1%
- Financials[1]: Month -0.4%, Quarter -1.6% — Aberdeen Asset 11.3%, Hng Kng Ex. Cleari 10.9%, ING Groep 8.1%, SWS 6.6%
- Insurance: Month unch., Quarter -1.6% — Universal Insurance 6.6%, RSA Insurance 6.1%, Assicurazioni Gen. 5.4%, AIA 5.1%, eHealth 4.2%
- Real estate: Month -0.4%, Quarter 7.8% — Sun Hung Kai Prps. 7.4%, Cheung Kong 4.4%, Segro 4.2%, HCP 3.4%, LaSalle Hotel 3.3%

**Industrials** W: 1.4% M: 0.2% Q: 1.0%
- Capital goods: Month -0.4%, Quarter 0.9% — Metso Oyj 25.0%, Alstom 14.7%, Vestas Wind Sys. 13.3%, AZZ 9.2%, Valmet 8.0%
- Business services: Month -0.9%, Quarter -3.1% — Babcock 10.9%, ADT 8.4%, G4S 7.5%, The Brink's 6.3%, Pitney Bowes 5.9%
- Transportation: Month 1.2%, Quarter 3.3% — SkyWest 9.3%, Deutsche Lufthansa 8.2%, Int'l Cons. Air 7.2%, Knight Trans. 6.4%, PostNL 5.1%

**Information technology** W: -0.7% M: -2.1% Q: 1.9%
- Software: Month -5.4%, Quarter -0.3% — Leidos 6.7%, Rovi 6.0%, Igate 4.5%, VIRTUSA 4.0%, Rackspace Hosting 3.9%
- Tech hardware: Month 1.1%, Quarter 3.1% — Synnex 31.1%, Intevac 12.3%, Mercury Systems 8.8%, Bel Fuse 7.2%, Belden 6.9%
- Semiconductors: Month 2.3%, Quarter 6.9% — Synaptics 5.1%, Diodes 4.5%, Samsung 3.5%, Cirrus Logic 3.4%, Rubicon Tech 3.4%

**Health Care** W: 0.5% M: -3.1% Q: 5.0%
- Health care[1]: Month 0.1%, Quarter 4.9% — Intuitive Surgical 16.2%, Align Tech. 8.0%, West Pharma. Svcs 6.8%, Steris 6.4%, Cryolife 5.4%
- Pharmaceuticals: Month -4.9%, Quarter 4.3% — Cambrex 9.9%, Questcor Pharma. 9.3%, Gilead Sciences 5.3%, Affymetrix 4.7%, Mylan 3.7%

**Materials** W: 1.1% M: -0.9% Q: 3.3%
- Materials[1]: Month -0.5%, Quarter 3.9% — SSAB 20.6%, Balchem 16.6%, Lafarge 14.7%, Holcim 13.2%

**Telecom** W: 1.4% M: 5.8% Q: 1.8%
- Telecom[1]: Month 5.7%, Quarter 1.7% — USA Mobility 6.7%, Portugal Telecom 5.8%, Windstream 5.0%, Telecom Italia 4.7%

**Utilities** W: 1.1% M: 4.0% Q: 11.1%
- Utilities[1]: Month 3.7%, Quarter 10.5% — PG&E 6.2%, ONE Gas 4.3%, Elec. de France 4.2%, Fortum 3.8%, Entergy 3.6%

1 — INDUSTRY GROUP'S % CHANGES BASED ON S&P 1500

## EXCHANGE TRADED FUNDS

**Major index ETFs**

| | Ticker | Week | Month | Quarter |
|---|---|---|---|---|
| Dow Jones industrials | DIA | 0.6% | 0.3% | -0.3% |
| S&P 500 | SPY | 0.5% | -0.7% | 1.9% |
| PowerShares QQQ | QQQ | -0.8% | -5.2% | -0.3% |

