**THE WESTON FIRM**
GREGORY S. WESTON (239944)
*greg@westonfirm.com*
JACK FITZGERALD (257370)
*jack@westonfirm.com*
MELANIE PERSINGER (275423)
*mel@westonfirm.com*
PAUL K. JOSEPH (287057)
*paul@westonfirm.com*
1405 Morena Blvd., Suite 201
San Diego, CA 92110
Telephone:     (619) 798-2006
Facsimile:     (480) 247 4553

**LAW OFFICES OF RONALD A.
MARRON, APLC**
RONALD A. MARRON (175650)
*ron@consumersadvocates.com*
SKYE RESENDES (278511)
*skye@consumersadvocates.com*
ALEXIS WOOD (270200)
*alexis@consumersadvocates.com*
651 Arroyo Drive
San Diego, CA 92103
Telephone:     (619) 696-9006
Facsimile:     (619) 564-6665

*Class Counsel*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| In re QUAKER OATS LABELING LITIGATION | Case No: 5:10-cv-0502-RS<br>Pleading Type: Class Action<br>Action Filed: February 3, 2010<br><br>**PLAINTIFFS' RESPONSE TO OBJECTIONS**<br><br>Judge:     The Honorable Richard Seeborg<br>Date:     June 26, 2014<br>Time:     1:30 p.m.<br>Location:     Courtroom 3 |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... iii

I.   Introduction ................................................................................................................... 1

II.  The Proposed FDA Regulation Does Not Undermine the Value of the Settlement ....................... 3

III. Yang's Criticisms of Dr. Wong's Declaration are Unfounded ...................................................... 7

IV.  The Objections to the Incentive Awards Are Baseless ................................................................. 10

V.   The Objections' Insinuation of Collusion is Baseless .................................................................. 10

VI.  Class Counsel has Addressed the Complaint Raised in the Garcia Letter.................................... 11

*In re Quaker Oats Labeling Litigation*, Case No: 5:10-cv-0502 RS
PLAINTIFFS' RESPONSE TO OBJECTIONS

# TABLE OF AUTHORITIES

**Cases**

*Brown v. Ticor Title Ins. Co.*,
    982 F.2d 386 (9th Cir. 1992) ............................................................................................ 11

*Henderson v. J.M. Smucker Co.*,
    2013 U.S. Dist. LEXIS 87030 (C.D. Cal. June 19, 2013) ............................................. 10

*In re Bluetooth Headset Prods. Liab. Litig.*,
    654 F.3d 935 (9th Cir. 2011) ........................................................................................ 1, 11

*In re Dry Max Pampers Litig.*,
    724 F.3d 713 (6th Cir. 2013) ............................................................................................ 1

*Radcliffe v. Experian Info. Solutions*,
    715 F.3d 1157 (9th Cir. 2013) ......................................................................................... 10

*Richardson v. L'Oreal USA, Inc.*,
    2013 U.S. Dist. LEXIS 158599 (D.D.C. Nov. 16, 2013) ............................................... 11

*Rodriguez v. West Publ'g Corp.*,
    563 F.3d 948 (9th Cir. 2009) ........................................................................................... 10

**Other Authorities**

64 Fed. Reg. 62746 (Nov. 17, 1999).......................................................................................... 4

68 Fed. Reg. 4134 (July 11, 2003) .............................................................................................. 4

78 Fed. Reg. 67169 (Nov. 8, 2013)............................................................................................. 4

Alberto Ascherio et al., *Trans Fatty Acids & Coronary Heart Disease*, 340 New Engl. J. Med. 94 (1999)
    .................................................................................................................................... 8

D. Mozaffarian & R. Clarke, *Quantitative effects on cardiovascular risk factors and coronary heart disease risk of replacing partially hydrogenated vegetable oils with other fats and oils*; European J. Clin. Nutr. S22  (2009) .................................................................................................... 8

Dep't of Health & Human Serv. & U.S. Dep't of Agric., 2005 Dietary Guidelines Advisory Committee Report, Section 10 (2005) ......................................................................................... 8

Mozaffarian et al., *Trans Fatty Acids and Cardiovascular Disease*; 354 New Engl. J. Med.1601 (2006) 9

W. Willet et al., "*Trans* Fatty Acids: Are the Effects Only Marginal?" 84 Am. J. Pub. Health 722 (1994)
    .................................................................................................................................... 1

## I.     Introduction

The Settlement before the Court is a rare one that provides the Class with a greater benefit than they possibly could have obtained through litigation. As Quaker notes in its response to objections, Plaintiffs would have faced a number of difficulties in litigating this case through trial and appeal. However, assuming the absolutely best case scenario for Plaintiffs, the most they could obtain at trial, after years of litigation, is an injunction that changes advertising practices damages and damages that offer class members a claims process to receive partial refunds on inexpensive food products.

