**GIBSON, DUNN & CRUTCHER LLP**
Daniel W. Nelson (*pro hac vice*)
DNelson@gibsondunn.com
Scott P. Martin (*pro hac vice*)
SMartin@gibsondunn.com
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 955-8500
Facsimile: (202) 530-4238

**Counsel for Defendant**
**The Quaker Oats Company**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE QUAKER OATS LABELING LITIGATION | CASE NO.: 5:10-CV-00502-RS |
| | **RESPONSE OF DEFENDANT THE QUAKER OATS COMPANY TO OBJECTIONS** |
| | Judge: Honorable Richard Seeborg<br>Hearing Date: June 26, 2014<br>Time: 1:30 p.m.<br>Place: Courtroom 3, 17th Floor<br>Action Filed: February 3, 2010 |

# TABLE OF CONTENTS

Page

RESPONSE TO OBJECTIONS ........................................................................... 1

I.    INTRODUCTION ......................................................................................... 1

II.   ARGUMENT ................................................................................................ 2

    A.    The Settlement Is Fair, Reasonable, And Adequate. ............................. 2

        1.    Plaintiffs Would Have Faced Significant Hurdles In Obtaining And Maintaining Class Certification. ................................................ 2

        2.    Plaintiffs Would Also Have Faced Significant Uncertainty On The Merits. ........................................................................................ 6

        3.    When Balanced Against These Risks, The Settlement Is Reasonable. ................................................................................... 7

        4.    The Settlement Enjoys Overwhelming Support From The Settlement Class. ....................................................................... 8

    B.    The Objectors' Arguments Provide No Basis For Rejecting The Settlement And Depriving Class Members Of Its Benefits. .................................. 9

        1.    The Injunctive Relief Provided By The Settlement Is Valuable To Class Members. ........................................................................ 9

        2.    Certification Of A Rule 23(b)(2) Class For Settlement Purposes Only Is Appropriate. ................................................................... 14

        3.    The Release Of Damages Claims Based On The Challenged Statements Is Not Overbroad. .................................................... 16

        4.    There Was No Collusion Or Conflict Of Interest. .................................... 21

III.  CONCLUSION ........................................................................................... 22

# TABLE OF AUTHORITIES

Page

## CASES

*Astiana v. Ben & Jerry's Homemade, Inc.*,
    No. C 10-4387, 2014 WL 60097 (N.D. Cal. Jan. 7, 2014)....................5

*Boyd v. Bechtel Corp.*,
    485 F. Supp. 610 (N.D. Cal. 1979)....................9

*Brown v. Ticor Title Ins. Co.*,
    982 F.2d 386 (9th Cir. 1992)....................17

*Browning v. Yahoo! Inc.*,
    No. 04-1463, 2007 WL 4105971 (N.D. Cal. Nov. 16, 2007)....................8

*Carson v. Am. Brands, Inc.*,
    450 U.S. 79 (1981)....................7

*Churchill Vill., LLC v. Gen. Elec.*,
    361 F.3d 566 (9th Cir. 2004)....................2

*Class Plaintiffs v. Seattle*,
    955 F.2d 1268 (9th Cir. 1992)....................19, 20

*Comcast v. Behrend*,
    133 S. Ct. 1426 (2013)....................5

*Dennis v. Kellogg Co.*,
    697 F.3d 858 (9th Cir. 2012)....................21

*Dupler v. Costco Wholesale Corp.*,
    705 F. Supp. 2d 231 (E.D.N.Y. 2010)....................8

*Fine v. ConAgra Foods, Inc.*,
    No. 10-10848, 2010 WL 3632469 (C.D. Cal. Aug. 26, 2010)....................4

*Fraley v. Facebook*,
    No. C 11-1726, 2012 WL 5838198 (N.D. Cal. Aug. 17, 2012)....................19

*Freeman v. MML Bay State Life Ins. Co.*,
    445 F. App'x 577 (3d Cir. 2011)....................20

*Garner v. State Farm Mut. Auto. Ins. Co.*,
    No. 08-1365, 2010 WL 1687832 (N.D. Cal. Apr. 22, 2010)....................8

*Hecht v. United Collection Bureau, Inc.*,
    691 F.3d 218 (2d Cir. 2012)....................18

*Hernandez v. Chipotle Mexican Grill, Inc.*,
    No. CV 12-5543, 2013 WL 6332002 (C.D. Cal Dec. 2, 2013)....................5

*Hesse v. Sprint Corp.*,
    598 F.3d 581 (9th Cir. 2010) .................................................................. 19, 20

*In re Bluetooth Headset Prods. Liab. Litig.*,
    654 F.3d 935 (9th Cir. 2011) ..................................................................... 2, 21

*In re Currency Fee Antitrust Litig.*,
    263 F.R.D. 110 (S.D.N.Y. 2009) .................................................................... 11

*In re Dry Max Pampers Litigation*,
    724 F.3d 713 (6th Cir. 2013) .......................................................................... 10

*In re Gen. Am. Life Ins. Co. Sales Prac. Litig.*,
    357 F.3d 800 (8th Cir. 2004) .......................................................................... 16

*In re Omnivision Techs., Inc.*,
    559 F. Supp. 2d 1036 (N.D. Cal. 2008) ........................................................... 8

*In re POM Wonderful LLC*,
    No. ML 10-02199, 2014 WL 1225184 (C.D. Cal. Mar. 25, 2014) ................... 5

*In re Portal Software, Inc. Sec. Litig.*,
    No. C-03-5138, 2007 WL 4171201 (N.D. Cal. Nov. 26, 2007) ....................... 7

*Jones v. ConAgra Prods.*,
    No. C 12-01633 (N.D. Cal. June 13, 2014) ..................................................... 3

*Laguna v. Coverall N. Am., Inc.*,
    — F.3d—, No. 12-55479, 2014 WL 2465049 (9th Cir. 2014) ...................... 11

*Lyons v. Coxcom, Inc.*,
    No. 08-cv-2047 (S.D. Cal. Aug. 23, 2010) .................................................... 10

*Major v. Ocean Spray Cranberries, Inc.*,
    No. 12-03067, 2013 WL 2558125 (N.D. Cal. June 10, 2013) ......................... 4

*Mazza v. Am. Honda Motor. Co.*,
    666 F.3d 581 (9th Cir. 2012) ............................................................................ 4

*McNeary-Calloway v. JP Morgan Chase Bank, N.A.*,
    863 F. Supp. 2d 928 (N.D. Cal. 2012) ........................................................... 19

*Nat'l Rural Telecomms. Coop. v. DirecTV, Inc.*,
    221 F.R.D. 523 (C.D. Cal. 2004) ..................................................................... 7

*Nwabueze v. AT&T Inc.*,
    No. C 09-01529, 2013 WL 6199596 (N.D. Cal. Nov. 27, 2013) ................... 18

*Officers for Justice v. Civil Serv. Comm'n*,
    688 F.2d 615 (9th Cir. 1982) .......................................................................... 19

*Pernod Ricard USA, LLC v. Bacardi U.S.A., Inc.*,
    653 F.3d 241 (3d Cir. 2011) ............................................................................. 7