**Sector ETFs** — State Street S&P sector index funds

| | Ticker | Week | Month | Quarter |
|---|---|---|---|---|
| Utilities | XLU | 1.1% | 3.5% | 11.2% |
| Energy | XLE | 1.2% | 3.4% | 3.7% |
| Telecom | IXP | 0.7% | 0.9% | -0.7% |
| Consumer staples | XLP | 0.5% | 0.9% | 1.4% |
| Industrials | XLI | 1.6% | unch. | 1.7% |
| Financials | XLF | 0.3% | -0.1% | 1.3% |
| Materials | XLB | 1.2% | -1.0% | 3.5% |
| Technology | XLK | -0.4% | -1.5% | 2.0% |
| Health care | XLV | 0.5% | -3.3% | 5.0% |
| Consumer discretionary | XLY | 0.6% | -4.0% | -2.5% |

Note: iShares ETF — SOURCE: STANDARD & POOR'S

**ETFs by investment style — Vanguard**

| | Ticker | Week | Month | Quarter |
|---|---|---|---|---|
| Large-cap value | VTV | 0.9% | 1.3% | 3.0% |
| Midcap value | VOE | 1.2% | 0.6% | 4.8% |
| Small-cap value | VBR | 1.3% | -0.3% | 3.7% |
| Large-cap blend | VV | 0.5% | -0.9% | 2.0% |
| Midcap blend | VO | 0.6% | -1.5% | 3.7% |
| Small-cap blend | VB | 0.6% | -2.7% | 2.1% |
| Large-cap growth | VUG | unch. | -3.5% | 0.8% |
| Midcap growth | VOT | unch. | -3.5% | 2.5% |
| Small-cap growth | VBK | -0.3% | -5.5% | 0.2% |

**Other index ETFs — iShares**

| | Ticker | Week | Month | Quarter |
|---|---|---|---|---|
| Emerging markets | EEM | 1.4% | 4.6% | 2.9% |
| International | EFA | 0.7% | unch. | 2.1% |
| Bonds | AGG | -0.1% | -0.2% | 1.2% |
| Real estate | ICF | 1.6% | -0.3% | 10.4% |
| Socially responsible | KLD | 0.9% | -0.5% | 2.5% |
| Gold | IAU | 0.8% | -2.5% | 5.2% |

---

# Amazon makes bet on what can be, not what is

▶ CONTINUED FROM 1B

digital platforms such as Amazon — especially Amazon — are the driver of all desires and the provider of all satisfaction.

An important aspect of talking the talk is to get others to do it for you, to convince them — media, analysts such as those at Forrester and conference speakers — of your inevitability.

The *Times* goes on to say, in by-the-by fashion, that Fire TV is part of Amazon's effort "to move from selling goods produced by others, which is traditionally a low-margin business, to presiding over the entire process of creation and consumption."

In addition to dismissing the totality of the retail industry, which indeed Amazon has a "vested interest" in undermining, this casual description goes on to define something that sounds curiously close to a Soviet-style dream of state commerce.

Again, Fire TV is a set-top box. Although set-top box makers have always felt that their devices could be a shortcut to taking over television — still a far more successful marketing medium than anything that exists in the digital world — TV has offered sufficient hurdles to continually dampen these aspirations.

For one thing, television is easy to use, and set-top boxes are much harder. TV viewers are older, hence, adoption of more complicated devices has been slower than adoption of various mobile devices that have siphoned the young from television.

Never fear.

"We're missionaries about inventing and simplifying on behalf of customers," said Amazon executive Peter Larsen, who spearheaded the Fire announcement. Not just product designers and manufacturers ... *missionaries*.

Still, in a real sense, technology companies such as Amazon have made good on their utopian and messianic language. They *have* reinvented the world — or at least made the world more dependent on their devices.