What Quaker offers here in settlement, however, is to reformulate two of its product lines that have always been made with artificial trans fat—in the case of Quaker Instant Oatmeal Fruit & Cream, a product that has been successfully sold with trans fat in nearly every American grocery store for decades.

Our nation's public health researchers and scholarly bodies have been pleading for the removal of artificial trans fat now for more than two decades.[1] As detailed below, the FDA has estimated the benefit to the American public of removing trans fat from the food supply to be at least $117 billion. Public comments on the proposal have been overwhelmingly positive, with essentially the only opposition coming from companies that use artificial trans fat in their products.[2]

In cases such as *Bluetooth* and *Pampers*[3] circuit courts have cautioned district courts to scrutinize settlements involving a release of damages claims where the relief is non-monetary. They nowhere held, and no case has ever held, that bargaining injunctive relief in return for release of

---

[1] *See* W. Willet et al., "*Trans* Fatty Acids: Are the Effects Only Marginal?", 84 Am. J. Pub. Health 722, 724 (1994) (arguing for a "regulated phaseout" of artificial trans fat)

[2] *See* Weston Declaration Re: Objections, Exhibits 3-9 (Letters in Support of FDA's Tentative Determination from American Heart Association and American College of Cardiology, Academy of Nutrition and Dietetics, American Medical Association, American Public Health Association, Dariush Mozaffarian, MD, DrPH, New York City Department of Health and Mental Hygiene, and Oregon Health Authority).

[3] *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935 (9th Cir. 2011) and *In re Dry Max Pampers Litig.*, 724 F.3d 713 (6th Cir. 2013).

1
2      damages claims—a standard, unremarkable practice in non-aggregated litigation—is somehow prohibited in class actions.

3      In *Bluetooth*, the relief offered by the defendant in return for a broad release was warnings about
4      using earpieces with the volume turned up too high. In *Pampers*, it was information about diaper rash.
5      In this case, by contrast, the class has bargained its contingent claims for small amounts of money for
6      the removal of a substance, in products they and their loved ones consume, that will cause heart
7      disease, diabetes, cancer, endothelial dysfunction, chronic inflammation, ovular infertility, and
8      cognitive decline.

9      Two timely objections were filed to the Settlement and fee motion before the Court. Neither has
10     merit.

11     The first was filed by counsel who were part of the unsuccessful group of firms seeking
12     appointment as interim class counsel in this case (Doc. 195, "Chacanaca Obj."). The single argument it
13     makes against the fairness of the Settlement is that the injunctive relief has no value because the
14     proposed FDA regulation supposedly would compel Quaker to provide the same relief as the
15     Settlement. In response, Plaintiffs show that even if the FDA eventually adopts its proposed regulation,
16     that there is no chance the FDA will mandate the removal of trans fat from Quaker products by the end
17     of next year, as the Settlement does.

18     The second was filed by Amy X. Yang (Doc. 193 "Yang Obj."), who states in her declaration
19     she is a graduate of Georgetown University Law Center. She has nonetheless ignored the rules of this
20     Court by filing an over-length, 27-page brief, and compounds this with multiple single-spaced, multi-
21     paragraph footnotes. Moreover, the citations are mostly from authorities outside of this Circuit. And
22     some of the citations to Ninth Circuit cases are to argue they should be ignored. For instance, Yang
23     advises the Court that the "sixth and eighth factors" the Ninth Circuit held courts should consider in
24     *Churchill Village,* "should be severely downplayed, if not dispensed with entirely," because they are
25     "empirically impoverished," relying instead on the authority of two law review articles. (Yang Obj. at
26     15 n.13). And, while both the fee motion and the underlying causes of action are entirely matters of
27     California law in this diversity action, there is not a single citation to any California state court, while
28     six law review articles are cited.

*In re Quaker Oats Labeling Litigation*, Case No: 5:10-cv-0502 RS
PLAINTIFFS' RESPONSE TO OBJECTIONS

1    Very little of Yang's objection deals with the primary question of whether the Settlement is a

2    fair one, and instead is mostly devoted to arguing against certification of the Settlement Class.