*Red v. Kraft Foods, Inc.*,
    No. 10-1028, 2011 WL 4599833 (C.D. Cal. Sept. 29, 2011) ........................... 4

*Red v. Kraft Foods, Inc.*,
  No. CV 10-1028, 2012 WL 8019257 (C.D. Cal. Apr. 12, 2012) ........................... 5

*Red v. Unilever United States, Inc.*,
  No. 10-cv-387 (N.D. Cal.) ................................................................................. 14

*Richards v. Delta Air Lines, Inc.*,
  453 F.3d 525 (D.C. Cir. 2006) .......................................................................... 18

*Richardson v. L'Oreal USA, Inc.*,
  — F. Supp. 2d —, No. 13-508, 2013 WL 5941486 (D.D.C. Nov. 16, 2013) .............. 17, 18

*Ries v. AriZona Beverages USA LLC*,
  287 F.R.D. 523 (N.D. Cal. 2012) ...................................................................... 6

*Rosen v. Unilever United States, Inc.*,
  No. C 09-02563, 2011 U.S. Dist. LEXIS 157519 (N.D. Cal. June 21, 2011) ..................... 10

*Sethavanish v. ZonePerfect Nutrition Co.*,
  No. 12-2907-SC, 2014 WL 580696 (N.D. Cal. Feb. 13, 2014) ................................... 3

*TBK Partners v. Western Union Corp.*,
  675 F.2d 456 (2d Cir. 1982) ............................................................................. 19

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
  396 F.3d 96 (2d Cir. 2005) ............................................................................... 16

*Wal-Mart v. Dukes*,
  131 S. Ct. 2541 (2011) ........................................................................... 4, 15, 16

*Weiner v. Snapple Beverage Corp.*,
  07 Civ. 8742(DLC), 2010 WL 3119452 ................................................................ 5

*Williams v. Boeing Co.*,
  517 F.3d 1120 (9th Cir. 2008) ..................................................................... 19, 20

*Xavier v. Philip Morris USA, Inc.*,
  787 F. Supp. 2d 1075 (N.D. Cal. 2011) ............................................................... 3

**OTHER AUTHORITIES**

Elaine Watson, *Food Labeling & Litigation: What's in Store for 2014?* (Dec. 10.
  2013), *available at* http://www.foodnavigator-usa.com/Regulation/Food-
  labeling-litigation-What-s-in-store-for-2014-Nutrition-Facts-GMOs-natural-
  claims-trans-fats-GE-salmon-whole-grain-statements ......................................... 12

**RULES**

Fed. R. Civ. P. 23(b)(2) .................................................................................... 14

Fed. R. Civ. P. 23(b)(3) ..................................................................................... 5

**REGULATIONS**

64 Fed. Reg. 62,746 (Nov. 17, 1999) ................................................................. 12

68 Fed. Reg. 4134 (July 11, 2003).................................................................. 12

78 Fed. Reg. 67,169 (proposed Nov. 8, 2013)............................................ 12, 13

v

# RESPONSE TO OBJECTIONS

Defendant The Quaker Oats Company ("Quaker") respectfully submits the following responses to the objections to final approval of the Settlement filed by Amy X. Yang (*see* D.E. 193 ("Yang Obj.")) and Robert Chacanaca (*see* D.E. 195 ("Chacanaca Obj.")) in this case.[1]

## I.    INTRODUCTION

This Court granted preliminary approval of the Settlement after conducting a thorough inquiry and finding that the terms of the agreement "appear[ed] fair, reasonable, and adequate." D.E. 180, at 2.   That was true on February 12, 2014, when this Court issued its preliminary approval order, and it remains true today:   There are no new facts or legal issues to change this Court's prior conclusion.   To the contrary, the reasonableness of the Settlement has become even more apparent given Class Members' overwhelmingly positive reaction to the Settlement.   In a Class estimated to include potentially hundreds of thousands of members, *see* D.E. 201, at 17-18, there have been only *two* timely-filed objections, and *zero* members have opted out of the Class. That is strong evidence that the Settlement enjoys considerable support from Class Members.

Although the two objectors raise various challenges to the Settlement, they do not address the majority of the *Churchill* factors used by the Ninth Circuit to evaluate the fairness of a proposed class settlement.   Several courts have acknowledged that the risks and expense of further litigation are the most important of these factors, including the very real possibility that, if the claims were pursued through trial, class members could receive nothing.   This factor heavily favors approval of the Settlement here, yet the objectors wholly ignore it.   Instead, they principally raise issues that were *already considered and rejected* by this Court in granting preliminary approval of the Settlement.   The objectors have offered no reason for this Court to deny final approval of a class settlement that has received a significantly positive response from the Class.

---

[1]    Unless otherwise noted, capitalized terms used in this memorandum have the same meaning as in the Settlement Agreement.

1

## II.    ARGUMENT

For the reasons below, and those stated in Plaintiffs' motion for preliminary approval of the Settlement, *see* D.E. 168, at 9-12, and the Parties' motion for final approval of the Settlement, *see* D.E. 201, at 7-21, Quaker respectfully requests that the Court certify the Class for settlement purposes under Rule 23(b)(2), find that the Settlement is fair, reasonable, and adequate under Rule 23(e)(2), and thus grant final approval of the Settlement.

### A.    The Settlement Is Fair, Reasonable, And Adequate.

The Ninth Circuit has identified the following non-exclusive factors that bear on whether a class settlement is fair, reasonable, and adequate:

> (1) the strength of plaintiffs' case; (2) the risk, expense, complexity and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement.

*Churchill Vill., LLC v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004); *see also*, *e.g.*, *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011).  The Parties' motion for final approval analyzes each of these so-called *Churchill* factors in detail.  *See* D.E. 201, at 9-16.  In the discussion below, Quaker focuses on the risks of further litigation and Class Members' reactions to the settlement.  These factors were not addressed by the objectors, and they strongly support final approval.

### 1.    Plaintiffs Would Have Faced Significant Hurdles In Obtaining And Maintaining Class Certification.

The "risk of maintaining class action status throughout the trial" (*Churchill*, 361 F.3d at 575) strongly supports approval of the Settlement.  Under governing precedent from the Supreme Court and the Ninth Circuit, and persuasive authority from other courts, Plaintiffs would have faced serious barriers to obtaining certification of any class and, if certification were granted, maintaining the class through trial.  Indeed, even Ms. Yang acknowledges that class certification

1 could have presented a substantial obstacle for Plaintiffs if this litigation were to have proceeded.

2 *See* Yang Obj. 9, 13.

3    **a.**    Ascertainability.  As an initial matter, Plaintiffs would face serious difficulties in

4 satisfying the ascertainability requirement that this Court has recognized as part of Rule 23(a).