**Amazon Kindle Vice President Peter Larsen introduces the Amazon Fire TV streaming device on April 2 in New York.**
DON EMMERT, AFP/GETTY IMAGES

> "We're missionaries about inventing and simplifying on behalf of customers."
>
> **Peter Larsen,** Amazon Kindle vice president

In part, they have done this by taking the emphasis off the device itself as a singular appliance — a commodity — and putting it on the much larger mission and transformative context. Fire TV is, as the *Times* puts it, an "ecosystem." This word is itself a step up from the word "platform" that raised the ante on the idea of a mere device.

In fact, while the *Times* was going all out here, other media outlets were skeptical, pointing out that Amazon's new device offered limited advantages over other set-top boxes and was more expensive, to boot. The latter seemed to miss the point: You don't want to win on the basis of what is, but of what can be. The smart money bets on transformation, which is open-ended, rather than reality, which is limited and commoditized.

Amazon has partnered with a company called Magisto, which makes editing software available through the new box.

"We see a real opportunity to use television as a tool for personal storytelling and personal communications, as opposed to just broadcast communications," said Magisto Chief Marketing Officer Reid Genauer as part of the announcement.

*Just broadcast communications. ... So small-time.*

The goal is to connect it all. Amazon wants to own the device you need to get the products it makes and control access to its customer base, hence, amassing super data streams ... or anyway, have everyone believe it is on its way to doing so, meaning everyone else ought to roll over and make way.

Curiously, corporations, traditional ones anyway, used to keep quiet about such hegemonic, evil-empire ambitions. They didn't want to invite scrutiny and regulation; massive horizontal and vertical control has had mixed results, anyway; and such ambitions strain belief.

But in the new world, where engineers turn out to be poets of a sort, it's the words themselves — not merely about product features but about the future and human potential and ultimate world takeover — that make your ho-hum device seem sexy.

---

## LEGAL MONDAY

For advertising information: 1.800.872.3433   www.marketplace.usatoday.com

**LEGAL NOTICE**

**If You Bought An Eligible Quaker Product At Any Time From February 3, 2006 To April 18, 2014, You May Be Part Of This Lawsuit.**

There is a class action Settlement of a lawsuit challenging the labeling and marketing of certain Quaker Chewy bars, Oatmeal To Go, and Instant Quaker Oatmeal products. Quaker denies that it did anything wrong and stands by its products and marketing.  The Court did not rule in favor of either party.

**WHO IS INCLUDED IN THE SETTLEMENT?**
Anyone who bought an eligible Quaker product at any time from February 3, 2006 to April 18, 2014. A full list of these Products is available at www.QuakerLawsuit.com or by calling 1-(888) 963-9429.

**WHAT DOES THIS SETTLEMENT PROVIDE?**
The Products at issue in the Litigation include varieties of Quaker Chewy bars, Oatmeal To Go, and Instant Quaker Oatmeal.  Currently, none of the Quaker Chewy bars named in the lawsuit contains any partially hydrogenated oil ingredient(s) ("PHOs"), and all other Products contain either no PHOs or an amount that the United States Food and Drug Administration requires to be declared on the Products' Nutrition Facts boxes as "0 grams" trans fat.  Under the Settlement Agreement, Quaker has agreed that, no later than December 31, 2015, it will remove PHOs from the Oatmeal To Go and Instant Quaker Oatmeal Products that currently contain them.  Quaker also agrees not to re-introduce PHOs into those products for at least 10 years thereafter.  Quaker agrees not to introduce PHOs into Quaker Chewy bars, or the Instant Quaker Oatmeal Products that do not currently contain PHOs, for a period of 10 years.  Finally, Quaker agrees that, by December 31, 2014, it will cease making the statement "contains a dietarily insignificant amount of trans fat" on the labels of any of the Products that contain 0.2 grams or more of artificial trans fat per serving.  The Settlement Agreement provides that, in exchange for Quaker's agreement to make these changes, Class Members will release claims against Quaker that were or could have been asserted in this lawsuit.  Full details about the Settlement, including the Release, are contained in a Settlement Agreement called the "Class Action Settlement Agreement," which is available at www.QuakerLawsuit.com.