3    Yang's ideological agenda is most apparent in footnote 7, claiming Plaintiffs supposedly lack

4    standing to seek injunctive relief because they are now aware of Quaker's allegedly unfair and

5    fraudulent conduct. Were the Court to accept such an argument, however, it would be of no benefit to

6    class members, and the Court would have to dismiss their injunctive relief claim, as well as any other

7    false advertising claim seeking injunctive relief. In short, Yang is willing to seize on any conceivable

8    argument against approval of the Settlement, even if it means arguing that private suits seeking

9    injunctions against false advertising can never be brought, and that this case and all others seeking false

10   advertising injunctions must be dismissed for lack of standing, and likewise any class settlement

11   involving an injunction must be rejected because the class representative can never be typical or

12   adequate.

13   **II.    The Proposed FDA Regulation Does Not Undermine the Value of the Settlement**

14   Chacanaca's sole argument against the Settlement is that because the FDA issued a tentative

15   determination to ban trans fat, the injunctive relief here is of no value. (Chacanaca Obj. at 4.)

16   As an initial matter, the FDA only issued its proposed regulation *after Plaintiffs' counsel*

17   *brought suit against it* under the Administrative Procedures Act, demanding it stop allowing the use of

18   artificial trans fat in the American food supply. *See* Compl., *Kummerow v. U.S. Food and Drug Admin.*

19   *et. al.*, No. 2:13-cv-02180 (C.D. Ill. Aug 9, 2013) (Weston Decl. Ex. 1). Since then, Plaintiffs' counsel

20   has continued to press the FDA to adopt the strongest form of its proposed regulation, on the fastest

21   possible time frame, and with none of the exceptions the FDA, in its notice and request for comment,

22   indicated it was considering.[4] *See*, *e.g.*, The Weston Firm's Comment Re: Tentative Determination

23   Regarding Partially Hydrogenated Oil, FDA Dkt. No. 2013–N–1317 (March 8, 2014) (Weston Decl.

24   Ex. 2).

25

26   [4] Specifically, the FDA stated it would consider and requested comments on: (1) limiting rather than
     banning artificial trans fat; (2) a stay of the effectiveness of the regulation to allow for research on
27   reformulation; (3) exceptions for certain packaged foods that supposedly cannot be reformulated to
     remove artificial trans fat; and (4) exceptions for small businesses.
28

3

1  The Court should not allow these efforts in other fora on behalf of the Settlement Class's

2  interests in a safe and wholesome food supply to be turned around and used against Plaintiffs and their

3  counsel simply because they have, thus far, enjoyed an initial success with the FDA's tentative

4  determination.

5  Under the Settlement, Quaker must remove Partially Hydrogenated Oils ("PHOs") from the

6  products at issue currently containing PHOs, including many flavors of its iconic Quaker Instant

7  Oatmeal, and may not reintroduce them. Nor may it reintroduce PHOs into the remaining products.

8  This relief is required by the end of next year. (Doc. 168-1, Ex. 1). The Settlement Agreement also

9  contains an early compliance provision whereby the label claim "adds a dietarily insignificant amount

10  of trans fat" on products Plaintiffs allege contain levels of trans fat that are in fact significant, may not

11  be used on products that contain more than 0.2 grams of artificial trans fat by the end of this year. *Id.*

12  By contrast, whether the FDA's proposed regulation will become final is unknown, and—even

13  if it does—the timeline for compliance is also unknown. The FDA's only other experience regulating

14  *trans* fat is not grounds for optimism. The FDA began the process of requiring that *trans* fat in food be

15  labeled in 1999. *See* 64 Fed. Reg. 62746 (Nov. 17, 1999) (proposed requirement to include *trans* fat in

16  nutrition labels). The FDA changed its approach to the labeling of *trans* fat from its initial proposed

17  rule to the final rule. *See* 64 Fed. Reg. 62746 (Nov. 17, 1999) (proposed rule planning to require that

18  *trans* fat be included in the amount declared for saturated fat); 68 Fed. Reg. 4134 (July 11, 2003) (final

19  rule requiring *trans* fats to be disclosed in a separate line on the nutrition label). The rule requiring

20  labeling of *trans* fat did not become final until 2003, and the FDA did not require compliance until

21  2006. *See* 68 Fed. Reg. 4134 (July 11, 2003) (final rule requiring *trans* fat labeling starting January 1,

22  2006).