5 Under this Court's caselaw, a class is not ascertainable unless membership can be established by

6 means of objective, verifiable criteria.  *See Xavier v. Philip Morris USA, Inc.*, 787 F. Supp. 2d

7 1075, 1088-90 (N.D. Cal. 2011).  "Without an objective, reliable way to ascertain class

8 membership the class quickly would become unmanageable, and the preclusive effect of final

9 judgment would be easy to evade."  *Id.* at 1089.  Quaker, however, "overwhelmingly sells to

10 retailers, not directly to consumers, and … there are no records identifying any but a small

11 fraction of consumers who have purchased [the Products] in the last several years."  *Sethavanish*

12 *v. ZonePerfect Nutrition Co.*, No. 12-2907-SC, 2014 WL 580696, at *4 (N.D. Cal. Feb. 13,

13 2014).  Under comparable circumstances, several cases over the last few years have rejected

14 class certification as inconsistent with the ascertainability requirement.  *See, e.g.*, D.E. 229,

15 *Jones v. ConAgra Prods.*, No. C 12-01633 (N.D. Cal. June 13, 2014) (finding a class

16 unascertainable where "there is no good way to determine who bought the relevant products");

17 *Xavier v. Philip Morris USA Inc.*, 787 F. Supp. 2d 1075, 1089 (N.D. Cal. 2011) (rejecting

18 ascertainability because "[t]here is no reliable way in which smokers themselves could document

19 their long-term smoking histories").

20    To be sure, "[c]ourts in this circuit are split on the issue," *Sethavanish*, 2014 WL 580696,

21 at *5, and some decisions suggest that classes like the one at issue here might be ascertainable.

22 Given this disagreement, however, Plaintiffs would face a serious risk that the Ninth Circuit

23 could resolve the issue while this case remains pending, and conclude that cases like *Jones* and

24 *Xavier* express the better view.  The Settlement avoids this potential problem for Plaintiffs.

25    **b.**    Commonality.  Plaintiffs also could face significant difficulties in continuing to

26 satisfy the commonality and typicality requirements of Rule 23(a) through trial and final

27 judgment.  To satisfy these requirements, the members of the class must have suffered the "same

28

injury." *Wal-Mart v. Dukes*, 131 S. Ct. 2541, 2551 (2011); *see also id.* at 2551 n.5 ("commonality and typicality . . . tend to merge"). "For everyone in the class to have been exposed" to the alleged misrepresentations, "it is necessary for everyone in the class to have viewed the allegedly misleading advertising." *Mazza v. Am. Honda Motor. Co.*, 666 F.3d 581, 596 (9th Cir. 2012). As a result, "there is . . . a question whether [the] class—as now defined— included consumers who were not exposed to the supposedly misleading product labeling claims." *Red v. Kraft Foods, Inc.*, No. 10-1028, 2011 WL 4599833, at *8 (C.D. Cal. Sept. 29, 2011). Plaintiffs could have had problems showing that all Class Members saw—let alone relied upon—Quaker's labeling when making their purchasing decisions.

That evidence at trial would likely demonstrate that consumers purchase Quaker's Products for a variety of reasons—including the Products' taste, availability, pricing promotions, and numerous other factors—that have nothing to do with the allegedly misleading statements. Consumers also vary in whether they considered—or even saw—the challenged statements, or found them to be relevant to their decision whether to purchase the Products. Indeed, this Court has already dismissed as preempted Plaintiffs' challenges to a number of statements on the Products' labels, and it would be difficult—or even impossible—to determine on a class-wide basis whether any given Class Member relied on such statements, the challenged statements that remain in the litigation, some combination of the two, or none of them at all.

Courts in this Circuit have repeatedly denied class certification in food and beverage class actions where, as here, variations among the class foreclose any assertion that the class members suffered the same injury. *See, e.g., Major v. Ocean Spray Cranberries, Inc.*, No. 12-03067, 2013 WL 2558125, at *3-*4 (N.D. Cal. June 10, 2013) (denying certification of proposed class of Ocean Spray juice purchasers); *Fine v. ConAgra Foods, Inc.*, No. 10-10848, 2010 WL 3632469, at *3 (C.D. Cal. Aug. 26, 2010) (rejecting proposed class of popcorn purchasers). If the trial evidence were to establish similar differences among class members, Plaintiffs would face serious difficulties in maintaining any certified class.

      **c.** <u>Predominance</u>. Even if Plaintiffs could identify a common issue, they still would

face a heavy burden to satisfy the requirements for certification of a damages class. Rule 23(b)(3) permits certification of such a class only if "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). Given this requirement, the Court has acknowledged the "likely difficulty in certifying and, if certified, maintaining a damages class under Rule 23(b)(3)." D.E. 180, at 3 ¶ 6.

To satisfy the predominance requirement, Plaintiffs would be required to show injury on a class-wide basis and also that their theory of damages is susceptible to class-wide damages. The Supreme Court has rejected attempts to certify a damages class where the plaintiffs' damages model "falls far short of establishing that damages are capable of measurement on a classwide basis," because "[q]uestions of individual damage calculations [would] inevitably overwhelm questions common to the class." *Comcast v. Behrend*, 133 S. Ct. 1426, 1433 (2013). Yet Plaintiffs have not identified any viable theory of class-wide damages, let alone a theory that is objectively measureable and tethered to the challenged and allegedly deceptive statements. And there is little reason to believe that they could do so: In similar cases, courts have rejected certification of damages classes based on variations among class members similar to those present here. *See, e.g.*, *In re POM Wonderful LLC*, No. ML 10-02199, 2014 WL 1225184, at *5 (C.D. Cal. Mar. 25, 2014) (predominance requirement not satisfied because plaintiffs' damages expert failed to "answer the critical question why the price difference existed, or to what extent it was a result of Pom's actions"); *Astiana v. Ben & Jerry's Homemade, Inc.*, No. C 10-4387, 2014 WL 60097, at *8-*13 (N.D. Cal. Jan. 7, 2014) (denying class certification in part because an individualized award of restitution would depend on how many products each class member purchased and because the defendant did not set the retail price); *Red v. Kraft Foods, Inc.*, No. CV 10-1028, 2012 WL 8019257, at *11 (C.D. Cal. Apr. 12, 2012) (same); *Hernandez v. Chipotle Mexican Grill, Inc.*, No. CV 12-5543, 2013 WL 6332002, *1-*2 (C.D. Cal Dec. 2, 2013) (denying class certification in part because there was no class-wide method for calculating damages that depend on the amount of purchases and date of those purchases); *Weiner v. Snapple Beverage Corp.*, 07 Civ. 8742(DLC), at *5-*12, 2010 WL 3119452 (denying Rule

5

23(b)(3) certification because individualized inquiries into causation, injury, and damages would predominate); *see also Ries v. AriZona Beverages USA LLC*, 287 F.R.D. 523, 541 (N.D. Cal. 2012) (Seeborg, J.) (noting that "individualized awards of monetary restitution . . . would require individualized assessments of damages based on how many products the class member had bought").

*        *        *

Each of these potential difficulties in maintaining class certification through trial support the fairness, reasonableness, and adequacy of a Settlement that provides guaranteed relief to Class Members without the uncertainty of further litigation. Yet the objectors simply ignore these weaknesses in Plaintiffs' case for certification.

### 2. Plaintiffs Would Also Have Faced Significant Uncertainty On The Merits.

The objectors similarly fail to acknowledge the significant hurdles, and therefore uncertainty, that the Class would have faced on the merits. Yet even Class Counsel have acknowledged that continued litigation would pose a significant risk to any recovery for the class. *See* D.E. 201, at 10-12.