**WHAT ARE YOUR OPTIONS?**
If you are a Class Member, you may (1) do nothing; (2) exclude yourself; (3) object to the settlement; and/or (4) attend a hearing about the fairness of the Settlement.  If you do nothing, the Settlement (if approved) will release all claims asserted in the lawsuit, including those for injunctive relief or damages.  The Release is set forth in the Settlement Agreement, available at www.QuakerLawsuit.com.

If you do not want to be bound by the Settlement Agreement, you must exclude yourself by letter postmarked by May 27, 2014.  If you exclude yourself, you can be part of another lawsuit against Quaker about the claims in this case. If you do not exclude yourself, and therefore remain a Class Member, you may object to the Settlement Agreement, but you may not be part of another lawsuit or seek additional relief related to the claims in this case. Objections must be filed with the Court and served on Class Counsel and Defense Counsel by May 27, 2014.

PLEASE SEE THE DETAILED NOTICE at www.QuakerLawsuit.com or call 1-(888) 963-9429 for complete instructions on how to object or exclude yourself, and other important information.  On June 26, 2014, at 1:30pm the Court will hold a Fairness Hearing at the United States District Court for the Northern District of California, before the Honorable Richard Seeborg, District Judge, in Courtroom 3, Phillip Burton Federal Building and United States Courthouse, 17th Floor, 450 Golden Gate Avenue, San Francisco, California 94102, to consider approval of the Settlement, payment of attorneys' fees and **expenses** of up to $760,000 to lawyers for the Class (Ronald A. Marron of the Law Office of Ronald Marron, and Gregory S. Weston and Jack Fitzgerald of The Weston Firm), payments of up to $750 for each of the Representative Plaintiffs, and related issues.  The motion(s) by Class Counsel for those fees, costs, and incentive awards will be available on the settlement website discussed above after they are filed with the Court and before the deadline for Objections or Requests for Exclusion. You may appear at the hearing, but you do not have to do so.

**HOW CAN YOU GET MORE INFORMATION?**
Visit www.QuakerLawsuit.com or call 1-(888) 963-9429; write to interim Class Counsel, Gregory S. Weston, the Weston Firm, 1405 Morena Blvd., Suite 201, San Diego, CA 92110; or e-mail interim Class Counsel, Gregory S. Weston, greg@westonfirm.com.

---

**For more information on how to place your ad in Legal Monday, call 1-800-872-3433**
Toll-free in the U.S. only

# Appendix B



400 SOUTH TENTH STREET
EMMAUS, PENNSYLVANIA 18098-0099    PHONE: 610 967-5171    FAX: 610 967-8964    www.rodale.com

## Verification of Publication

<u>Commonwealth of Pennsylvania</u>
<u>County of Lehigh</u>

Being duly sworn, Joseph A. Saliba says that he is the Credit Manager of Rodale Inc. dba <u>Prevention Magazine</u>, and is duly authorized by Rodale Inc., to make this affidavit and is fully acquainted with the facts stated herein: the legal notice advertisement for <u>Classaura LLC</u> was published in the May 2014 issue of <u>Prevention Magazine</u>.

*Joseph A. Saliba*
Joseph A. Saliba
Credit Manager
Rodale Inc.

---

**LEGAL NOTICE**

## If You Bought An Eligible Quaker Product At Any Time From February 3, 2006 To April 18, 2014, You May Be Affected By A Proposed Class Action Settlement

There is a class action Settlement of a lawsuit challenging the labeling and marketing of certain Quaker Chewy bars, Oatmeal To-Go, and Instant Quaker Oatmeal products. Quaker denies that it did anything wrong and stands by its products and marketing. The Court did not rule in favor of either party.