23  Thus, the one other time the FDA implemented a trans fat regulation, it took more than six years

24  from the time of the initial proposal to the time the regulation became effective, suggesting here that the

25  current proposal will not become effective until January of 2020. Indeed, the FDA's Tentative Decision

26  expressly contemplates "a multi-year compliance period" if the regulation is finalized. 78 Fed. Reg.

27  67169, 67173 (Nov. 8, 2013). *See also* Elaine Watson, *Food Labeling & Litigation: What's in Store for*

28  *2014?* (Dec. 10, 2013) (noting that "[i]t's not clear how soon after the comments are filed that the FDA

4

might issue final guidance," but that if the FDA requires removal of PHOs "it is expected to suggest a phase out over a period of years, rather than months"), *available at* http://tinyurl.com/quaker5r (last visited June 16, 2014).

By contrast, the Settlement *ensures* that the Quaker products at issue in this litigation will be free of artificial trans fat by the end of next year, and stay that way for at least ten years, regardless of any action that the FDA may or may not take with respect to the proposal, such as granting exemptions for removal.

The six years that passed between the FDA's proposal to label trans fat and the time trans fat needed to be labeled was actually on the fast side for an FDA proposal. The following tables show three examples of the FDA taking more than ten years to implement safety regulations.

| Regulations for Over-the-Counter Sunscreens, FDA Dkt. No. 78N-38[5] | |
|---|---|
| Aug. 25, 1978 | FDA publishes advance notice of rulemaking |
| May 12, 1993 | FDA publishes tentative final rules |
| 1994 to 1997 | FDA issues proposed amendments to 1993 rules |
| May 21, 1999 | FDA adopts its final rules (Fed. Reg. Doc. 99–12949) |
| May 21, 2001 | Final rules become effective |
| Time from first proposal to effective regulation: **21 years, 10 months** | |

| Egg Safety Rules for Prevention of Salmonella Poisoning, FDA Dkt. No. 2000N-190 | |
|---|---|
| March 16, 2000 | FDA and USDA request comments on their Egg Safety Action Plan |
| Sept. 22, 2004 | FDA proposes initial egg safety rules to prevent salmonella poisoning and requests comments |
| May 10, 2005 | FDA reopens its comment period |
| Sept. 8, 2009 | FDA issues its final rule (Fed. Reg. Doc. E9–16119) |
| July 9, 2010 | Compliance date for 50,000+ hen operations |
| July 9, 2012 | Compliance date for 3,000-50,000 hen operations |
| Time from first proposal to effective regulation: **10 years, 4 months (large operations) and 12 years, 4 months (small operations)** | |

---

[5] FDA dockets are most easily accessed at regulations.gov rather than the FDA's website.

| Use of Triclosan as an Additive in Soap, FDA Dkt. No. 75N-183H | |
|---|---|
| 1974 | FDA publishes its initial advance notice of proposed rulemaking that would regulate the use of triclosan in antibacterial soap |
| 1978 | FDA issues tentative conclusion that the use of triclosan is ineffective in antibacterial hand soap in preventing disease, yet imposes risks on the public through exposure to a potentially harmful chemical and encouraging the development of antibiotic-resistant bacteria, and issues its first tentative final rule prohibiting it as an ingredient |
| 1991 | FDA expands its proposed ban on triclosan in hand soap to include topical antiseptics |
| 1994 | FDA issues an amended tentative final monograph |
| 2003 | FDA reopens the comment period on its proposed rule |
| 2010 | The Natural Resources Defense Council sues FDA under the Administrative Procedures Act for not acting on its proposal for 32 years, and further asserting triclosan causes considerable environmental damage and disrupts the hormonal systems of both animals and human beings. Summary judgment for FDA is granted by the district court for lack of standing, and then reversed with regard to the triclosan claims. *Natural Resources Defense Council, Inc. v. United States Food & Drug Administration*, 710 F.3d. 71 (2d Cir. 2012). |
| 2013 | FDA and NRDC settle their suit, with FDA agreeing to take final action on its triclosan ban proposal by 2016 |
| 2013 | FDA issues a proposed amendment of the Tentative Final Monograph, reiterates its conclusion that triclosan should not be used in soap and topical antiseptics, and sets a schedule for comments and implementation that indicates that, at soonest, triclosan will not be prohibited until June 2015 |
| Time from proposal to prohibit triclosan in soap to effective date of regulation: **37-38 years** | |

6

In summary, even for regulations designed to remedy significant risks to public health, the FDA's regulatory process moves at a glacial pace.[6] Thus, the only argument advanced by Chacanaca against the fairness of the Settlement, that the FDA's tentative determination to remove artificial trans fat from the food supply renders the injunctive relief here of "zero or de minimis value," is based on the unfounded premise that the tentative determination will, anytime soon, impose on Quaker the same duties as the Settlement. (Chacanaca Obj. at 4.)