If this case had proceeded to litigation, Quaker would anticipate seeking summary judgment (and, if necessary, raising at trial) significant questions of liability, including whether the Products' labeling was in fact misleading, whether reasonable purchasers would have been misled by the challenged statements, and whether the labeling is misleading when read in full, rather than selectively. Plaintiffs' theory is that vague assertions, including—for certain Products, and for certain labels—that the Products are "wholesome," are misleading because of the presence of *trans* fat. But they would have to establish that the Class Members read these statements and interpreted them as making healthfulness claims that are somehow misleading even though the amounts of *trans* fat in the Products were required by the Food and Drug Administration ("FDA") to be declared as zero, even though the sole source of *trans* fat in the Products—partially hydrogenated oils ("PHOs")—was plainly disclosed in the labeling, and

6

even though the Products also disclosed that the PHOs contributed a small amount of *trans* fat to the products. *Cf.*, *e.g.*, *Pernod Ricard USA, LLC v. Bacardi U.S.A., Inc.*, 653 F.3d 241, 251 (3d Cir. 2011) (rejecting attempt by plaintiffs in false advertising cases to read challenged statements "in isolation"). And even if Plaintiffs were successful in defeating summary judgment and proving their claims at trial, Quaker would be entitled to raise its arguments again on appeal.

"Courts judge the fairness of a proposed compromise by weighing the plaintiff's likelihood of success on the merits against the amount and form of the relief offered in the settlement." *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 88 n.14 (1981). Settlement is favored where, as here, "establishing liability and damages at trial would be difficult because of the uncertainties associated with proving its claims, which are 'exacerbated by the unpredictability of a lengthy and complex jury trial.'" *In re Portal Software, Inc. Sec. Litig.*, No. C-03-5138, 2007 WL 4171201, at *3 (N.D. Cal. Nov. 26, 2007) (citation omitted). The significant uncertainty faced by Plaintiffs if they were to pursue their claims in litigation supports their decision to enter into a Settlement that guarantees meaningful relief for the Class.

### 3. When Balanced Against These Risks, The Settlement Is Reasonable.

Approval of a settlement is proper where, as here, "the settlement terms compare favorably to the uncertainties associated with continued litigation regarding the contested issues in this case," including where the settlement "provides Class Members with a meaningful business resolution regarding contested issues." *Nat'l Rural Telecomms. Coop. v. DirecTV, Inc.*, 221 F.R.D. 523, 526 (C.D. Cal. 2004). The Settlement provides substantial injunctive relief, specifically addresses the claims asserted by Plaintiffs, and will remain in place for years.

The Parties have already invested more than three years in costly and time-consuming pretrial litigation. The discovery undertaken so far makes clear that Plaintiffs face substantial challenges at each remaining stage of litigation, including class certification, summary judgment, trial, and appeal. At each stage going forward, Plaintiffs risk losing the opportunity to obtain the injunctive relief provided by the Settlement and receiving nothing. The Settlement secures a

7

favorable outcome for the Class while simultaneously removing the significant risks of moving forward with litigation.

The objectors apparently fail to recognize that, but for this settlement, the class would likely receive nothing at all—and at most a *de minimis* recovery after years of additional litigation. *See, e.g, Browning v. Yahoo! Inc.*, No. 04-1463, 2007 WL 4105971, at *8 (N.D. Cal. Nov. 16, 2007) (overruling objections based on an unreasonably optimistic view of the potential success of the claims). Balancing the benefits offered in this Settlement against the substantial uncertainties and risks that Plaintiffs would face—including the strong possibility that they and the Class would have recovered nothing if they had proceeded with the litigation—strongly supports approval of the Settlement.

### 4. The Settlement Enjoys Overwhelming Support From The Settlement Class.

This Court "'may appropriately infer that a class settlement is fair, adequate, and reasonable when few class members object to it.'" *Garner v. State Farm Mut. Auto. Ins. Co.*, No. 08-1365, 2010 WL 1687832, at *14 (N.D. Cal. Apr. 22, 2010) (citation omitted). "It is established that the absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members." *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1043 (N.D. Cal. 2008) (citation omitted); *see also, e.g.*, *Dupler v. Costco Wholesale Corp.*, 705 F. Supp. 2d 231, 239 (E.D.N.Y. 2010) ("[A] small number of class members seeking exclusion or objecting indicates an overwhelming positive reaction of the class."). In this case, however, only two Class Members have objected—even though the class is estimated to contain hundreds of thousands of members. Moreover, Class Members who believed that they would forfeit valuable claims if they remained in the Class were free to opt out of the class and preserve those claims. Yet not a single Class Members did so. These facts strongly suggest that Class Members are satisfied with the relief provided by the Settlement. *See, e.g.*, *Boyd v. Bechtel Corp.*, 485 F. Supp. 610, 624

(N.D. Cal. 1979) (objections from only 16% of the class was "persuasive" that the settlement was adequate).

**B.      The Objectors' Arguments Provide No Basis For Rejecting The Settlement And Depriving Class Members Of Its Benefits.**

The objectors ignore the compelling evidence that the Settlement enjoys support from the class, the significant hurdles that Plaintiffs and the Class would face if they were to pursue litigation, and each of the other factors followed by courts in the Ninth Circuit.  Mr. Chacanaca's objection also failed to comply with this Court's order granting preliminary approval, which required Mr. Chacanaca to serve a copy of his objection on the Class Action Administrator.  *See* D.E. 180, at 5 ¶ 12.  Yet even considering the objectors' submissions on their merits, *vel non*, they raise mostly boilerplate objections, many of which were advanced unsuccessfully in Mr. Chacanaca's procedurally improper "opposition" to Plaintiffs' motion for preliminary approval.  These objections should not stand in the way of final approval.

**1.      The Injunctive Relief Provided By The Settlement Is Valuable To Class Members.**

As the Parties explained in their motion for final approval, the Settlement provides substantial injunctive relief for the Class, which confers a significant benefit on the Class and accomplishes the principal goals of the litigation.  *See* D.E. 201, at 14-15.