### WHO IS INCLUDED IN THE SETTLEMENT?

Anyone who bought an eligible Quaker product at any time from February 3, 2006 to April 18, 2014. A full list of these Products is available at www.QuakerLawsuit.com or by calling 1-(888) 963-9429.

### WHAT DOES THIS SETTLEMENT PROVIDE?

The Products at issue in the Litigation include varieties of Quaker Chewy bars, Oatmeal To Go, and Instant Quaker Oatmeal. Currently, none of the Quaker Chewy bars named in the lawsuit contains any partially hydrogenated oil ingredient(s) ("PHOs"), and all other Products contain either no PHOs or an amount that the United States Food and Drug Administration requires to be declared on the Products' Nutrition Facts boxes as "0 grams" trans fat. Under the Settlement Agreement, Quaker has agreed that, no later than December 31, 2015, it will remove PHOs from the Oatmeal To Go and Instant Quaker Oatmeal Products that currently contain them. Quaker also agrees not to re-introduce PHOs into those products for at least 10 years thereafter. Quaker agrees not to introduce PHOs into Quaker Chewy bars, or the Instant Quaker Oatmeal Products that do not currently contain PHOs, for a period of 10 years. Finally, Quaker agrees that, by December 31, 2014, it will cease making the statement "contains a dietarily insignificant amount of trans fat" on the labels of any of the Products that contain 0.2 grams or more of artificial trans fat per serving. The Settlement Agreement provides that, in exchange for Quaker's agreement to make these changes, Class Members will release claims against Quaker that were or could have been asserted in this lawsuit. Full details about the Settlement, including the Release, are contained in a Settlement Agreement called the "Class Action Settlement Agreement," available at www.QuakerLawsuit.com.

### WHAT ARE YOUR OPTIONS?

If you are a Class Member, you may (1) do nothing; (2) exclude yourself; (3) object to the settlement; and/or (4) attend a hearing about the fairness of the Settlement. If you do nothing, the Settlement (if approved) will release all claims asserted in the lawsuit, including those for injunctive relief or damages. The Release is set forth in the Settlement Agreement, available at www.QuakerLawsuit.com.

If you do not want to be bound by the Settlement Agreement, you must exclude yourself by letter postmarked by May 27, 2014. If you exclude yourself, you can be part of another lawsuit against Quaker about the claims in this case. If you do not exclude yourself, and therefore remain a Class Member, you may object to the Settlement Agreement, but you may not be part of another lawsuit or seek additional relief related to the claims in this case. Objections must be filed with the Court and served on Class Counsel and Defense Counsel by May 27, 2014.

PLEASE SEE THE DETAILED NOTICE at www.QuakerLawsuit.com or call 1-(888) 963-9429 for complete instructions on how to object or exclude yourself, and other important information. On June 26, 2014, at 1:30pm the Court will hold a Fairness Hearing at the United States District Court for the Northern District of California, before the Honorable Richard Seeborg, District Judge, in Courtroom 3, Phillip Burton Federal Building and United States Courthouse, 17th Floor, 450 Golden Gate Avenue, San Francisco, California 94102, to consider approval of the Settlement, payment of attorneys' fees and expenses of up to $760,000 to lawyers for the Class (Ronald A. Marron of the Law Office of Ronald Marron, and Gregory S. Weston and Jack Fitzgerald of The Weston Firm), payments of up to $750 for each of the Representative Plaintiffs, and related issues. The motion(s) by Class Counsel for those fees, costs, and incentive awards will be available on the settlement website discussed above after they are filed with the Court and before the deadline for Objections or Requests for Exclusion. You may appear at the hearing, but you do not have to do so.

### HOW CAN YOU GET MORE INFORMATION?

Visit www.QuakerLawsuit.com or call 1-(888) 963-9429; write to Interim Class Counsel, Gregory S. Weston, the Weston Firm, 1405 Morena Blvd., Suite 201, San Diego, CA 92110; or e-mail greg@westonfirm.com.