## III.    Yang's Criticisms of Dr. Wong's Declaration are Unfounded

Nathan Wong is Professor of Medicine and Epidemiology at the University of California, Irvine Schools of Medicine and Public Health. He also is Director of UCI's Heart Disease Prevention Program and has authored or co-authored more than 200 articles about the epidemiology and the prevention of heart disease and diabetes in peer-reviewed medical journals, and is the editor-in-chief of a medical school textbook on heart disease. (Doc. 190-3, Corrected Wong Decl. ¶¶ 2-4.)

In support of approval of the Settlement, he estimated the monetary and health benefits of the removal of trans fat from Quaker products using Quaker's sales and formulation data, as his long training and experience qualifies him to do. (*Id.* ¶¶ 26-48.)

Yang makes three particular objections to Dr. Wong's estimates. First, she labels "the most glaring" problem that he "mistakenly assumes that trans fat consumption in a single year (rather than consumption over an entire lifetime) can be responsible for an individual's death. Wong Decl. ¶31." (Yang Obj. at 18.) However, no such assumption, mistaken or otherwise, is made at the cited paragraph, which is simply one of several where Dr. Wong explains his methodology in extrapolating a *New England Journal of Medicine* study that estimates the nationwide excess mortality from trans fat

---

[6] *See also* 79 Fed. Reg. 7933 (good manufacturing practices for infant formula: notice of proposed rulemaking published July 9, 1996, compliance date for final rule is July 10, 2014, 18 years later.); FDA Dkt. No. 1995N-0304 (regulation prohibiting ephedrine-based OTC diet pills takes 6 years and 10 months from proposal to effective date); FDA Dkt. No. 2005-N-0404 (regulation on use of "gluten-free" on food labels takes 7 years and 7 months from proposal to compliance date); 79 Fed. Reg. 23262 (Rules for omega-3 fatty acid claims on food labels first proposed in November 2007, compliance date for final rule is January 2016, 8 years and 1 month later).

7

consumption to the much smaller number resulting from consumption of just the artificial trans fat in the products at issue here.

Next, Yang claims that Dr. Wong fails to "account for the fact that diseases correlate only with excessive consumption of trans fat; there is no linear relationship." (Yang Obj. at 18.) This too is wrong. In support of her "fact" that "there is no linear relationship," she cites two sources. The first is a blog post, and the second is a "study" from the Competitive Enterprise Institute, a lobbying organization bankrolled by Charles and David Koch, and best known for churning out "studies" in defense of coal pollution, mountaintop removal mining, and for its criticism of what it calls "global warming alarmism."

Dr. Wong, however, far from ignoring the issue, addressed it directly, citing multiple government and scholarly sources concluding that the danger of artificial trans fat consumption "is progressive and **linear**" and none of the many studies examining the danger of artificial trans fat consumption have found "a level of *trans* fat in the diet . . . below which there is no [increased] risk of CHD [coronary heart disease]." (Wong Decl at ¶¶ 21-22 and 11 (citing, *inter alia*, Alberto Ascherio et al., *Trans Fatty Acids & Coronary Heart Disease*, 340 New Eng. J. Med. 94 (1999); D. Mozaffarian and R. Clarke, *Quantitative effects on cardiovascular risk factors and coronary heart disease risk of replacing partially hydrogenated vegetable oils with other fats and oils*; European J. Clin. Nutr. S22 (2009); Dep't of Health & Human Serv. & U.S. Dep't of Agric., 2005 Dietary Guidelines Advisory Committee Report, Section 10 (2005)).)

Yang also claims the American Heart Association supposedly "does not recommend that trans fat be consumption be reduced to zero" based on a non-scholarly "consumer education" portion of the organization's website that recommends trans fat consumption be kept to "less than 1%" of calories consumed. (Yang Obj. at 19.) Nowhere at Yang's citation, however, does AHA state that any amount of trans fat is safe, and the context of this portion of its website indicates a concern that its consumer dietary recommendations not be overly onerous, lest they be ignored entirely.