**a.**      The injunctive relief in the Settlement Agreement provides that Quaker will remove PHOs from the products at issue in the litigation that currently contain PHOs, and not reintroduce PHOs into those products for ten years thereafter.  And with respect to products that do not currently contain PHOs, Quaker commits not to introduce PHOs into those products for ten years.  This relief, which will be effective no later than December 31, 2015, includes the principal relief sought in the operative complaint.  *See* D.E. 102, at 31 ¶¶ A-B.  The Settlement Agreement also contains an early compliance provision whereby one of the claims already dismissed as preempted—"adds a dietarily insignificant amount of trans fat"—will not appear on labels or packaging of products that contain more than 0.2 grams of trans fat from PHOs after

9

December 31, 2014.  Similar settlement agreements—providing injunctive relief for class members, and monetary amounts only for attorney's fees, costs, and incentive payments to the named plaintiffs—have been approved by courts in this Circuit.  *See*, *e.g.*, D.E. 93, *Lyons v. Coxcom, Inc.*, No. 08-cv-2047 (S.D. Cal. Aug. 23, 2010) (granting final approval of Rule 23(b)(2) settlement where class members did not receive a direct monetary benefit but were required to release monetary claims); *see also Rosen v. Unilever United States, Inc.*, No. C 09-02563, 2011 U.S. Dist. LEXIS 157519 (N.D. Cal. June 21, 2011) (granting final approval to class settlement requiring removal of *trans* fat from all Unilever margarines but no payments to the class).[2]

This injunctive relief is particularly valuable because the Class is unlikely ever to receive any meaningful relief in the form of damages.  This Court has already dismissed many of Plaintiffs' challenges to statements made or images used on packaging or advertising for the Products.  *See* D.E. 34 (dismissing as preempted challenges to "0 grams trans fat" labeling, statements that the products contain whole grain oats and do not contain high fructose corn syrup, and "good source" claims); D.E. 131 (dismissing as preempted claims challenging "adds a dietarily insignificant amount of *trans* fat" and "Heart Healthy/Images of Hearts labels, noting the "close" question but deciding not to dismiss Plaintiffs' "Helps Reduce Cholesterol" claims at

_____

[2]    The injunctive relief provided in this Settlement differs considerably from the relief at issue in *In re Dry Max Pampers Litigation*, 724 F.3d 713 (6th Cir. 2013), on which Ms. Yang heavily relies.  In that case, the defendant agreed to minor labeling changes that, in fact, "amount[ed] to little more than an advertisement" for their own product.  *Id.* at 719.  Counsel for the plaintiffs nonetheless sought a fee award of $2.73 million—even though they had not "serve[d] a single request for written discovery" or "file[d] a response to [the defendants'] motion to dismiss."  *Id.* at 718.  The Sixth Circuit concluded that the "value of th[e] changes" was not "so great, for unnamed class members, as to render counsel's $2.73 million fee reasonable rather than preferential in light of it."  *Id.* at 719.  Class Counsel will undoubtedly note in their response to Ms. Yang's objection that they requested a significantly smaller amount, and litigated this case for several years before negotiating the Settlement.  Yet even focusing exclusively on the scope of injunctive relief, the meaningful relief provided here—which includes reformulation of Products to remove the key ingredient challenged by Plaintiffs—far exceeds the minor labeling challenges at issue in *Pampers*.

the time, and expressing skepticism about several of Plaintiffs' other claims). In addition, Plaintiffs would face a number of barriers to success if they were to seek certification of a damages class pursuant to Rule 23(b)(3). *See supra* at 4-5.

Even in the unlikely event that a damages class were certified, the value of each claim would be exceedingly small both because of the generally low prices of the Products and because of the small value of any alleged "premium" that a given Class Member supposedly paid as a result of the handful of challenged labeling statements that appeared episodically on some of the products. Class Members benefit from receiving guaranteed relief now, rather than only the speculative possibility that, after years of litigation, they might receive either nothing at all or an exceedingly small recovery.

In addition, courts have acknowledged the substantial benefit that injunctive relief provides to Class Members and the public at large. *See, e.g., In re Currency Conversion Fee Antitrust Litig.*, 263 F.R.D. 110, 123 (S.D.N.Y. 2009) (court held that injunctive relief was among the factors that "weigh[ed] strongly in favor of the settlement"). Ms. Yang challenges the calculations made by Plaintiffs' expert, Dr. Nathan Wong, regarding the monetary value of the injunctive relief provided by the Settlement. *See* Yang Obj. 18. But the Ninth Circuit has squarely rejected the notion that injunctive relief must be assigned a monetary value before a court can approve a class settlement. *See Laguna v. Coverall N. Am., Inc.*, — F.3d—, No. 12-55479, 2014 WL 2465049, at *4 (9th Cir. 2014). A district court "has no obligation to make explicit monetary valuations of injunctive remedies," nor has the Ninth Circuit ever "required a district court to assign a monetary value to purely injunctive relief." *Id.* "To the contrary," the Ninth Circuit emphasized, "courts cannot 'judge with confidence the value of the terms of a settlement agreement, especially one in which, as here, the settlement provides for injunctive relief.'" *Id.* at *4 n.1 (quoting *Staton v. Boeing Co.*, 327 F.3d 938, 959 (9th Cir. 2003)). Instead, it is sufficient that "the settlement would yield significant benefits for Plaintiffs given the risks and costs of continuing litigation." *Id.* at *4. As explained above, that is precisely the case here.

1    **b.**    Mr. Chacanaca repeats his argument that a recent proposal by the FDA

2    undermines the injunctive relief proposed by the Settlement.  This argument was addressed at the

3    preliminary-approval stage, *see* D.E. 178, at 15-17, and it remains meritless.  As Plaintiffs

4    explained in their motion for preliminary approval, after an agreement in principal was reached,

5    but before the Settlement Agreement was signed, the FDA proposed requiring FDA approval for

6    inclusion of PHOs as a food additive, which (absent such approval) would require the removal of

7    PHOs from the products.  Although Mr. Chacanaca relies heavily on this proposal, *see* D.E. 195,

8    at 4, it does not negate in any respect the value provided by the settlement, *see* D.E. 168.

9    The FDA's proposal contemplates prohibiting food manufacturers from selling PHOs,

10   directly or as an ingredient, absent FDA approval. *See* Tentative Determination Regarding

11   Partially Hydrogenated Oils; Request for Comments and for Scientific Data and Information, 78

12   Fed. Reg. 67,169 (proposed Nov. 8, 2013).  But whether the proposal will become final is

13   unknown, and—even if it does—the timeline both for finality and for compliance is also

14   unknown.  The potential variability from the proposal to any final determination, as well as the

15   timeframe for compliance, is a significant variable—as illustrated by the FDA's most recent

16   action with respect to *trans* fat.  The FDA began in 1999 the process of requiring that *trans* fat in

17   food be labeled.  *See* 64 Fed. Reg. 62,746 (Nov. 17, 1999) (proposed requirement to include

18   *trans* fat in nutrition labels).  The FDA changed its approach to the labeling of *trans* fat from its

19   initial proposed rule to the final rule.  *See id.* (proposed rule planning to require that *trans* fat be

20   included in the amount declared for saturated fat); 68 Fed. Reg. 41,434 (July 11, 2003) (final rule

21   requiring *trans* fats to be disclosed in a separate line on the nutrition label).  The rule requiring

22   labeling of *trans* fat did not become final until 2003, and the FDA did not require compliance

23   until 2006—seven years after the initial proposal.  *See id.* (final rule requiring *trans* fat labeling

24   starting January 1, 2006).

25   It is impossible to know what approach the FDA will ultimately follow for PHOs, or what

26   timeframe the FDA will require for elimination of PHOs even if it decides to require elimination.