Indeed, contrary to the disreputable Competitive Enterprise Institute "study" Yang relies upon, the AHA offered its unqualified support for the FDA's proposal for a complete trans fat ban, stating in a press release that "[t]he FDA's actions to ultimately remove artificial trans fat from the diets of all

8

Americans is a tremendous step forward in the fight against heart disease" and it "stands ready to support the FDA in its work to ***eliminate this unsafe ingredient*** from our food supply." *See* http://newsroom.heart.org/news/american-heart-association-praises-fda-action-on-trans-fat. (emphasis added). *See also* Weston Decl. Ex. 3 (American Heart Association's Letter to FDA re Tentative Determination).

Yang's third and final objection is "Dr. Wong does not account for possible dietary substitution after the reformulation. . . . Instead, Dr. Wong presumes in effect that reformulation of these products will compel consumers of Quaker products to go on a diet." (Yang Obj. at 19.) Nowhere, however, does she state where he makes this supposed presumption, and cites no other source than her prior Competitive Enterprise Institute article, which was written to criticize the FDA's proposed trans fat ban. With this lack of specificity, it is hard to respond to this objection, other than to note that possible consumer substitutes for trans fat are most certainly considered by Dr. Wong's sources. *See*, *e.g.*, Mozaffarian et al., *Trans Fatty Acids and Cardiovascular Disease*, 354 New Engl. J. Med.1601, 1609-10 (2006) (Doc. 190-5, Ex. H to Corrected Wong Decl.) (discussing sensitivity of trans fat mortality and morbidity estimates to assumptions about substitute ingredients). Another study conducted by Dr. Mozaffarian, professor at Harvard Medical School and School of Public Health, focused entirely on comparing artificial trans fat with several possible substitute fats. His conclusion is that while the best substitutes for trans fat are oils high in monounsaturated fat, such as canola oil, replacement consumption of even the worst trans fat substitutes—lard, butter, and palm oil—still result in a gigantic reduction in heart disease compared to the use of artificial trans fat.[7]

In short, Dr. Wong's analysis is a relatively simple one which he is well qualified to make. The dangers of trans fat have been extensively studied and quantified, and he needed only to take these studies and apply them to the known quantity of trans fat that will be removed as a result of the Settlement. The sources he relies on are largely the same as those relied upon by the FDA, whose own cost-benefit analysis of trans fat removal found:

---

[7] D. Mozaffarian & R. Clarke, *Quantitative effects on cardiovascular risk factors and coronary heart disease risk of replacing partially hydrogenated vegetable oils with other fats and oils*, Euro. J. Clin. Nutr. S22, S22–S33 (2009).

9

We estimate the 20-year net present value of costs [of a trans fat ban] to be between $12 and

$14 billion, where the upper and lower estimates are calculated at 3 and 7 percent discount

rates. Using the same method, **we estimate benefits between $117 and $242 billion**.

78 Fed. Reg. at 69173-74 (emphasis added). *See also Henderson v. J.M. Smucker Co.*, 2013 U.S. Dist.

LEXIS 87030, at *34-39 (C.D. Cal. June 19, 2013) (relying on Dr. Wong's conclusions about the

benefit of trans fat removal to make the finding "the removal of PHVO from Uncrustables conferred a

significant benefit to a large class of persons" and rejecting similar "conclusory remarks" that his

estimates are "flawed" or that he was unqualified to offer his estimates).

## IV.     The Objections to the Incentive Awards Are Baseless

Yang begins her lengthy complaint about the proposed $750 incentive awards with citations to

several out-of-circuit cases where incentive awards were not approved, but does not provide argument

why those cases should be applied here. The only two Ninth Circuit authorities she cites are clearly

inapplicable. (*See* Yang Obj. at 25.) *Radcliffe v. Experian Info. Solutions*, 715 F.3d 1157 (9th Cir.

2013), involved an incentive award that was *conditioned upon endorsement of the settlement*, which

was not the case here. *Id.* at 1163. *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 960 (9th Cir. 2009),

similarly involved improper terms attached to the incentive award. There, the incentive award was tied

"to a sliding scale based on the amount recovered," and so "the incentive agreements disjoined the

contingency financial interests of the contracting representatives from the class." *Id.* at 959.