27   *See, e.g.*, Elaine Watson, *Food Labeling & Litigation: What's in Store for 2014?* (Dec. 10. 2013)

28

(noting that "[i]t's not clear how soon after the comments are filed that the FDA might issue final guidance," but that the FDA requires removal of PHOs "it is expected to suggest a phase out over a period of years, rather than months") *available at* http://www.foodnavigator-usa.com/ Regulation/Food-labeling-litigation-What-s-in-store-for-2014-Nutrition-Facts-GMOs-natural-claims-trans-fats-GE-salmon-whole-grain-statements.  This uncertainty stands in stark contrast to the injunctive relief included in the Settlement, which would ensure that the Quaker products at issue in this litigation will be free of PHOs by December 31, 2015, and that PHOs will not be introduced or reintroduced into the Products for a period of ten years—regardless of any action that the FDA may or may not take with respect to the proposal.  It also would guarantee that, to the extent that any products have more than 0.2 grams of trans fat from PHOs as of December 31, 2014, Quaker will cease using the claim "contains a dietarily insignificant amount of trans fat" during the duration of the reformulation process—once again, regardless of the FDA's regulatory process.

In fact, the FDA's actions *highlight* the substantial benefits that the injunctive relief will provide to the Class.  In its notice, the FDA discussed a number of scientific articles noting the potential risks posed by consumption of certain amounts of *trans* fat.  *See* Tentative Determination, 78 Fed. Reg. at 67,172-73.  Although Quaker vehemently disagrees with these conclusions, particularly for the small amounts of *trans* fat (if any) present in the Products, the injunctive relief ensures a prompt schedule for removal of PHOs (and thus *trans* fat) from any Products that currently contain them.  And while Ms. Yang speculates that, absent the Settlement, Quaker would likely eliminate PHOs on its own initiative, *see* D.E. 194, at 19, the FDA's staff has concluded that voluntary reformulation is unlikely:  "[T]he persistence of a significant number of products using partially hydrogenated oils even after so many products have been reformulated to remove such oils may indicate that the low hanging fruit for reformulation has already been picked."  Memorandum from Richard Bruns to Mical Honigfort, D.E. 168-1 Ex. 3.  Unlike the mere possibility that the FDA may eventually require regulatory

approval to use PHOs as a food additive, the Settlement has no uncertainty as to its requirements. That is a significant benefit to the Class that warrants approval of the Settlement.

### 2. Certification Of A Rule 23(b)(2) Class For Settlement Purposes Only Is Appropriate.

Under Rule 23(b)(2), certification of a class seeking injunctive relief is appropriate where (1) "the party opposing the class has acted or refused to act on grounds that apply generally to the class," and (2) "final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Both requirements are satisfied here. All Class Members purchased products containing allegedly misleading statements, and the injunctive relief provided by the Settlement is appropriate for all Class Members: This forward-looking relief will provide the Class, and all members of the public, with PHO-free versions of the Products for at least ten years, which is a desirable result and achieves the primary purpose of the litigation. Other courts have determined that certification under Rule 23(b)(2) is proper in similar cases. *See, e.g.*, D.E. 163, *Red v. Unilever United States, Inc.*, No. 10-cv-387 (N.D. Cal.) (certifying Rule 23(b)(2) class for settlement where defendant agreed to eliminate *trans* fats in product as injunctive relief, in exchange for release of all claims).

**a.** Ms. Yang's argument that the injunctive relief does not benefit the entire class because "various class members didn't even purchase products that contains [*sic*] partially-hydrogenated vegetable oils" (Yang Obj. 18) is incorrect. Ms. Yang is simply speculating that some members of the Class purchased exclusively Products that did not contain PHOs. But even if that were true, Quaker has agreed in the Settlement not to introduce PHOs into *any* of the Products for a period of ten years. For some Products, this commitment is not to *re*introduce PHOs that are removed by December 31, 2015; for others, Quaker agreed not to introduce PHOs for a period of ten years. Whichever Product was purchased by a given Class Member, however, that Class Member receives the benefit of this valuable commitment by Quaker for at least ten years.

14

Ms. Yang engages in similar speculation when she claims that the "settlement relief at most benefits future purchasers of Quaker products," Yang Obj. 6, but that some Class Members may never again purchase the Products, *id.* at 7-8. None of the Class Members before the Court has suggested that they will not purchase Quaker Products in the future; even Ms. Yang herself declines to make such an assertion in her declaration.

Yet even indulging Ms. Yang's theory that such Class Members exist, it cannot be a basis for declining certification of a Rule 23(b)(2) class. To the contrary, Ms. Yang's approach would foreclose Rule 23(b)(2) certification (and settlement) in practically any case.[3] Unless the class definition is completely circular and unascertainable—defined, for example, as those individuals who will be subject to a particular type of allegedly unlawful conduct in the future—then there is no way to guarantee that each member of the class would be confronted at some later date with the same challenged conduct in precisely the same way. Yet courts have not hesitated to certify such cases, or to approve class settlements that provide broad relief to any member of the class that would otherwise be subject to the challenged conduct in the future—in this case, the allegedly misleading labeling of Quaker's Products. *See supra* at 9-10.

**b.** Ms. Yang also argues at length that certification of a Rule 23(b)(2) class is inappropriate because the complaint asserts purportedly "non-incidental" claims for damages. Yang Obj. 10. This argument fundamentally misunderstands both the governing caselaw and the nature of the Settlement.

In *Dukes*, the Supreme Court concluded that "claims for backpay were improperly certified" under Rule 23(b)(2) because they sought "monetary relief" that was "not incidental to the injunctive or declaratory relief." 131 S. Ct. at 2557. The plaintiffs in that case sought certification of an injunctive-relief class under the more generous standard for certification under

---

[3] Ms. Yang apparently recognizes as much, strongly hinting that Rule 23(b)(2) certification would (in her view) be appropriate only in a narrow category of cases such as "civil rights" disputes. Yang Obj. 8. This, however, is not the law, nor is it consistent with numerous Rule 23(b)(2) certification decisions by this Court and others.

Rule 23(b)(2), but nonetheless sought to litigate—as a class claim—a request for damages. But, the Supreme Court held, they could not pursue non-incidental damages claims as part of a Rule 23(b)(2) class; instead, "[i]ndividualized monetary claims belong [] in Rule 23(b)(3)." *Id.* at 2545.

The proposed settlement Class at issue in this case, in contrast, does not involve *any* claim for damages. The settlement Class is seeking exclusively injunctive relief, and the Settlement Agreement exclusively provides such relief. As a result, there are no damages claims—incidental or otherwise—that would be included within the Rule 23(b)(2) certification, and thus no problem for certification under *Dukes*.

Although Ms. Yang would prefer a rule that "[a]ny *release* of individualized monetary damage claims requires the full providence of (b)(3) protections," Yang Obj. 11 (emphasis added), she cannot cite even a single authority for that proposition. Instead, her authority establishes only that Rule 23(b)(2) does not permit *certification* of a litigation class asserting non-incidental damages claims, which is not the case here. But the Ninth Circuit has squarely held that class settlement agreements can release damages claims even in the context of Rule 23(b)(2) certification, provided that certain procedural protections—such as notice and the right to opt-out—are provided to Class Members. As discussed below, the Settlement fully complied with this requirement. *See infra* at 19-20.