Yang's general complaint is that it is unfair that the class representatives get more from this

case than unnamed class members, and this creates a conflict. However, this is invariably true of

incentive awards, so it cannot serve as the basis of an objection to this particular one. Moreover, while

the class representatives benefit more than unnamed class members, this is just compensation for the

time and risks they put into this suit.

## V.     The Objections' Insinuation of Collusion is Baseless

Objectors' insinuation that the Settlement evinces collusion is baseless, and their reliance on

*Bluetooth* is misplaced. *Bluetooth* simply does not hold that it is improper for a settlement to provide

that defendants will not oppose a fee request so long as it is below a certain amount.

The Ninth Circuit in *Bluetooth* found that the district court erred by failing to provide a "clear explanation" for how the settlement agreement in that case satisfied Rule 23(e)'s fairness, adequacy, and reasonableness requirement and to rule out the possibility of "collusion" between the parties. 654 F.3d at 947, 949. As the FDA has found, and as Dr. Wong's declaration further establishes, the removal of trans fat will be of great benefit to the class. By contrast, the settlement in *Bluetooth* merely required the insertion of a warning label in Bluetooth headsets that listening at high volumes may damage hearing. Even this, however, was possibly acceptable, which is why the Ninth Circuit remanded the issue for further considering rather than directing the Court to deny the settement approval.

*Richardson v. L'Oreal USA, Inc.*, is similarly irrelevant to the Court's analysis of the Settlement. 2013 U.S. Dist. LEXIS 158599 (D.D.C. Nov. 16, 2013). The court's primary concern in *L'Oreal* was that the proposed settlement did not provide absent class members with notice and an opportunity to opt-out. *See id.* at *32-34. The instant Settlement Agreement, in contrast, comports with *Brown v. Ticor Title Ins. Co.* by providing notice to the class and an opportunity for class members to opt-out. 982 F.2d 386, 392 (9th Cir. 1992) (noting that a Rule 23(b)(2) settlement may "bind an absent plaintiff concerning a claim for monetary damages" where the absent class members are provided the opportunity to opt-out). (*See also* Doc. 168-1, Ex. 1 (Settlement Agreement ¶ 9.3).)

Finally, as stated in the motion for preliminary approval, the Settlement Agreement permits Plaintiffs to apply for attorneys' fees and costs up to $760,000, and provides that Defendant will not object to such a request; it does not condition the terms of the Settlement Agreement on the Court's approval of any minimum amount—or, indeed, on the Court's approval of *any* fees. Nor are the incentive awards a condition for approval.

## VI.    Class Counsel has Addressed the Complaint Raised in the Garcia Letter

Alexander Garcia has written the Court letters complaining he was not timely provided with information about the Settlement in response to his request. (Docs. 192, 200, 202.) In fact, the Settlement Administrator did respond to Mr. Garcia's letter, however Mr. Garcia appears to have not received it because his address changed before it arrived. (Retnasaba Decl. Re: Objections ¶¶ 3-5.) The return address on Mr. Garcia's initial letter was:

Alexander Garcia, #01A4538
Southport Correctional Facility

11

P.O. Box 2000
Pine City, NY 14871-200.

The return address on Mr. Garcia's letters to the Court, however, was:

Alexander Garcia, #01A4538
Coxsackie Correctional Facility
P.O. Box 999
Coxsackie, NY 12051-0999.

Upon seeing the letter to the Court, Class Counsel promptly directed the Settlement Administrator to resend the full settlement notice to both of these addresses. (*Id*.)

Dated: June 19, 2014                                  Respectfully submitted,

                                                     /s/ Gregory S. Weston
                                                     Gregory S. Weston

                                                     **THE WESTON FIRM**
                                                     GREGORY S. WESTON
                                                     JACK FITZGERALD
                                                     MELANIE PERSINGER
                                                      PAUL K. JOSEPH
                                                     1405 Morena Blvd, Suite 201
                                                     San Diego, CA 92110
                                                     Telephone: (619) 798-2006
                                                     Facsimile: (480) 247-4553

                                                     **LAW OFFICES OF RONALD A.
                                                     MARRON, APLC**
                                                     RONALD A. MARRON
                                                     SKYE RESENDES
                                                     ALEXIS WOOD
                                                     651 Arroyo Drive
                                                     San Diego, CA 92103
                                                     Telephone:    (619) 696-9006
                                                     Facsimile:    (619) 564-6665

                                                     *Class Counsel*