### 3. The Release Of Damages Claims Based On The Challenged Statements Is Not Overbroad.

Ms. Yang's argument that the Settlement contains an "unlawfully broad release at the expense of absent class members" (Yang Obj. 25) has been rejected in similar circumstances by courts around the country. As the Second Circuit has acknowledged, "[b]road class action settlements are common, since defendants and their cohorts would otherwise face nearly limitless liability from related lawsuits in jurisdictions throughout the country." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 106 (2d Cir. 2005); *see also, e.g., In re Gen. Am. Life Ins. Co. Sales Prac. Litig.*, 357 F.3d 800, 805 (8th Cir. 2004) (noting that most "settling

16

defendants insist" on a broad release of claims).  Indeed, "[p]ractically speaking," without the

ability to execute broad releases of liability, "'class action settlements simply will not occur.'"

*Visa U.S.A.*, 396 F.3d at 106 (citation omitted).  The release of claims contained in the

Settlement Agreement is not overbroad, and this Court should be deeply hesitant to disturb any

of its terms.

a.      Contrary to Ms. Yang's contention that the release must be confined to requests

for injunctive relief because the class would be certified only under Rule 23(b)(2), the Ninth

Circuit has concluded that a Rule 23(b)(2) settlement may "bind an absent plaintiff concerning a

claim for monetary damages" where the absent class members are provided notice and the

opportunity to opt out.  *Brown v. Ticor Title Ins. Co.*, 982 F.2d 386, 392 (9th Cir. 1992).  Ms.

Yang's assertion that "[a]llowing a right of opt-out does not cure the [purported] certification

defect" (Yang Obj. 12) cannot be reconciled with *Brown*.  The procedural requirements

discussed in *Brown* are necessary to protect the due process rights of absent class members, and

they were carefully followed here:  As this Court recognized in its order granting preliminary

approval, the Parties provided "the best notice practicable under the circumstances," which

"constitute[s] due and sufficient notice to all Class Members," D.E. 180, at 4 ¶ 10, as well as the

opportunity for dissatisfied Class Members (of which there were none) to opt-out, *see id.* at 5

¶ 11.

In this respect, the Settlement Agreement is easily distinguishable from *Richardson v.

L'Oreal USA, Inc.*, — F. Supp. 2d —, No. 13-508, 2013 WL 5941486 (D.D.C. Nov. 16, 2013),

on which both Ms. Yang and Mr. Chacanaca rely.  In that case, the parties negotiated a

settlement agreement that envisioned certification under Rule 23(b)(2) and a release of all

claims, including claims for damages.  Critically, however, the settlement agreement did not

envision notice or the ability to opt-out, and thus "absent class members [would] be precluded

from bringing a class action for damages in the future, *all without knowing about it or without

being given the chance to opt out*."  *Id.* at *9 (emphasis).  As in *Brown*, the district court in

*Richardson* recognized that "[i]t does not comport with due process to bind a plaintiff who is not

17

before a court, and who is perhaps even unaware of a judgment, as to money damages claims, without notifying her of the suit and giving her the chance to opt out." *Id.* It denied approval of the settlement because, unlike here, the parties had not faithfully implemented these requirements.[4]

**b.** Ms. Yang also appears to object that the release is overbroad because it includes more than the specific injunctive relief provided by the Settlement. But there is no legal requirement that the release perfectly match the settlement relief. To the contrary, settlement releases routinely contain provisions broader than the relief afforded in the settlement. *See Nwabueze v. AT&T Inc.*, No. C 09-01529, 2013 WL 6199596, at *10–11 (N.D. Cal. Nov. 27, 2013) (releasing claims beyond relief provided in the settlement agreement and determining that without a "broad release, no settlement would have been possible").

Ms. Yang also asserts that the language of the release "fails to track the allegations of the complaint in this case." Objection at 26. Ms. Yang is incorrect: Plaintiffs' complaint specifically requested relief in the form of both monetary damages and injunctive relief. *See* D.E. 102 at 31.

As a result, a release that addresses both forms of relief cannot be construed as overbroad relative to the allegations in the operative complaint. Following extensive negotiation, however, Plaintiffs apparently accepted that the difficulties they would face if they sought certification of a

---

[4] The Second Circuit's decision *Hecht v. United Collection Bureau, Inc.*, 691 F.3d 218 (2d Cir. 2012), is similarly distinguishable. The Second Circuit held that "[a]bsent class members have a due process right to notice and an opportunity to opt out of class litigation when the action is 'predominantly' for money damages," leaving open the question "whether the right to notice and an opportunity to opt out applies even when monetary claims do not predominate." *Id.* at 222. As noted above, the question of whether monetary relief is incidental to injunctive relief is irrelevant here, as the Settlement envisions certification *only* of claims for injunctive relief. In any event, the Settlement satisfies even the most stringent procedural protections (notice and ability to opt-out) that *Hecht* would require before releasing damages claims. *See also, e.g., Richards v. Delta Air Lines, Inc.*, 453 F.3d 525, 530 (D.C. Cir. 2006) (holding that, even where "recovery of damages is at the heart of the complaint," unlike here, absent class members need only "have a chance to opt out of the class and go it alone—or not at all.").

18

damages class under Rule 23(b)(3) counseled in favor of a settlement involving only injunctive relief. *See* D.E. 168, at 6-7. Even if the operative complaint had sought only injunctive relief, however, it is "'mainly irrelevant'" whether the relief covered by the release "'was specifically requested in the complaint.'" *Class Plaintiffs v. Seattle*, 955 F.2d 1268, 1288 (9th Cir. 1992) (quoting *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 632 n.18 (9th Cir. 1982)). Instead, "the weight of authority" in this circuit and others "holds that a federal court may release not only those claims alleged in the complaint, but also a claim 'based on the identical factual predicate as that underlying the claims in the settled class action even though the claim was not presented and might not have been presentable in the class action.'" *Id.* at 1287 (quoting *TBK Partners v. Western Union Corp.*, 675 F.2d 456, 460 (2d Cir. 1982)); *see also Hesse v. Sprint Corp.*, 598 F.3d 581, 590 (9th Cir. 2010) (same); *Williams v. Boeing Co.*, 517 F.3d 1120, 1133-34 (9th Cir. 2008) (same); *McNeary-Calloway v. JP Morgan Chase Bank, N.A.*, 863 F. Supp. 2d 928, 949 (N.D. Cal. 2012) (same).[5]

  **c.**  Ms. Yang also asserts that the release is overbroad because it includes claims "that were or could have been asserted relating to the Products." Yang Obj. 26. But the Ninth Circuit has rejected such a narrow approach to settlement releases. Instead, released claims need only be "based on the identical factual predicate as that underlying the claims in the settled class action." *Hesse v. Sprint Corp.*, 598 F.3d 581, 590 (9th Cir. 2010). Even when a court does not have jurisdiction over certain claims, it still has the power to permit release of those claims so long as they depend "on the same set of facts" as the claims before the court. *Id.*; *see also*, *e.g.*,

---

  [5] This Court's decision in *Fraley v. Facebook*, No. C 11-1726, 2012 WL 5838198 (N.D. Cal. Aug. 17, 2012), on which Ms. Yang relies, is inapposite. In *Fraley*, the issue was not the scope of the release, but instead whether the overall settlement was "fair, adequate, and reasonable." *Id.* at *2. The Court concluded that the injunctive relief provided in the Settlement was inadequate to support a "release of Facebook for any . . . past misconduct." *Id.* at *3. But the Court did not conclude—nor could it have done so under governing precedent—that a release of damages claims is *categorically* inappropriate where a settlement provides exclusively injunctive relief. As the Parties have explained, the Settlement at issue here provides meaningful relief to the Class that is "fair, adequate, and reasonable." That is true even though the Settlement Agreement releases certain damages claims.

19

*Class Plaintiffs*, 955 F.2d at 1287-88 (same). Applying the same standard, the Third Circuit has explained that this rule permits the release of any claims that "arise out of, or are in any way related to, the covered transactions." *Freeman v. MML Bay State Life Ins. Co.*, 445 F. App'x 577, 580 (3d Cir. 2011).

The release contained in the Settlement Agreement plainly fulfills the "identical factual predicate" standard. It is expressly limited to claims "that were or could have been asserted relating to the Products." D.E. 168-1, at 18. And the agreement further clarifies that the release covers:

> all claims . . . arising out of, in connection with, or related in any way, directly or indirectly, to Defendant's advertising, marketing, packaging, labeling, promotion, manufacture, distribution, and/or sale of the Products, that have been brought, or could have been brought, in the Litigation against the Released Persons.

*Id*. at 18–19. Thus, Ms. Yang's contention that the release could cover claims such as "whether Quaker is price-fixing with another company in violation of antitrust laws, or whether the new revised sketch of the Quaker Oats Man looks a bit too much like my grandfather" (Yang Obj. 27) is false.

Yet even if the release could be twisted to include the fanciful claims imagined by Ms. Yang, any concerns raised by those hypotheticals could adequately be addressed in the unlikely scenario that they ever arise: the question whether a particular claim is barred by the release usually arises in subsequent litigation after a settlement has been approved. Indeed, *Hesse*, on which Ms. Yang relies, involved precisely such a situation. 598 F.3d at 584 (addressing whether customers challenging a Washington state tax were precluded from bringing their claims because of an earlier settlement); *see also Williams*, 517 F3d at 1134 ("While Boeing may have drafted the settlement agreement to include as broad a release as possible, the release would have only been enforceable as to subsequent claims relying upon a legal theory different from that relied upon in the class action complaint, but depending upon the same set of facts."). Any inquiry now into whether a particular hypothetical claim unrelated to the facts at issue here would fall within the terms of the release would be tantamount to an advisory opinion.

20

The damages release in the Settlement is not overbroad, and this Court should reject Ms. Yang's attempts to portray it as such by inventing implausible and unasserted claims.

### 4. There Was No Collusion Or Conflict Of Interest.

Both Mr. Chacanaca and Ms. Yang claim that the Settlement evinces collusion among the parties. Mr. Chacanaca has now raised these arguments twice: in his improper "opposition" to Plaintiffs' motion for preliminary approval, and again in his objection to final approval. *See* D.E. 172, 195. These arguments were fully addressed before this Court during the hearing on preliminary approval. *See* D.E. 178, at 12-15. This Court granted preliminary approval over Mr. Chacanaca's unsupported assertions of collusion, and it should grant final approval notwithstanding those same objections.

The objectors note that, when a class settlement is reached before certification, the settlement agreement must be scrutinized for signs of "collusion or other conflicts of interest." *Bluetooth*, 654 F.3d at 946; *see also Dennis v. Kellogg Co.*, 697 F.3d 858, 864 (9th Cir. 2012) (same). In *Bluetooth*, the Ninth Circuit explained that the presence of particular "warning signs" for collusion requires district courts to scrutinize more carefully a proposed settlement agreement. *See* 654 F.3d at 947. Yet the objectors do nothing more than recite the warning signs; they do not offer any evidence that the Settlement was *in fact* the result of collusion. Simply put, there is no evidence—nor does either objector suggest such evidence exists— indicating that the Parties reached this Settlement as a result of collusion, self-interest, or any conflict of interest. The Settlement provides substantial injunctive relief to the class and was reached following an arms-length negotiation process undertaken with the Class Members' benefit in mind, including with the assistance of a neutral mediator. *See Bluetooth*, 654 F.3d at 948 (noting that the use of a "neutral mediator" is "a factor weighing in favor of a finding of non-collusiveness").

Moreover, *Bluetooth* emphasized that, even where some or all of the "warning signs" exist, the ultimate issue remains whether "the end product is a fair, adequate, and reasonable settlement agreement." 654 F.3d at 947-48. The terms of the Settlement provide real and

1   meaningful injunctive relief to class members, and (as the Parties have established at length) are

2   fair, reasonable, and adequate for Class Members.  The Settlement therefore satisfies the

3   requirements of Rule 23(e)(2), and should accordingly be approved.

4   **III.     CONCLUSION**

5          For the foregoing reasons, as well as those contained in Plaintiffs' motion for preliminary

6   approval and the Parties' motion for final approval, Quaker respectfully requests that the Court

7   overrule the objections, approve the Parties' proposed Settlement as fair, reasonable, and

8   adequate, certify the proposed Class under Rule 23(b)(2) for settlement purposes only, and enter

9   final judgment in the case.

                                           Respectfully submitted,

10

11  DATED: June 19, 2014

                                           By: /s/ Daniel W. Nelson_____

12

                                           **GIBSON, DUNN & CRUTCHER LLP**
13                                         DANIEL W. NELSON
                                           SCOTT P. MARTIN
14                                         1050 Connecticut Avenue, N.W.
                                           Washington, D.C. 20036
15                                         Telephone:     (202) 955-8500
                                           Facsimile:     (202) 530-4238
16

17                                         **Attorneys for The Quaker Oats Company**

18

19

20

21

22

23

24

25

26

27

28

# CERTIFICATE OF SERVICE

I hereby certify that on June 19, 2014, I served via electronic and first-class mail the foregoing document to Interim Class Counsel, and Objectors/Objectors' Counsel at the below-listed addresses:

**<u>Interim Class Counsel</u>**

THE WESTON FIRM
Jack Fitzgerald (257370)
jack@westonfirm.com
Gregory S. Weston (239944)
greg@westonfirm.com
Melanie Persinger (275423)
mel@westonfirm.com
Paul K. Joseph (287057)
paul@westonfirm.com
San Diego, CA  92110
1405 Morena Blvd., Suite 201
Telephone:  (619) 798 2006
Facsimile:  (480) 247 4553

**<u>Objectors and Objectors' Counsel</u>**

Amy X. Yang
6005 Ridge View Drive
Alexandria, VA 22310
Telephone: (410) 207-8745

BECK & LEE TRIAL LAWYERS
Jared H. Beck (233743)
Elizabeth Lee Beck (233742)
Corporate Park at Kendall
12485 SW 137th Ave., Suite 205
Miami, Florida 33186
Tel: 305-234-2060
Fax: 786-664-3334

Dated:  June 19, 2014                          GIBSON, DUNN & CRUTCHER LLP

                                               By:  ___/s/ Daniel W. Nelson_____
                                                         Daniel W. Nelson

                                               Attorney for Defendant
                                               The Quaker Oats Company, Inc.